## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **JENNIFER KILNAPP**<br>15822 Meigs Boulevard<br>Brookpark, Ohio 44142<br><br>          Plaintiff,<br><br>vs.<br><br>**CITY OF CLEVELAND**<br>c/o Mark D. Griffin, Chief Legal Officer<br>601 Lakeside Avenue, Room 106<br>Cleveland, Ohio 44114<br><br>and<br><br>**DORNAT DRUMMOND**<br>*in his official capacity as*<br>*City of Cleveland Chief of Police,*<br>1300 Ontario Street<br>Cleveland, Ohio 44113<br><br>and<br><br>**BAILEY GANNON**<br>*in his official and personal capacity,*<br>c/o Cleveland Division of Police<br>1300 Ontario Street<br>Cleveland, Ohio 44113<br><br>          Defendants. | CASE NO.<br><br>**Complaint**<br><br>(Jury demand endorsed hereon) |

## Introduction

1.    On the morning of July 20, 2020, rookie Cleveland Police Officer Bailey Gannon shot his partner. Screaming as he fled in panic down a flight of stairs from a man who was neither chasing nor threatening him, **Gannon pointed his gun over his head—in the opposite direction he was running—**

**and began firing blindly behind him**. One of his bullets hit his partner, whom he had just run right past.

2. Before the end of the day, Cleveland homicide detectives and the Ohio Bureau of Criminal Investigations conducted forensic examination of the scene. The results suggested it was probably Gannon who shot his partner. Nevertheless, the Cleveland Division of Police and Cuyahoga County Prosecutor's Office quickly charged an African American man named Darryl Borden with attempted murder, wrongly claiming he shot Gannon's partner. They did not drop the attempted murder charges against Borden until June 2021—almost a year after the shooting.

3. Investigators concluded that Gannon lied about his role in the shooting. Yet the City did not discipline Gannon for lying, let alone for shooting his partner. To the contrary, three months after the shooting the City rated Gannon's overall performance as exceeding expectations. His supervisor called the shooting a **"minor set back" for Gannon**.

4. It wasn't minor for his partner. Gannon's bullet ripped through her forearm before fragmenting in her bicep and chest, lodging near her spine. She believed she was going to die. Nearly two years later, she still has nerve damage that causes pain and numbness in her dominant arm, wrist, and hand. Far worse, she suffers from PTSD. She has frequently relived the feeling she was about to die and experienced recurring nightmares. Because of her injuries, she is still unable to return to duty. It is unclear whether she

2

ever will be. Her name is Jennifer Kilnapp. She brings this claim to redress her rights under the United States Constitution.

## Parties

5.  At all times relevant to this lawsuit, Jennifer Kilnapp was a United States citizen and resident of the State of Ohio.

6.  Dornat Drummond is the current Chief of Police for the City of Cleveland. Preceding him in that role at the time of the shooting was Calvin Williams.

7.  At all times relevant to this lawsuit, the Chief of Police was a policymaking official for the City of Cleveland Division of Police ("CDP") with respect to, among other things, practices, policies, customs, and training.

8.  Bailey Gannon is, or at the relevant time was, a police officer with the City of Cleveland Division of Police.

9.  The City of Cleveland, Chief of Police, and Gannon are each a "person" within the meaning of 42 U.S.C. § 1983.

10. At all times relevant to this lawsuit, for purposes of federal law, the City of Cleveland, Chief of Police, and Gannon were "state actors," acting under color of state law.

11. At all times relevant to this lawsuit, the Chief of Police and Gannon were each an employee, agent, and/or servant of the City of Cleveland, acting in the course and scope of their employment, agency, and/or service.

## Jurisdiction and venue

12. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because the claims involved arise under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3).

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this lawsuit occurred in this District.

## Factual allegations

14. Jennifer Kilnapp became a City of Cleveland police officer in August 2017.

15. In the Summer of 2020, the Division of Police assigned Kilnapp to partner with a rookie officer, Bailey Gannon.

16. Gannon, whose father is a sergeant with CDP, entered the field as a patrol officer in January 2020.

*Rookie officer Bailey Gannon shoots his partner while firing blindly over his head and running away from a suspect who was neither chasing nor threatening him.*

17. In the early hours of July 20, 2020, Officers Kilnapp and Gannon responded to a call on the east side of Cleveland alleging there was an emotionally disturbed man with a gun on the second floor of the boarding home he was staying in.

18. There was no report of the man shooting at anyone or otherwise being physically violent.

19. After learning the man, Darryl Borden, was in a second-floor bathroom, the two went upstairs to the hallway.

20.     Gannon then took the lead and stood offset from the bathroom door with Kilnapp in position a few feet behind him. The staircase was between Gannon and Kilnapp.

21.     Gannon did not knock and announce their presence as police officers.

22.     Gannon did not ask Borden to come out of the bathroom.

23.     Still in the bathroom, Borden made no threatening statements to the Officers or in their presence.

24.     At that point, Gannon had time to:

   o   knock and announce himself as a police officer;

   o   try and de-escalate the situation by talking to Borden or otherwise;

   o   withdraw from the area to establish a perimeter;

   o   attempt surveillance into the bathroom;

   o   wait for Borden to come out voluntarily; or,

   o   call for backup, SWAT, or member of the specialized Crisis Intervention Team.

25.     Gannon chose not to do any of those things.

26.     Despite no apparent need for immediate engagement, upon information and belief, Gannon decided to open the bathroom door.

27.     When he did, Borden was standing in the bathroom.

28.     Borden was apparently holding a firearm but it was down at his side in one hand, pointed towards the ground. It was not raised or pointed at Gannon.

5

29. Borden did not step towards Gannon or make any other threatening gestures or statements.

30. Gannon chose not to order Borden to drop his weapon or to get on the floor.

31. Instead, Gannon panicked.

32. He spun back out of the doorway, where he was no longer in the line of sight or fire between himself and Borden.

33. Out of the line of fire, Gannon still chose not to order Borden to put down his weapon, get on the floor, or come out of the bathroom.

34. Gannon instead turned and ran towards the stairs. Borden didn't flee, chase Gannon out of the bathroom, or open fire. He stayed in the bathroom.

35. Kilnapp was standing in position near the top of the staircase.

36. Gannon bolted down the stairs, screaming as he fled.

37. As he ran, Gannon pointed his gun over his head behind him—in the opposite direction he was running—and began shooting.

38. Gannon was not looking where he was shooting.

39. Gannon hit Kilnapp with one of his blindly fired bullets while she stood near the top of the stairs.

40. Gannon's bullet ripped through Kilnapp's right forearm and fragmented. One fragment punctured her bicep. Another struck her in the armpit before tearing through her chest and lodging near her spine.

41. Kilnapp was able to get out of the house on her own but quickly realized she had been shot. She believed she was about to die.

42.    Gannon's body camera footage shows him running away while Kilnapp yells after him, *"I'm shot. I'm shot. Don't leave me."*

43.    EMS rushed Kilnapp to the hospital.

44.    Two weeks later, surgeons were able to remove the bullet fragment near her spine.

45.    Gannon never apologized to Kilnapp for shooting her.

*The City and Police wrongly claim Borden shot Kilnapp.*

46.    Upon information and belief, by the night of the shooting or the day after homicide detectives already suspected Gannon was the shooter.

47.    Within hours of the shooting, CDP and the Ohio Bureau of Criminal Investigations conducted a forensic examination of the scene.

48.    BCI took 12 laser scans of the scene to determine bullet trajectories. The following day, BCI used computer software to create 3D models showing the bullet trajectories.

49.    The BCI model below is an overhead view of the staircase, hallway, and bathroom. BCI marked the trajectory of one of Gannon's bullets in yellow, showing him firing from the stairs:



50. BCI's laser scans and 3D modeling show that bullet entering the wall near the top of the staircase on a slight downward angle. Because Gannon was running down the stairs when he fired, the BCI model shows Gannon must have been holding his gun above his head when he fired.

51. BCI's 3D modeling also shows Kilnapp's approximate vantage point when Gannon began shooting, as well as the path of Borden's bullets when he reacted to Gannon opening fire:



52. The forensic examination at the scene shows no bullets from Borden fired even remotely in Kilnapp's direction. As depicted above, Borden fired from inside the bathroom into the bathroom door before the bullets landed in the wall opposite him. Kilnapp was never in Borden's line of fire.

53. Upon information and belief, there were no witnesses who claimed to see Borden shoot at Kilnapp, or even in her direction.

54. There was no body camera footage showing Borden shooting at Kilnapp, or even in her direction.

55. Gannon claimed to homicide detectives that when he opened the door, Borden was holding a gun in two hands and pointing it at the door.

56. Upon information and belief, the subsequent investigation proved that Gannon's account of the shooting could not possibly be true.

57.  Gannon's body camera footage shows his claim was a lie.

58.  Upon information and belief, Gannon's body camera footage also records him admitting he might have shot Kilnapp.

59.  Nevertheless, Defendants quickly charged Borden with attempted murder, claiming it was he and not Gannon who shot Kilnapp.

60.  In a press release on July 31, 2020, the Cuyahoga County Prosecutor's office claimed that Borden "fired multiple shots at officers striking Officer Kilnapp."

61.  By that time, the Cleveland Division of Police had forensic evidence and other evidence suggesting it was Gannon—not Borden—who shot Kilnapp.

62.  Upon information and belief, the City and the Division of Police made other untrue public statements claiming that Borden hid in the bathroom with his gun pointed towards the door waiting to ambush the Officers.

63.  In addition to the trajectory tracing, upon information and belief, subsequent audio testing of Gannon's body camera footage proved that Gannon shot first. Only after Gannon was running down the staircase and started shooting did Borden fire any shots. Borden did not fire any shots at Kilnapp or Gannon.

64.  Upon information and belief, subsequent additional ballistics testing further proved that Gannon shot Kilnapp.

65.  Even so, upon information and belief, the Cleveland Division of Police and the Prosecutor's Office continued to publicly claim that Borden shot Kilnapp despite evidence that it was not true.

66. Despite knowing that Gannon shot Kilnapp, the Cleveland Division of Police hid from Kilnapp that Gannon shot her until Spring 2021.

67. The Cleveland Division of Police and the Prosecutor's Office did not drop the attempted murder charges against Borden until the end of June 2021, almost a year after the shooting.

*Despite proof he shot his partner, the City doesn't discipline Gannon. It disciplines Kilnapp instead.*

68. In March 2021, the Chief of Police suspended Kilnapp as a result of the incident. The Chief claimed as justification that Kilnapp forget to turn on her body camera before entering the house on the night of the shooting.

69. It is a regular occurrence that Cleveland police officers fail to turn on their body cameras before arriving at an incident. CDP frequently gives those officers no more than counseling for such infractions.

70. On the other hand, CDP took no disciplinary action against Gannon for misleading investigators, despite their determination that his version of events could not possibly be true.

71. CDP also chose not to discipline Gannon for shooting his partner by firing blindly over his head while running in the other direction, even though his actions flagrantly violated the most basic gun-safety rules.

72. To the contrary, three months after Gannon shot his partner, the Division of Police gave Gannon an annual performance review that described him as exceeding expectations. His supervising officers described the shooting as a "minor set back" for Gannon.

11

*The shooting caused Jennifer Kilnapp ongoing physical and emotional injuries.*

73.   It wasn't minor for Jennifer Kilnapp.

74.   Nearly two years later, Kilnapp is still unable to return to work.

75.   Gannon's bullet caused nerve damage to Kilnapp's right arm, her dominant one. She continues to have physical pain, weakness, numbness, and tingling in her arm, wrist, and hand. It took her well over a year to regain full range of motion.

76.   Worse than her physical injuries are the lingering emotional ones.

77.   When Gannon shot her, Kilnapp believed she was about to die.

78.   She has been diagnosed with post-traumatic stress disorder from being shot.

79.   For more than a year after Gannon shot her, she suffered frequent flashbacks and near-nightly nightmares.

80.   It is unlikely Kilnapp will ever be able to return to duty as a full-time patrol officer. That is particularly so for the Cleveland Division of Police: she is fearful of even stepping foot into the City of Cleveland.

*The City's policies and customs violate the Constitution*
*and were a cause of Kilnapp's injuries.*

81.   In December 2014, the U.S. Department of Justice found that the Cleveland Division of Police had engaged in an ongoing pattern and practice of excessive force, as well a litany of other failures regarding training and implementation of constitutionally appropriate use-of-force and de-escalation policies and procedures.

12

*CDP's continued excessive use of force and failure to implement appropriate use-of-force policies.*

82.  In July 2020, the same month that Gannon shot Kilnapp, a Monitor appointed by the United States District Court to evaluate CDP's progress revising its policies, procedures, and training submitted a Semiannual Report, covering the six-month period ending February 2020.

83.  The Monitor concluded that the City and Division of Police still did not have fully adequate training and policies on use of force and de-escalation.

84.  According to the Report, CDP used force twice as often in making arrests in 2019 (2.4% of the time) than in 2015 (1.2% of the time). (July 2020 Monitor Report at Exh. A, pg. 1). In addition, the Report detailed that the Division of Police's own internal investigations found slightly more use-of-force violations by officers in 2019 than in 2015. (*Id*. at Exh. A, pg. 5).

85.  The ensuing Monitor Report in February 2021, which covered the period during which Gannon shot Kilnapp, found that these same failures persisted.

86.  The February 2021 Report determined that the Division of Police still needed to ensure that its "active use of force policy is complied with by each officer that uses force." (February 2021 Monitor Report at 4).

87.  Even now, the most recent Monitor's Report, from October 2021, found that in several critical respects the Division of Police is still not fully adequate with respect to implementation and training on effective use-of-force and de-escalation policies.

13

88.  Based on the foregoing, CDP and the City of Cleveland have a policy or custom of tolerating, permitting, encouraging, or engaging in excessive force in violation of the Constitution. This policy or custom is evidenced in part by: the failure to train officers; the failure to implement effective use-of-force policies; and, ongoing behavior by officers, among other things. Such failures amount to deliberate indifference to the rights of persons with whom the police come into contact and the rights of fellow officers themselves.

89.  That policy or custom was closely related to or actually caused Kilnapp's injuries.

*CDP's ongoing failure to adequately train new officers and recruits.*

90.  The Monitor's July 2020 Report also found the City and Division of Police were still not adequately training officers "how to police effectively and safely in accordance with CDP policy ... and the Constitution and laws of the United States." (July 2020 Monitor Report at 58). The February 2021 Monitor Report reached the same conclusion. (February 2021 Monitor Report at 103).

91.  The July 2020 Monitor Report highlighted particular problems with training rookie officers. It concluded that CDP continued to lack a fully appropriate "training plan for recruits and training for new officers in the field." (July 2020 Monitor Report at 62). The Monitor thus determined that CDP would need to "review and revise" both its academy and field training programs for recruits and new officers. (*Id*. at 61).

92.  The Report also concluded that the City and Division of Police had an ongoing failure to devote adequate resources to training, noting that the

14

Monitor "previously urged CDP to devote additional resources to its training section," explicitly referencing new classes of recruits in the process. (*Id*. at 61).

93. Despite its urging, by February 2021, the Monitor found that the Division of Police "continue[d] to struggle to develop adequate training curricula" for officers. (February 2021 Monitor Report at 105). In other words, the Division of Police did not make meaningful progress in adequate training of new officers from 2020 to 2021.

94. The Monitor specifically singled out CDP's failure to train on the use of force. It noted that both the Monitor and Department of Justice "rejected out of hand" the Division of Police's "updated In-Service Training for Use of Force." (*Id*. at 105).

95. The July 2020 Report also noted that the Division of Police still did not provide officers with adequate training on how to deal with individuals during a behavioral health crisis. (July 2020 Monitor Report at 56).

96. Based on the foregoing, CDP and the City of Cleveland have a policy or custom of failing to adequately train officers—particularly new officers and recruits—in various relevant areas, including: the use of force; intervention with individuals suffering from behavioral health crises; de-escalation; and, other officer-safety tactics. Such failures amount to deliberate indifference to the rights of persons with whom the police come into contact and the rights of fellow officers themselves.

97.   Those policies or customs were closely related to or actually caused Kilnapp's injuries.

*The City and Division of Police ratified Gannon's shooting of Kilnapp*.

98.   The Chief of Police ratified Gannon's shooting of Kilnapp by failing to discipline him for it or to further investigate it, despite Gannon's admission on the night of the shooting and despite the fact that Gannon mislead or lied to investigators, which conduct by the Chief equates to an official policy or custom.

**First claim for relief –
Excessive force under the Fourth Amendment**

99.   Kilnapp realleges each and every allegation set forth above as if fully rewritten.

100.  By shooting Kilnapp, Gannon seized her within the meaning of the Fourth Amendment.

101.  Upon information and belief, Gannon shot Kilnapp incorrectly believing she was Borden following him.

102.  Gannon's mistaken belief was objectively unreasonable under the circumstances.

103.  Even if Gannon did not mistake Kilnapp for Borden, Gannon fired in Kilnapp's direction from point blank range, despite knowing she was in the range of fire.

104.  Gannon intended to fire his weapon; he did not fire it accidentally.

105.  By doing so, Gannon seized Kilnapp through means intentionally applied.

106.   At no point did Kilnapp discharge her firearm or aim it in Gannon's direction.

107.   At no point did Kilnapp pose a significant threat of death or serious physical harm to Gannon.

108.   The force Gannon used against Kilnapp was objectively unreasonable and excessive.

109.   Gannon's actions violate the Fourth Amendment of the U.S. Constitution.

110.   For the reasons described above, Defendants' conduct reflects a policy or custom of the City of Cleveland and Division of Police.

111.   Defendants are therefore liable to Kilnapp under 42 U.S.C. § 1983.

112.   As a direct and proximate result of Defendants' conduct, Kilnapp: suffered physical and psychological injury, some of which may be permanent; endured emotional distress and humiliation; incurred costs and expenses, such as attorneys' fees and costs of suit; and, was otherwise injured. Some or all of her damages will continue to accrue in the future.

113.   The conduct of Gannon, as described above, was done maliciously and/or with reckless indifference to Kilnapp's federally protected rights, for which Gannon, in his individual capacity, is liable for punitive damages.

<u>**Second claim for relief –**</u>
<u>**Excessive force under the Fourteenth Amendment**</u>
(pleaded in the alternative)

114.   Kilnapp realleges each and every allegation set forth above as if fully rewritten.

115.   By firing blindly at Kilnapp, Gannon's use of force against Kilnapp was an arbitrary exercise of governmental power.

17

116.  By firing blindly at Kilnapp, Gannon used force against Kilnapp maliciously and sadistically.

117.  As explained above, Gannon had sufficient opportunities to consider, choose, or deliberate on another course of action besides escalating the situation and besides firing blindly at Kilnapp.

118.  Gannon knew that the consequences of his actions were certain or substantially certain to result from firing his weapon in the manner and at the distance he did.

119.  Gannon's intent to harm anyone within his range of fire may be inferred.

120.  Gannon's conduct shocks the conscience and reflects deliberate indifference towards Kilnapp's federally protected rights.

121.  Gannon's actions violate the Fourteenth Amendment of the U.S. Constitution.

122.  For the reasons described above, Defendants' conduct reflects a policy or custom of the City of Cleveland and Division of Police.

123.  Defendants are therefore liable to Kilnapp under 42 U.S.C. § 1983.

124.  As a direct and proximate result of Defendants' conduct, Kilnapp: suffered physical and psychological injury, some of which may be permanent; endured emotional distress and humiliation; incurred costs and expenses, such as attorneys' fees and costs of suit; and, was otherwise injured. Some or all of her damages will continue to accrue in the future.

125.    The conduct of Gannon, as described above, was done maliciously and/or with

reckless indifference to Kilnapp's federally protected rights, for which

Gannon, in his individual capacity, is liable for punitive damages.

**Wherefore,** Kilnapp prays for judgment against Defendants for:

(a) recovery for lost wages, benefits, and other economic loss;

(b) recovery for her physical and psychological injuries, including but not

limited to emotional distress damages and other compensatory damages in

amounts that will fully and fairly compensate her for her injury, damage, and

loss;

(c) equitable and prospective injunctive relief against future constitutional

violations;

(d) a declaratory judgment holding that Defendants have violated Kilnapp's

constitutional rights;

(e) punitive damages against Gannon in his individual capacity;

(f) attorneys' fees and costs of suit under 42 U.S.C. § 1988, 42 U.S.C. §

2000cc-2(a), and other applicable federal laws; and,

(g) such other appropriate relief as the Court deems just.

## <u>Jury demand</u>

A trial by jury is hereby demanded in the within matter in the maximum

number of jurors allowed by law.

Respectfully submitted,

  /s/ Matthew D. Besser
Cathleen M. Bolek (0059884)
Matthew D. Besser (0078071)
**BOLEK BESSER GLESIUS LLC**
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*