**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| Jennifer Kilnapp | ) | CASE NO. 1:22-CV-01225 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | **Plaintiff Jennifer Kilnapp's opposition to** |
| | ) | **Defendant City of Cleveland and Dornat** |
| City of Cleveland, *et al.*, | ) | **Drummond's motion to dismiss** |
| | ) | |
| Defendants. | ) | |

For years before the shooting in this case, the Cleveland Division of Police was on notice that its training on the proper use of force was inadequate. It was on notice that its training of new officers was particularly deficient. Despite years to remedy these failings, by the time rookie police officer Bailey Gannon shot his partner, the City still hadn't fixed them. Not only did the City fail to discipline him for the shooting, or for subsequently misleading investigators, they covered his actions up by falsely telling the public that someone else shot Officer Kilnapp. They also hid the truth from Kilnapp herself. On top of all that, the Division of Police failed to properly disclose the shooting to the federally appointed Cleveland Police Monitor Team as required by law and its own internal policy. A reasonable jury might conclude that was no mere clerical oversight. In fact, it seems the Monitor only learned of the shooting because Kilnapp filed this case.

When viewed in the light most favorable to Officer Kilnapp, the Complaint plausibly pleads municipal liability under any of three different theories: failure to train; an unconstitutional custom; and/or, ratification of Gannon's excessive use of

force. A jury could reasonably find any of those three. Because Kilnapp need only plausibly allege one. The motion to dismiss is without merit and should be denied.[1]

## Factual background

Officer Kilnapp incorporates the facts in her opposition to Gannon's motion for judgment on the pleadings. Also relevant here is what happened after Gannon shot her.

### A. *Defendants falsely pin the shooting on someone else and choose not to discipline Gannon for shooting his partner and misleading investigators.*

By the night of the shooting or the day after, Cleveland homicide detectives already suspected Gannon was the real shooter. (Complaint at ¶ 46). Within hours, detectives and an investigator from the Ohio Bureau of Criminal Investigations conducted a forensic examination of the scene. (*Id*. at ¶ 47). It included 12 laser scans to determine bullet trajectories. (*Id*. at ¶ 48). From those, BCI created 3D computer modeling of the trajectories. (*Id*.). The modeling shows Gannon was down on the staircase, around the corner from the bathroom when he started shooting. (*Id*. at ¶ 49). Because one of his bullets hit the wall on a slight downward angle, the forensic exam proves that Gannon was holding his gun above his head when he fired. (*Id.* at ¶ 50).

The subsequent investigation also proved that Gannon's account of the shooting was untrue. (*Id*. at ¶ 56). Among other things, it proved that Gannon misled investigators when he claimed that the man in the bathroom, Darryl Borden, shot first.

[1] It is also untimely. The City's and Chief's Answer (and thus their 12(b) motion) was due on September 13, 2022. (*See* Doc. # 5–6). Defendants have filed no Answer. Because they did not file this motion until September 16th, it is untimely. Plaintiff does not move for default. It is appropriate, however, for the Court to treat the untimely motion to dismiss as a motion for judgment on the pleadings under Civil Rule 12(c), *e.g., Braun v. Ultimate Jetcharters, Inc.*, 2013 U.S. Dist. LEXIS 22323, *2 (N.D. Ohio Feb. 19, 2013), and to order Defendants to file an Answer.

(*Id*. at ¶ 64). In truth, the investigation revealed Borden did not fire until after Gannon started shooting. (*Id*.). In fact, Borden didn't fire any shots at either officer. (*Id*.).

Even so, the Division of Police falsely stated to the public that Borden was waiting to ambush the officers and had his gun pointed at the door when Gannon opened it. (*Id*. at ¶ 59, 62, 65). Defendants also falsely told the public it was Borden who shot Kilnapp, despite evidence that wasn't true. (*See id*. at ¶¶ 59, 65). They continued to claim as much for a year. (*See id*.). Though CDP knew Gannon was the real shooter long before, it did not disclose that to Kilnapp herself until Spring 2021. (*Id*. at ¶ 66).

The Chief and Division of Police chose not to discipline Gannon for shooting his partner by firing blindly over his head while running in the opposite direction. (*Id*. at ¶ 71). Nor did Defendants discipline Gannon even after homicide detective determined that he misled them. (*Id*. at ¶ 70). Instead, three months after the shooting, the Division of Police gave Gannon a performance review describing him as exceeding expectations. (*Id*. at ¶ 72). His supervisor called the shooting a "minor set back" for Gannon. (*Id*.).

Worse yet, the City did not disclose the shooting to the Cleveland Police Monitoring Team, appointed by the Northern District of Ohio. On September 22, 2022, the Monitoring Team issued its Eleventh Semi-Annual Report. It is a public document. In it, the Monitor states that it "recently"[2] learned of Kilnapp's shooting, and that **CDP did not properly document, investigate, or disclose it to the Monitor "in a manner consistent with CDP policy…."** As a result, the Monitor has "launched an in-depth

[2] By "recently," the Monitor meant that it learned Gannon was the shooter only because Kilnapp brought this lawsuit. Witnesses would testify to that if need be.

review" of her shooting "to determine what occurred" and "how it was investigated." The relevant excerpt states in its entirety:

> In addition, the Monitoring Team recently learned of a use of force incident that resulted in a CDP officer being shot and injured by a fellow officer. Based on our current understanding, this incident was not properly documented, investigated, or disclosed to the Monitoring Team in a manner consistent with CDP policy or the requirements of the Consent Decree. The Monitoring Team has launched an in-depth review of this case to determine what occurred, how it was investigated and reported, and the impact on compliance.

(September 2022 Monitor Report at 19, attached as Exhibit A).

*B. Defendants have a documented, public history of tolerating excessive force and ignoring obvious training deficiencies of new officers, about which it was repeatedly warned.*

None of this happened in a vacuum. The Division of Police has a long and well-publicized history of issues with excessive force and inadequate training regarding the use of force. That is especially so for new officers.

In July 2020, the same month that Gannon shot Kilnapp, the Cleveland Police Monitoring Team issued its Eighth Semiannual Report evaluating CDP's progress revising its policies, procedures, and training. (*Id*. at ¶ 82). The Report covered the six-month period from September 2019 to February 2020. (*Id*.). In it, the Monitor concludes that even after agreeing several years earlier to improve and reform its policies and practices, CDP still lacked fully adequate training and policies regarding the use of force and de-escalation. (*Id*. at ¶ 83). According to the Report, CDP was still not adequately training officers **"how to police effectively and safely in accordance with CDP policy ... and the Constitution and laws of the United States."** (*See id*. at ¶ 90). For example, Cleveland Police used force twice as often in making arrests in 2019 (2.4%

of the time) than in 2015 (1.2% of the time). (*See id*. at ¶ 84). The Report also recounted that the Division of Police's own internal investigations found slightly more use-of-force violations by officers in 2019 than in 2015. (*Id*.).

The ensuing Monitor Report in February 2021 covered the period during which Gannon shot Kilnapp. (*Id*. at ¶85). It found that these same training failures persisted. (*Id*.). The Monitor concluded that the Division of Police *still* needed to ensure that its "active use of force policy is complied with by each officer that uses force." (*Id*.).

In reaching these conclusions, the Monitor Team highlighted training of new officers as a particular area of concern. (*Id*. at ¶ 91). In 2020, the Monitor called out CDP for its ongoing failure to devote adequate resources to training. (*Id*. at ¶ 92). That failure persisted even though the Monitor had **"previously urged CDP to devote additional resources to its training section,"** explicitly referencing new classes of recruits in the process. (*See id*.). Despite years to address these deficiencies, the Monitor Team found that by 2020, the Cleveland Police still lacked a fully appropriate **"training plan for recruits and training for new officers in the field**." (*See id*. at ¶ 91). The July 2020 Report thus again instructed CDP that it still needed to "review and revise" both its academy and field training programs for recruits and new officers. (*See id*.).

Yet by the time Gannon shot Kilnapp, CDP had not fixed the problem. In February 2021, the Monitor found that CDP "**continue[d] to struggle to develop adequate training curricula**" for officers. (*Id*. at ¶ 93). In other words, the Division of Police didn't make meaningful progress fixing its training deficiencies in 2020. (*Id*.).

Among the areas where the Monitor found officer training persistently deficient is in the proper use of force. (*Id*. at ¶ 94). Despite notice of its failings for several years, the July 2020 Report explained that both the Monitor and the Department of Justice "rejected out of hand" the Division of Police's "updated In-Service Training for Use of Force." (*See id.*).

**Law and analysis**

There is no heightened pleading requirement in Section 1983 cases. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). The complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 550 U.S. at 678.

The only basis on which the City and Chief moves to dismiss is on the question of municipal liability. A municipality may be liable under Section 1983 when its "policy or custom" causes a constitutional injury. *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978). Such a policy or custom may be demonstrated by any of four methods. A plaintiff can show: (1) that there is a relevant official policy or legislative enactment; (2) "that an official with final decision making authority ratified illegal actions"; (3) that the municipality has inadequate training or supervision; or, (4) that there is "a custom of tolerance or acquiescence of federal rights violations." *E.g., Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019); *accord Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir.

2020). In this case, Officer Kilnapp plausibly alleges a claim under three of these methods. First, that Defendants have failed to adequately train officers—particularly new officers—on the appropriate use of force and de-escalation, despite years of notice that its training was inadequate. Second, that the Division of Police has a custom of tolerating, acquiescing in, or encouraging excessive force. And finally, that the Chief of Police ratified Gannon's conduct by failing to discipline him and by covering up his actions. Kilnapp need only plausibly allege one of these to state a claim.

*A. The consequences of failing to adequately train officers in the use of deadly force are "obvious." The Division of Police is liable for that failure even without evidence of a pattern of prior violations.*

The failure to train "is a custom or policy which can lead to municipal liability" when it amounts to deliberate indifference and either causes or is closely related to a constitutional violation. *E.g.*, *Brown v. Battle Creek Police Dept.*, 844 F.3d 556, 573 (6th Cir. 2016) (quotation omitted); *Jackson*, 925 F.3d at 836. Deliberate indifference *may* be shown with evidence of "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it." *Jackson*, 925 F.3d at 836 (internal quotation omitted). But that is not the only way.

In some cases, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 **without proof of a pre-existing pattern of violations**." *Connick v. Thompson*, 563 U.S. 51, 64 (2011) (emphasis added); *accord Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015). The Supreme Court has held that the use of deadly force is one such circumstance. Where the use of deadly force is concerned, "the need to train officers in the constitutional limitations" is "so

obvious that the failure to do so could properly be characterized as deliberate indifference to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) (quotation omitted). As a result, no prior pattern of improper use of deadly force is necessary to establish municipal liability on a failure-to-train claim. *Id.*; *see Connick*, 563 U.S. at 61; *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020).

Viewed in the light most favorable to Officer Kilnapp, a reasonable jury could find that the City and Division of Police failed to adequately train its officers—including its new ones—on the proper use of deadly force. After investigating CDP's policies and practices, a federally appointed Monitor repeatedly found inadequate training of officers regarding the use of force and de-escalation. According to the Monitor, that failure to train existed before Gannon shot Kilnapp, continued during the period in which he shot her, and even persisted after. Though the Monitor asked CDP for years to fix its training, by 2020 it still had not. That includes training on the use of force. As of 2020, the Monitor and the Department of Justice both "rejected out of hand" the Division of Police's "updated In-Service Training for Use of Force." (*See id* at ¶ 94).

These training failures are starkest where new officers are concerned. The Monitor concluded that as of 2020, the Cleveland Police: continued to lack an adequate "training plan for recruits and training for new officers in the field"; still needed to "review and revise" its academy and field training programs for new officers; and, was still not devoting adequate resources to training. (*See id*. at ¶¶ 91–92). Despite years of

warnings, by the time Gannon shot Kilnapp, CDP had not fixed these ongoing deficiencies.

Because the consequences of failing to appropriately train police on the use of deadly force is "so obvious," that failure amounts to deliberate indifference and supports an inference of causation. *See City of Canton*, 489 U.S. at 390 n.10; *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 409–10 (1997). A reasonable jury could find those failures in this case. It could also find that if CDP had adequately trained Gannon, the rookie would not have shot his own partner. If a jury found as much, municipal liability would attach as a matter of law and no prior pattern of violations need be proven.[3]

All the same, there *is* a prior pattern that put the City on "notice that the training was deficient." *See Jackson*, 925 F.3d at 836. Over the years, the Monitor repeatedly told CDP that it needed to fix its training plan for new officers. In fact, the Monitor highlighted that it had "previously urged CDP to devote additional resources to its training section." (Complaint at ¶ 92). Still, the Division of Police "continue[d] to struggle to develop adequate training curricula" for officers. (*Id.* at ¶ 93). The fact that the Monitor and the Department of Justice "rejected out of hand" the Division of Police's proposed revised use-of-force training only underscores that CDP knew of its deficient training on use of force. These allegations permit a reasonable inference that

---

[3] The City's contention that Kilnapp needs to cite a specific policy by name would interject a heightened pleading standard that does not exist. *See Leatherman*, 507 U.S. at 164. What's more, Defendants' argument would hold Kilnapp to a summary-judgment standard without the benefit of discovery.

CDP was on sufficient notice of its training deficiencies. Even without the benefit of discovery, these allegations plausibly allege liability for failure to train.

Defendants' protest notwithstanding, the Complaint does not rely on the 2014 Department of Justice Report or Consent Decree to establish the claims. The Complaint quotes neither. It refers instead to the contemporaneous Reports of the federally appointed Cleveland Police Monitoring Team. Defendants cite no authority suggesting those Reports may not be alleged in a Section 1983 complaint. To conclude as much would be to ignore reality. The Monitor Team is required to investigate CDP's policies and practices, and to report to the Northern District semi-annually. The Reports referenced cover the periods in question and concern matters related to the constitutional violations alleged. They are properly a part of the Complaint.

The case cited by Defendants, *Yatsko v. Graziolli*, 2021 U.S. App. LEXIS 36006, *17 (6th Cir. Dec. 6, 2021), is inapposite. The Court there held that a 2014 DOJ report was irrelevant because it was written four years before the incident giving rise to the claim. *Id*. at * 17. By contrast, the Court recognized that the DOJ Report was "'clearly timely'" in an earlier case where the "incident at issue in that case occurred ... during the DOJ investigation." *Id*. (*quoting Kalvitz v. City of Cleveland*, 2017 U.S. Dist. LEXIS 217570, at *28 (N.D. Ohio Oct. 16, 2017)). That reasoning puts this case on the *Kalvitz* side of the line. The Reports are not from years before Gannon shot Kilnapp; they are from the same period. As in *Kalvitz*, those contemporaneous government documents permit a

reasonable jury to find CDP's action or inaction gives rise to municipal liability. *See Kalvitz*, 2017 U.S. Dist. LEXIS 217570 at *31–33.[4]

Defendants reference to hearsay likewise misses the point. The pleadings stage is not the point at which a plaintiff must demonstrate admissibility. Nor must she cite every piece of evidence that might become available during the case. Without discovery that would be an impossible task. It would also conflict with the Supreme Court's caution against demanding "hypertechnical" pleading. *See Iqbal*, 566 U.S. at 678.

Regardless, Defendants have not demonstrated that the Reports are entirely hearsay—that *nothing* in them could ever be admissible. For that matter, they cite no statement in any of the Reports that Evidence Rule 802 would preclude, let alone preclude at the pleadings stage. At any rate, the Reports are government documents excepted from the hearsay rule by Evidence Rule 803(8). *Cf. Kalvitz*, 2017 U.S. Dist. LEXIS 217570, at *25 (holding that the 2014 Department of Justice Report "meets the criteria for Federal Rule of Evidence 803(8)"). The Reports might be covered by any number of other hearsay exceptions as well. At a more basic level, they are admissible to show Defendants were on notice of the need for proper training—a purpose for which the hearsay rule does not apply. In any case, it is premature at this stage for the Court to resolve the issue one way or another.

[4] The Court could also take notice of the various excessive force incidents in the department that have led to lawsuits on public dockets, and even criminal indictments of officers.

*B. The Division of Police has a custom of tolerating, acquiescing in, or encouraging excessive force.*

Viewed in the light most favorable to Officer Kilnapp as the non-moving party, the Complaint also plausibly alleges that Defendants have a custom of tolerating, acquiescing in, or encouraging excessive force. (*See* Complaint at ¶ 88). A plaintiff can demonstrate the existence of such a custom by showing four things: (1) a "clear and persistent pattern of illegal activity"; (2) "notice or constructive notice" by the defendant; (3) "the defendant's tacit approval of the unconstitutional conduct" reflecting deliberate indifference; and, (4) that the custom was a "moving force or had a direct causal link" to the violation. *Kalvitz*, 2017 U.S. Dist. LEXIS 217570, at *23 (*citing Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Even without any discovery, Officer Kilnapp has pleaded as much here.

The Complaint reflects that a federally appointed Monitor has been tasked with investigating and reporting on the Division of Police's efforts to reform a years-long pattern of excessive-force violations. It also reflects CDP was well-aware of the problem and had been for years. Nevertheless, by the time of the shooting, the Division of Police had still not adequately addressed the systemic failures causing those issues. To take just one example, the same month as the shooting, the Monitor concluded CDP was using force even more often than it did just a few years earlier. Defendants' ongoing failure to remedy it use-of-force issues (in the face of years of opportunity to do so) would permit a jury to reasonably infer deliberate indifference to the problem. Along the same lines, a jury could find a connection between CDP's failures and Gannon's

conduct. *Cf. Brown*, 520 U.S. at 409–10 (permitting an inference of causation from the "high degree of predictability" between a municipality's indifference and a subsequent constitutional violation). Viewed in the appropriate light at the pleadings stage, the Complaint plausibly alleges a custom for the purposes of municipal liability.

*C. Defendants ratified Gannon's conduct, not just by failing to discipline him for it, but by then covering it up.*

Finally, the complaint plausibly alleges municipal liability based on ratification. Viewed in the light most favorable to Officer Kilnapp, a jury could reasonably conclude that Defendants ratified Gannon's actions not only by failing to discipline him for the shooting, or for misleading investigators, but also by covering it up. Defendants made false statements about the shooting to the public. They also failed to disclose it to the Monitor "in a manner consistent with CDP policy." A reasonable jury could conclude that the City did not do so accidentally. A jury could similarly conclude that CDP's post-shooting decision to hide the truth from Kilnapp for months caused additional emotional harm long after the shooting itself.

With respect to discipline, the Supreme Court holds that if an "authorized policymaker[] approves" a subordinate's actions after the fact, that "ratification would be chargeable to the municipality because their decision is final." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Under Ohio law, "the chief of police is the final policymaker with regard to investigations that do not result in disciplinary action." *Wright v. City of Canton*, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001) (*citing* O.R.C. § 737.12). Thus, the Sixth Circuit has previously held that a municipality ratified an officer's conduct based

on a chief of police's disciplinary decisions. *See Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985); *Arendale v. City of Memphis*, 519 F.3d 587, 602 (6th Cir. 2008) (because the chief of police had final policymaking authority regarding discipline, the city could be liable under *Monell* if a constitutional violation occurred). It is true that the "mere fact" that no employee was disciplined does not typically by itself establish ratification. *See M.J. v. Akron City School Dist. Bd. of Edn.*, 2020 U.S. Dist. LEXIS 74270, at *50 (N.D. Ohio Apr. 28, 2020). But the "mere fact" that CDP did not discipline Gannon is not the sole basis from which a jury could infer ratification.

Besides failing to discipline him, the facts suggest the Division of Police then covered up for him, hiding the truth from the public, from the Monitoring Team, and from Kilnapp herself. As the Complaint alleges, CDP had forensic evidence from the start showing that Gannon shot Kilnapp. At the same time, the Division of Police made false statements to the public accusing someone else of shooting her. Defendants persisted with those false statements for a year. All that happened while the Monitor was investigating CDP's years-long failure to correct officer uses of excessive force. Yet despite being legally required to do so, CDP failed to properly disclose the shooting to the Monitor "in a manner consistent with CDP policy." A jury could reasonably infer that was a conscious choice. Multiple courts have held that covering up a subordinate's actions supports a finding of ratification under *Monell*. *E.g.*, *Quinto-Collins v. City of Antioch*, 2022 U.S. Dist. LEXIS 471, *3–4 (N.D. Cal. Jan. 3, 2022) ("An intentional cover-up sends a message to individual officers that the behavior . . . is

permissible within the department. If these allegations prove to be true, a reasonable jury could find that the Chief's statements and actions were evidence of a pre-existing policy approving the actions that led to [the injury]."); *Linga v. County of Riverside*, 2021 U.S. Dist. LEXIS 194103, *14 (C.D. Cal. April 23, 2021); *Crane v. City of Arlington*, 2020 U.S. Dist. LEXIS 125222, *26 (N.D. Tex. July 16, 2020); *LaJocies v. City of N. Las Vegas*, 2011 U.S. Dist. LEXIS 55524, *20 (D. Nev. May 24, 2011) ("There is also substantial evidence of a cover-up of the incident demonstrating that the Defendants may have ratified a subordinate's action."). CDP's failure to follow its own reporting policy would also permit a jury to find ratification. *Cf. Praprotnik*, 485 U.S. at 131 ("Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced."). Viewed in the light most favorable to Kilnapp, and drawing reasonable inferences in her favor, those facts could permit a reasonable jury to find ratification of Gannon's conduct.

*D. Official capacity suits are the norm in Section 1983 cases and there is no reason to dismiss the Chief in his official capacity.*

As a rule, official-capacity suits are permitted under Section 1983. *Monell*, 436 U.S. at 690 n. 55. *Monell* and its progeny "clearly recognize and condone official capacity claims against local government employees, and the courts routinely countenance such lawsuits." *Porter v. City of Columbus*, 2008 U.S. Dist. LEXIS 4415, at *17 (S.D. Ohio Jan. 22, 2008). As just one example, a "plaintiff may bring a claim against city officials for their failure to adequately train officers." *Swann v. City of Columbus Police*, 2005 U.S. Dist. LEXIS 59786, at *6 (S.D. Ohio June 2, 2005). The Cleveland Chief of Police

has routinely been named in his official capacity in excessive-force cases like this one. There is nothing improper about naming him in his official capacity here. Though some courts have dismissed government employees named in their official capacities where it would be duplicative of the remaining claim against the entity itself, there appears to be no precedent *requiring* it. There is no reason to do so here, particularly given the Chief's position as a final policymaker on various relevant policies and practices.

**Conclusion**

The rules of pleading are not a game of gotcha. They do not require "hypertechnical" pleading. *Iqbal*, 566 U.S. at 678. The Complaint here "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" That is all that is required. For the reasons outlined above, the converted motion for judgment on the pleadings is without merit and should be denied.

Respectfully submitted,

/s/ Matthew D. Besser

Cathleen M. Bolek (0059884)
Matthew D. Besser (0078071)
**BOLEK BESSER GLESIUS LLC**
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*

## Certificate of service

The undersigned hereby certifies that a copy of the foregoing was served electronically this 14th day of October, 2022 upon:

Amanda M. Boutton (aboutton@clevelandohio.gov)
Michael J. Pike (MPike@clevelandohio.gov)
James R. Russell, Jr. (jrussell2@clevelandohio.gov)
Craig J. Morice (CMorice@clevelandohio.gov)

*Counsel for Defendants*

## Local Rule 7.1 certification

This case has been assigned to the standard track. This brief complies with the page limits set forth in Local Rule 7.1.

/s/ Matthew D. Besser
*Counsel for Plaintiff*