

Cleveland
Police
Monitoring
Team

# Eleventh Semiannual Report

September 2022

## Table of Contents

**I. LETTER FROM THE MONITOR** .......... **2**

**II. EXECUTIVE SUMMARY** .......... **4**

1. Introduction .......... 4
2. Purpose and Form of This Report .......... 5

**III. COMMUNITY ENGAGEMENT AND BUILDING TRUST** .......... **9**

1. Community Police Commission ("CPC") .......... 9
2. District Policing Committees .......... 11

**IV. COMMUNITY & PROBLEM-ORIENTED POLICING** .......... **13**

**V. BIAS-FREE POLICING** .......... **15**

**VI. USE OF FORCE** .......... **17**

1. Officer Use of Force Principles & Policy .......... 17
2. Use of Force Investigation and Review .......... 20
3. Force Review Board .......... 23
4. Force Investigation Team Assessment .......... 24
5. CDP Data Collection .......... 24

**VII. CRISIS INTERVENTION** .......... **25**

**VIII. SEARCH AND SEIZURE** .......... **32**

**IX. ACCOUNTABILITY** .......... **34**

1. Internally Discovered Misconduct .......... 35
2. Office of Professional Standards ("OPS") .......... 38
3. Police Review Board ("PRB") .......... 44
4. Discipline and Disciplinary Hearings .......... 46

**X. TRANSPARENCY & OVERSIGHT** .......... **48**

1. Police Inspector General .......... 48
2. Data Collection and Analysis .......... 49
3. Public Availability of CDP-Related Information .......... 50

**XI. OFFICER ASSISTANCE & SUPPORT** .......... **53**

1. Training .......... 53
2. Equipment & Resources .......... 57
3. Recruitment & Hiring .......... 59
4. Performance Evaluations and Promotions .......... 62
5. Staffing .......... 63

**XII. SUPERVISION** .......... **66**

1. First-Line Supervisors .......... 66
2. Officer Intervention Program .......... 67
3. Body-Worn Cameras .......... 69

**XIII. OUTCOME ASSESSMENTS** .......... **71**

## I. LETTER FROM THE MONITOR

As we emerge out of a long period of regular interruptions and challenges due to COVID, the Monitoring Team has increased its presence in-person in Cleveland and its work is moving forward at a faster pace. While progress has been made by CDP during this reporting period, the momentum has predictably slowed as both CDP and the Monitoring Team adjusted to various factors, such as a new Mayoral administration and the departure of Chief Williams. This reporting period has presented opportunities to advance compliance progress in the Consent Decree. As such, this report will pinpoint areas where progress has been made, as well as where more work and focus is needed on the part of the City.

In addition to renewed energy, we have entered a different stage of the Consent Decree. The substantive focus of the work has transitioned from technical assistance to assessments. Over the past six years the Monitoring Team has collaborated with the Parties on the development of policy, training, and systems of critical self-analysis including the Force Review Board and systematic data collection of important officer activities. Much of the work has been providing expertise during the development period, including editing, and in some cases drafting, the content of the policies and training.

As we move forward, the City must meet its deadlines and manage the quality and timeliness of the many Consent Decree requirements and deliverables. In meeting the requirements of the Consent Decree, the CDP will need to proceed without the day-to-day direct guidance of the Monitoring Team that was common in previous reporting periods. We will be looking for greater sophistication from the City and the CDP in their self-reporting and transparency in their management and accountability systems.

The Monitoring Team gave room for Mayor Bibb's administration to transition into place and take over the daily management of City operations. We are now into the latter part of the Administration's first year and look forward to an uptick in the pace that will effectively put the City's efforts toward compliance through rigorous assessment and review in order to accurately determine where the City stands.

There are significant and critical areas of the Consent Decree that remain in non-compliance, as well as key areas that are in various stages of being assessed for compliance. There are areas that are foundational to the Consent Decree such as Accountability, Community Engagement and Building Trust, Community and Problem-Oriented Policing, Search and Seizure, Transparency and Oversight, Officer Assistance and Support, and Supervision, that have a significant distance to advance before coming into Substantial and Effective Compliance as required by paragraph 401 of the Consent Decree. Other areas, such as Use of Force and Crisis Intervention, are much further along and are nearing Substantial and Effective Compliance.

All of these Consent Decree requirements are necessary to accomplish in order to establish the CDP as a police agency that practices Constitutional Policing and the City of Cleveland as an accountable partner through the Office of Professional Standards and other areas in government on which safety agencies rely to achieve their mission with the public. While there are areas that are being regularly assessed by the Monitoring Team, there are other areas where the City and CDP are not yet ready to be assessed due not only to a significant amount of transition and fluctuation within the City and CDP in the last year, but also the investment of time in some areas.

Mayor Bibb has been extremely thoughtful and deliberate about meeting with the Monitor and listening to ideas aimed at improving the effectiveness of City resources assigned to Consent Decree compliance efforts. As a result of these meetings and open conversation about what is needed to effectively and efficiently reach compliance, Mayor Bibb is building a Consent Decree implementation team, designed to be a full-time group of employees whose sole focus is working with the CDP, and its stakeholders, the DOJ and the Monitoring Team to keep the deliverables and pace of compliance on track, which will hopefully decrease the time it will take the City and CDP to meet the requirements of the Consent Decree. The City recently announced the implementation team in a press release as the Police Accountability Team.

Lastly, as Monitor, I serve as an agent of the federal district court judge, Judge Solomon Oliver, Jr., assigned to this reform effort. It is important to keep in mind that the Monitor, and the team members selected to work with me, are not parties to this litigation. We are neither plaintiff nor defendant. Instead, we are the eyes and ears of the Court regarding the day-to-day progress of Consent Decree implementation. And we are responsible for fairly and objectively assessing that progress. In that way, the role of an Independent Monitor inherently requires a distinct level of autonomy from the parties unlike that seen in traditional litigation. The Consent Decree plainly states that the Monitor works under the supervision of the court and the court alone. For that reason, it is essential that we are able to fulfill our responsibilities without any undue influence or interference.

*Hassan Aden*
Monitor
September 19, 2022

# II. EXECUTIVE SUMMARY

## 1. Introduction

This report, the eleventh of its kind, continues the path set out during the Tenth Semiannual Report – that of focusing more time and attention to the City's compliance with the various Consent Decree mandates and the production of reviews and assessments to determine its progress. Ultimately, while substantive work on policy and training continue to occur through the efforts of CDP and the City's personnel responsible for such tasks, the Monitoring Team is continuing to home in on answering its central inquiry – is CDP complying with Consent Decree requirements in practice? As such, the Monitoring Team addresses this question, to the extent possible, with its below summaries of the current state of the various sections of the Consent Decree and continues to convey what lies ahead for the City of Cleveland and CDP in these efforts. In this stage of our work, it is important to accurately assess where the City is, and to establish clear targets for achieving Substantial and Effective Compliance. The Monitoring Team has carried out this work in earnest, through several completed and nearly complete reviews and assessments that it has conducted throughout the first part of 2022. The Monitoring Team will continue this increasingly important work of assessing the City's and CDP's work, through a variety of methodologies, to determine whether City has achieved compliance in the different sections of the Consent Decree and if not, what steps should be taken to ensure it attains compliance in the future.

This review covers activities completed from January 1, 2022, to June 30, 2022. The report also recognizes some additional activities and accomplishments that have taken place after June 30, 2022 to account for continued progress. The Monitoring Team is aware that the City and CDP do not always agree with the Monitoring Team's assessment for every paragraph as outlined in our semiannual reports, believing that they have more advanced compliance on certain paragraphs than assigned in the reports. However, the Monitoring Team reminds the City and CDP that it is their burden to demonstrate the degree of compliance for each paragraph for which they believe the compliance status should be changed. Upon receiving evidence from the City and CDP, the Monitoring Team can then reassess these discrete paragraphs to determine whether the compliance status should be altered in future reports.

As stated above, the Monitoring Team has worked on several qualitative assessments thus far in 2022 to examine CDP's adherence in practice to its policies developed since the adoption of the Consent Decree. The assessments are in various stages of completion, but comprise of the following assessments: Force Review Board observations and reviews (rolling assessment), Lateral Hire Assessment (filed with the Court in January of 2022), OPS/PRB Preliminary Assessment (filed in February 2022), Recruit Hire Assessment (filed in June of 2022), Handcuffing on Crisis Calls of Juvenile Females (near completion), Use of Force (now a rolling review; a first review filed in March of 2022), Chief of Police Disciplinary Decisions (near completion), Force

Investigation Team (methodology under collaboration), and Stop, Search & Seizure (methodology under development). The Monitoring Team encourages the community and interested parties to review its completed assessment reports from the first half of 2022, appended to this report (Appendices A-D), to observe the City's progress and identified areas of improvement in these topic areas. All of the Monitoring Team's completed reviews, assessments and reports can be found at our website: http://www.clevelandpolicemonitor.net/ under "Resources and Reports." Furthermore, in addition to a number of reviews that are currently underway, the Monitoring Team's plans include additional qualitative reviews throughout the remainder of 2022 and into 2023.

While the major focus of 2022's Monitoring Team efforts have been reviews and assessments, the Monitoring Team continues to work collaboratively with the City and Division, through regular meetings, phone calls, and written communications, to both provide technical assistance where appropriate and to raise concerns that implicate Consent Decree requirements. For example, towards the end of this reporting period and in the weeks thereafter, the Monitoring Team noted several concerns regarding the Office of Professional Standards (OPS) and has brought it to the City's attention. Notably, recent pre-scheduled meetings between OPS, the Monitoring Team and Department of Justice have been cancelled with little to no explanation, important inquiries and communications from the Monitoring Team have been unaddressed, and**,** until recently the City's efforts and hiring an OPS Administrator have not only disregarded the advice of the Monitoring Team but also demonstrated a lackluster effort to recruit the best candidate for the position. OPS is not the only key vacancy currently impacting the City's ability to meet compliance. The City will also need to give considerable attention to address the long-term vacancy in the Inspector General position. The newly appointed Chief Administrative Officer for the City, Elise Hara Auvil, has incorporated the Monitoring Team suggestions regarding OPS concerns as well as in other areas where previous City staff struggled to understand the importance and the benefit to the City in listening to the Monitoring Team's technical assistance and advice.

While the City may find the Monitoring Team's raising of such issues frustrating, the Team does so in an effort to support the City's best path to Consent Decree compliance and emphasizes that work under this agreement will continue unendingly without serious attention and regard for areas where the City and/or the CDP are falling short.

## 2. Purpose and Form of This Report

Since the Third Semiannual Report, the Monitoring Team has summed up the status of the City's compliance with each paragraph of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance runs the risk of being an over-simplification," these summary representations remain useful descriptors for viewing progress

over time.[1]

Therefore, each section of the Eleventh Semiannual Report summarizes the Monitoring Team's general conclusions about compliance status by describing the state of each paragraph listed as one of the following:

> **Non-Compliance.** The City or Division has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

> **Partial Compliance.** The City or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

> **Operational Compliance.** The City and/or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

> **General Compliance.** The City or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

The same caveats that have previously applied to these summary categories remain applicable and are thus repeated here verbatim. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP have not made good-faith efforts or commendable strides

[1] Third Semiannual Report at 9.

toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or Division have made "sufficient, material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[2]

Third, these summary terms do not appear in the Consent Decree. The Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree, but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[3] "by a preponderance of the evidence."[4]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original Consent Decree language itself.[5] An important point to note is that since the issuance of the Monitoring Team's last semiannual report, some revisions were made to the original language of the Consent Decree. The City of Cleveland and Department of Justice filed a joint motion with the Court in March of 2022[6] to account for voter-approved amendments to Section 115 of the City's Charter. The joint motion was approved by the Court on March 18, 2022. Therefore, readers may notice that the paragraph summaries provided in the charts below reflect those Consent Decree changes, where applicable. In addition, the charts primarily cover paragraphs 14 through 340 of the Consent Decree, but other paragraphs also contain requirements that the City must meet.[7]

We also repeat here that the overall "compliance status" conclusions displayed in tables at the beginning of each section herein do not replace the more rigorous and comprehensive quantitative and qualitative assessments of how CDP performs over time:

> [T]he Monitoring Team bases its assessments on its current understandings,

[2] Third Semiannual Report at 10.
[3] Dkt. 413-1 ¶ 456 (emphasis added).
[4] *Id.* at ¶ 397.
[5] *See Id.*
[6] Dkt. 413-1.
[7] *See* Third Semiannual Report at 10.

> knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where the Division is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[8]

The descriptions of progress contained below should be considered as a synthesis or bottom-line reporting of substantive discussions from each major Consent Decree area contained within this report.

Finally, as is evidenced by the extensive and broad-reaching Consent Decree itself, the City of Cleveland's implementation of the Consent Decree and the many action items and projects it encompasses, is a substantial task. Many areas of the Decree require many reporting periods for the City to achieve—and for the Monitoring Team to confirm and consequently report on these major milestones. Therefore, at times this semiannual report, as with previous semiannual reports, reprints content from prior semiannual reports in instances where there has not been enough material progress to warrant an update. In such cases, the Monitoring Team is not citing to prior semiannual reports in the interest of readability.

[8] *Id.* at 11.

## III. COMMUNITY ENGAGEMENT AND BUILDING TRUST

| Paragraph | Status of Compliance |
|---|---|
| 14. CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | **PARTIAL COMPLIANCE** |

### 1. Community Police Commission ("CPC")

| Paragraph | Status of Compliance |
|---|---|
| 15. Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | **GENERAL COMPLIANCE** |
| 16. CPC members "will be appointed and vacancies will be filled in accordance with the City's Charter"; and periodic meetings with Chief of Police to "provide recommendations." | **GENERAL COMPLIANCE** |
| 17(a). "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | **GENERAL COMPLIANCE** |
| 17(b). "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | **GENERAL COMPLIANCE** |
| 17(c). "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence" | **PARTIAL COMPLIANCE** |
| 17(d). "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency" | **PARTIAL COMPLIANCE** |
| 18(a). "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **PARTIAL COMPLIANCE** |
| 18(b). [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **PARTIAL COMPLIANCE** |
| 18(c). "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **OPERATIONAL COMPLIANCE** |
| 19. "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is legally restricted." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 20. CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | **OPERATIONAL COMPLIANCE** |
| 21. "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **PARTIAL COMPLIANCE** |
| 22. CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |

### a. Background

Since the Monitoring Team's latest report, there has been a significant change regarding the Community Police Commission's ("CPC" or the "Commission") structure, function, and jurisdiction due to the adoption of the amendments to Section 115 of the City's Charter, as voted on by the City of Cleveland community in November of 2021. The amendments established the CPC into the City Charter, giving it a broader authority and responsibilities than the CPC previously created by the Consent Decree. As a result of the updated Charter, amendments were made to the Consent Decree in order to ensure accurate alignment between the Consent Decree's mandates and the new requirements of the City Charter. The updated Consent Decree, containing all applicable edits, was filed with the Court on March 11, 2022.[9] As of the time of this writing, a City committee is finishing up interviews of candidates for the new CPC and will be soon sending their recommendations to the Mayor. It is our understanding that City Council is also working to finalize its choices for three Council-appointed members.

As discussed in previous semiannual reports, the City struggled with providing the CPC access to information during the first six years of Consent Decree implementation. The City reports that this was due to their concerns around the scope of the Consent Decree created CPC's authority. With the expansion of the CPC's authority and responsibility, the Monitoring Team expects that some of these difficulties will be alleviated. A productive and professional relationship between the City and its CPC remains an essential element to the City achieving and maintaining compliance with the Consent Decree.

While the City is working to establish the new CPC as mandated by the City Charter, the current CPC will continue to operate until such time as the new Commission has been appointed. As such, the current iteration of Cleveland's CPC, as established by the Consent Decree, has remained active during the reporting period. The Commission held virtual and in-person meetings and continued to use workgroups to drive its substantive work.

During this reporting period, the CPC produced the following deliverables. In April of 2022, the

[9] Dkt. 413-1.

CPC released its 2021 Annual Report, which included highlights from the CPC's online project entitled the "100 Years of Policing Project," about the history of Cleveland Police Reforms. The Commission also held a public meeting where the details of the project were presented to the community. Furthermore, the CPC made recommendations on emerging police technologies, and also conducted an analysis of Consent Decree compliance with outside agencies. During the Consent Decree created CPC's final meeting, the Commission received commendations from the City and various government entities. The Monitoring Team greatly appreciates and respects the work that has been carried out by the CPC's volunteer commissioners during their tenure, and looks forward to continued community engagement in the form of the newly established CPC under the City Charter.

## 2. District Policing Committees

| Paragraph | Status of Compliance |
|---|---|
| 23. Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |
| 24. CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | **NON-COMPLIANCE** |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | **PARTIAL COMPLIANCE** |

In a welcomed change from previous reporting periods, the City has begun to make progress toward fulfilling its requirements toward creating District Policing Committees (DPCs) under the Consent Decree. This was demonstrated during their presentation to the CPC, which took place on May 19, 2022. This was the first such presentation of this kind and provided a promising start to a practice that is required to occur on at least an annual basis, per paragraph 26 of the Consent Decree. At the May 19th presentation, all district officers who presented on behalf of the DPCs were enthusiastic and engaging. Each district presentation included information on community demographics, strategies to address crime and safety issues, and identified community safety concerns. Some of the district presentations included strategies to increase participation and diversification of DPC membership, but all districts must make significant efforts toward this goal,

as mandated by paragraph 24 of the Consent Decree. In order to successfully comply with the Consent Decree, all districts will need to develop and execute outreach strategies to increase each DPC's participation and reach.

Beyond requiring the above described DPC presentations to the CPC, the 2022 Monitoring Plan[10] also specifically called for increased advertisements for DPCs. Based on the materials provided to the Monitoring Team during this reporting period, there appears to be a considerable increase information sharing to the public. Nevertheless, the usage of the legacy term "District Community Relations Committee" causes the Monitoring Team to continue to question whether CDP has fully embraced the transition and reimagined the composition of the DPCs as required by the Consent Decree.

[10] 2022 Monitoring Plan can be found here.

## IV. COMMUNITY & PROBLEM-ORIENTED POLICING

| Paragraph | Status of Compliance |
|---|---|
| 27. Implementation of "comprehensive and integrated community and problem-oriented policing model" by the City. | **PARTIAL COMPLIANCE** |
| 28. Ensuring that "mission statement reflects [the Division's] commitment to community-oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **OPERATIONAL COMPLIANCE / PARTIAL COMPLIANCE** |
| 29. Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **PARTIAL COMPLIANCE** |
| 30. Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically identified areas. | **PARTIAL COMPLIANCE** |
| 31. Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32. CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33. Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34. "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles. Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

As reported in the Tenth Semiannual Report, CDP has made some progress toward implementation of the mandates required for Community & Problem-Oriented Policing (CPOP) under the Consent Decree. During the last reporting period, the Division made significant strides developing their

Brazos system,[11] which provides the foundation for data gathering in the areas of Search and Seizures, Community Engagement, Community and Problem-Oriented Policing, and Crisis Intervention. Since the Monitoring Team's last report, CDP's CPOP General Police Order (GPO) and the CPOP Data Collection training were finalized and filed with the Court (updated and filed March 1, 2022). Furthermore, early on in this reporting period, the Division provided the CPOP Data Collection training to the entire Division to jumpstart use of the Brazos data collection system for CPOP data. CDP has reported that CPOP data were not captured in the Brazos system until March 1, 2022. Therefore, while CDP reports that they've been collecting CPOP data since March of 2022, the Monitoring Team has not yet received or reviewed said data. CDP plans to produce its first report on its CPOP data in 2023, and the Monitoring Team looks forward to analyzing the data as well in a future compliance review on CPOP. The Monitoring Team continues to emphasize that while CPOP data collection is certainly important for fulling Consent Decree mandates, this must be coupled with CDP's ability to demonstrate a change in culture by embracing and enacting CPOP principles throughout the Division.

The Monitoring Team will soon be determining when it will conduct its assessment of CDP's CPOP efforts to measure CDP's success at fulfilling its CPOP-related requirements under the Consent Decree.

[11] https://www.tylertech.com/products/brazos

## V. BIAS-FREE POLICING

| Paragraph | Status of Compliance |
|---|---|
| 35. Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **PARTIAL COMPLIANCE** |
| 36. "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 37. CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **PARTIAL COMPLIANCE** |
| 38. "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **OPERATIONAL COMPLIANCE** |
| 39–40. Develop bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas within 18 months of the Effective Date. | **OPERATIONAL COMPLIANCE** |
| 41. Supervisor training on bias-free policing and procedural justice issues covering specific areas | **NON-COMPLIANCE** |
| 42. Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **PARTIAL COMPLIANCE** |
| 43. Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | **NON-COMPLIANCE** |
| 44. Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **PARTIAL COMPLIANCE** |

While CDP's Training Section has made significant strides in a number of areas, there continues to be an outstanding need in the area of bias-free course curriculum and training. The Training Section readily identified the existing gap and has been working to potentially address it by contracting with an outside third-party vendor. In the meantime, CDP has had to rely on the use of Cultural Humility Training provided to the Division by the Ohio Peace Officer Training Commission. CDP was able to make some key additions to the four-hour training provided by the State. Those additions included details regarding CDP's Bias-free Policing policy. However, relying on outside training for this key Consent Decree deliverable is less than ideal; bias-free policing is an essential aspect of changing CDP's culture and strengthening its relationship with

the community, and reinforcing this through its own, CDP-specific bias-free training is important. The Monitoring Team will continue to assess the Division's progress in this essential area of the Consent Decree.

The Decree also requires the Division to provide "[d]istrict-level cultural competency training regarding the histories and culture of local immigrant and ethnic communities."[12] The Division worked with the Monitoring Team, Department of Justice, and a CPC co-chair to develop District Neighborhood Awareness trainings comprised of the appropriate scope, quality, and content. After more than three years of work on this deliverable, representatives from the Training Section of CDP delivered the training in all five police districts. The trainings were well-attended. Of the 887 officers reportedly eligible for the training, 825 of them completed the one-hour training. Thirty-six officers did not attend due to being on extended illness, restricted status, suspension, or military leave. Another twenty-six officers did not participate for other reasons and the Division has indicated they will be rescheduled to receive the training. Overall, the Division achieved nearly a 94% completion rate for officers who were eligible for the training.

Members of the Monitoring Team and Department of Justice observed more than a dozen District Neighborhood Awareness training sessions across all five districts. We observed instructors who were prepared and enthusiastic. Participating officers remained alert and responsive to questions posed by instructors. Each training covered topics such as diverse populations of each respective district and information related to uprisings in the 1960s. The training provided some definitional discussion of cultural competency, cultural humility, ethnicity, and intersectionality. The Court-approved curriculum also required the instructors to discuss more recent critical incidents of compelling public interest that has fostered community distrust of officers. Only after attending multiple training sessions that were delivered across the City, did individual members of the Monitoring Team realize the collective failure of the Division to cover this critically important information, despite years of work to develop a comprehensive curriculum designed to satisfy the requirements of the Consent Decree. The Monitoring Team recognizes this neighborhood training was delivered in a manner unlike the typical District-wide trainings delivered at the Academy. For that reason, it was not possible to provide real-time feedback to the Training Section commander as normally occurs. The Division has not provided any explanation for the failure to ensure that all trainings adequately covered the Court-approved curriculum. Additionally, the Monitoring Team and Department of Justice have repeatedly urged the Division to involve subject-matter experts and community leaders as members of their instructional team to ensure that participants are gaining accurate and informed insights. The Division is required to deliver this training annually. The Monitoring Team will continue to assess its progress and provide updates to the Court.

[12] Dkt. 413-1, Ex. A ¶40.

# VI. USE OF FORCE

## 1. Officer Use of Force Principles & Policy

| Paragraph | Status of Compliance |
|---|---|
| 45. "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **PARTIAL COMPLIANCE** |
| 46. "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **PARTIAL COMPLIANCE** |
| 47. Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **PARTIAL COMPLIANCE** |
| 48. "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **PARTIAL COMPLIANCE** |
| 49. Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **OPERATIONAL COMPLIANCE** |
| 50. "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **OPERATIONAL COMPLIANCE** |
| 51. Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **OPERATIONAL COMPLIANCE** |
| 52. "No officer will carry any weapon that is not authorized or approved by CDP." | **OPERATIONAL COMPLIANCE** |
| 53. "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | **OPERATIONAL COMPLIANCE** |
| 54–83 "The City will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 84. CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly listed elements. | **OPERATIONAL COMPLIANCE** |
| 85. CDP "will provide the use of force training described in paragraph 84 to all new officers." | **OPERATIONAL COMPLIANCE** |
| 86. "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 87. "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | **GENERAL COMPLIANCE** |
| 88. Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | **OPERATIONAL COMPLIANCE** |
| 89. "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | **OPERATIONAL COMPLIANCE** |
| 90. "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | **OPERATIONAL COMPLIANCE** |
| 91. Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | **OPERATIONAL COMPLIANCE** |
| 92. "Use of Force Reports will be maintained centrally." | **OPERATIONAL COMPLIANCE** |

### a. Reviewing Use of Force

In October 2020, a select group of Monitoring Team members reviewed CDP's use of force incidents that occurred between 2018 and 2019 to test whether officers apply force in a manner that complies with the Division's new policies and terms of the Consent Decree. The findings from this assessment were summarized in a memorandum filed with the Court on March 22, 2022.

The Monitoring Team assessed a sample of 130 use of force incidents. The sample consisted of all Level 3 force cases, and a statistically representative sample of Level 1 and Level 2 cases, with an oversample of non-firearm Level 1 cases. Each of the Level 2 and 3 cases in the sample were assessed by two Monitoring Team reviewers, while Level 1 cases were each assessed by one reviewer. The Monitoring Team created, tested, and refined a qualitative assessment instrument that was endorsed by the City and Department of Justice.

The Monitoring Team found that the uses of force reviewed were generally within policy, the chain of command reviews appropriately identified and addressed problematic uses of force by referring cases to Internal Affairs or the Training Division, and supervisors on scene engaged with officers.

That said, the Monitoring Team's review did highlight a few deficiencies by CDP officers in tactics, and the ability to deescalate, both of which at times created the need for force. The Monitoring Team was also concerned that use of force reviews by the chain of command continue to take months to complete. Policy 2.01.06 dictates that "each level in the chain of command shall review the [use of force] report within three tours of duty"; conversely the Monitoring Team's reviews indicated that they could take as long as several months. Understanding that Policy 2.01.06 went into effect in 2021 and the cases the Monitoring Team subject matter experts reviewed were from 2018 and 2019, the purpose for noting the delays in this document serves to advise the City and the CDP that review timelines will be a focus of upcoming compliance reviews and assessments of use of force cases. Finally, the Monitoring Team concluded that the Division needs to create processes and structures for issues identified during use of force events, such as inadequate de-escalation or problematic tactics, to be addressed in training.

The Monitoring Team has identified some problematic trends relating to the investigation of officer-involved shootings. In July 2021, the Monitoring Team reviewed two fatal officer-involved shootings that were investigated by the Force Investigation Team (FIT). Overall, the Monitoring Team identified substantial issues and concerns regarding the two investigations. We identified problems with respect to the timeliness of the investigations, and the quality of the interviews of the subject officers. In addition, we found that the investigation reports contained indicators of pro-officer bias. Ultimately, we classified the investigations as "poor" and not in compliance with the Consent Decree. As of this writing, the Monitoring Team is poised to begin a comprehensive assessment of FIT investigations and will be able to report on current practices and compliance after its conclusion.

In addition, the Monitoring Team recently learned of a use of force incident that resulted in a CDP officer being shot and injured by a fellow officer. Based on our current understanding, this incident was not properly documented, investigated, or disclosed to the Monitoring Team in a manner consistent with CDP policy or the requirements of the Consent Decree. The Monitoring Team has launched an in-depth review of this case to determine what occurred, how it was investigated and reported, and the impact on compliance.

The Monitoring Team is now engaged in ongoing quarterly reviews of uses of force to formally assess CDP's compliance with Section VI of the Consent Decree and continues to monitor use of force case data monthly at CDP's CDPStat Meetings. As these reviews and regular monitoring continue, the Monitoring Team will discuss with the Division the internal review process for use of force incidents and the process for determining the final disposition of the incident. In addition,

a comprehensive evaluation of Force Investigation Team (FIT) investigations will begin over the course of the next reporting period.

### b. In-Service Training

During the assessment period, CDP completed, after consideration collaboration with the Monitoring Team and the Department of Justice, what it referred to as its 2022 Session II In-service Training Curricula. For Session II, the use of force content was successfully woven into reality-based scenarios that covered use of force concepts alongside search and seizure policy and legal requirements. Specifically, the scenarios covered important use of force requirements such as force only being used when necessary, objectively reasonable and proportionate to the level of resistance, and the on-going obligation to de-escalate interactions. The approved scenario training used a commendable variety of adult learning techniques, including question-and-answer, scenario-based training, written assessments, and debriefing.

Furthermore, CDP submitted the 2022 Session III In-service Training Curricula for approval during this reporting period. Session III topics include active threat response, subject control, Question, Persuade, Refer (QPR), Active Bystandership for Law Enforcement (ABLE), and ASP Baton, oleoresin capsicum (OC) Spray. Initially, CDP submitted a complex "Stress Scrambler" live-fire scenario that combined use of force decision making and reporting, de-escalation, required uses of wearable camera systems (WCS) and integrating it into the scenarios, and use of the patrol rifle. CDP has informed the Monitoring Team that this scenario training will be delayed until 2023, in order to accommodate active threat response training for 2022. While Session III curriculum is still under collaboration with the Parties, the Monitoring Team has found the curriculum to be comprehensive and CDP to be responsive to feedback and looks forward to approving the curriculum in the near future. Members of the Monitoring Team plan to attend at least one Session III class for reporting out in the next semiannual report.

## 2. Use of Force Investigation and Review

| Paragraph | Status of Compliance |
|---|---|
| 93. "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **OPERATIONAL COMPLIANCE** |
| 94. Setting specific requirements relating to the investigation of low-level, Level 1 force. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 95–109. Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | **OPERATIONAL COMPLIANCE** |
| 110. "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **OPERATIONAL COMPLIANCE** |
| 111. Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **OPERATIONAL COMPLIANCE** |
| 112. Composition of FIT Team. | **OPERATIONAL COMPLIANCE** |
| 113. "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **OPERATIONAL COMPLIANCE** |
| 114. "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 115. Response of FIT to use of force scenes. FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **OPERATIONAL COMPLIANCE** |
| 116. "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **PARTIAL COMPLIANCE** |
| 117. Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 118. Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **PARTIAL COMPLIANCE** |
| 120. Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **PARTIAL COMPLIANCE** |
| 121. Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 122. Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **PARTIAL COMPLIANCE** |
| 123. Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 124–30. Establishment and operation of Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **PARTIAL COMPLIANCE** |

### a. Background

As prior semiannual reports have summarized, the Consent Decree establishes protocols for the Division to investigate uses of force based on the reported level of force. On April 22, 2020, the Monitoring Team indicated to the Court its approval of four final documents from CDP relating to the investigation of use of force incidents: (1) a Use of Force Supervisory Reviews and Investigations Policy (Supervisory Review Policy); (2) a Force Investigation Team (FIT) Manual; (3) a FIT GPO; and (4) a Memorandum of Understanding Between the Cleveland Division of Police and the Cuyahoga County Sheriff's Department to Conduct Independent Criminal Investigations of Uses of Force by Cleveland Police That Result in the Actual or Anticipated Death of a Person (MOU).

Additionally, on June 30, 2020, the Court conditionally approved the proposed Force Review Board (FRB) Policy for a period starting on the date the FRB holds its first meeting and extending for six months. The FRB serves as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective.[13] During this time, the Monitoring Team was to assess FRB operations to determine if it can effectively carry out all of the duties that the Consent Decree prescribes.

The first meeting of the FRB occurred on February 8, 2021, followed by a board on April 26, 2021. The third-quarter board took place on August 20, 2021. During the first few meetings, there were problems with the technology and audio quality which hindered the Monitoring Team and Department of Justice's ability to fully hear the discussions at the meeting. During the three FRB meetings held on December 10, 2021, March 18, 2022 and June 17, 2022 select members of the Monitoring Team were in attendance, and systematically documented observations. CDP also held on FRB on June 3, 2022 for which the Monitoring Team was not in attendance. For each FRB meeting where the Monitoring Team was present, Monitoring Team members used a qualitative

[13] Dkt. 413-1 at ¶ 124.

instrument to document the FRB process, and compliance with CDP policy and the requirements of the Consent Decree. As described in detail below, this process revealed that most cases are being done in a manner consistent with policy and the Consent Decree; however, significant concerns that must be addressed have also been raised throughout the process.

The Monitoring Team remains concerned with the timeliness of reviews of use of force incidents, as the delays in chain of command reviews negatively impact the ability of CDP to fully adjudicate use of force cases promptly. As we currently engage in assessments of use of force events, FIT investigations, FRB processes, and discipline imposed by the Chief of Police, identifying sources of, and contributing factors to delays remains a top priority. The Monitoring Team is focused on ensuring that issues relevant to use of force that may be addressed through training, counseling, policy, and/or discipline are resolved quickly and effectively.

### 3. Force Review Board

For this semiannual report, the Monitoring Team is not reporting out on the specific quantitative findings from the ongoing FRB assessment, preferring to address these statistics and their implications in a standalone memorandum. Instead, we will briefly mention high level observations from the past three meetings.

Reviewers found most, but not all the presentations, provided an accurate, objective summary of the facts, and were inclusive of information material to evaluating the circumstances of each case, decision making, and the legal basis for searches, detentions, arrests, and other actions. Reviewers did note some potential sources of bias being introduced during presentations, such as the inclusion of information that vouches for the reputation of officers while failing to objectively review the use of force in question. This type of unobjective advocacy for officers distracted from problematic behavior displayed during the use of force incidents.

On multiple occasions, Monitoring Team members observed the presenter was also a member of the FRB and voted on the case that they presented. This highlights a conflict of interest that, per Policy 2.01.08, compromises the integrity of the process. Policy 2.01.08 states "FRB member shall immediately notify the Chair upon learning that abstention is necessary to avoid a conflict of interest."

Lastly, throughout many of the FRB meetings, numerous issues around WCS policy, equipment, and training have arisen, including officers' inability to activate cameras on motorbikes, clarification on when WCS may and may not be used (specifically in hospital settings), discussion on use of WCS when working with federal task forces, and issues related to battery life and mounting systems. The Monitoring Team will continue to track these issues and anticipates that CDP will address them through the appropriate channels.

While the Monitoring Team's high-level findings and observations indicate that the Division is operationally in compliance, the Monitoring Team finds that holding meetings quarterly precludes a timely review (most cases are reviewed 4-6 months after the use of force). Further, in two of the last three meetings, the Board did not have enough time to review all the cases. Monitoring Team members found that some of the issues related to running out of time were preventable, as the FRB at times focused on minutia irrelevant to the use of force analysis, while glossing over more salient force-related concerns. Increasing the frequency of FRB meetings from the current quarterly cadence could address the need for the Division to handle matters expeditiously.

### 4. Force Investigation Team Assessment

The Monitoring Team has developed a methodology to assess Force Investigation Team ("FIT") investigations to ensure compliance with CDP policy and the requirements of the Consent Decree. This methodology is in the process of being shared with the Parties, and once the methodology has been finalized, assessment activity will commence during the next reporting period.

### 5. CDP Data Collection

During this reporting period on April 22, 2022, CDP published its 2021 Use of Force Report. The Monitoring Plan did not require a review period by the Parties prior to publication. That said, both the Department of Justice and the Monitoring Team found issues with how the data were presented and interpreted in tables and figures, and we expect future publications to include analyses that contextualize and explain the data.

The Monitoring Team received an "Outcome Measure Report" data file from CDP on July 13, 2022. This file includes information relevant to CDP's required use of force reporting. The Monitoring Team has reviewed the data and submitted several questions for follow-up from the Division, to which it did receive a response. These data are described in greater detail in the Outcome Measures section of this report.

The Monitoring Team has noted, based on data provided during CDPStat presentations by the Division, that use of force numbers are up slightly, year to date, relative to 2021. In particular, events involving firearm points are up measurably, year to date, over both 2021 and 2020. We will continue to track these trends during our regular communications with CDP, and look forward to the Division's own assessments of the patterns in these data, and analysis of possible drivers and responses.

## VII. CRISIS INTERVENTION

| Paragraph | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | **OPERATIONAL COMPLIANCE** |
| 132. Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | **GENERAL COMPLIANCE** |
| 133. Composition of Advisory Committee. | **GENERAL COMPLIANCE** |
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 135. Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | **PARTIAL COMPLIANCE** |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **GENERAL COMPLIANCE** |
| 137. CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **GENERAL COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **GENERAL COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 141. "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **PARTIAL COMPLIANCE** |
| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **OPERATIONAL COMPLIANCE** |
| 143. Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 144. Initial and annual crisis intervention training for dispatchers and call-takers. | **OPERATIONAL COMPLIANCE** |
| 145. "The City will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **PARTIAL COMPLIANCE** |
| 146–47. Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **OPERATIONAL COMPLIANCE** |
| 148. Designation of specialized CIT officers, per specific, expressly-listed requirements. | **OPERATIONAL COMPLIANCE** |
| 149. "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **PARTIAL COMPLIANCE** |
| 150. "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **PARTIAL COMPLIANCE** |
| 151. "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **PARTIAL COMPLIANCE** |
| 152. "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements. The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **PARTIAL COMPLIANCE** |
| 153. City "will consider" crisis intervention program assessment by Ohio Criminal Justice Coordinating Center of Excellence. | **GENERAL COMPLIANCE** |
| 154. CDP "will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 155. CDP "will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals . . . to the health care system, rather than the judicial system . . . where it is appropriate to do so." | **OPERATIONAL COMPLIANCE** |
| 156. CDP policies and procedures will ensure that "specialized CIT officers . . . must be dispatched to all calls or incidents that appear to involve an individual in crisis." CDP must "track incidents in which a specialized officer was not dispatched to such calls" and "identify any barriers" to ensuring dispatch of specialized CIT officer to such calls. | **PARTIAL COMPLIANCE** |
| 157. "CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum," specific, expressly-identified data. | **OPERATIONAL COMPLIANCE** |
| 158. Public reporting of paragraph 157 data and provision to Advisory Committee. | **OPERATIONAL COMPLIANCE** |
| 159. "The City will utilize" paragraph 157 data "to identify training needs and develop case studies and teaching scenarios" for training and other expressly-identified systemic purposes. | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires the Division to build and enhance its Crisis Intervention Program with the goals of:

- Assisting individuals in crisis;
- Improving the safety of officers, consumers, family members, and others within the community;
- Providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and
- Reducing the need for individuals with mental illness to have further involvement with the criminal justice system.[14]

### b. Where the Division Stands

The Tenth Semiannual Report noted many of the tasks set forth in the Consent Decree have reached operational or general compliance. The Division has completed four annual in-service trainings for all officers and is close to completing this year's in-service training. Additionally, the Division has completed an initial training for call-takers, dispatchers, and supervisors and has continued to train new dispatchers in the court-approved behavioral curriculum. The Division is working with the ADAMHS Board to increase the number of specialized Crisis Intervention Team (CIT) Officers by completing three CIT Officer 40 Hour Trainings per year. New information systems processes have provided improved data collection. Expanded professional expertise has helped

[14] Dkt. 413-1 at ¶ 131.

organize more targeted data reports. These data reports are helping to identify areas for further improvements in responding to individuals experiencing a behavioral crisis.

#### i. The Mental Health Response Advisory Committee and the MHRAC Subcommittees: Training, Community Engagement, Diversion and Quality Improvement

The Division, the Department of Justice and the Monitoring Team view the work of the Mental Health Response Advisory Committee (MHRAC) as a key factor in the Division's successful work to meet the tasks set forth in the Consent Decree. MHRAC will retain a unique role as the Consent Decree moves towards the outcome phase and eventual completion of the agreement. CDP has emphasized the importance of maintaining the community partnerships between CDP and the members of MHRAC past the end of the Consent Decree. However, MHRAC's leadership has been clear that additional work is needed to transition MHRAC to a group that will maintain its contribution to the Division and City of Cleveland. To this end, the MHRAC leadership has committed to a review of MHRAC's goals and structure at an upcoming general membership meeting to develop a strategy to retain the group's sustainability beyond the life of the Consent Decree.

The positive picture of CDP and MHRAC, while accurate, has not been without challenges. A community member of a Task Force updating the CDP Crisis Intervention Policies noted that a policy had been posted to an updated CDP website that was not consistent with the court-approved version. A line about the role of EMS was dropped from the policy. Unfortunately, the response to this issue was not timely and raised concerns of MHRAC members. The Monitoring Team called CDP's attention to this matter and eventually the correct policy was uploaded to the website and subsequently used in the process of revising the Crisis Intervention Policy. This incident can put the progress CDP and MHRAC have made at risk and could have potentially undone some of the community trust that has developed. The challenge for CDP and MHRAC in the future will be to stay alert for such incidents and respond successfully without the involvement of the Monitoring Team and Department of Justice.

MHRAC's Training Subcommittee under the leadership of chair Shannon Jerse of St. Vincent Hospital, and the technical assistance provided by Carole Ballard of the Alcohol, Drug Addiction & Mental Health Services (ADAMHS) Board, took on a series of responsibilities in developing the CDP Crisis Intervention training. The committee worked with CDP to obtain court approval for a new in-service curriculum on homelessness, completed the approval process for use of the State of Ohio Peace Officer Training Commission (OPOTC) Basic Recruit curriculum, and developed an initial draft of a revised curriculum for call-takers, dispatchers, and supervisors. Initial feedback from the in-service training has been very good with close to 70% of participants rating the training as increasing their knowledge and learning. Similar feedback from the call-

takers and dispatchers training was equally positive with trainees actively engaged in the practical activities including listening to tapes that were recorded live and viewing behavioral health-related videos. The Training Committee's success over several years has led the subcommittee members to have a reputation as a hard-working, civic-minded group.

MHRAC's Community Engagement Subcommittee is chaired by Beth Zietlow-DeJesus, ADAMHS Board Director of External Affairs. The subcommittee's work focuses on community engagement activities and includes an ongoing update of resources cards for each CDP District. The committee has struggled with limitations imposed by the pandemic, given the inability to organize public gatherings. However, the committee has worked to promote community knowledge about the work of MHRAC through promoting awareness of the MHRAC Annual Report. The Community Engagement Subcommittee worked with various media organizations to create live radio shows on WOVU with Rev. Gohlstin, WCPN's Sound of Ideas and CW Focus making use of presentations by CDP, the ADAMHS Board, Frontline Services, Policy Matters Ohio, and the Monitoring Team. Finally, the subcommittee has been working on a hybrid series in Partnership with Cleveland's TV20 on "Conversations about Mental Health and Substance Use Crisis Response in Cleveland."

After discussion and review at MHRAC's Monthly Meeting, a decision was reached to move the MHRAC Diversion Subcommittee to the County Diversion Board which oversees the new County Diversion Center. Larry Heller continued as a co-chair of the Diversion Subcommittee which is now re-formed as Diversion Community Input Committee. He was joined in this capacity by co-chair LaTonya Goldsby of Black Lives Matter, Cleveland. This new committee will continue to liaise with MHRAC and provide community input to the Diversion Center. The new center provides diversion opportunities for not only law enforcement agencies, also intervention options for the public at large.

MHRAC's Quality Improvement Subcommittee (QI), which was chaired by Deputy Chief Joellen O'Neill during this reporting period, has taken on a critical role for the Consent Decree. The Consent Decree notes that CDP will track calls and incidents involving individuals in crisis to identify training needs and develop case studies and teaching scenarios. The CDP data reports have made use of CDP's and MHRAC's early work in developing a comprehensive Behavioral Health Form. CDP has worked to improve the officer response rate to the form and the available data is becoming more representative of CDP crisis intervention events. As reported previously, some key aspects of the new policy are already showing results.[15] Officers are making greater use of EMS when needed, which was one of the goals of the new CDP Crisis Intervention Policy. The arrest rate has remained very low, as has the injury rate to officers and community members. The incidents of violence or the presence of weapons is also low, which helps to change the stereotypes that lead to stigma associated with behavioral health issues. Such data has led to discussions with

[15] Ninth Semiannual Report at 81.

relevant social service agencies such as the YWCA Normal Herr Women's Shelter, CDP, the ADAMHS Board, and MHRAC in order to problem-solve and offer solutions to difficult situations.

As noted, CDP's enhanced data collection has allowed the Quality Improvement Subcommittee to achieve a level of data specificity that enables them to identify and examine specific issues and patterns of potentially problematic performance indicators at an early stage. For example, the QI Team identified a subset of 2021 crisis intervention cases in which African American juvenile females were disproportionately being handcuffed. CDP representatives at the meeting noted the potential importance of this data and indicated that this result could present an opportunity to improve the Division's crisis intervention work. Dr. Ronnie Dunn, a member of the Monitoring Team with expertise in the area of racial profiling and diversity, equity, and inclusion, was brought in to provide technical assistance to the QI team in examining this issue for potential bias, particularly racial. After a thorough examination of the statistical data, it was determined that it would be necessary to review the WCS video footage from all 2021 crisis intervention cases in which juvenile females were handcuffed. Eventually, the Monitoring Team convened a five-member committee and developed an instrument to assess the crisis incidents. This audit is nearing completion, and the results should provide CDP and the QI Team with a model to inform further analysis of this issue using a larger sample including crisis intervention cases involving juvenile female subjects across multiple years. It is anticipated that the pilot will provide information to guide CDP and the MHRAC QI Subcommittee towards further improvements in the Division's Crisis Intervention work.

### c. Progress and Tasks that Remain

#### i. Continued Selection and Training of Specialized CIT Officers

The selection and training of Specialized CIT Officers has continued during the past two years, despite significant challenges related to the pandemic. The specialized training of CIT Officers is best done as in-person training with intensive scenario work. The pandemic limited the ability to conduct this type of training. The Division understandably faces challenges in the recruitment and selection process. The level of leadership required from CDP officers means they must volunteer for the training without extra financial compensation. Despite these challenges, CDP appears to have developed a steady stream of qualified applicants. As with last year, there are a number of future selection and training cycles planned. As discussed in the last semiannual report, the Division has been responsive to and worked hard to make these goals a reality. A number of CDP crisis intervention leaders have recently retired. As a result, Deputy Chief Joellen O'Neill has stepped back in as the acting CIT Coordinator and a Co-Chair of MHRAC. MHRAC members have made a point of complimenting the Deputy Chief for her work. The training of the Specialized CIT Officers represents the capstone of the Division's efforts to set in place a successful crisis intervention program. As the number of trained Specialized CIT Officers approaches 100, the

Division is approaching a point where a critical mass of such officers will have the opportunity to make a meaningful difference in the Division's crisis intervention strategy.

### ii. The Role of the Quality Improvement Subcommittee

As mentioned in the last semiannual report, the opening paragraph of the Crisis Intervention section of the Consent Decree ends with "The Crisis Intervention Program will provide a forum for effective problem solving regarding the interaction between criminal justice and mental health care system and create a context for sustainable change."[16] CDP and the MHRAC QI subcommittee are clearly moving towards this goal. The expanded CDP information system has now provided a data-driven method for effective problem solving. As discussed in the previous report,[17] given the partnership between the community, local law enforcement such as CDP, educational institutions such as Case Western University and the local behavioral health authority such as the ADAMHS Board, MHRAC is positioned to make ongoing improvements in responding to behavioral crisis events. CDP has the opportunity to examine outcomes on a level not available to very many departments in this country. The ability to make positive changes based on the available data will be determined by the strength of the relationship that has been built between CDP, MHRAC and the Cleveland community. Capitalizing on the opportunity being presented is the challenge ahead for the MHRAC Quality Improvement Committee.

### iii. The Future of the Mental Health Response Advisory Committee

As discussed at several points in this report, the Mental Health Response Advisory Committee is at a critical point if it is to become an on-going part of the Cleveland community. MHRAC has served a valuable purpose for the Division. It is important to have a place where challenging issues can be addressed and solved. However, the Consent Decree has a limited lifespan. MHRAC's next retreat will set the tone for MHRAC's future.

[16] Dkt. 413-1 at ¶ 131
[17] Tenth Semiannual Report at 18.
.

## VIII. SEARCH AND SEIZURE

| Paragraph | Status of Compliance |
|---|---|
| 160. “CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below,” and conform to expressly-identified principles. | **PARTIAL COMPLIANCE** |
| 161–65. Policy requirements for officers for stops, searches, and detentions. | **PARTIAL COMPLIANCE** |
| 166. “Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged,” and “the supervisor will respond to the scene.” | **PARTIAL COMPLIANCE** |
| 167. “Officers will not use ‘canned’ or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests.” | **PARTIAL COMPLIANCE** |
| 168. “Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports.” CDP “will train officers” on documenting stops. “Supervisors will review all documentation of investigatory stops, searches, and arrests.” | **PARTIAL COMPLIANCE** |
| 169. Supervisor will review of “each arrest report by officers under their command,” with supervisors reviewing reports for specific, expressly-identified deficiencies. | **PARTIAL COMPLIANCE** |
| 170–72. Supervisory review of investigatory stops, searches, and arrests. | **PARTIAL COMPLIANCE** |
| 173. Provision of “initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements” of the Consent Decree that “will address the requirements of Fourth Amendment and related law, CDP policies,” and specific, expressly-identified topics. | **OPERATIONAL COMPLIANCE** |
| 174–75. Provision of “annual search and seizure in-service training that is adequate in quality, quantity, type, and scope” incorporating specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires that CDP “revise, develop, and implement” policies on how its officers “conduct all investigatory stops, searches, and arrests with the goal” that such actions

comply with the "Constitution, state and federal law."[18] In addition to ensuring that officers adhere to these legal requirements, the policies also must prohibit officers from relying on a subject's "race, ethnicity, gender, and perceived sexual orientation" as a reason to stop, search, or arrest an individual.[19]

In the Tenth Semiannual Report, the Monitoring Team documented CDP's completion of policies associated with Search and Seizure, in addition to the training that accompanied the new policies. We also reported on officers' use and completion of the new electronic "Stop Forms," created to collect various data points required by the Consent Decree in a systematic way across the Division. The Tenth Semiannual Report outlined how the Monitoring Team will evaluate the outcome of CDP's stops to determine both the compliance with and the impact of the new policies and procedures after a material period of time.

### b. Where the Division Stands

In this report, we note that an approximately six-month period of data collection, from July - December of 2021, provided the basis for CDP's initial analysis of the use of the Search & Seizure Stop Form. CDP submitted a draft of this initial Search & Seizure Report for review at the end of May 2022. The Monitoring Team and Department of Justice raised a number of questions about CDP's analysis of the Search and Seizure data it collected, and the Parties plan to meet in September of 2022, to discuss the report and the feedback provided.

As noted above, the Monitoring Team will also conduct an assessment of the implementation of the Search & Seizure policies and procedures, in addition to assessing the Stop Form data, which is currently being developed. We anticipate that this pilot audit will be conducted in the Fall of 2022. This assessment will specifically examine the data to ensure officers adhered to the prohibition against using a subject's perceived "race, gender, and sexual orientation" as the reason to stop, search, or arrest an individual. The audit will also examine a representative sample of the stops to ascertain whether officers had and articulated appropriate legal grounds for any stop, detention, search and seizure (i.e., arrest). In addition, this audit will entail an examination of whether supervisors met their requirements in accordance with the policies approved and on file with the Court, and the Consent Decree.

Both CDP's Search & Seizure Report and the Monitoring Team's assessment will be included in the next semiannual report. As for the status of compliance relative to this semiannual report, the table associated with the relevant paragraphs of the Consent Decree remains unchanged from the Tenth Semiannual Report, reflecting "Partial Compliance" in relation to all except paragraph 173, which had met "Operational Compliance."

[18] Dkt. 413-1 ¶ 160.
[19] Dkt. 413-1 ¶ 161; Dkt. 97 at 42.

## IX. ACCOUNTABILITY

| Paragraph | Status of Compliance |
|---|---|
| 176. "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **PARTIAL COMPLIANCE** |

The Monitoring Team continues to conduct a series of assessments to determine to what extent CDP is in compliance with paragraph 176. As reported in our Tenth Semiannual Report, thus far, the Monitoring Team has evaluated discipline imposed by the previous Director of Public Safety and a small sample of police internal investigations. The Monitoring Team has also provided both public reports and technical assistance with the intent of assisting the City in coming into compliance with required police accountability provisions.

Since the time of our last report, we have also completed a formal preliminary assessment of the adjudication and investigation of a sample of community complaints made to the Office of Professional Standards (OPS). That assessment was published during this six-month reporting period and dated February 24, 2022. That assessment acknowledged dramatic improvements in the quality of OPS investigations and the CDP's processes for adjudicating community complaints. It also highlighted a continued need for improvement in the quality of OPS interviews. The Monitoring Team also reiterated a need for OPS investigators to receive formal feedback through performance evaluations as a critical component of ensuring investigators have the skills necessary to complete fair and competent investigations.

An assessment regarding the imposition of discipline by the Chief of Police is in process. That report is scheduled to be published during the next semiannual reporting period. Additional assessments will be conducted regarding the quality of Force Investigation Team (FIT) investigations, Internal Affairs investigations, and the quality of OPS investigations and Police Review Board (PRB) adjudications of non-sustained allegations. The Monitoring Team also intends to reevaluate compliance in relation to the imposition of discipline by the Director of Public Safety after a sufficient period of time has passed since the Monitoring Team's last review.

### 1. Internally Discovered Misconduct

| Paragraph | Status of Compliance |
|---|---|
| 177. "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | **NON-COMPLIANCE**[20] |
| 178. "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | **OPERATIONAL COMPLIANCE** |
| 179. Qualifications for IA investigators. | **PARTIAL COMPLIANCE** |
| 180. Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly- identified topics. | **GENERAL COMPLIANCE**[21] |
| 181. "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **PARTIAL COMPLIANCE**[22] |
| 182. "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **PARTIAL COMPLIANCE** [23] |
| 183. IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **PARTIAL COMPLIANCE** |
| 184. IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **PARTIAL COMPLIANCE** |

[20] A new Internal Affairs Superintendent was appointed by the CDP on May 31, 2022. During the next reporting period, the Monitoring Team will confer with the Parties to determine an appropriate timeline for a comprehensive evaluation of the quality and timeliness of CDP Internal Affairs investigations. As previously reported, the Monitoring Team believes that any such assessment will need to wait until the new Internal Affairs Superintendent has been given an opportunity to make any necessary reforms and changes to Internal Affairs practices and investigations.

[21] With new staff expected to be assigned to Internal Affairs in the next reporting period, the Monitoring Team will evaluate the timing and quality of initial training to ensure ongoing compliance in this area.

[22] The Monitoring Team is looking forward to receiving ongoing information from the new IA Superintendent that will establish ongoing and adequate training for IA staff.

[23] The Monitoring Team will be unable to conduct an assessment of compliance with paragraphs 182 through 188 until a comprehensive evaluation of IA case investigations can be conducted.

| | |
|---|---|
| 185. IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **NON-COMPLIANCE** |
| 186–87. IA investigative report requirements. | **PARTIAL COMPLIANCE** |
| 188. Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **NON-COMPLIANCE** |
| 189. "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **OPERATIONAL COMPLIANCE** |
| 190. "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | **OPERATIONAL COMPLIANCE** |
| 191. "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **OPERATIONAL COMPLIANCE** |
| 192. "Officers who retaliate . . . will be subject to the disciplinary process." | **PARTIAL COMPLIANCE** [24] |

### a. Background

To comply with the terms of the Consent Decree, CDP's Internal Affairs (IA) unit must "conduct objective, comprehensive, and timely investigations of internal allegations of officer misconduct." Ultimately, IA must be the primary engine for the Division's administrative (non-criminal) investigations of officer misconduct and, more generally, the main oversight mechanism for ensuring that the Division's performance standards are being met.

### b. Where Internal Affairs Stands Now

#### i. Quality of Internal Affairs Investigations

As previously reported, the Monitoring Team completed a preliminary assessment of a sample of IA case investigations using a qualitative methodology. This sample was chosen by the former IA

[24] As noted in our prior report, allegations have been made that Internal Affairs failed to appropriately investigate a specific allegation of retaliation. The Monitoring Team has requested that the City initiate an independent investigation into these allegations, which has not yet been done. Until an independent investigation is conducted and findings adjudicated, the City will not be able to establish full compliance as it relates to this paragraph of the Consent Decree.

Superintendent. Overall, the Monitoring Team identified substantive issues of concern in three out of eight of the reviewed cases. We provided feedback to IA that detailed the nature of those substantive concerns including the use of leading questions, the need to follow-up on objective evidence to assist in determining the veracity of officers and the quality of findings. The Monitoring Team is currently waiting for the new IA Superintendent to advise that IA is ready for a more comprehensive assessment of its case investigations.

#### ii. Quality of Fatal Use of Force Investigations

As previously reported, in 2021 the Monitoring Team conducted a review of two fatal uses of force investigations conducted by the Force Investigations Team (FIT), about incidents which took place in 2019 and 2020. The Monitoring Team classified both FIT administrative investigations as "poor" and not in compliance with the Consent Decree. The Monitoring Team has not conducted a thorough review of any more recent FIT cases and is scheduled to review FIT cases during the latter part of 2022 and will be able to report on more current FIT practices after completing that assessment.

#### iii. Internal Affairs Superintendent

On May 31, 2022, a new Internal Affairs Superintendent was appointed by the Division; former CDP Inspector General and Cuyahoga County Sheriff Chris Viland. With his hire, CDP came back into compliance with paragraph 178 of the Consent Decree which requires that CDP "Internal Affairs [to]be headed by "a qualified civilian who is not a current or former employee of CDP" who "will report directly to the Chief of Police."[25] As previously noted, Superintendent Viland will need to work diligently to move Internal Affairs into compliance with Section IX of the Consent Decree as it relates to Internally Discovered Misconduct, Reporting Misconduct and Preventing Retaliation.[26] Unfortunately, it is impossible to predict how much time the new Superintendent will need to achieve compliance.

#### iv. Internal Harassment and Bias Complaints

Like many police departments around the country, CDP uses the City's Human Resources Department to investigate internal complaints relating to allegations of harassment or bias made against department employees or supervisors. The Monitoring Team has been tracking two particular cases, which were brought to our attention by the Black Shield Police Association a Division-recognized association of Cleveland police officers. In both cases, although prima facie allegations of misconduct were made by the involved officers, no timely investigations of the allegations have been made. In one case, the complaint was made to the Chief in January 2021. In

[25] Dkt. 413-1 ¶178.
[26] Dkt. 413-1 ¶176-192.

October 2021, the Monitoring Team was advised that the case was close to completion. However, the City recently informed us in July 2022 that the City is just now beginning interviews. Based upon the most recent status update, it has taken more than eighteen months for the City to commence its investigation into this matter. That is a significant delay that will not only impact the quality of the investigation, it also does not engender any reasonable belief on the part of the Monitoring Team that the City is capable of fairly adjudicating these complaints. Unless the City can ensure that these types of allegations are investigated in a timely and competent manner, Consent Decree compliance will not be forthcoming.

## 2. Office of Professional Standards ("OPS")

| Paragraph | Status of Compliance |
|---|---|
| 193. OPS investigates "all complaints of misconduct it receives" and will confer with IA "to develop polices and procedures for handling matters over which they both have investigative jurisdiction." | **OPERATIONAL COMPLIANCE** |
| 194. "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | **NON-COMPLIANCE**[27] |
| 195–96. Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 197. "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | **GENERAL COMPLIANCE** |
| 198. "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | **OPERATIONAL COMPLIANCE** |
| 199. "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 200. Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 201. Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | **NON-COMPLIANCE** |
| 202. "CDP and the City will work with the police unions . . . to allow civilian | **OPERATIONAL** |

[27] Due to the resignation of the OPS Administrator in November 2021, and the City's failure to identify a qualified candidate to permanently replace him, the Monitoring Team has reclassified paragraph 194 compliance from "Operational Compliance" to "Non-Compliance."

| | |
|---|---|
| complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **COMPLIANCE** |
| 203. CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **OPERATIONAL COMPLIANCE** |
| 204. "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 205. CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | **OPERATIONAL COMPLIANCE** |
| 206. "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **OPERATIONAL COMPLIANCE** |
| 207. "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **GENERAL COMPLIANCE** |
| 208. Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209. "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |
| 210. "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **PARTIAL COMPLIANCE**[28] |

[28] As of May 24, 2022, the OPS stopped providing the Monitoring Team and the Department of Justice with Bi-Weekly Reports that provide data regarding timeliness and handling of OPS cases. OPS has explained that due to staffing challenges, the data is not currently available. As such, we have downgraded OPS compliance in that regard from "Operational Compliance" to "Partial Compliance."

| | |
|---|---|
| 211. Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **OPERATIONAL COMPLIANCE** |
| 212. "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 213. "[A]llegations of excessive use of force" tracked as separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 214. "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **PARTIAL COMPLIANCE** |
| 215. "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **GENERAL COMPLIANCE** |
| 216. Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217. Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |
| 218. "The City will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **PARTIAL COMPLIANCE** |
| 219. "CDP will ensure that OPS has timely access to all reports related to the incident . . ," and authority of OPS "to conduct additional investigation" of any complaint of police misconduct when CDP investigation has already taken place relating to the incident. | **PARTIAL COMPLIANCE** |
| 220. "OPS investigators will attempt to interview each complainant in person" and record the interview. | **OPERATIONAL COMPLIANCE** |
| 221. "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **OPERATIONAL COMPLIANCE** |
| 222. "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **PARTIAL COMPLIANCE** |
| 223. "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **PARTIAL COMPLIANCE** |
| 224. OPS findings categories. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 225. "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **GENERAL COMPLIANCE** |
| 226. Items for consideration for OPS findings. | **PARTIAL COMPLIANCE** |
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | **OPERATIONAL COMPLIANCE** |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly- identified junctures. | **OPERATIONAL COMPLIANCE** |
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | **OPERATIONAL COMPLIANCE** |

### a. Background

The Office of Professional Standards (OPS) is the civilian-staffed office charged with investigating the complaints of civilians about Division of Police personnel. Cleveland's City Charter requires OPS to conduct "a full and complete investigation" of all community complaints of employee misconduct.[29]

As the Monitoring Team has regularly summarized, the Consent Decree includes a number of requirements—such as hiring a qualified and experienced OPS Administrator, ensuring high-quality training for investigators, establishing a separate budget for OPS, and promoting awareness throughout Cleveland about the availability of civilian complaint forms—all designed to ensure that OPS can conduct thorough and competent investigations of civilian complaints and reach findings that are supported by the preponderance of evidence.[30]

### b. Where OPS Stands Now

When monitoring first began, the OPS was suffering from an enormous backlog of civilian complaints, which had been a continuing barrier to bringing the OPS into compliance with the Consent Decree. As noted in the Eighth Semiannual Report, the City hired an outside contractor to address the backlog and successfully eliminated it.

In our Ninth Semiannual Report, the Monitoring Team noted that the OPS's open caseload had increased from 88 cases (December 2019) to 162 cases by the end of November 2020. The Monitoring Team also commented that, "the OPS backlog of cases over a year old has doubled

[29] Charter of the City of Cleveland, § 115-4.
[30] Dkt. 413-1 at ¶¶ 193-229.

from seven cases at the beginning of 2020 to 16 cases as of the end of November." In our Tenth Semiannual Report, we observed that the number of open cases has further increased to 208. In addition, the number of cases that were over one-year-old at the time had doubled to 32.

In addition, the Monitoring Team noted concern in our last report that the average number of open investigations (workload) per OPS investigator had continued to increase, with OPS staff averaging 23 investigations each, which, we noted, did "not appear to us to be a sustainable workload."

Due to the resignation of a staffer responsible for OPS administrative support, the Monitoring Team has not received a bi-weekly report since May 24, 2022. As of that date, the OPS reported 164 open cases and 28 cases exceeding a one-year anniversary date. The OPS reported the average number of open investigations per OPS investigator as 14.8 (n=163/11 investigators). While the average number of open investigations per OPS investigators has been reduced significantly, the number of old investigations (over one-year old), is still unacceptably high.

| Month | # of Assigned Active Investigations | Average per Investigator |
|---|---|---|
| December 2019 | 87 | 9.6 |
| November 2020 | 155 | 17.2 |
| June 2021 | 207 | 23.0 |
| May 2022 | 163 | 14.8 |

The OPS has reported the imminent hiring of additional administrative support for the office and has promised to, once again, provide bi-weekly reports to the Monitoring Team in the immediate future.

### c. Progress and Tasks that Remain

#### i. OPS Staff Performance Reviews

As described in the Monitoring Team's last three semiannual reports, the OPS must institute a robust employee performance review process to ensure employee adherence to OPS Court-approved policies and best practices in investigations. Thus far, although the OPS submitted a draft performance evaluation form to the Monitoring Team and the Department of Justice for comment (which was subsequently reviewed and returned to the OPS), the OPS has not reported that any formal performance evaluations have been conducted. In addition, we have been advised that the OPS Senior Investigator will be retiring during the next reporting period, which potentially leaves

the OPS without any executive staff.[31] As such, the Monitoring Team anticipates the OPS will struggle to maintain compliance over the course of the next reporting period.

### ii. Community Awareness

The Consent Decree requires that "the City and CDP, in consultation with the [CPC] and the OPS, will develop and implement a program to promote awareness throughout the Cleveland community about the process for filing complaints with OPS."[32]

The Fourth Year Monitoring Plan, anticipating the hiring of the new Community Engagement Coordinator, imposed a deadline on the completion of the draft Community Awareness Plan, required by the Consent Decree for November 30, 2019. Although new Community Engagement Coordinator was eventually hired, that staff member resigned in September 2021 and the date for the completion of the Community Awareness plan was pushed to September 2022. A new Community Engagement Coordinator was subsequently hired, and draft plan was submitted to the Monitoring Team and the Department of Justice for comment in May 2022. We provided comments back to the OPS in June and look forward to seeing a robust draft for further review and approval by the Court.

### iii. Hiring of OPS Administrator

As previously noted, the OPS Administrator resigned his position to take a police oversight position in another state in December 2021. As of the end of the reporting period, the City was still in the process of collecting applications for that position. The Monitoring Team was surprised to see that the job profile was not immediately posted to the website for the National Association for Civilian Oversight of Law Enforcement (NACOLE), which is where many oversight professionals look for job opportunities. Although the job profile was eventually posted to the NACOLE website, we remain concerned as to the lack of any apparent recruitment strategy for the position. Without the presence of a qualified OPS Administrator, the OPS will not be able to come into compliance with respect to those Consent Decree provisions that are still outstanding.

### iv. OPS Investigation Failure

On July 8, 2022, then-Interim Chief Drummond advised the OPS of his decision to issue a written reprimand to a police dispatcher, in lieu of substantial discipline, due to the failure of the OPS to provide timely notification of an OPS investigation to the dispatcher. The Monitoring Team inquired with OPS and learned that, in fact, an OPS investigator had failed to notify the subject

[31] The OPS Executive Staff consists of the OPS Administrator (vacant since December 2021), the Senior Investigator (vacancy anticipated in September 2022) and the General Manager (vacant since March 2020).
[32] Dkt. 413-1 at ¶ 201.

dispatcher of the investigation, in clear violation of the Collective Bargaining Agreement, thus resulting in the inability of the Chief to impose a suspension on the dispatcher.[33]

The OPS agreed in late August to create a checklist for investigators to use when completing their investigations to ensure similar mistakes are not made in the future. We look forward to seeing that checklist created and used in all future OPS cases.

#### v. OPS Challenges Moving Forward (Addendum)

Towards the end of the reporting period and in the weeks thereafter, the OPS has experienced significant personnel changes. Not only is the OPS without a permanent Administrator and a General Manager, it is probable that whoever ends up in these positions will be new, without institutional knowledge. In addition, the OPS recently disclosed that it is losing several experienced investigators through retirements and resignations. Moreover, as previously mentioned, the position of an OPS staffer who provided administrative support has been vacant for months, resulting in a months-long backlog in findings letters, which was only recently resolved by hiring this staffer back as an independent contractor. On top that, the OPS Management Analyst has recently resigned, making it likely that the OPS will become non-compliant with respect to the Consent Decree's data analysis requirements (see paragraph 210 compliance status, above).

Consequently, it appears as though the new OPS Administrator will be almost restarting the program from scratch, and it is quite possible that will result in OPS backsliding in compliance. The Monitoring Team will continue to stand by to provide technical assistance as necessary, but the road ahead for the OPS appears challenging.

### 3. Police Review Board ("PRB")

| Paragraph | Status of Compliance |
|---|---|
| 230. "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | **GENERAL COMPLIANCE** |
| 231. "PRB members will not be current or former members of the CDP." | **GENERAL COMPLIANCE** |

[33] The dispatcher was ultimately sustained for making Facebook posts (on an account showing her in her Cleveland police uniform) making "several comments that advocated for the neglect of the City of Cleveland infrastructure, accused all protestors of rioting, accused Black Lives Matter as being a terrorist organization, and liked a comment that protestors should be shot."

| | |
|---|---|
| 232. "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | **OPERATIONAL COMPLIANCE** |
| 233–34. Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | **GENERAL COMPLIANCE** |
| 235. PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | **OPERATIONAL COMPLIANCE** |
| 236. "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . . " PRB may "ask the investigator to conduct further investigation" as necessary. | **GENERAL COMPLIANCE** |
| 237. "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | **PARTIAL COMPLIANCE** |
| 238. "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | **OPERATIONAL COMPLIANCE** |
| 239. [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | **OPERATIONAL COMPLIANCE** |

### a. Background

Cleveland's Civilian Police Review Board reviews and analyzes completed OPS investigations. It makes a formal recommendation to the Chief of Police on the ultimate disposition of the case and, if warranted, the discipline that an involved officer should receive. A well-functioning PRB remains critical to ensuring that OPS investigations are sound and that the Chief of Police receives a well-informed recommendation on the disposition of OPS cases.

### b. Where the PRB Stands

As previously reported, since the adoption of the PRB Operations Manual in 2017, the PRB has convened regularly to address cases that it receives from OPS. During this time, the performance of the PRB has largely been out of the Board's hands. The timeliness of the PRB's review of cases, and precisely what the PRB is reviewing, depends on how well OPS has effectuated its duties in the investigatory stage.

In the last reporting period, the Monitoring Team completed an assessment of a subset of OPS cases sustained by the PRB. We noted "striking improvements in the PRB adjudication process for handling community-initiated complaints" and "excellent follow-up by the CPRB in those cases where the Chief has departed from their recommendations." We also noted, however, that

the OPS and PRB "must do more to adequately identify and systemically address training and policy issues (and areas where police services can be improved) outside of the traditional disciplinary process."

In order to fully assess PRB compliance, however, it will be necessary for the Monitoring Team to review a population of cases where the PRB has "not sustained" allegations of misconduct. That assessment will be scheduled along with our next assessment of OPS compliance.

## 4. Discipline and Disciplinary Hearings

| Paragraph | Status of Compliance |
|---|---|
| 240. "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | **GENERAL COMPLIANCE** |
| 241. Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | **PARTIAL COMPLIANCE**[34] |
| 242. Disciplinary recommendations by PRB to proceed through the City's disciplinary process. Written justification by Chief or Director of their disagreement with PRB's recommendations. | **OPERATIONAL COMPLIANCE** |
| 243. "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | **OPERATIONAL COMPLIANCE** |
| 245. "The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | **PARTIAL COMPLIANCE** |
| 246. "[T]he City will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | **OPERATIONAL COMPLIANCE** |
| 247. "All disciplinary decisions will be documented in writing." | **OPERATIONAL COMPLIANCE** |
| 248. "[T]he City will provide its disciplinary matrix to the PRB, Commission, the Police Inspector General, and the police unions for comment." | **OPERATIONAL COMPLIANCE** |

[34] After the reporting period, the Division submitted a case for review which purported to establish compliance with paragraph 241 of the Consent Decree. The Monitoring Team will review this case and has informed the Division that they will need to update policies to reflect Consent Decree expectations.

| | |
|---|---|
| 249. "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires that CDP "ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented."[35]

### b. Where the Division Stands

As previously reported, it has taken far too long for cases to be adjudicated, and delays have been observed in the scheduling of pre-disciplinary hearings and in the imposition of discipline upon the conclusion of those hearings. Our ongoing assessments will evaluate the disciplinary system and CDP's ability to ensure long term accountability of its employees.

Although, in our last report, we noted that the Division had "buttressed up the staffing of its Case Preparation Unit," which had a "positive impact" on some of our continuing concerns; we have recently seen what appears to be a cut in staffing levels for that important Unit. Any cuts to the staffing of this unit are particularly problematic, given increased demands that will be made when the Division has to update its processes to comply with new provisions of Charter Section 115. Section 115 promises significant changes in how police discipline is adjudicated in the City of Cleveland and appropriate resourcing will be required to ensure those changes can be implemented in a manner that will support Constitutional policing in Cleveland.

[35] Dkt. 277.

## X. TRANSPARENCY & OVERSIGHT

### 1. Police Inspector General

| Paragraph | Status of Compliance |
|---|---|
| 250. "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | **NON-COMPLIANCE** |
| 251. IG work in Office of Mayor but report to Chief of Police. | **POSITION CURRENTLY VACANT** |
| 252. IG "will not be a current or former employee of CDP." | **POSITION CURRENTLY VACANT** |
| 253–54. Duties and authority of IG. | **POSITION CURRENTLY VACANT** |
| 255. Budget of IG must be "a separate line item" in City budget and "afford[] sufficient independence and resources" to comply with Consent Decree. | **POSITION CURRENTLY VACANT** |
| 256. IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | **POSITION CURRENTLY VACANT** |

#### a. Background

The Consent Decree created a new, internal oversight function within the Division—a Police Inspector General (IG). The IG is required to have the authority to review CDP policies and practices, conduct audits and investigations, analyze data for aggregate and systemic trends, develop recommendations for reform, analyze investigations conducted, and review imposed discipline.

#### b. Where the Division Stands

As of the beginning of 2021, CDP's first Inspector General resigned his position upon being appointed as the Sheriff of Cuyahoga County. In the last reporting period, the City has advised that even after a nationwide recruitment, no suitable candidates had been identified. We have received

no further updates during this reported period and are troubled that this important position remains unfilled.

## 2. Data Collection and Analysis

| Paragraph | Status of Compliance |
|---|---|
| 257. "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **PARTIAL COMPLIANCE** |
| 258. Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **PARTIAL COMPLIANCE** |
| 259. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **OPERATIONAL COMPLIANCE** |
| 260. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **PARTIAL COMPLIANCE** |
| 261. Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | **PARTIAL COMPLIANCE** |
| 262. Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **PARTIAL COMPLIANCE** |
| 263. Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264. Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **NON-COMPLIANCE**[36] |

[36] Since the closing of this reporting period, continued work has occurred on the annual stops data report. The Monitoring Team will continue to assess the City's progress in this area and will provide an update during the Semiannual Report.

| | |
|---|---|
| 265. Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **NON-COMPLIANCE** |
| 266. Annual analysis of "prior year's force" data with FRB. | **PARTIAL COMPLIANCE** |

### a. Background

The requirement to hire a Data Collection and Analysis Coordinator (DCAC) was met several years ago. The incumbent faithfully reports on data collected and for the last few years has completed the collection and submission of all outcome measure data as enumerated in paragraph 367. The DCAC is skillfully collecting and reporting on data, though we do not see the Division leadership exhibit a curiosity about the data nor create a demand for analysis of those data. Most reports submitted are descriptive in nature. Questions raised by the Department of Justice personnel or members of the Monitoring Team at the monthly CDPStat meeting are met with no response or a statement that they will have to review and get back to us. There seems to be a focus on data accuracy, which is of course important and relevant, but little interest in the meaning of the data, the story behind the data, or the way the data may help leverage change in practice.

## 3. Public Availability of CDP-Related Information

| Paragraph | Status of Compliance |
|---|---|
| 267. "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | **PARTIAL COMPLIANCE** |
| 268. "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires that CDP's "policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports" be posted on CDP's website.[37] Likewise, "[t]o ensure transparency in the implementation of" the Decree,

[37] Dkt. 413-1 at 1; id. ¶ 268.

"all CDP audits, reports, and outcome analyses related to the implementation of this [the Consent Decree] will be made publicly available, including at the City and CDP websites."[38]

### b. Where the Division Stands

There remain issues with the accessibility of the website, its accuracy and its organization. The policies are more accessible as are many reports and Consent Decree related materials. We remain concerned about outdated information on the website as well as the organization of materials which suits the most informed user rather than those in search of information without much background.

Someone in the Division must take responsibility for the accuracy of the website. The section for Office of Professional Standards shows no meetings since April 2022, yet it does show the current reality of a vacancy in leadership since December 2021. At this writing, Mr. Chris Viland is still listed as the Inspector General and he left that post over a year ago.

It has become easier to find important documents on the website, but they remain organized in a way that suits the Division and not the public. Improvements can still be made on the organization of materials online. The policies are now online in separate PDF files, rather than in a single omnibus file.[39] The policies are supported by both an Index and Table of Contents, which does greatly increase accessibility. Yet, the online structure is slightly confusing, with recent policies contained in "New Revisions – General Police Order," rather than in the main policy section, which sometimes includes rescinded policies. The Monitoring Team encourages CDP to review the organization for increased ease of searching and for greater transparency with the community. Overall, though, the accessibility to CDP policies is vastly improved.

While important sections of the Division and the Department of Public Safety are listed, topics are not listed in ways that reflect the needs of a typical user. For example, someone interested in use of force and using the search tool would not find data from the Division about Use of Force. The search leads the user to Monitoring Team reports and not CDP reports. The Police Publications and Information page contains links to the Office of Professional Standards, the Force Review Board, Settlement Agreement Documents, the Crisis Intervention and Mental Health Response Advisory Committee, the Community Police Commissions, and Budgets and Internal Audits.[40] While the Division still needs to fully populate the information, there are reports present giving the public some information about the activities of those departments.

---

[38] Dkt. 413-1 ¶ 267.
[39] https://www.clevelandohio.gov/CityofCleveland/Home/Government/CityAgencies/PublicSafety/Police/PolicyProcedures
[40] https://www.clevelandohio.gov/CityofCleveland/Home/Government/CityAgencies/PublicSafety/Police/PublicationsInformation

### c. Progress and Tasks That Remain

The Monitoring Team continues to maintain that the Division and the community it serves will benefit from a Division that is open to the public and sets clear expectations of how information related to critical incidents will be shared. CDP should establish and publicly share its plans to share information from critical incidents. We will continue to encourage as much transparency as possible about officer activities, Division decisions, and data relative to use of force, stops and searches, and internal investigations. The more the public knows about the Division, the more trust it will have in the overall systems.

## XI. OFFICER ASSISTANCE & SUPPORT

### 1. Training

| Paragraph | Status of Compliance |
| --- | --- |
| 269. "The City will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | **PARTIAL COMPLIANCE** |
| 270. "CDP will expand the scope and membership of the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | **PARTIAL COMPLIANCE**[41] |
| 273. "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | **PARTIAL COMPLIANCE** |
| 274. "The City, including the Training Review Committee, will annually review and update CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **PARTIAL COMPLIANCE** |
| 275. "CDP's Commander responsible for training" will be in charge of "all CDP training." | **PARTIAL COMPLIANCE** |
| 276. "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **PARTIAL COMPLIANCE** |
| 277. "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **PARTIAL COMPLIANCE** |
| 279. "For all other substantive updates or revisions to policy or procedure, the City will ensure and document that all relevant CDP personnel have received and read the policy or procedure. Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **PARTIAL COMPLIANCE** |

[41] We note that while this status changed from Non-Compliance to Partial Compliance in this report, the Monitoring Team still has not received materials from the recruit academy for review.

| | |
|---|---|
| 280. Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | **OPERATIONAL COMPLIANCE**[42] |
| 281. "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **PARTIAL COMPLIANCE** |
| 282. "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **NON-COMPLIANCE**[43] |
| 283. "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **NON-COMPLIANCE** |
| 284. Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **NON-COMPLIANCE** |
| 285. New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **NON-COMPLIANCE** |
| 286. "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **NON-COMPLIANCE** |
| 287. "The City and the Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **NON-COMPLIANCE** |
| 288. "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **PARTIAL COMPLIANCE** |

[42] While the status of this paragraph has changed from Partial Compliance to Operational Compliance in this report, the Monitoring Team is still fully reviewing training materials to ensure that all training – including specialty training – is indeed going through the Training Commander.

[43] The Monitoring Team notes that after the end of the period covered by this report, we received a memorandum containing recommendations for updating the Field Training Officer program that if implemented as recommended, would lead to an upgrade in the compliance status of this and possibly other related Consent Decree paragraphs.

| | |
|---|---|
| 289. "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **OPERATIONAL COMPLIANCE** |
| 290. "The City will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **PARTIAL COMPLIANCE** |

### a. Background

Training CDP personnel on the new requirements and expectations of Decree-required policies and initiatives continues to be critical to ensuring these changes are infused into the operations of the Division. While the Monitoring Team has seen marked improvements in the efforts by the Training Unit to provide effective and engaging training to its personnel under the leadership of its current Commander, its journey to full compliance with the various requirements of this section of the Decree remain a work in progress.

### b. Where the Division Stands

During the current reporting period, the Division submitted for review several important training initiatives, including but not limited to the following topics:

- Integrated Reality-Based training encompassing use of force, search and seizure, and bias-free policing
- TASER 7 Transition
- Cultural Humility: Diversity, equity, and inclusion
- Crisis Intervention: Homelessness
- District Neighborhood Awareness Training
- Emergency Response Driving
- ABLE: Refresher
- QPR: Question, Persuade, Refer
- Subject Control
- Officer Involved Shooter Investigation Training

The Training Section, led by Commander Maguth, should be recognized for the substantial improvements over his tenure as commander of the section. In general, the Monitoring Team has noted upgrades in initial drafts of training curriculum that have been submitted by CDP for approval this reporting period as compared to in previous years. The Training Section is showing that it is increasingly creating training curricula to include more adult-learning techniques, scenarios and learner engagement in its lesson plans. Of note is the integration of Reality-Based

training using complex, planned scenarios. These scenarios ensure a more realistic experience in which officers must draw from policies and training on multiple skill areas. The Training Commander is seeking to expand the use of such scenario training, and the Monitoring Team encourages its expansion and will report on further progress in future semiannual reports.

Consistent bi-weekly meetings among the Parties continue, and the Training Unit Commander uses the meetings to seek input and bounce ideas off the Monitoring Team and Department of Justice representatives, and often cites his aspirational goals. Furthermore, through these meetings and written correspondence, the Training Unit has been open and responsive to feedback it receives on its lesson plans. However, CDP continues to struggle to ensure that ALL training conducted throughout the Division is approved by the Training Unit Commander. This is particularly true with outside or contracted training, which is often boilerplate curriculum, and various units within CDP routinely ignore the Training Unit when providing specialty training. This concern has been repeatedly expressed by the Monitoring Team and will impede Consent Decree compliance until resolved.

While in the Tenth Semiannual Report, the Monitoring Team pointed to the delay in CDP hiring professional curriculum developers to work within the Training Section, we can report here that CDP has at least contracted with an outside vendor, Polis Solutions, to assist in the development of the Supervisor Training. This training is slated to cover, at a minimum, use of force and bias-based complaint investigations. The curriculum is currently under development and is anticipated to be implemented in Q4 of 2022. CDP submitted to the Monitoring Team and Department of Justice materials for the first module of this training after the review period of this report, and those materials are currently under review. The Monitoring Team looks forward to seeing the full curriculum produced in collaboration by CDP and Polis Solutions and will provide relevant feedback to ensure consistency with Consent Decree requirements.

In the Tenth Semiannual Report, we indicated that CDP should re-engage with the Training Review Committee (TRC). The TRC currently is convened at least annually to review and update the Division's Needs Assessment and Training Plan. However, the TRC also serves to review internal training, which involves providing feedback and recommendations on a regular basis. This information is currently forwarded via email and file sharing platforms to members of the TRC and either verbal or written feedback is solicited to be incorporated into the curriculum or training. The formal approval process through the TRC has not been fully implemented, as it is still being looked at for improvements by the Training Commander. In the next Semiannual Report, we will report on development of a formalized approval process for the TRC.

### c. Progress and Tasks that Remain

The Monitoring Team has previously recounted the steps that CDP must make with respect to officer training to reach compliance with the Consent Decree. Looming large among them is fully implementing the concept that the Training Commander must approve ALL training prior to the initiation of any sessions. The Monitoring Team will continue to monitor this closely to measure progress.

Additionally, the Training Section remains understaffed. The Monitoring Team recognizes that many agencies nationally are struggling to fill positions, but the significant role that training plays in implementing so many of the Consent Decree required policy and culture changes demands adequate staff to speed up the overall training development, approval and implementation process.

## 2. Equipment & Resources

| Paragraph | Status of Compliance |
|---|---|
| 291. "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | **PARTIAL COMPLIANCE** |
| 292. "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 293. "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | **OPERATIONAL COMPLIANCE** |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | **NON-COMPLIANCE** |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 296. "CDP will . . . implement an effective, centralized records management system." | **OPERATIONAL COMPLIANCE** |
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | **OPERATIONAL COMPLIANCE** |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | **OPERATIONAL COMPLIANCE** |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires the City of Cleveland to "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement."[44] The Plan must "provide for necessary equipment including, at least . . . an adequate number of computers; an adequate number of operable and safe zone cars; zone cars with reliable, functioning computers that provide officers with up-to-date technology, including" mobile computer-aided dispatch (CAD), access to the Division's records management system (RMS), and access to law enforcement databases; and "zone cars equipped with first-aid kits . . ."[45] It must address how the Division will satisfy the other substantive requirements of the Decree. It likewise must "ensure that CDP" both "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies."[46]

### b. Where the Division Stands

The Monitoring Team recently received information from the City, after the period covered by this report, indicating that progress continues to be made on implementation of the City's equipment and resource plan. Assessing where the City stands on its implement is slated for this next reporting period, and the Monitoring Team will provide an update in its Twelfth Semiannual Report.

[44] Dkt. 413-1 ¶ 292.
[45] Id. ¶ 293.
[46] Id. ¶ 293.

## 3. Recruitment & Hiring

| Paragraph | Status of Compliance |
|---|---|
| 300. "The City will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | **PARTIAL COMPLIANCE** |
| 301. "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | **GENERAL COMPLIANCE** |
| 302. "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | **OPERATIONAL COMPLIANCE** |
| 303. "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | **OPERATIONAL COMPLIANCE** |
| 304. "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | **PARTIAL COMPLIANCE** |
| 305. "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | **PARTIAL COMPLIANCE** |
| 306. "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | **PARTIAL COMPLIANCE** |
| 307. "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | **OPERATIONAL COMPLIANCE** |
| 308. "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | **GENERAL COMPLIANCE** |
| 309. "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 310. "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 311. "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires the City to "integrate community and problem-oriented policing principles" into its recruitment practices, and to "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community . . . [and] establish[es] and clearly identif[ies] the goals of CDP's recruitment efforts."[47] Additionally, the Consent Decree requires a thorough background check for all hires including lateral hires.

### b. Where the Division Stands Now

We previously reported that the Division completed its Recruitment and Hiring Plan, which incorporates feedback from the Department of Justice, Monitoring Team, and the expressed concerns of the Cleveland public. As with police departments across the nation, recruiting new officers is increasingly difficult, and even more so in the continuing pandemic. The pace of the recruitment and completion rates from the academy continue to lag behind the number of Division members who separate from service, which is a cause for concern. The recruitment team at the Department of Public Safety is creative and working regularly with an array of community partners to increase their visibility, to promote the public safety jobs, and to increase opportunities for conversations.

With now six full years of data, the Department of Public Safety, which houses the Recruitment Team, should be able to analyze and present data about the recruitment process and rates of success and failures, as well as the lessons learned from the variety of creative recruitment efforts it has implemented. What we find is that the various entities in the City who have a role in recruitment and hiring lack coordination and direction. For the most part, the individual officers that have a role in recruitment and hiring each play their part, yet the lack of coordination and focus from a higher level is a disadvantage for the overall success. In particular, salary remains an issue for not only recruitment but also retention. There was a recent amendment to the collective bargaining agreement pertaining to raises, and the Monitoring Team is waiting to see where this places CDP's compensation scale as compared to other Ohio agencies.

The Monitoring Team recently reviewed and filed reports on the background investigations of CDP hires – both a recruit and a lateral class. While the requirements of the Consent Decree were

[47] Dkt. 413-1 ¶ 302.

mostly achieved, the depth of background reviews could have been better. The Monitoring Team found the background reviews to be cursory in many cases. More disturbing are some of the decisions to hire, or offer positions, made by the Personnel Hiring Committee. Hiring decisions seem to be made irrespective of the background investigations. Most confounding in the reviews was the decision to extend an offer of employment to an individual when 12 of 13 members of the committee voted no upon considering that candidate.

In reviews of background investigations of both the lateral class and the new recruit class, it was alarming that Cleveland elected to hire individuals that many other departments chose not to hire based on background. For example, a lateral hiring process resulted in hires who, by assessment of the Monitoring Team, had significant background issues that should have precluded their appointment as officers. Additionally, the Monitoring Team examined the case of an officer who resigned from the Division to join the Division of Fire, which ultimately rejected his transfer. He was immediately returned to full duty in the Division of Police. The Monitoring Team raised these concerns with CDP and continues to assess the overall recruitment and hiring processes to ensure compliance and hiring of officers who reflect the principles of community and problem-oriented policing.

### c. Progress and Tasks that Remain

Following the Court's approval of the Recruitment and Hiring Plan, CDP must "report annually to the public its recruiting activities and outcomes," including disaggregated data on applicants, interviewees, and selectees, as well as the successes and challenges to recruiting qualified and high-quality applicants.[48] A comprehensive report is prepared and filed by the recruitment team. The large number of people who voluntarily separated from service during 2021 as reported by CDP raises concerns about the ability of the Division to retain personnel. While recruitment is a challenge across the country, the details offered in exit interviews about why officers are leaving the CDP include issues of salary and morale and need to be addressed. The Division and City leadership must look carefully at what can be done to retain police officers. Additionally, all entities who have a role in recruitment and hiring must find ways to collaborate more closely. Each part of the process relies significantly on the other. Presently, it seems as if the Public Safety Recruitment Office, the Civil Service Commission, and the Human Resources Department are not as connected as they could be. The Monitoring Team will continue to gauge progress by analyzing the numbers and trends with respect to applicants and hired recruits, as well as by working with the City to provide ongoing technical assistance on the Plan's implementation.

[48] Dkt. 413-1 at ¶ 307.

## 4. Performance Evaluations and Promotions

| Paragraph | Status of Compliance |
| --- | --- |
| 312. "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | **NON-COMPLIANCE** |
| 313. "The City will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **NON-COMPLIANCE** |
| 314–15. CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas. "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | **NON-COMPLIANCE** |
| 316. "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **NON-COMPLIANCE** |
| 317. "The City will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **NON-COMPLIANCE** |
| 318. In considering promotion, "appointing authority will consider" specific, expressly- listed "factors." | **NON-COMPLIANCE** |

### a. Background

The City must address how it evaluates officer performance and must ensure that high-performing officers have access to promotional opportunities. Under the Consent Decree, the City must "develop and implement fair and consistent practices to accurately evaluate officers" across a number of dimensions, including 'integrity, community policing, and critical police functions.'"[49]

### b. Where the Division Stands

During this reporting period, CDP reported that they were working internally to improve upon its previously submitted draft General Police Order and Performance Management Manual. The

[49] Dkt. 413-1 at ¶ 313.

Monitoring Team received these updated materials on July 20, 2022, along with applicable draft matrices to accompany those fundamental directives. The Monitoring Team and Department of Justice are currently reviewing these documents and anticipate additional collaboration with CDP in an effort to finalize a policy and manual that satisfies the requirements of the Consent Decree swiftly but effectively. As the Monitoring Team does not have evidence that the Division or its supervisors are implementing performance evaluations in compliance with Consent Decree requirements, the ratings remain in Non-Compliance.

During this reporting period, the Monitoring Team received a comprehensive briefing on the overall promotional process over March and April of 2022. The briefing conveyed an objectivity and focus on qualifications based on demonstrated performance as primary criteria for promotion. Since April, the Monitoring Team has requested on several occasions written materials that demonstrate the current promotions process, as well as written criteria that allow consistency in promotions in order to ensure objectivity in the process. While we received some preliminary questions, we have not received the current or updated materials requested from all the entities necessary for the Monitoring Team to form an assessment of the process and would likely raise the compliance status.

### c. Progress and Tasks that Remain

Under the 2022 Monitoring Plan, the City has again been tasked with incorporating community and problem-oriented policing into its promotions and evaluations. Progress on this work has continued to lag, to the Monitoring Team's dismay. Once these nascent plans are established and realized, enhanced performance evaluations and standardized promotions will both provide professional development opportunities within the Division, and aid significantly in employee management. While this work is underway, the Monitoring Team impresses upon the City that it should regarded as a priority.

## 5. Staffing

| Paragraph | Status of Compliance |
|---|---|
| 319. "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 320. Requirements of CDP Staffing Plan. | **PARTIAL COMPLIANCE** |
| 321. "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree contemplates changes to CDP's approach to staffing, assigning, and deploying its personnel within the City of Cleveland. Under the requirements of the Decree, for example, CDP must:

- Implement a "comprehensive and integrated model;"[50]
- Ensure rigorous investigations and reviews of force incidents;[51]
- Ensure that specialized crisis intervention officers "are dispatched to an incident involving an individual in crisis" and are able to "have primary responsibility for the scene;"[52]
- Provide supervisors with the ability to "review all documentation of investigatory stops, searches, and arrests;"[53]
- Ensure that officers can receive the training required by the Decree;[54]
- Provide necessary opportunity for "first line supervisors [to] provide close and effective supervision of officers;"[55]
- Implement the Early Intervention System;[56] and
- Provide supervisors with the ability to "conduct adequate random and directed audits of body worn camera recordings."[57]

These provisions require changes in the way that CDP will deploy its existing personnel and in the overall number of sworn and civilian personnel. To that end, the Consent Decree specifically envisions a Staffing Plan by which the CDP must "address and provide for each of the following":

- "[P]ersonnel deployment to ensure effective community and problem-oriented policing;
- "[A] sufficient number of well-trained staff and resources to conduct timely misconduct investigations;

[50] Dkt. 413-1 at ¶ 27.
[51] Id. at ¶¶ 93-130.
[52] Id. at ¶ 151.
[53] Id. at ¶ 168.
[54] Id. at ¶ 271.
[55] Id. at ¶ 322.
[56] Id. at ¶ 326-36.
[57] Id. at ¶ 339.

- "[T]o the extent feasible, Unity of Command; and
- "[A] sufficient number of supervisors."[58]

### b. Where the Division Stands Now

As the Monitoring Team has reported, the Division completed the Decree-mandated Staffing Plan in 2017. Since then, the Monitoring Team has not received information about updates on implementation of CDP's Staffing Plan. The Monitoring Team plans to report more detail on this process in its next semiannual report, as numerous opportunities have emerged, including a new Mayoral administration and a new Chief of Police who may have a new vision for CDP's staffing needs and strategies.

### c. Progress and Tasks that Remain

Significant requirements of the Decree, including the comprehensive implementation of CDP's new community and problem-oriented policing strategy, are directly linked to the Division's ability to carry out the approved Staffing Plan. Given the challenges that CDP and other police departments have faced in recent years with hiring and retention, accomplishing this task likely requires both changes to long-held practices, as well as creative strategies to work within the reality of lower than desired staffing numbers. As mentioned in previous reports, the Division could reimagine its deployment plans, through collaboration with community, the Monitoring Team and the Department of Justice, to increase focus on community priorities and phase out services that do not impact community satisfaction or public safety goals. The Division will need to remain committed to these efforts in order for Decree-required policies, procedures, and plans to be fully and effectively implemented.

[58] *Id.* at ¶ 320.

# XII. SUPERVISION

## 1. First-Line Supervisors

| Paragraph | Status of Compliance |
|---|---|
| 322. "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **PARTIAL COMPLIANCE** |
| 323. "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 324. "Thereafter all sworn supervisors will receive adequate in-service management training." | **PARTIAL COMPLIANCE** |
| 325. "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires that CDP ensure "close and effective supervision of officers."[59] Supervisors must be held "directly accountable for the quality and effectiveness of their supervision" of officers in their command.[60] To do so, the Decree requires that the Division establish new policies and procedures addressing supervision. It also requires training for supervisors on a host of specific topics.[61]

### b. Where the Division Stands

The Division completed training on supervisor review of force and the Monitoring Team looks forward to reviewing how that training is applied in practice. Training for new supervisors is ongoing and the CDP will certify that each new supervisor has completed the supervisory training upon promotion. In August of this year, CDP submitted the initial draft of specific modules of the 2022 supervisory in-service training curriculum, which it developed in collaboration with an

[59] Dkt. 413-1 ¶ 322.
[60] Id. ¶ 325.
[61] Dkt. 413-1 ¶ 323.

outside vendor. The Monitoring Team and Department of Justice's review is underway, and the Monitoring Team is looking forward to receiving the rest of the drafted modules in order to ensure that the entire curriculum aptly addresses topics required for supervisory in-service training.

### c. Progress and Tasks that Remain

CDP must complete the supervisor in-service training of all CDP supervisors. As the Monitoring Team conducts other specific assessments on use of force, discipline, and more, the Team looks for opportunities to review the work of supervisors in practice, further assessing adherence to paragraphs 322-325. Furthermore, the Monitoring Team will review and audit training curriculum and training sessions which address supervisors' roles and responsibilities in order to further assess compliance with these paragraphs. The Monitoring Team is also planning a supervisor forum in 2022, as well as officer focus groups.

## 2. Officer Intervention Program

| Paragraph | Status of Compliance |
|---|---|
| 326. CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | **NON-COMPLIANCE** |
| 327. "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **NON-COMPLIANCE** |
| 328. "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **NON-COMPLIANCE** |
| 329. "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **NON-COMPLIANCE** |
| 330–36. Additional express requirements of OIP. | **NON-COMPLIANCE** |

### a. Background

The Consent Decree requires that CDP's Officer Intervention Program (OIP) be transformed into an effective "early intervention system," or "EIS." An EIS is a non-disciplinary system for

identifying and addressing potentially problematic officer performance before it becomes a problem.

Specifically, the Consent Decree requires that the Division's OIP become a broader management tool that will "proactive[ly] identif[y] . . . potentially problematic behavior among officers" and provide non-punitive supervisory intervention in order to "modify officers' behavior and improve performance" before the performance gradually becomes deep-seated and difficult to resolve.[62] The Decree requires the implementation and use of "a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" on officer performance and that forms the basis of an EIS.[63]

### b. Where the Division Stands

There have been several iterations of the draft OIP policy (which encompasses its vision for an updated EIS system) that have gone back and forth between the Division and Parties over the past reporting periods. During this reporting period, the Division worked on an updated draft of the OIP Policy, and the Parties and Monitoring Team conducted another review. CDP, the Monitoring Team and Department of Justice also met to discuss this policy and related Consent Decree provisions in June. Since the end of the reporting period, CDP has resubmitted the policy and the Employee Assistance Unit (EAU) manual, which is the unit tasked with implementing the OIP. These documents remain under review by the Monitoring Team and Department of Justice at the time of this writing. CDP reports to the Monitoring Team that it has been working to identify best practices to effectively implement the OIP policy and an EIS program, particularly as they relate to identifying appropriate thresholds as required by Consent Decree paragraph 329. The Division has requested more time to ensure that their proposal reflects a data-driven approach. The Monitoring Team looks forward to reviewing the subsequent proposed structure.

### c. Progress and Tasks that Remain

It continues to be the case that CDP needs to finalize its policies, manuals, and implementation materials related to the OIP/EIS to fully establish an upgraded early intervention system. Many pieces of the plan are currently under review by the Monitoring Team. CDP continues to work on this, but significant questions remain ahead to identify the best approach for CDP's EIS implementation. While this continues to be an understandable challenge, it must also remain a priority, as it is an essential piece to Consent Decree compliance.

---

[62] Dkt. 413-1 at ¶¶ 326-27.
[63] *Id.* at ¶ 328.

## 3. Body-Worn Cameras

| Paragraph | Status of Compliance |
|---|---|
| 337. "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | **OPERATIONAL COMPLIANCE** |
| 338. "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **OPERATIONAL COMPLIANCE** |
| 339. "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **OPERATIONAL COMPLIANCE** |
| 340. "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **OPERATIONAL COMPLIANCE** |

### a. Background

Prior semiannual reports have summarized the history of the Division's use of body-worn camera technology. Because CDP elected to deploy the cameras, various Consent Decree requirements relating to policies and procedures are activated.

### b. Where the Division Stands

As of 2021, the City reports that all CDP patrol officers are equipped with Axon's Body Worn 3 camera systems. These officers are expected, under policy, to use their cameras when working a City shift. While the Division and its officers continue to use their Wearable Camera System (WCS) to capture incidents and interactions, the Monitoring Team has noted certain patterns in its use of force reviews that will inform CDP on where it is implementing the cameras successfully, and areas where improvements can be made.

Of note, in its review of uses of force from the first quarter of 2022, the Monitoring Team found that 95% of Level 1 incidents were captures on WCS, and approximately 90% of Level 2 uses of force were captured. Nevertheless, 16 of the 37 events that were reviewed did have one or more WCS issues flagged by reviewers. These issues include, but are not limited to:

- The WCS did not remain activated for the entire incident (n=5)
- The WCS fell off or became dislodged (n=5)
- Only some of the responding officers' cameras were activated (n=4).

As the Monitoring Team carries on with its rolling use of force reviews, these issues will continue to be noted and brought to the attention of CDP to resolve.

### c. Progress and Tasks that Remain

#### i. Compliance with Policy

As noted in previous reports, the Monitoring Team continues to be concerned about use of force incidents by CDP personnel working secondary employment. Though officers working in secondary employment are in full CDP uniform, they are not equipped with their WCS. This impedes quality of investigations by CDP, and also complicates the Monitoring Team's ability to conduct effective oversight.

#### ii. General Policy for the Release of CDP Information

When the Monitoring Team previously approved the Division's body-worn cameras policies, it conditioned that approval on the City and CDP establishing a general policy for the release of records, data, and information—including but not limited to body-worn camera footage—to the public. The Monitoring Team has not yet seen a draft of such a policy from the Division, and strongly encourages CDP to prioritize its creation, as this is an important part of police legitimacy and demonstrations of transparency for the community. The Monitoring Team is also aware that legislation has been passed requiring the release of police BWC video within newly defined timeframes and this requirement must be reflected in CDP policy.

## XIII. OUTCOME ASSESSMENTS

The Consent Decree sets forth a number of specific outcome assessments primarily in paragraph 367 – Outcome Measures – that are largely quantitative measures across various domains. These counts enable the Division and the Monitoring Team to assess the frequency of events such as use of force and arrests, the rate of change across years as well as data from the City's Civil Service Division that reveals the number of recruits, demographic information, and their collective success/failure rates in the hiring process. The several subparagraphs in paragraph 367 translate into over 750 rows of data on an excel spreadsheet, with each row representing a different measure. Nearly every line of that paragraph generates a row of data to be collected and analyzed. These outcome measures can contribute to the Monitoring Team's understanding of whether CDP's implementation of the specific policies, procedures, and ways of providing policing services envisioned by the Consent Decree are indeed resulting in behavior change that leads to safe, fair, effective, and constitutional policing.

In 2019, the Division first took responsibility for the assembly of these data directly, where prior effort was led by members of the Monitoring Team. The Data Team continues to collect these outputs and assemble them in the sheet designed by the Monitoring Team in 2015. The effort to collect and record these data is substantial and could be utilized by many departments in the City far more effectively. One clear example is the richness of the data across now more than five years on the candidate pre-screening success and failure. These data are primarily held by the Civil Service Department and yet, analysis across years of these data could inform recruitment strategies, or management decisions by the Division or Training Committee around methods of testing or need to support candidates differently to enhance pre-screening success. In all cases these data have the potential to provide a wealth of information for all levels of management, though it seems at times from conversations and submitted reports, the Division's management personnel does not rely on the available data or analysis for management purposes.

There is a clear emphasis on accuracy of reporting by the Division and the Data Analytics Unit is focused on accuracy and sharing descriptive data. The Monitoring Team also notes that the Data Analytics Unit has created dashboards, using Microsoft Power Bi, to report data during CDPStat since early in 2022. The Monitoring Team appreciates this hard work and feels strongly that these dashboards should induce the Division, beyond the Data Analytics Uni, to dive more deeply into the details of the data to better understand their meaning, as well as to facilitate management throughout CDP. In the reports the Division has created thus far on use of force, on recruitment, and on drafts the Monitoring Team has seen for stops, searches, and arrests, there is minimal analysis and insufficient commentary on deeper questions that could inform or leverage change. The Monitoring Team looks forward to hearing how CDP will use its data tools not only to report on data, but also use them for internal management purposes by command and other supervisors. We cannot envision a clear path to compliance without regular, robust analysis and application of these data for continued Division improvement. Collection along with analysis is required to be

able to operate as a self-managing entity and one that is able to identify, study, and implement changes necessary to reach compliance.

As the Monitoring Team reviews the data for Outcome Measures for 2021, we see a number of items that raise questions and look forward to discussing those with the Division. Delving into the details provides context, and both asks and answers important questions that help CDP's management understand matters ranging from issues with policy or supervision differences. For example, in rows 15 and 17 of the outcome measures data spreadsheet (Appendix E), a careful reader will note that in Districts 2 and 4 there are unusually low numbers for use of force. These data should cause CDP's management to ask "why?" Is this a function of training or supervision style or sophistication of officers? Is there something about officer behavior or supervision in those districts to create such a variance? Is there something about the people who live and travel in those districts? How do you know?

The Monitoring Team also notices that tackling and takedown numbers (row 30) are low in 2021. Is there a reason for this? Is it training or data quality or something else? We look carefully at the numbers relating to complaints. The number of complaints regarding force is down. Are officers getting better? If so, what other data points help confirm that explanation over other possible reasons such as poor data quality?

The Monitoring Team also notes that use of force in almost all categories shows continued improvement. Overall use of force is down, the policy violations continue to decrease, and the number and percentage of cases ending in arrest are down slightly. Incidents of force are most often with Black individuals, with 150 incidents with Black people and 42 with white people, a three-fold difference. The data further show that most force incidents are on individuals between the ages of 18 and 39 who are most likely male (see rows 48-70). In our regular communications with CDP on data, particularly during the monthly CDPStat presentations by the Division staff, we note that in the first half of 2022 the use of force numbers, particularly pointing of a firearm are nearly double year to date. It is critical that the Division dig deeply into the context and the stories behind the data to understand not only why this is happening but also how to impact the trajectory.

Many people are reported to be in behavioral crisis or under the influence of drugs or alcohol during use of force incidents (n=106). It seems that in 2021 the number of officers injured increased slightly (from 32 officers injured to 38 officers injured) and remains overall lower than at the start of the Consent Decree (rows 82 and 83). Approximately 75% of officers involved in use of force incidents reported no injuries (300/407) and, mercifully, only 22 required hospital treatment (rows 84-97).

With the concerns about recruitment and retention of police officers across the US, ensuring the applicants that are serious and engaged complete the application process and pass all stages is an important element for successful recruiting. As we look at the numbers for pass/fail rates we note that at all stages of hiring, and for all demographic groups, the failure rate is high (rows 559-591).

In other jurisdictions, municipalities find ways to support and promote candidate success. Study groups, exercise groups, and investments in other types of support could help promising candidates pass at higher rates. It seems important for the leadership of the Division of Public Safety as well as in the Division to review these data and use them to inform innovative strategies to help achieve goals.

The Monitoring Team is working on qualitative assessments to test adherence in practice to the policies in place. The assessments are in various stages of completion, and several are ongoing in a rolling fashion. The list below describes what assessments are in process for the calendar year of 2022.

1. Force Review Board (FRB): This is an ongoing review and Monitoring Team members attend each FRB meeting. The Monitoring Team has completed systemic qualitative reviews of all cases presented during the last three FRB Meetings (Dec. 2021, Mar. 2022, June 2022), with at least two reviewers for each case.
2. Lateral Hire Assessment: This was completed in November 2021 and the memo was filed with the Court in January 2022.
3. Recruit Hire Assessment: This assessment was completed in April 2022 and a memo was subsequently filed with Court. The Monitoring Team has offered technical assistance to the team that conducts these checks. We hope that the information and suggestions we provide will increase the quality of the reviews for the next class.
4. Handcuffing on crisis calls of female juveniles: This was inspired by conversations at MHRAC meetings where participants had specific questions and concerns around officer bias in these situations, in which female juveniles in crisis who were ultimately handcuffed were disproportionately non-white. The review is complete as of this writing and the report is forthcoming.
5. Use of Force: A committee of the Monitoring Team reviewed all reported use of force cases closed in the first quarter of 2022 (January through March). This totaled approximately 60 cases. The next steps will be internal deconfliction and then presentation to CDP. This process will be repeated for subsequent quarters.
6. Chief of Police Discipline: This review is nearing completion by the Monitoring Team and a report is forthcoming.
7. Force Investigation Team: The Monitoring Team is finalizing the methodology and is in the process of sharing it with the Parties.
8. Stop, Search & Seizure: The Monitoring Team is finalizing the development of the methodology and protocol.
9. Crisis Intervention Team response: In the next few months the Monitoring Team will develop and pilot an assessment instrument. A more complete assessment will follow next year.



# Cleveland Police Monitoring Team

**Hassan Aden**
Monitor

**Ayesha Hardaway**
Deputy Monitor

**Christine Cole**
Director of Outcome Measures

**Charles R. See**
Director of Community Engagement

**Dr. Modupe Akinola**
**Melissa Bretz**
**Assistant Chief Shunta Boston**
**Dr. Ronnie Dunn**
**Dr. Randolph Dupont**
**Lisa Fink**
**Maggie Goodrich**
**Chief Tammy Hooper (ret.)**
**Dr. Megan McDonough**
**Rick Myers**
**Commissioner Charles H. Ramsey (ret.)**
**Dr. Richard Rosenthal**
**Victor Ruiz**
**Captain Scott Sargent (ret.)**
**Sean Smoot**
**Timothy Tramble**
Monitoring Team

# APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING TEAM COMPLIANCE AUDIT OF CDP's LATERAL HIRE BACKGROUND CHECKS** |
| CITY OF CLEVELAND | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

The Monitoring Team respectfully submits its Compliance Audit of Cleveland Division of Police ("CDP" or "the Division") Background Checks for Lateral Hires pursuant to paragraphs 308 – 311 of the Consent Decree. Those provisions of the Consent Decree require the Division to "conduct thorough, objective, and timely pre-employment investigations" regarding all applicant's prior use of force training, history of using lethal and less than lethal force, and any history of complaints.[1] This is in addition to the requirement that CDP conduct thorough, objective and timely background investigation investigations to determine candidates' suitability for law enforcement employment.[2]

[1] Dkt. 7-1 at ¶¶308 – 311.
[2] *Id.*

The Monitoring Team audited the pre-employment investigation files of a recent class of lateral hires to assess the Division's compliance with these provisions. The attached Memorandum ("Exhibit A") describes the methodology and findings of the review.

Respectfully submitted,

/s/ Hassan Aden

HASSAN ADEN
Monitor
The Aden Group LLC
8022 Fairfax Road
Alexandria, VA 22308
Tel: (571) 274-7821
Email: aden@theadengroup.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2022, I served the foregoing document entitled **NOTICE SUBMITTING MONITORING TEAM COMPLIANCE AUDIT OF CDP's LATERAL HIRE BACKGROUND CHECKS** via the court's ECF system to all counsel of record.

/s/ Ayesha Hardaway
AYESHA HARDAWAY

EXHIBIT A

# MEMORANDUM

DATE: JANUARY 28, 2022

TO: MARK GRIFFIN, LAW DIRECTOR
KARRIE HOWARD, DIRECTOR OF PUBLIC SAFETY
DORNAT DRUMMOND, INTERIM POLICE CHIEF
JOELLEN O'NEILL, DEPUTY POLICE CHIEF
DANIEL FAY, COMMANDER
TIMOTHY MYGATT, DEPUTY CHIEF, CRT
JONAS GEISSLER, CRT
ACRIVI COROMELAS, CRT
STEVEN J. PAFFILAS, CIVIL DIVISION CHIEF, AUSA
MICHELLE HEYER, AUSA
SARA DECARO, AUSA
MICHAEL EVANOVICH, AUSA

FROM: HASSAN ADEN, MONITOR

RE: BACKGROUND CHECKS FOR LATERAL HIRES – COMPLIANCE AUDIT

After learning of the Division's intent to recruit lateral hires from a circulated Divisional Notice, received August 13, 2021 the Monitoring Team notified Public Safety Director Howard of the Team's intent to audit the background check process of any candidates receiving an offer. Subsequently, Director Howard organized a telephone call with Cleveland Division of Police personnel l leading the recruitment of lateral hires, specifically Commander Daniel Fay. That conversation included discussion about the Monitor's interest in the process, review of the relevant paragraphs, and plans to coordinate the review process. The purpose of the audit was to assess the Division of Police's compliance with Consent Decree paragraphs 308-311. That audit was conducted at the Cleveland Division of Police training academy on November 30, 2021. Reviewers included Hassan Aden, Ayesha Bell Hardaway, and Christine Cole of the Monitoring Team. Michelle Heyer from the US Attorney's Office was present as an observer and did not score any of the files.

**Methodology**: The three Monitoring Team members were each assigned a file for one of the three lateral candidates that received a conditional offer of employment. Michelle Heyer reviewed two files of candidates who did not receive offers of employment. The files of two candidates who did not receive an offer of employment were reviewed to understand the difference between those who received a recommendation for hire and those who did not. The reviewers worked in close proximity to one another, with each reviewer working through their assigned file, raising questions, and sharing observations throughout the process of review. Throughout the review, Monitoring Team members discussed aspects as a group, rendering subsequent reviews for internal validity unnecessary.

**Assessing the Files:** Each file included on the inside front cover a list of potential contents with a (blank space) presumably for a check mark or an X, indicating the inclusion or presence of that item. Several spaces were blank even when there were items included in the file, suggesting that the cover sheet was not universally used by the reviewer. This checklist was

EXHIBIT A

helpful for us to orient ourselves to the files and their content. Each file contained a red folder with CDP background information and one or more manila folders each containing materials from the candidates' prior law enforcement agency employer. Cover sheets for each section, in order and with the section titles corresponding to the table of contents, which were not included, would facilitate review by parties not involved in the compilation of the files, including chain of command reviewers. We spent about 15 minutes orienting ourselves to the files, their general contents, and organization.

**Scoring the Files:** The Monitoring Team created a score sheet (see attached to view sheet and scores) to assess each requirement of the relevant Consent Decree paragraphs. The presence or evidence of the requirement garnered a score of 1, the absence of evidence resulted in a score of 0. There is a total possible score of 18 for the enumerated items. It may be that some work was completed in accordance with the Consent Decree paragraphs, but if there is not visible evidence of that work or product in the notes, the score received is 0. For example, a score of 0 is awarded if the files contained a signed consent form from the candidate for the preservice drug screening, but no evidence of the completed screening, nor notes reporting whether drugs or steroids were detected is included in the file. A memo or note that indicates the drug screening was completed and deemed satisfactory by the medical unit, and is on file in the medical office receives a score of 1 or the full score.

**Overall Impressions:** The CDP files show the investigators consistently reviewed criminal background checks, employment verification, and credit checks. The ways the investigators completed the comprehensive questionnaire template was uneven. The investigators consistently used a different color font to highlight clear problems with the background, which was helpful, though the depth of questions and details of responses from prior employers varied widely. CDP investigators generally received extensive information from prior employers. These other agency files often contained detailed background investigatory details – beyond the scope of the CDP background review as documented. It appears that the data in the files from other agencies were not considered.

The reviews show a lack of adherence to the expectations with and as such, non-compliance with paragraphs 308-311. Generally, the files lack much of the required documentation from paragraphs 308-311. The scores are 50%, 27%, and 61% compliant. None of those meet an acceptable threshold for compliance.

The decision to hire illustrates a disregard for the content of the background investigations and the problematic histories of these three candidates as reported by the other agencies to which the candidates applied. The information in the files collected by the CDP investigators seem to be disqualifying for hire, and yet, each of these three candidates was extended an offer of employment.

# APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING TEAM PRELIMINARY ASSESSMENT OF THE OFFICE OF PROFESSIONAL STANDARDS and THE CIVILIAN POLICE REVIEW BOARD** |
| CITY OF CLEVELAND | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Monitoring Team respectfully submits its preliminary assessment of the Office of Professional Standards ("OPS") and the Civilian Police Review Board ("CPRB"). (Exhibit A). The Consent Decree requires the Monitoring Team to "conduct reviews and audits as necessary to determine whether the City and CDP have complied with the requirements of this Agreement."[1] The Monitoring Team has an ongoing obligation to assess the City of Cleveland's progress and compliance with terms of the Consent Decree. As such, the Monitoring Team completed a preliminary assessment of the progress of OPS and CPRB toward compliance with Consent Decree—and specifically Paragraphs 193 through 239 of the Consent Decree. The goal of this initial assessment was to provide OPS and CPRB with a better understanding of where each department stands in regards to overall compliance. It was fully anticipated that the Monitoring

[1] Dkt. 7-1 at ¶360.

Team would identify areas where challenges still exist and that OPS would use the feedback contained within this assessment to achieve full and effective compliance in a future, more comprehensive assessment.

In order to complete the preliminary assessment, the Monitoring Team developed an assessment tool and methodology for reviewing citizen complaint investigations sustained by the CPRB. The draft tool was reviewed by the DOJ, the OPS Administrator and the former CDP Inspector General. After conferral with these stakeholders, the online tool and methodology were finalized. This assessment is limited to only those cases received by the OPS after June 1, 2019, where at least one sustained finding was made by the CPRB and where a pre-disciplinary hearing was conducted by CDP Chief of Police before December 31, 2020. The assessment evaluated OPS and CPRB performance across several areas as detailed in Paragraphs 200, 216, 218-221, 223-228, 236-239, 241-242, 244, and 247 of the Consent Decree.

The attached review details the findings from the preliminary assessment. It identifies several areas of improvement as it relates to the thoroughness and timeliness of investigations, document keeping and communication, and timeliness of preparation of cases by the Chief's office. The report highlights a significant concern in the increase of OPS complaints. The City must act quickly and provide additional resources to the OPS in order to attend to this significant increase in workload. This unacceptable workload will negatively impact the OPS' ability to achieve full and effective compliance with the Consent Decree. It is also important to highlight the recent departure of former OPS Administrator Roger Smith who left to become the Director of the Office of Accountability and Transparency for the City of Phoenix. It is hoped that the newly appointed OPS Administrator will use this assessment to further improve the work of the OPS and

bring the program into full and effective compliance with the Consent Decree. The Monitoring Team will provide the Court with future updates on all additional assessments of OPS and CPRB.

Respectfully submitted,

/s/ Hassan Aden

HASSAN ADEN
Monitor
The Aden Group LLC
8022 Fairfax Road
Alexandria, VA 22308
Tel: (571) 274-7821
Email: aden@theadengroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I served the foregoing document entitled **Notice Submitting Monitoring Team Preliminary Assessment of The Office of Professional Standards and The Civilian Police Review Board** via the court's ECF system to all counsel of record.

/s/ Ayesha B. Hardaway
AYESHA B. HARDAWAY




**February 24, 2022**

**COURT MONITORING TEAM'S PRELIMINARY ASSESSMENT OF OFFICE OF PROFESSIONAL STANDARDS COMPLIANCE WITH THE SETTLEMENT AGREEMENT BETWEEN THE CITY OF CLEVELAND AND THE U.S. DEPARTMENT OF JUSTICE**

The Cleveland Consent Decree Monitoring Team is pleased to present this preliminary assessment into the work of Cleveland's Office of Professional Standards (OPS) and the Civilian Police Review Board (CPRB). This assessment also evaluates the impact of the Cleveland Division of Police and Department of Public Safety's actions and impact on the adjudication of community complaints against the police that fall within the jurisdiction and mandate of the OPS/CPRB.

This assessment has been a long time coming. As described herein, it was not until 2018 (three years after the Consent Decree was adopted) that the Monitoring Team identified substantial

improvements as having been made in the OPS program. They included the critically important creation and implementation of an Investigations Manual, among other things. Even after these improvements had been made, the Monitoring Team and the OPS agreed that the OPS needed more time before it would be fully ready for a formal assessment of its work. In late 2020, the Monitoring Team and the OPS agreed that this first assessment should be a limited one, in order for the OPS administration to better understand where the OPS/CPRB program stands with respect to issues of overall compliance with the Consent Decree. It was fully anticipated that the Monitoring Team would identify areas where challenges still exist and that OPS would use the feedback contained within this assessment to achieve full and effective compliance in a future, more comprehensive assessment.

As of the writing of this report, OPS Administrator Roger Smith departed from the OPS to be the first Director of the Office of Accountability and Transparency for the City of Phoenix, with jurisdiction over the Phoenix Police Department. It is hoped that the newly appointed OPS Administrator will use this assessment to further improve the work of the OPS and bring the program into full and effective compliance with the Consent Decree.

This assessment is limited to only those cases received by the OPS after June 1, 2019, where at least one sustained finding was made by the CPRB and where a pre-disciplinary hearing was conducted by the Cleveland Division of Police (CDP) Chief of Police before December 31, 2020.[1] The purpose of this assessment is to evaluate compliance with Consent Decree requirements with respect to civilian complaints, the OPS and the CPRB—and specifically Paragraphs 193 through 239 of the Consent Decree.

### 1. Methodology

The Monitoring Team, in its role of assessing the status of Consent Decree reforms, developed an assessment tool and methodology for reviewing citizen complaint investigations sustained by the CPRB. The draft tool was reviewed by the DOJ, the OPS Administrator and the former CDP Inspector General. After conferral with these stakeholders, the online tool and methodology were finalized.

The Monitoring Team's review included all cases sustained by the CPRB and adjudicated by the CDP after the new OPS Administrator[2] had an opportunity to implement the OPS Operations Manual and once the CDP fully staffed its new Case Preparation Unit. It is important to note that the Operations Manual compliant with Consent Decree paragraph 200 was adopted effective

[1] The Monitoring Team and the parties (the DOJ and the City of Cleveland) agreed to the assessment including cases falling within this period to allow recent improvements in case adjudication staffing at the CDP to be considered as they related to the timeliness in the adjudication of community complaints falling within the mandate of the OPS and CPRB.
[2] Roger Smith was hired in June 2018 as the Administrator of OPS.

February 2017. The Monitoring Team accessed cases through the IA Pro and Evidence.com databases. There was a total of twenty-three (23) cases that met the above-noted criteria.

The Monitoring Team's review coordinator confirmed that the appropriate documents were available to reviewers, including documentation normally uploaded to IA Pro, Wearable Camera Systems (WCS) video, audio and video recordings of CPRB hearings. In addition, the CDP and Department of Public Safety provided transcripts for all Chief's hearings and Director's hearings conducted for the identified cases.

A team of four reviewers examined all case documentation, including watching video recordings of OPS interviews and of relevant portions of CPRB meetings. Each case was randomly assigned to a reviewer. The review coordinator subsequently conducted an independent review of each assessment tool and conferred with the reviewers, as necessary, to ensure consistency amongst the assessments. Ultimately, there were no irreconcilable differences of opinion as to any key issues or conclusions made by the reviewers.

The review considered all parts of the investigation and adjudication processes, to include the underlying OPS investigation and OPS findings, Civilian Police Review Board hearings, findings and recommendations, along with the rationale and disciplinary decisions made during adjudication of cases by the Chief and the Director of Public Safety.

The review specifically evaluated to what extent:

- "OPS investigations of complaints were as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of evidence" as required by paragraph 218 of the Consent Decree;
- "CPRB's recommended dispositions [were] based on a preponderance of the evidence" with the "CPRB set[ting] forth its conclusion and an explanation for its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended discipline," as required by paragraph 237 of the Consent Decree; and,
- The Chief and the Director of Public Safety were compliant with the requirements of paragraphs 240 through 243 of the Consent Decree (relating to Disciplinary Hearings) and paragraphs 245 and 247 of the Consent Decree (relating to Discipline).

### 2. Background of OPS Compliance Issues

*The DOJ's 2014 findings*

On December 4, 2014, the U.S. Department of Justice's Civil Rights Division and the United States Attorney's Office for the Northern District of Ohio (DOJ) issued a report detailing their findings from a civil rights investigation into the Cleveland Division of Police. Amongst those findings, the

DOJ detailed numerous deficiencies in carrying out the OPS' mandate to adequately investigate civilian complaints of officer misconduct.

The DOJ found that OPS and CDP investigations of civilian complaints were "neither timely nor thorough, that civilians face a variety of barriers to completing the complaint process, and that the system as a whole lacks transparency." Ultimately, the DOJ found that as a result of the deficiencies, "CDP falls woefully short of meeting its obligation to ensure officer accountability and promote community trust."[3]

The DOJ noted that the problems it identified were not new. At the conclusion of a prior civil rights investigation in 2004, the DOJ had concluded that:

1) "OPS was understaffed;
2) Investigators were not provided with the guidance and resources to do their jobs effectively;
3) Investigations were untimely;
4) Civilians' access to the complaint process was limited; and,
5) Some complaints that should have been investigated were not."[4]

By 2014, the DOJ found that "these problems remain, and in some cases, have worsened." The DOJ identified:

1) "Impossibly high caseloads for investigators,
2) The inappropriate and premature rejection of civilians' complaints,
3) Substandard investigations,
4) Significant delays in completing investigations,
5) The failure to document and track outcomes, and
6) A troubling pattern of OPS inappropriately rejecting complaints that may have warranted an investigation."[5]

The DOJ report identified "staggering [OPS] caseloads [that] make it impossible to taken even some basic investigative steps such as seeking out witnesses or visiting the scene of the alleged misconduct." The DOJ "saw many complaints that took more than a year to resolve" and "[f]or dozens of complaints" the DOJ saw "no record they were ever resolved."[6]

The DOJ further identified a litany of investigative failures, to include:

- Investigations that consistently lacked basic follow up, such as going to the scene and seeking out witnesses;"

---

[3] DOJ Investigation report, at p. 38.
[4] *Id.*, at p. 39.
[5] *Id.*
[6] *Id.*, at p. 40.

- Complaints involving allegations of serious misconduct where investigations consisted solely of officer statements, the complainant's signed form and recorded interview, and little, if any, additional documentation;" and,
- A systemic failure on the part of the OPS to "interview [] involved officer[s] unless the officer requests an oral interview in lieu of a written response.[7]

The DOJ also found deficiencies in the work of the CPRB, tasked with reviewing OPS investigations and making findings on those complaints. The DOJ found that "[t]he Board's review of these investigations [was] [] inadequate." The DOJ noted that Board files "frequently lack[ed] final dispositions and, when dispositions are included, there is no evidence of the Board's rationale supporting its decisions." The DOJ also noted that when CPRB findings were overturned by the Chief, there was no notice provided to the complainants.[8]

Overall, the DOJ found that the "CDP's civilian complaint system, as a whole is disorganized and ineffective … with no systems in place to track the performance of OPS and the Police Review Board."[9]

*The Monitoring Team's Early Observations:*

Up until a change of leadership at the OPS in 2018, the Monitoring Team's reports regarding the state of the OPS-CPRB program were dire.

- In the Monitoring Team's first three Semiannual reports we noted serious failures and found the OPS's situation unacceptable. In June 2017, we found OPS to be non-compliant with 50% of its Consent Decree Requirements.[10]
- In our Fourth Semiannual Report (January 2018), and in reference to the above-noted comments from the Third Semiannual Report, the Monitoring Team reported having "remained frustrated by OPS's lack of progress – as well as the increasing likelihood that the systemic failures of OPS in investigating, civilian complaints in a fair, thorough, objective, and timely manner will serve as an anchor that will prevent timely, ultimate compliance with the Consent Decree. Put differently, the OPS-CPRB system is lagging far behind progress made in a number of other areas, which threatens to extend the duration of the reform process." We did note, however, that new leadership at OPS provided the organization with an opportunity "to get on the right track." However, we also commented

[7] *Id.*
[8] *Id.*, at 41.
[9] *Id.*, at 42.
[10] First Semiannual Report, pp. 7 & 47. Located at: First+Semiannual+Report--2016-06-02--FOR+RELEASE.pdf (squarespace.com); Second Semiannual Report, pp. 7 & 8. Located at: Second+Semiannual+Report--2017-01-10.pdf (squarespace.com); Third Semiannual Report, p. 48. Located at: Third+Semiannual+Report--FINAL--FOR+FILING.pdf (squarespace.com).

that "systemic and long-standing problems that have festered over years still require significant time, energy, and resources to make OPS into a functioning and credible oversight agency."[11]

Beginning with our Fifth Semiannual Report (August 2018), the Monitoring Team identified a number of areas of improvement at the OPS, to include the completion of OPS and CPRB operations manuals, the creation of a Backlog Reduction Plan, the creation of specific milestones to guide the OPS in achieving Consent Decree compliance, the publication of an OPS annual report, and the creation of additional essential staffing positions within the organization. The Monitoring Team noted that while the lack of a permanent OPS Administrator had contributed to continuing struggles within the organization, a new Administrator began working at the OPS, effective June 4, 2018.[12]

By the time of the publication of the Sixth Semiannual Report (March 2019), we reported having seen "improvements in the quality of OPS investigative practices; however, we still noted that "OPS still need[ed] to make additional progress to address some fundamental investigative deficiencies."[13] In our Seventh Semiannual Report (September 2019), we reported concerns that "in some cases, [an OPS] desire for the timely completion of case investigations might have negatively impacted the quality of work in some instances." We reported that we had "been providing continuing feedback to the OPS administration in an effort to ensure that OPS ha[d] the capacity to appropriately balance the need for both timely and competent investigations." We also reported on our continuing concerns regarding the apparent lack of timeliness in the final ultimate adjudication of sustained findings recommended by the CPRB on OPS investigations.[14]

In July 2020, our Eighth Semiannual Report announced our intent to conduct a comprehensive assessment of OPS case investigations and the CPRB review process, using both quantitative and qualitative methodologies.[15]

### 3. Assessment Findings

To achieve compliance with the Consent Decree, OPS investigations must be both competent (e.g., thorough and fair) and timely. Unless and until the OPS is able to achieve both of these objectives, full and effective compliance with the Consent Decree will not be reached. In

---

[11] Fourth Semiannual Report, p. 59. Located at: Fourth+Semiannual+Report-FILED.pdf (squarespace.com).
[12] Fifth Semi-Annual Report, pp. 82-89. Located at: FINAL+FOR+FILING.pdf (squarespace.com).
[13] Sixth Semi-Annual Report, p. 48. Located at: Sixth+Semiannual+Report--FINAL.pdf (squarespace.com).
[14] Seventh Semi-Annual Report, pp. 47 & 50. Located at: Seventh+Semiannual+Report+-+FILED.pdf (squarespace.com).
[15] Eighth Semi-Annual Report, p. 47. Located at: FILE_9341.pdf (squarespace.com)

addition, the entirety of the complaint adjudication process must be reliable in that it results in the timely imposition of fair and reasonable discipline.

The following findings and observations were made in this initial assessment regarding **Competency**:

- **Overall, there have been dramatic improvements in the quality of the work of OPS. The OPS administration should be lauded for taking a program that was clearly broken and ineffectual and making it into a program that can be the subject of legitimate evaluation with specified areas of improvement. There are still, however, important compliance issues that need to be addressed.**
- **There have also been striking improvements in the CPRB adjudication process for handling community-initiated complaints (to include timeliness of review by the OPS administration, setting cases for review by the CPRB and forwarding sustained finding recommendations to the Chief). In addition, there has been excellent follow-up by the CPRB in those cases where the Chief has departed from their recommendations - a remarkable change given that prior to the Consent Decree no process even existed for the CPRB to pursue appeals to the Director of Public Safety.**
- **There is a clear and continuing need for more training of OPS investigators to improve the quality of their interviews and a continuing need for formal evaluations of OPS investigators to ensure systemically fair and competent investigations.**
- **Although the timeliness of reviews by the OPS administration is excellent, OPS administrators sometimes appear to have prioritized timeliness over ensuring the quality of investigations.**
- **The OPS-CPRB must do more to adequately identify and systemically address training and policy issues (and areas where police services can be improved) outside of the traditional disciplinary process.**
- **Finally, there is a need for the OPS to ensure that all disposition letters sent to complainants provide sufficient information for them to understand not only the ultimate finding made by the Chief or the Director, but also the rationale provided by the Chief or Director behind that finding.**

The following findings and observations were made in this initial assessment regarding **Timeliness**:

- **Improvements need to be made with respect to the timeliness of OPS investigations and additional resources are needed to eliminate a recent new backlog of case investigations.**

- **With respect to the CDP and the Department of Public Safety, the amount of time it takes the CDP and the Department of Public Safety to impose discipline on sustained community-initiated complaints (approximately one year on average) is far in excess of what is required to be compliant with the Consent Decree.**

### A. Evaluation of Competency

Reviewers were asked to rate each OPS investigation according to the following definitions with the following overall results:

| | | |
|---|---|---|
| Excellent | The investigation complied with all Consent Decree requirements and the OPS manual, and investigators made reasonable attempts to follow all leads and answer all material questions. The investigation was fair, thorough, objective, and timely. | 1 case<br>(4%) |
| Very Good | The investigation complied with most Consent Decree requirements and OPS protocols and investigators made reasonable attempts to follow all leads and answer all material questions. | 2 cases<br>(8%) |
| Good | Although some aspects of the investigation could be improved, the identified flaws did not appear to materially or unduly impact the quality of the overall investigation. The resulting investigation provided sufficient information to evaluate the incident but could be improved. | 10 cases<br>(43%) |
| Fair | Several aspects of the investigation could be improved. Identified flaws materially impacted the quality of the overall investigation, and the resulting file provided insufficient information to evaluate the incident. | 5 cases<br>(22%) |
| Poor | All or nearly all aspects of the investigation could be improved. The investigation failed to establish sufficient information to support an evidence-based evaluation of the incident due to investigative deficiencies, material omissions, or other issues. | 5 cases<br>(22%) |

In order to achieve full and effective compliance on the quality of investigations, it would be expected that <u>all</u> OPS investigations would fall within the Good to Excellent categories. Unfortunately, OPS achieved this goal in only 55% of its cases. Although the quality of investigations has improved greatly over the past two years, OPS still must make additional improvements to achieve full and effective compliance. OPS must ensure that investigations of all community complaints do not contain flaws that materially or unduly impact the quality of the overall investigation and that those investigations systemically provide sufficient information to evaluate the underlying incident and make reasonable findings.

### B. Specific Concerns Identified:

The most significant concerns identified by the reviewers can be classified as follows:

| | |
|---|---|
| 1. Failure to identify, contact or interview all necessary third-party witnesses | 12 cases (52% of cases) |
| 2. Failure to make training and/or policy recommendations | 11 cases (48% of cases) |
| 3. Poor interview techniques | 9 cases (39% of cases) |
| 4. Failure to download/upload all relevant information/documentation in IA Pro | 8 cases (35% of cases) |
| 5. Failure to investigate all potential allegations | 7 cases (30% of cases) |
| 6. Disposition letter failed to explain rationale for the ultimate disciplinary decision | 6 cases (26% of cases) |
| 7. Insufficient attempts to contact and interview complainant | 3 cases (13% of cases) |
| 8. Poor or incomplete investigative report | 3 cases (13% of cases) |
| 9. Aggressive presentation by OPS investigator to CPRB | 1 case (4% of cases) |
| 10. Failure to record interviews | 1 case (4% of cases) |

1. <u>Failure to contact and interview all necessary third-party witnesses (52% of cases)</u>

In half of the cases reviewed, OPS investigators failed to attempt to contact and interview relevant third-party witnesses. It is our concern that in its attempt to improve timeliness, the OPS Administration (and the CPRB) have been approving case investigations and making findings on cases that have not been fully investigated. This is a crucial issue that must be resolved by the OPS and CPRB in order to achieve a finding of "full and effective compliance" with the requirements of the Consent Decree.

Comments by reviewers in these cases include:

- "The investigation would have been far more reliable had the second caller (who called 911 under similar circumstances as the complainant) been identified and interviewed."
- "There was a failure to attempt to locate or interview third-party witness; resulting in a finding of 'insufficient evidence' on a harassment allegation."

- "Additional witnesses were not identified or interviewed, despite at least two people who gave names when calling that night. No attempt was made to canvass the area where incident occurred."
- "There did not appear to be any effort to interview the manager of the establishment who was present on the night in question."
- "There was no attempt to contact and interview a 2nd social worker who witnessed much of the initial incident. Also, there was no record of an interview with a third witness whose name was provided by the 1st social worker."
- "OPS never interviewed the dispatch supervisor who had reviewed the recording of the call in question and opined on its quality."
- "Relevant testimony was not sought from the officer regarding the potential presence of a second officer at the scene. Nor was the officer asked about his WCS footage. This oversight led to important evidence not being gathered during the investigation."
- "Additional witnesses would have helped. There was no evidence the OPS investigator attempted to obtain any witness information and he ultimately only interviewed the complainant and the subject officer."
- "OPS never interviewed the complainant's girlfriend who made the initial 9-1-1 call. Her comments to a witness officer as heard on WCS were critical to the case."

2. <u>Failure to make training and/or policy recommendations (48% of cases):</u>

One of the most important tasks for civilian oversight of law enforcement, as it reviews and monitors police conduct, is the identification of policy and training deficiencies that can be used as "lessons learned" to reduce the risk of future police misconduct.

In this area, the Monitoring Team was unable to locate documentation where policy and training issues were, or should have been, identified and passed along to the Department of Public Safety and the CDP for action. As noted by the reviewers:

- "This matter could (and arguably should) have been addressed as a training matter with the subject officer, as opposed to a matter of misconduct."
- "The core issues of the case related to policy and training versus intentional misconduct or malfeasance. There [was] no indication OPS interviewed personnel from the training section, nor was there a discussion as to whether the subject officer was recently trained in search and seizure law. Also, there was no indication that this issue was referred to the Training Section for CDP wide training on search and seizure."
- "The OPS could have used this as "a good opportunity to [recommend] general training to all members (lessons learned relating to expectations regarding the use of social media), but there was no evidence this was done."

The Monitoring Team recommends that the OPS and CPRB create a more formal process, to include a section in all OPS investigative reports to identify policy and training issues and to forward those concerns to the CDP and the Department of Safety. The OPS should then track those recommendations and publicly report on any actions taken (or declined to be taken) by the Division.

3. Poor interview techniques (39% of cases):

The issue of failing to conduct thorough and objective interviews of witnesses has plagued the OPS since the time of the first DOJ investigation. The OPS Administration has explained to the Monitoring Team that they have not been provided with the resources to sit in on or personally review recordings of the vast majority of interviews conducted by OPS staff. As such, they expressed a strong interest in hearing our findings on this issue. The OPS Administrator has also reported that extensive in-house training has been provided to the investigative staff on how to conduct interviews.

Unfortunately, the training provided to OPS does not appear to have been adequate to achieve Consent Decree compliance. As noted by our reviewers:

- "The OPS investigator seemed somewhat inexperienced in asking interview questions of the subject officers and failed to ask deeply probative questions."
- "The witness interviews relied too heavily on closed questions. Potentially limiting the range of responses from the witness, and potentially contaminating the witnesses' responses."
- "The interview of the subject officer was aggressive and confrontational, bordering on an interrogation and was not an advantageous style of interview for this case." In a second case, it was noted that "the interview of the subject officer was closer to an interrogation than an interview and bordered at times on hostile and aggressive."[16]
- "The investigator spent a lot of time reciting relevant GPO language to the officer and prefacing his questions with lengthy recounting of his interpretation of the law and relevant facts. In some ways, it could have bordered on argumentative but it was a one-sided argument."
- "The investigator could not control the interview, the complainant was ranting throughout and it was evident that the investigator just wanted to end the call, resulting in the investigator failing to ask important follow-up questions."

In the only case reviewed involving a complainant who had limited English speaking proficiency, the reviewer commented that "it was unclear from the recording or the electronic file whether the

[16] It must be noted, however, that the Monitoring Team has identified significant improvements in this area. In the past, overly aggressive interviewing techniques were common amongst certain OPS investigators; at the current time, this type of conduct appears to be more of an aberration than a continuing course of conduct.

investigator established that the complainant was proficient in English for the interview to be conducted without an interpreter. The investigator also asked a few unnecessary leading questions but this may have been due to the discomfort caused by some of the communication difficulties."[17]

The OPS Administrator has informed the Monitoring Team that a number of the issues identified in this assessment were previously identified by OPS Administration and have already been addressed with OPS staff. OPS Administration was specifically aware that a few of its investigators had occasionally engaged in overly aggressive interview techniques and that these investigators had already been counselled about their performance.

The new OPS Administrator will need to review OPS training that has previously been provided in this area and determine to what extent additional training will be needed to ensure compliance. As previously suggested by the Monitoring Team, it appears that ongoing monitoring or reviews of interviews in support of a formal performance review process will be required for the OPS to achieve full and effective compliance in this area.

4. <u>Failure to download/upload all relevant information/documentation in IA Pro (35% of cases):</u>

The importance of documenting all aspects of investigations cannot be overstated. The old axiom of "if it's not documented, it didn't happen" must be applied to the OPS when it conducts its investigations and uploads information into its Management Information System. In addition, without full documentation, reviewing bodies such as the Monitoring Team or the Inspector General are unable to effectively evaluate the progress of the OPS and CPRB as to Consent Decree compliance and overall competence.

In a full one-third of the cases reviewed, there was information missing from IA Pro. In these cases, we found examples of the following: no documentation of investigative plans, missing recordings of interviews, missing correspondence from the Chief's Office, and lack of documentation as to notice provided to complainants and officers. In one case, there was no documentation of when a case was returned to OPS from CDP Internal Affairs. Finally, the Monitoring Team was unable to find any documentation of CPRB decision-making with respect to agreements or disagreements with the Chief and the Director of Public Safety regarding their departures from recommendations made by the CPRB.[18]

---

[17] It should be noted that Under Title VI (and the Safe Streets Act), the City is required to provide Limited English Proficient individuals with meaningful access to their programs and services. Providing "meaningful access" will generally involve some combination of services for oral interpretation and written translation of vital documents. See, (Civil Rights | Limited English Proficient (LEP) | Office of Justice Programs (ojp.gov)).

[18] The only way the Monitoring Team was able to identify the CPRB conclusions in this regard involved a labor-intensive process of accessing and then listening to CPRB meetings conducted after the Chief sent notice of his departure to the OPS and CPRB.

5. <u>Failure to investigate all potential allegations (26% of cases):</u>

Another important component of the community complaint adjudication process is the need for the investigative and reviewing bodies to identify and fully investigate all significant allegations of misconduct. In 30% of the cases reviewed, however, we noted failures on the part of the OPS and the CPRB to identify areas where serious misconduct may have occurred and to fully investigate those acts or omissions.

In one case, the OPS failed to allege or investigate a "Failure to Supervise" allegation brought up by the complainant. In an additional three cases, the OPS failed to initiate false statement allegations against subject officers who made statements during the course of the OPS investigation that appeared to have been (or had the potential to be) provably false. In yet another case, the reviewer noted that the OPS failed to look into the complainant's allegation that an officer failed to submit a complete report on an incident, instead focusing on the allegation that the officer failed to cite the driver of the vehicle that collided with the complainant.

Ultimately, the responsibility for ensuring that all potential instances of officer misconduct are fully investigated and adjudicated falls on every stakeholder in the adjudication process, starting with the OPS investigator, and including the OPS Administration, the CPRB and the Chief and/or Director of Public Safety. In none of these cases was there any intervention on the part of any of these stakeholders.

The failure to fully identify and investigate all potential allegations should be a rare occurrence. The various stakeholders in the community complaint adjudication process will need to be more attuned to this issue, and act accordingly, before Consent Decree compliance can be achieved.

6. <u>Failure of disposition letters to explain the rationale for ultimate disciplinary decision (26% of cases):</u>

It is important for an oversight agency to be transparent and provide civilian complainants with explanations of rationales for decision-making. This is particularly important when complaints are not sustained. The CPRB manual has specific provisions in that regard. Specifically, in cases where the Chief or the Director of Public Safety has decided to depart from the Board's adjudication and/or recommended discipline and the Board has decided not to appeal or formally disagree with that decision, pursuant to CPRB Policy Manual Section L.3, the OPS is required to provide notice to the complainant to "include the Board's reasoning for not reconsidering the Chief's determination." In addition, that same Manual Section requires that "[i]n all cases adjudicated by the Board," the OPS shall "provide a timely written explanation to the complainant and the subject employee(s) *outlining the reasoning* behind the Board's decision to issue findings of "insufficient evidence," "unfounded" or "exonerated." (Emphasis added).

In a number of cases, however, the current processes used by the OPS and the CDP do not appear to provide complainants with the information they would need to understand the rationale behind the decisions made by the Division, the Director or, sometimes, the CPRB.

In one case, the reviewer noted that "OPS' final disposition letter to the complainant did not provide any notice of Chief's departure from PRB recommendations or the history of decision-making. It only stated that PRB sustained and the Chief issued a written reprimand." In another case, it was noted that although the OPS disposition letter to the complainant did outline the course of events, it did not explicitly state whether or not the CPRB publicly challenged the decision-making of the Public Safety Director. In yet another case, there was no indication of any letter to the complainant advising her of a dismissal by the Chief - instead, the last letter sent by the OPS only advised her of sustained findings having been recommended by the CPRB.

Just as important as advising complainants of why the CPRB declined to sustain an allegation, is the need to be transparent as to the ultimate findings when the Chief or the Director do not follow CPRB recommendations as to findings and/or discipline. In all but one case, the Chief provided rationale for his departures[19] and there is no apparent reason why the OPS did not pass along that rationale to the complainant in all cases.

7. Insufficient efforts to contact and interview complainant (13% of cases):

The OPS Manual is very clear on what is required regarding OPS investigators' efforts to contact complainants. Section 403 of the Manual provides specific detail for procedures for contacting and/or interviewing complainants. This Manual Section was created specifically to deal with a prior history where the OPS systemically failed to take appropriate efforts to contact and interview complainants. The Manual includes a requirement that OPS investigators go to the complainant's last known address "after three unsuccessful attempts to contact the complainant."

In two different cases reviewed, however, the complainant was not located or interviewed and there was no documentation of any OPS investigator attempt to visit the complainant's last known address. In a third case, even though the first OPS investigator promised a complainant a subsequent "full blown" interview, a second investigator failed to follow through on that promise.

8. Poor or incomplete investigative reports (13% of cases)

In the past, the Monitoring Team observed systemically poor report writing on the part of OPS investigators. This no longer appears to be a systemic issue. However, in one of the cases reviewed, it was noted that the "overall report was a cliff notes type report more than a comprehensive investigative report." In another case, it was reported that although the interview of the complainant was conducted in a "very respectful and compassionate way," and the interview was

[19] In one case, the Chief's explanation was purely conclusory. There was no documentation, however, of any attempt by the OPS or the PRB to obtain a more robust rationale from the Chief.

"thorough and produced very detailed information," the OPS investigative report did not include some critical information from the interview. In a third case, it was reported that the investigative report contained no documentation about why witnesses were unable to be identified.

9. Singular Case Issues:

In singular cases, issues of concern were identified by reviewers that warrant comment herein:

A. Aggressive presentation by OPS investigator to Board or at pre-disciplinary hearing

In the past, the Monitoring Team noted overaggressive presentations to the CPRB or at pre-disciplinary hearings. In all but one case that was reviewed, such behavior no longer appears to occur. However, in one notable case, the OPS investigator was noted to have been "over-zealous and even interrupted Board members during their deliberations." The Monitoring Team understands that OPS Administration has been cognizant of this issue and addresses it as necessary with OPS staff. The Monitoring Team believes that the new OPS administration will need to address any future issues in this regard, to include overly aggressive interview techniques, on a more formal basis, through a formal performance review process.

B. Failure to record interviews

In the past, OPS investigators, more often than not, failed to record their interviews. This appears to be no longer the case. However, in one case, it was noted that although the OPS investigator appropriately conducted "non-evidentiary interviews" with CDP personnel for technical advice, the investigator failed to record the interviews.

10. Additional Issue of Concern: Video recordings of subject officers:

Finally, in two cases, the reviewer noted the poor quality of WCS video recordings of OPS interviews with subject officers which highlighted a continuing need for more adequate video recording technology to be provided in the OPS interview room.

In addition, in one instance, the subject officer video interview shut off at a midway point without explanation or documentation thereof.

### C. Evaluation of Timeliness

1. Full Adjudication of OPS Cases:

As previously stated, even if an OPS investigation is thorough, fair and professional, if the investigation or the adjudication of a complaint is not timely, the community and the police are not well served. Untimely investigations undercut the efficacy of any police accountability systems. In addition, such delays also lead to procedural injustice for both the community and the

involved officers. Of the 23 cases that were assessed, the Monitoring Team noted that only one case was fully adjudicated in a timely fashion. (That case was adjudicated in 152 days (approximately 5 months from the time the complaint was received by OPS until the time a disciplinary decision was made)).

The overall time for the full adjudication of OPS-PRB cases was on average, approximately one year from the date the complaint was received by OPS. (Average time was 361.2 days, with a median of 363 days). The case that took the longest amount of time to resolve, took 567 days (approximately 19 months). That case ultimately included a CPRB appeal of the Chief's departure from their disciplinary recommendation.

Th stages of adjudicating a complaint, include:

1. Completion of OPS investigation
2. Completion of CPRB hearings & findings
3. Completion of findings letter to CDP
4. Charging letter from CDP
5. Pre-disciplinary hearing
6. Chief's findings
7. (If Chief departs from CPRB findings) Review of Chief's findings by CPRB and appeal decision
8. (If CPRB decides to appeal) Hearing conducted by Director of Public Safety
9. Disciplinary decision by Director of Public Safety

Each stage takes time and is an integral part of the overall process of attempting to ensure officers and complainants receive fair treatment and due process. However, as the Monitoring Team has repeatedly noted, and as this review has established, it is impossible to ensure the overall timely

adjudication of complaints (as envisioned by the Consent Decree),[20] without creating and monitoring timeliness goals for each and every stage of the process.[21]

The Monitoring Team has concluded that Consent Decree compliance will not be possible in this important area of police accountability until the City establishes such timeliness goals and ensures all stakeholders work towards achieving each and every goal.

2. <u>Timeliness of Various Stages of OPS Adjudication Process</u>:

*Stage 1: OPS Investigation Timeliness.*

With respect to the first stage of the investigation/adjudication process, Consent Decree paragraph 216 requires that "[i]nvestigation of complaints assigned to the standard track will be completed within 45 days" and "[i]nvestigation of complaints assigned to the complex track will be completed within 90 days during the first 6 months following the Effective Date and within 75 days thereafter."

Only 52% (n=12) of the cases reviewed were completed within the required 90-day period. Of those cases completed within 90 days, the average time of completion was 38 days (median between 38 and 47 days). Of those cases not completed within 90 days, the average time of completion was 205 days (217 days median).

The time for completion of investigations ranged from 11 days to 377 days. Two cases took over one year (366 & 377 days), but seven cases (30%) took more than 6 months to complete.

<u>Current issues with timeliness of OPS investigations:</u>

Unfortunately, the number of open cases at the OPS has been trending upwards over the course of 2021. This trend appears to be based, in large part, on an increase in the number of OPS complaints currently being received. The number of OPS complaints received in the first 9 months of each year hit a low of 151 in 2018. As of September 28, 2021, however, the number of complaints received was reported by the OPS to be 237, an increase of 57% over the last three years

[20] See paragraph 177 requiring CDP Internal Affairs to conduct "objective, comprehensive, and timely investigations of all internal allegations of officer misconduct;" paragraph 194 requiring the City to hire an OPS administrator with the ability to manage, amongst other things the "timely, and objective investigation of complaints;" paragraph 253 requiring the Inspector General to "analyze investigations conducted by OPS to determine whether they are timely, complete, [and] thorough…"; and, paragraph 320, requiring the City to create a police staffing plan that will ensure, among other things, "a sufficient number of well-trained staff and resources to conduct timely misconduct investigations."

[21] With the passage of Issue 24, it appears that additional stages to the disciplinary process may need to be added; as such, this issue may be of increasing importance in the upcoming future.

As a result, over the course of 2021, the number of pending investigations overall has significantly increased. This has led to an increase in the average OPS investigator's caseload. At the beginning of 2021, the OPS reported a total of **169** active investigations, assigned amongst a total of nine investigators, showing an average caseload of 18.7 cases per investigator. As of the end of October 2021, the OPS reported a total of **237** active case investigations amongst eleven investigators, resulting in an increase in average caseload from 18.7 to 21.5, even with the addition of two new investigators.[22]

In addition, as of the end of October 2021, the OPS reported having a total of **52** case investigations that are over one year old and not yet completed. This is a dramatic increase over the number of year-old case investigations reported at the beginning of 2021 wherein the OPS reported a total of **18** cases that were over a year old and still pending the completion of an OPS investigation.

The City must act quickly and provide additional resources to the OPS in order to attend to this significant increase in workload. Only in this way will the City be able to eliminate this unacceptable workload that will negatively impact the OPS' ability to achieve full and effective compliance with the Consent Decree.

*Stage 2: Assignment of Cases to CPRB / Completion of CPRB hearing.*

With respect to the reviewed cases, it took the OPS-CPRB, on average, almost two months (57.5 days average; median = 49 days), from the time an investigation was completed to the time that the CPRB adjudicated the case. It does appear that a large part of any delays in this stage of the process can be attributed to the CPRB meeting only once a month.[23]

In sixteen (70%) of the cases, the CPRB was able to hear the case within a two-month period. In seven cases, however, it took between 75 and 141 days for the CPRB to adjudicate an OPS investigation (average of 101 days; median of 82 days).

Prior to our next evaluation, the City, the OPS and the CPRB should further examine this issue to determine to what extent case adjudication times can be shortened. In a best-case scenario, all

---

[22] One case was assigned to the Supervising Investigator, reducing the caseload from 237 to 236 cases, split amongst eleven investigators. One temporary investigator was added onto the OPS Bi-weekly report as of June 22, 2021; a second temporary investigator was added onto the OPS Bi-weekly report as of July 6, 2021. The caseloads for these new investigators started small, with each investigator only being assigned one case each and then increased over time with each new investigator being assigned 8 to 9 cases as of the end of October, 2021. As of the end of October, neither of the new investigators were carrying a full caseload, resulting in the permanent investigators carrying an actual average caseload of 24.4 cases each.

[23] The issue of how often the CPRB should meet was the subject of significant discussion in the early stages of Consent Decree implementation (2017-2018). CPRB workload is substantial and meeting more than once a month was considered to be too great a burden on the CPRB membership, who receive only small stipends from the city for their work.

community complaints should be able to be adjudicated by the CPRB within 30-45 days of the completion of an OPS investigation.

*Stage 3: Preparation of Findings Letters to Chief.*

OPS Manual Section 802 requires the OPS Administrator to prepare a letter to the complainant, explaining CPRB findings within 15 days of a CPRB meeting (and "promptly direct that a findings letter be delivered to the Chief of Police requesting that a charging document be issued"). For the 23 cases reviewed, the longest it took the Administrator to send such a letter was 24 days (on four occasions) and the average number of days to send a findings letter was 17 days (median = 17 days). Although OPS was generally compliant with this OPS Manual requirement, the 15-day requirement was not met in a majority of the cases.

*Stage 4: Preparation of Charge Letters.*

In prior public reports, the Monitoring Team has identified a lack of timeliness in the scheduling of OPS case-related pre-disciplinary hearings by the Chief of Police to be an issue of significant concern (although we have noted that some of those delays were the result of the COVID-19 pandemic, which resulted in the inability of the Division to conduct any pre-disciplinary hearings from March through May, 2020).[24] Over the past few reporting periods, the Chief's Office increased staffing to the "Case Prep Unit" to address the Division's need to handle discipline in a more timely and effective manner. In fact, immediately prior to conducting this assessment, the Monitoring Team updated the population of cases to be reviewed to allow this assessment to evaluate impact of the increase in the Case Prep Unit's staffing.

Out of 24 charge letters created[25] – it took the Division 78 days, on average [median between 58 and 66 days], to produce a letter to the subject officer(s) advising them of the charges against them. This stage of the disciplinary process should take no longer than 30 days, except in unusual circumstances (such as where an OPS case needs to be combined with other pending internal allegations).

[24] See, Third Semiannual Report, at p. 48 [discussing OPS failure to refer cases to Chief's Office]; Seventh Semiannual Report, at p. 50 [regarding the reported inability of the CDP to schedule timely OPS pre-disciplinary hearings]; Eighth Semiannual Report, at p. 49 [recommending that the CDP establish timeliness goals for the completion of Chief's Hearings; and, Ninth Semiannual Report, at p. 93 [noting challenges posed by COVID-19 pandemic on timeliness of Chief's Hearings].

[25] Due to a number of factors, not every case involved the issuance of a charge letter and some cases involved the creation of more than one charge letter.

*Stage 5: Completion of pre-disciplinary hearing.*

On average, it took the Division 22 days to conduct pre-disciplinary hearings from the date of the charge letter (median = 21 days].

As such, this was the one stage of the adjudication process where it appears that timeliness has been achieved.

*Stage 6: Chief's Findings.*

This part of the adjudication process involves the amount of time that the Chief took to decide and impose discipline after completing a pre-disciplinary hearing.

The population included twenty-five (25) individual disciplinary decisions made by the Chief.[26] The average amount of time it took the Chief to issue discipline was thirty-nine (39) days from the date of the pre-disciplinary hearing (with a median of 36 days). The Chief issued eleven (11) decisions in less than 30 days (46%), and a total of 22 decisions in 60 days or less (92%). In one case, however, involving a letter of reprimand, without a pre-disciplinary hearing, it took the Chief on hundred and fifteen (115) days to issue his decision.

Although the Monitoring Team has witnessed impressive improvements in timeliness in this area, more needs to be done. In order to ensure procedural justice for both the community and the involved officers, except in the most exceptional cases, it should take the Chief no longer than 30 days to issue discipline and that, in most cases, discipline should be imposed within 15 days of a pre-disciplinary hearing.

*Stage 7: CPRB reviews cases involving departures from the Chief of CPRB recommendations.*

The Monitoring Team found that the OPS-CPRB has created a robust process by which the CPRB considers departures by the Chief from its disciplinary recommendations at the next available hearing. This is an excellent process improvement given that, in the past, there was no record of the CPRB even considering appealing a departure by the Chief to the Director of Public Safety.

*Stage 8: [If CPRB decides to appeal] – hearing conducted by Director of Public Safety, and,*
*Stage 9: Disciplinary Decision by Director of Public Safety.*

Only four of the cases reviewed involved instances where the Chief departed from CPRB disciplinary recommendations and the CPRB chose to appeal the Chief's decision to the Director

[26] In some cases, the Chief issued more than one disciplinary decision, in other cases, the Director of Public Safety issued a disciplinary decision instead of the Chief.

of Public Safety. In the first case, it took 165 days for the Director to resolve the case (taking 101 days for a hearing to be scheduled and an additional 64 days for the Director to make a disciplinary decision). In subsequent cases, the Director laudably put into place a process where hearings could be conducted within three days of a CPRB decision to appeal.

Even so, in the next two cases decided by the Director, it took him 76 and 97 days to make his decision. And while there was a significant improvement in the amount of time the Director took to make his decision in the final case we reviewed (35 days), improvements in the amount of time it takes to issue these decisions would positively impact on the overall timeline for complaint adjudication.

# APPENDIX C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING** |
| CITY OF CLEVELAND | ) | **TEAM USE OF FORCE REVIEW** |
| | ) | **MEMORANDUM** |
| Defendant. | ) | |
| | ) | |
| | ) | |

The Monitoring Team respectfully submits its Use of Force Review of Cleveland Division of Police ("CDP" or "the Division") pursuant to paragraph 45 of the Consent Decree.[1] The Monitoring Team recently completed an assessment of a sample of use of force cases from 2018 and 2019. These cases were reviewed by the chain of command and closed by June 2020. The attached memorandum summarizes the process and the findings of the Monitoring Team's (MT) review of this selected sample of use of force cases and reviews. (Exhibit A) The review period commenced in October 2020 and ran through the spring of 2021. The Monitoring Team presented findings in two meetings to the City: one in February 2021 and one in May 2021. Additional reviews will take place in 2022 to assess compliance.

[1] Dkt. 413-1, Ex. A ¶45; Dkt. 416.

Respectfully submitted,

/s/ Hassan Aden

HASSAN ADEN
Monitor
The Aden Group LLC
8022 Fairfax Road
Alexandria, VA 22308
Tel: (571) 274-7821
Email: aden@theadengroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2022, I served the foregoing document entitled **Notice Submitting Monitoring Team Use of Force Review Memorandum** via the court's ECF system to all counsel of record.

/s/ Ayesha Hardaway
AYESHA HARDAWAY

# MEMORANDUM

DATE: MARCH 22, 2022

TO: MARK GRIFFIN, LAW DIRECTOR
KARRIE HOWARD, DIRECTOR OF PUBLIC SAFETY
DORNAT DRUMMOND, INTERIM POLICE CHIEF
JOELLEN O'NEILL, DEPUTY POLICE CHIEF
DANIEL FAY, DEPUTY POLICE CHIEF
TIMOTHY MYGATT, DEPUTY CHIEF, CRT
JONAS GEISSLER, CRT
ACRIVI COROMELAS, CRT
STEVEN J. PAFFILAS, CIVIL DIVISION CHIEF, AUSA
MICHELLE HEYER, AUSA
SARA DECARO, AUSA
MICHAEL EVANOVICH, AUSA

FROM: HASSAN ADEN, MONITOR

RE: MONITOR'S 2020-2021 USE OF FORCE REVIEW

---

Pursuant to the responsibility to ensure that the intent of the reforms detailed in Section VI of the Consent Decree are met by the Cleveland Division of Police (CDP), the Monitoring Team (MT) designed and performed a review of use of force incidents. The Consent Decree requires:

> The force policies, training, supervision, and accountability systems will be designed with the goal of ensuring that officers use techniques other than force to effect compliance with police orders whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; de-escalate the use of force at the earliest possible moment; and accurately and completely report all uses of force. (¶ 45)

This memo summarizes the process and the findings of the MT's review. The review period commenced in October 2020 and ran through the spring of 2021. The MT presented findings to the City during two meetings: one in February 2021 and one in May 2021. Additional reviews will take place in 2022 to test for compliance.

## Methodology

To determine if CDP has been complying with the requirements of the Consent Decree and CDP approved policies, the MT assessed a sample of use of force cases and reviews. The MT created, tested, and refined a tool that was endorsed by the City and the United States Department of Justice (DOJ). While the MT found that the tool and the process worked well, the process was slow. Regrettably, the feedback to the City was delayed, and led the MT to redesign the process for future reviews.

Selection of Cases: The MT drew a representative sample of use of force incidents that occurred between 2018 and 2019, were reviewed completely by the chain of command, and were closed by early June 2020. Cases were broken out by the reported level of force used (Levels 1, 2, and 3) and cases were randomly selected from within the category. Level 1 refers to force that is reasonably likely to cause only transient pain and/or disorientation, but not expected to cause injury; un-holstering a weapon is also considered Level 1. Level 2 is force that causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury. Level 3 is force that includes deadly force, and uses of force that result in death or serious physical harm. (See CDP Policy 2.01.01 for the full definitions of each level of force).

The sample included 130 cases, with an oversample of non-firearm Level 1 cases. The MT's sampling frame reflected a 95% confidence interval, a 10% margin of error, and a response distribution of 80%. Sample cases were extracted based on the agreed upon methodology mentioned above.

Sample Composition

| **Force Level** | **Population** | **Sample*** | **# of Reviews** |
|---|---|---|---|
| Level 3 | 27 | 27 | 54 |
| Level 2 | 227 | 49 | 98 |
| Level 1 (all)^ | 421 | 54 | 54 |
| TOTAL | 675 | 130 | 206 |

*95% Confidence Interval, +/- 10% Margin of Error, 80% Response Distribution
^ Level 1 cases will be oversampled via random oversampling when the case numbers are sampled

Assignment of Cases: The cases were divided into six phases and assigned to MT members for review. The MT believed initially that each phase would require one month to review and then those findings would be presented to the City. In practice, the reviews took longer than expected and the MT facilitated discussions on a select number of cases in May of 2021 for three phases and November 2021 for the remaining cases.

To expedite the review and to allow for a larger sample, the MT's methodology used a process with a different number of reviewers based on the level of force of each case.

- Level 2s and 3s were reviewed by 2 reviewers
- Level 1s were reviewed by 1 reviewer

Review of Cases: CDP provided the reviewers access through laptops with VPN and IAPro (accountability management software) access. Case files were deposited into the electronic file-sharing system used by the Monitoring Team and CDP. This process protects personally identifiable information in transit and at rest. CDP provided access to evidence.com to all reviewers to access the Wearable Camera System footage. Reviewers used the approved tool in

Alchemer, allowing reviewers to assess each of the cases in an electronic format to facilitate analysis of the data. The data collected using the tool was saved to the cloud and individual reviews may be downloaded as a PDF. A subset of the MT sample was also reviewed by experts retained by the DOJ. The DOJ sub-sample was identified by its own experts, not by the MT.

The review of Level 1 cases (both non-firearms and pointing firearms cases) was limited to a reduced set of assessment questions, focusing on necessity of the force, proportionality of the force, reasonableness of the force, efforts to deescalate where appropriate, and overall quality of the report and review. This expedited review allowed more cases to be reviewed and enhanced the ability of the MT to determine if over/underreporting or misclassification of cases occurred. The Monitoring Team planned, but did not find it necessary, to increase the number of reviews of the Level 2 cases based on its review of the Level 1 cases.

The data from Alchemer was reviewed and cases where the MT reviewer disagreed with the chain of command review on reasonableness, proportionality or necessity, as well as officers' attempts/or failure to deescalate were flagged. The MT also flagged for further review any case where the MT reviewers were not aligned. The MT held internal calls to reconcile any differences within the team and to discuss cases where other concerns, relating to tactics, supervision, or training issues were identified.

**Findings**

General Findings: Overall, on force in particular, the MT found that officers' use of force is generally within policy, the chain of command reviews are identifying and dealing appropriately with problematic uses of force (by referring cases to Internal Affairs or Training), and supervisors on scene are engaged with officers.

The MT's review did highlight a few deficiencies by CDP officers in tactics and the ability to deescalate, both of which at times created the need for force. Similarly concerning is the reality that use of force reviews by the chain of command continue to take months to complete, which is unfair to the officers involved and creates potential liability issues for the City. Policy 2.01.06 dictates that "each level in the chain of command shall review the [use of force] report within three tours of duty"; conversely our reviews indicated that they could take as long as several months. Understanding that Policy 2.01.06 went into effect in 2021 and the cases the monitoring team subject matter experts reviewed were from 2018 and 2019, the purpose for noting the delays in this document, serves to advise the City and the CDP that review timelines will be a focus of our upcoming compliance reviews and assessments of use of force cases. Finally, the Division needs to create processes and structures for lessons from the street – such as inadequate de-escalation or problematic tactics – to be addressed in training. In the sample of cases reviewed, there was no indication by the chain of command that the Training Section was advised of the issues described here.

Specific Findings: In the May 2021 discussion, the MT identified only one case where there was a difference of opinion in the review by the chain of command and the MT's reviewers. There were nine cases where the reviewers identified tactical issues that could have changed outcomes (i.e., the level of force used, or the need to use force altogether) and as such should be reviewed,

have lessons extracted from them, and be shared with training units. In the November 2021 discussion, the MT presented to CDP two cases of concern. One case with questionable force was also poorly handled by the chain of command review. A second case involved an out of policy use of force that resulted in the officer leaving the Division before the case was fully adjudicated. The reviewers raised significant concerns that need to be addressed to change the possibility of a similar fact pattern reoccurring. This case produced a number of important lessons that should be extracted and shared with training and supervisory personnel.

Overall, the MT found that the cases in the sample were well reviewed, and street supervisors were engaged and responding within policy mandates to use of force incidents. In the vast majority of the cases assessed by the MT, the officers appropriately exercised force consistent with policy. MT reviewers found officers and chain of command reviews correct in their assessments of necessity, proportionality, objective reasonableness, and the officers' ability and efforts to de-escalate. For the most part, the chain of command review identified problem behavior and the majority of the time, dealt with the problem behavior appropriately with education or discipline.

In cases that the MT called out for discussion, the MT did so because officer tactics actually created the necessity for force. In other cases, officers' lack of effort to deescalate, or inability to slow things down necessitated the use of force. A continuing concern of the MT is that CDP seems to lack an effective monitoring system for tracking identified systemic issues. Some MT members learned about a tracking system used at the Force Review Board (FRB) that tracks the quality improvement loop for FRB recommendations. Perhaps this can be modified to include recommendations that come from the chain of command for other use of force reviews, as most use of force cases are not reviewed by the FRB. A true learning organization better connects the observations and work to eliminate the problematic tactical decisions. Additionally, Paragraph 274 of the Consent Decree requires that the CDP training plan be informed by "trends in misconduct complaints, problematic uses of force; analysis of officer safety issues…"; All training issues should inform the needs assessment, and in turn, training issues should be prioritized and inform the training plan.

Based on the MT's review of the random sample, the Division seems to be using force in accordance with its policy and expressed norms. Street supervisors are observed to be engaged and appropriate. The chain of command review is mostly working to identify and address problematic behavior. Based on data from IAPro and the monthly COMPSTAT, the review of use of force cases continues to take longer than expected with some cases, even those not referred to Internal Affairs, taking over 180 days. Finally, a number of problematic cases were difficult to review due to the lack of camera images. This is often attributed to the fact that officers working secondary employment are not required to use the Wearable Camera System.

Presently, the MT is transitioning to a rolling review process that will involve assessing a representative sample of cases closed at the end of each quarter. A methodology for this revised process is in development and has not yet been finalized. The MT will use the revised methodology to formally assess CDP's compliance with Section VI of the Consent Decree.

# APPENDIX D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING TEAM ASSESSMENT OF CDP's 148th RECRUIT CLASS BACKGROUND CHECKS** |
| CITY OF CLEVELAND | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

The Monitoring Team respectfully submits its Assessment of Cleveland Division of Police ("CDP" or "the Division") Background Checks for its 148th Recruit Class pursuant to paragraphs 308 – 310 of the Consent Decree. The Consent Decree requires the Division to "conduct thorough, objective, and timely background investigations of candidates for sworn positions."[1] The Division must assess "a candidate's criminal history, employment history, use of controlled substances, and ability to work with diverse communities."[2] This is in addition to the requirement that CDP will continue to require all candidates for sworn personnel position, including new recruits and lateral

[1] Dkt. 413-1, Exhibit A at ¶309; Dkt. 416.
[2] *Id.*

hires, "to undergo a psychological and medical examination to determine their fitness for employment."[3]

The Monitoring Teams previously submitted to the Court its findings related to the Division's background investigations for lateral hires.[4] Since that time, and as a necessary follow-up, the Monitoring Team audited CDP's pre-employment investigation files of the 148th police officer recruits. This assessment provides the Court with necessary information on how the Division pre-employment background investigations for non-lateral candidates complies with paragraphs 308-310 of the Consent Decree. The attached Memorandum ("Exhibit A") describes the methodology and findings of the review.

Respectfully submitted,

/s/ Hassan Aden

HASSAN ADEN
Monitor
The Aden Group LLC
8022 Fairfax Road
Alexandria, VA 22308
Tel: (571) 274-7821
Email: aden@theadengroup.com

---

[3] *Id*. at ¶308.
[4] Dkt. 401.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2022, I served the foregoing document entitled **Notice Submitting Monitoring Team Assessment OF CDP's 148th Recruit Class Background Checks** via the court's ECF system to all counsel of record.

/s/ Ayesha Hardaway
AYESHA HARDAWAY

**MEMORANDUM**

DATE: JUNE 14, 2022

TO: MARK GRIFFIN, LAW DIRECTOR
KARRIE HOWARD, DIRECTOR OF PUBLIC SAFETY
GARY SINGLETARY, CHIEF COUNSEL
DORNAT DRUMMOND, INTERIM POLICE CHIEF
JOELLEN O'NEILL, DEPUTY POLICE CHIEF
TIMOTHY MYGATT, DEPUTY CHIEF, CRT
JONAS GEISSLER, CRT
ACRIVI COROMELAS, CRT
MICHELLE HEYER, AUSA
SARA DECARO, AUSA
MICHAEL EVANOVICH, AUSA

FROM: HASSAN ADEN, MONITOR

RE: COMPLIANCE ASSESSMENT OF RECRUIT HIRING BACKGROUND CHECK PROCESS, 148TH RECRUIT CLASS

Pursuant to the 2022 Monitoring Plan, a Compliance Assessment of Paragraphs 308, 309, and 310 of the Consent Decree was conducted over the course of two days in April 2022. This assessment focused on Cleveland Division of Police's ("CDP") process of selecting and hiring its 148th recruit class.

This assessment followed the Monitoring Team's ("MT") January 2022 audit of the 149th recruit class of lateral hires. In that assessment, the MT found none of the candidates hired met an acceptable threshold for compliance outlined in Paragraphs 308 through 311. The goal of the current assessment was to determine if the candidates included in the 148th recruit class were vetted in a similar fashion, or conversely, if the candidate histories and background investigations complied with the requirements of the Consent Decree.

In the present review of the 148th recruit class's personnel files, we found that most requirements detailed in the Consent Decree were being met during the selection process. That said, there were two requirements missing from every personnel file reviewed, and some other findings that raised further questions. One very concerning item is the documented internet search for civil actions, which showed a date on the printed internet page of a day in April – the week the MT conducted the visit. This shows not only that the review was not completed before hiring, but also appears to have been completed only because of the scheduled assessment by the Monitoring Team. Compliance requires an enduring effort to do what is expected and to do so with integrity. In addition to making compliance determinations for each of the paragraphs assessed, the MT has provided recommendations to improve the quality of the applicant review process moving forward.

## I. Methodology

On April 14 and 15, 2022 three pairs of MT reviewers reviewed the full contents of the background check files produced by the CDP Personnel Division for the 148th recruit class's academy graduates. The reviewers included Shunta Boston, Christine Cole, Ronnie Dunn, Tammy Hooper, Megan McDonough, and Victor Ruiz. The files were reviewed in a classroom of the Police Training Academy in the Justice Center. Each day there were members of the CDP Personnel Department present to observe and ensure the integrity of the files. On April 14, Assistant US Attorney Sara DeCaro observed for a few hours and on April 15, Michelle Heyer, also an Assistant US Attorney, joined as the MT members were completing the reviews.

The review teams selected file folders at random from the boxes provided by CDP. Ultimately, every file was reviewed and scored. Each pair reviewed the files and assessed the contents against the requirements of Paragraphs 308 through 310 of the Consent Decree using a structured scoring instrument previously approved by the Parties. The requirements of Paragraph 311 were also assessed if the applicant indicated prior law enforcement experience. After reviewing about half of the files, the reviewers paired with new partners to help ensure consistency across teams. Additionally, in situations in which it was unclear how to score a finding using the instrument, MT members raised the issue for broader group discussion. By using a standardized instrument, assigning two reviewers per case, mixing up the pairs during the process, and working near other reviewers, we believe a sufficient level of interrater consistency was achieved.

The approved instrument produced numerical scores for each of the files by assigning point values to the contents. These points were based on the specific requirements of each of the relevant paragraphs of the Consent Decree, and were assigned as follows:

**Scoring Protocol for Each Consent Decree Paragraph**

| Requirement | Scoring |
|---|---|
| **308**: CDP will continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological and medical examination to determine their fitness for employment. CDP will continue to maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers. The program will continue to be designed to detect the use of illegal substances, including steroids. | Psychological examination for fitness for duty (1 point)<br>Medical examination for fitness for duty (1 point)<br>Preservice drug screening (illegal substances and steroids) (1 point)<br>Total: 3 points |
| **309:** CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions in accordance with federal anti-discrimination laws. CDP's suitability determination will include assessing a candidate's criminal history, employment history, use of controlled substances, and ability to work with diverse communities. CDP also will determine, to the extent possible, whether the candidate has | Background check thoroughness (1 point)<br>Background check timeliness (1 point)<br>Criminal history (1 point)<br>Employment history (1 point)<br>Controlled substance use (1 point)<br>Ability to work with diverse communities (1 point) |

| | |
|---|---|
| been named in a civil action in either Cuyahoga County and/or in the County where the officer lives. | Named in civil action in Cuyahoga County or county of residence (1 point for "no")<br><br>Total: 7 points |
| **310:** As part of the hiring process, consistent with applicable law, CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's previous supervisor(s). This review, and any salient information obtained, will be documented in the candidate's file. | Information from prior employer (1 point)<br><br>Information from prior supervisors (1 point)<br><br>Total: 2 points |
| **311:** If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history. This review, and any salient information obtained from this review, will be documented in the candidate's file. | (*only if relevant*)<br><br>Thorough review of prior law enforcement history (1 point)<br><br>Objective review of prior law enforcement history (1 point)<br><br>Timely review of prior law enforcement history (1 point)<br><br>Lethal and non-lethal UOF history (1 point)<br><br>UOF training history (1 point)<br><br>Request complaint history (1 point)<br><br>Total: 6 points |

## II. Findings

In total, 44 personnel files were reviewed and scored. Of the 12 total points possible for Paragraphs 308 through 310, the average score was 9.0. Files ranged from a low total score of 5, to the highest score (and mode) of 10.

**Total Points Per File, Frequency**




Of the 44 files scored, no file received the one point available for a demonstrated ability to work with diverse communities (¶ 309). There was no evidence in any file, either in application materials

or other records, of considering this requirement. Similarly, no file received a point for requesting records from prior employers (¶ 310). Despite documentation of speaking with prior supervisors in many of the files, there was no evidence in any file that prior employment records were requested or reviewed.

**Percent of Files Meeting Each Requirement Scored**

| ¶ | **Requirement** | **% of files that met requirement** |
|---|---|---|
| 308 | Psychological examination for fitness for duty | 97.7% |
| 308 | Medical examination for fitness for duty | 97.7% |
| 308 | Preservice drug screening (illegal substances and steroids) | 97.7% |
| 309 | Background check thoroughness | 77.3% |
| 309 | Background check timeliness | 97.7% |
| 309 | Criminal history | 86.4% |
| 309 | Employment history | 88.6% |
| 309 | Controlled substance use | 97.7% |
| 309 | Ability to work with diverse communities | 0.0% |
| 309 | Named in civil action in Cuyahoga County or county of residence | 86.4% |
| 310 | Information from prior employer | 0.0% |
| 310 | Information from prior supervisors | 72.7% |
| | **Total** | 75.0% |

Additionally, in many of the files, notwithstanding the requirement to request and review employee files from past employment; no file had evidence that any such request or review was completed. In most cases the file notes indicated that the CDP did not perform any form of check with prior employers due to the company's reliance on a "Work Number" service (i.e., a user-paid employment verification database), to which CDP does not subscribe. In some cases, this meant that no prior employers were spoken to for a candidate. One recruit in the 148th academy class had prior law enforcement experience with a sheriff's department. As this was not their last job before applying to CDP, it was not considered a lateral hire. The personnel file contained no law enforcement employment records or other information, beyond self-disclosing the employment, and a single counseling incident.

MT reviewers were also concerned to find numerous examples of untruthfulness in the files of candidates who are now sworn CDP officers. For example, multiple candidates failed to disclose that they were terminated from or disciplined at a job on their application; this was then indicated by a correction form, or the investigator's own notes. One applicant stated that they had no prior military experience, but the file folder included discharge papers obtained by the investigator. Another applicant indicated that they received a high school diploma in a particular year, but their records indicated receipt of a GED two years later.

Several candidates had criminal history incidents that were not sufficiently explained in the file. For example, one candidate's background revealed that as a teen, they had a number of incidents with police involvement, some involving acts of violence. This candidate was hired without a considerable amount of time having passed or work experience to demonstrate that this was not a

persistent pattern of problem behavior; there was no evidence in the file to indicate that these incidents were discussed or researched further.

Some, but not all, of the files included a sheet that indicated how many application reviewers voted for or against hiring a candidate. In many cases there were some votes against a candidate, and yet no explanation for why the individual was hired. In the most egregious case, twelve reviewers voted “do not recommend” and only one voted “recommend”. No additional information was provided with regard to why this vote was overridden, and the applicant was extended an offer.

Lastly, many recruits indicated having applied to numerous public agencies, sometimes all over the country. In many cases the recruit was not offered employment at these other agencies. Sometimes this was due to failing oral interviews, written exams, or other reasons that were not disclosed. While there is no requirement in the Consent Decree that states that recruits who are not offered employment elsewhere are ineligible to apply to CDP, this finding raised questions about the selection requirements and standards currently in place at the Division, relative to its peer agencies.

## III. Compliance Assessment

**Paragraph 308** of the Consent Decree requires all hires to undergo physical and medical examinations to determine fitness for employment, and to maintain a drug testing program. The personnel file reviews found that in all but one, documentation of passing the three tests was provided. This indicates initial compliance with Paragraph 308.[1]

**Paragraph 309** of the Consent Decree requires CDP to conduct thorough, objective, and timely background investigations. CDP must assess candidates’ criminal history, employment history, use of controlled substances, ability to work with diverse communities, and whether the candidate has been named in a civil action.

There are numerous areas within this Paragraph that must be addressed for CDP to achieve compliance. Specifically:

- There is no evidence that CDP completed civil records checks at the time of hire. The internet searches included in each personnel folder were dated from the week of April 11, 2022 – the same week the MT was scheduled to conduct our review. This shows not only that the review was not completed before hiring, but also appears to have been completed only because of the scheduled assessment by the Monitoring Team. Compliance requires an enduring effort to do what is expected and to do so with integrity.

[1] This assessment is based only the data provided by the City, i.e., that the candidate files contained a check box if the City recorded a passed psychological examination. Our assessment does not include our consideration of the adequacy of the underlying psychological examinations to determine candidates’ fitness for employment. *See* Settlement Par. 308. We anticipate assessing compliance with that requirement of the Settlement in an upcoming report.

- CDP must identify a process for systematically assessing and documenting a candidate's ability to work with diverse communities. If this assessment is part of some other examination, it must be referenced in the background check file.
- Criminal history documentation must be timely and accurate. Updated record check documentation should be provided for individuals who are extended offers but defer enrollment in the Academy to a subsequent class. The MT was advised by the detectives in the room during reviews that the recruit in the 148th class who had deferred did have an updated check, but there was no documentation of this in their personnel folder.
- CDP must document salient details when investigating recruits' criminal history. For example, if a recruit states that their criminal history was the result of recurring identity theft, there should be documentation that this explanation was investigated and corroborated.

**Paragraph 310** requires that CDP request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's previous supervisors. As previously stated, the records requests are not currently taking place at all, based on the contents of the personnel files. Additionally, in many cases supervisors were not contacted by investigators. For some recruits, this meant that there was no confirmed work history based on supervisor appraisals or records reviews. To be compliant in this area:

- CDP must provide robust documentation of candidates' employment histories, to include records.
- CDP must work to identify a process to complete comprehensive investigations, even when employment records are maintained by companies requiring subscriptions.

Lastly, **Paragraph 311** states that if a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history. There is no evidence that this requirement was met for the one recruit in the 148th class with prior law enforcement experience, and therefore is not in compliance.

## IV. Areas for Improvements in Background Check Processes

Notwithstanding the scores, and initial compliance assessment, the Monitoring Team has a number of recommendations to improve the quality of the background checks, the process and transparency of selection and decision making, and recommendations for follow up with recruits in ways that could help their on-the-job success.

**Quality of the file:** The files are best described as chaotic. There is little rational organization in the accordion folder with the exception of the inclusion of a manilla file and a colored file. The manilla file most often contained the application from the candidate and the investigator's summary packet. The colored file typically held the work product of the investigator. It would help if categories of data were collected together and separated by a tabbed page or at the very

least a colored piece of paper. All files should have a table of contents that can be substituted as a checklist for content and be identical in order of documents.

The reviewers also found the documentation of interviews with prior employers and personal references to be sparse. Digging more deeply to assess the candidates' fitness for the job would be beneficial. There is little to no data in these files about the candidate as a person. The investigation seemed superficial. In most files was a sheet with signatures and badge numbers in one of two columns – recommend and do not recommend. In all cases, it would be helpful to understand what factors were considered in the decision. This is particularly important in the one case where all but one CDP reviewer did *not* recommend hiring. In any case where there is not unanimous agreement, the dissent should be explained.

**Additional Sources of Data**: While this was not contemplated at the time of the Consent Decree negotiation, the Monitoring Team believes a more thorough background check should include a review of social media posts. In the last few years, in agencies across the country, we have seen evidence of police officers on social media that reveal a bias against certain groups or suggest an inability to work with diverse communities.

**Opportunities to create an environment of success**: The degree to which this recruit class has experienced financial problems is remarkable. We note that most have worked in low paying jobs, are very young, and have not had educational opportunities after high school. The CDP and its Wellness Unit can proactively offer financial planning assistance to this class and other members of the Division. Helping officers who have demonstrated a difficulty with financial management can forestall issues for them as individuals and employees. Police officers have the opportunity to earn significant income through extra jobs and as it well known by management and senior officers, that extra income cannot be guaranteed. Officers in financial distress can also be a liability for the Division and encourage risky behavior of officers.

## V. Conclusion

**Compliance status**: Paragraph 308 is deemed complaint. The three required examinations were conducted for each candidate and the file, in all but one instance, reported the findings as passing. We assume that should a request be made for evidence of the drug screening, the psychological evaluation, and the medical test those could be provided.

Paragraph 309 is not compliant. CDP must determine a method to assess a candidate's ability to work with a diverse community. Often this is a function of the psych eval in combination with the background check, perhaps a social media review, and an assessment of history of bias. The files show no evidence that the background investigator or any other professional assessed the candidate for their ability to work with diverse communities. Paragraph 310 is not compliant. The section above lays out what must occur to achieve compliance. Generally, the background checks with past employers must be more rigorous and follow the language of the Consent Decree.

The Monitoring Team will work with the Background Investigators to help achieve compliance and create more professional looking and easy to use files.

The Monitoring Team understands that background investigations have just begun for a new academy class slated to begin in August 2022. The Monitoring Team will work with the staff to ensure compliance with the Consent Decree on the three paragraphs that govern recruit backgrounds. This supportive activity could commence as soon as June 2022. During the process, the MT will provide TA on how to make the files more complete, compliant, and professional in appearance.

The Cleveland Division of Police should strive to be the top agency in the state of Ohio and accept only the most qualified people for its ranks. Becoming that kind of agency begins with excellent compensation and benefits packages, purposeful and intentional recruiting, followed by thoroughly vetting its candidate pool to glean only the most qualified people to serve Cleveland communities. The Monitoring Team understands the challenges in addressing staffing shortages across police departments in the country. We also understand the risks involved in rushing to fulfill staffing numbers with people not suited to serve our communities.

# APPENDIX E

**EXHIBIT E - 2021 Outcome Measures**

| Baseline Appendix Line # | Consent Decree Paragraph | Consent Decree Section | Topic | Name of Measure | Included in Baseline? (yes/no) | Source of Data | 2015 Data Collected | 2016 Data Collected | 2017 Data Collected | 2018 Data Collected | 2019 Data Collected | 2020 Data Collected | 2021 Data Collected | % increase or decrease from 2015 through 2016 | % increase or decrease from 2016 through 2017 | % increase or decrease from 2017 through 2018 | % increase or decrease from 2018 through 2019 | % increase or decrease from 2019 through 2020 | % increase or decrease from 2020 through 2021 | Compound annual growth rate (CAGR) from 2015 through 2021 | Compound annual growth rate (CAGR) Use of Force from 2019 through 2021 | Validated by Source (yes/no) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **367** | **a** | **Use of Force (UOF)** | | | | | | | | | | | | | | | | | | | | |
| 2 | 367 | a. 1 | UOF | UoF Charges | yes | IAPro | | | | | | | | | | | | | | | | | |
| 3 | | | | # of UOF charges | | | 350 | 307 | 242 | 380 | 379 | 291 | 213 | -12% | -21% | 57% | 0% | -23% | -27% | -7% | -17% | yes | 2015/Baseline: Validational data from CPD captured 349 use of force cases (based on timing of data request); 2016: Validational data from CPD captured 318 use of force cases (based on timing of data request). 2017: 237 use of force cases identified by CPD, but 242 citizens involved in UoF incidents. 2018: 338 use of force cases identified by CPD, but 380 citizens involved in UoF incidents 2019: 343 use of force cases identifed by CDP, but 379 citizens involved in UOF incidents. 2020 260 Incidents Identified, 291 subjects (Total # of subjects involved in UoF). 2021 - 194 incidents identified, 213 subjects. |
| 4 | | | | # of non-UoF charges | | | 38,920 | 31,968 | 33,085 | 26,707 | 20,974 | 15,921 | 16,192 | -18% | 3% | -19% | -21% | -24% | 2% | -12% | -8% | yes | 2015: 39,270 charges; 2016: 32275 charges 2019: 21,733 charges; 2020: 656 subject charges for UoF were subtracted from the total charges 16,577 to get 15,921. 2021 16,405 |
| 5 | 367 | a. 1 | UOF | UoF Charges ending in arrests | yes | IAPro | | | | | | | | | | | | | | | | | |
| 6 | | | | # UoF ending in arrests | | | 285 | 243 | 191 | 296 | 303 | 217 | 154 | -15% | -21% | 55% | 2% | -28% | -29% | -8% | -20% | yes | 2015 Validational data from CPD captured 289 Arrests with 609 different charge types 2019: 303 of 379 citizens involved in UOF were arrested |
| 7 | | | | Total # of non-UoF ending in arrests | | | 24,086 | 19,425 | 18,785 | 15,319 | 12,487 | 9,016 | 9,103 | -19% | -3% | -18% | -18% | -28% | 1% | -13% | -10% | yes | 24,371 total arrests in 2015; 19,668 total arrests in 2016; 18,976 total arrests in 2017; 15,615 total arrests in 2018 2019: 12,790 total arrests. 2020: Total arrested - individuals arrested in UoF to get 9,016. 2021 total is 9,257. Subract this by 154 to get 9,103. |
| 8 | 367 | a. 1 | UOF | UoF rates | yes | IAPro | | | | | | | | | | | | | | | | | |
| 9 | | | | UoF as % of all charges | | | 0.9% | 1.0% | 0.7% | 1.4% | 1.8% | 1.8% | 1.3% | 7% | -24% | 93% | 27% | 1% | -28% | 6% | -10% | yes | 2020: Numerator represents total # of individuals involved in UoF. Denominator is charges of Non-UoF |
| 10 | | | | UoF arrests as % of all arrests | | | 1.2% | 1.2% | 1.0% | 1.9% | 2.4% | 2.4% | 1.7% | 6% | -19% | 88% | 27% | -1% | -29% | 5% | -11% | yes | 2020: Numerator represents UoF total arrests. Denominator is total number of arrests |
| 11 | | | | % of UoFs ending in arrest | | | 81% | 79% | 79% | 78% | 80% | 75% | 72% | -3% | 0% | -1% | 3% | -7% | -3% | -2% | -3% | yes | 2020: Numerator is UoF arrests. Denominator is charges |
| 12 | | | | % of non-UoFs ending in arrest | | | 62% | 61% | 57% | 57% | 60% | 57% | 56% | -2% | -7% | 1% | 4% | -5% | -1% | -1% | -2% | yes | Formula for past "Total number of nonUOF ending in arrest/ and # of non UOF charges" individuals/charges-different units 2019-12487/12790=98% |
| 13 | 367 | a. 1 | UOF | District | yes | IAPro | | | | | | | | | | | | | | | | | |
| 14 | | | | District 1 | | | 36 | 29 | 25 | 34 | 53 | 34 | 22 | -19% | -14% | 36% | 56% | -36% | -35% | -7% | -25% | yes | |
| 15 | | | | District 2 | | | 64 | 57 | 54 | 82 | 72 | 71 | 42 | -11% | -5% | 52% | -12% | -1% | -41% | -6% | -16% | yes | |
| 16 | | | | District 3 | | | 100 | 114 | 68 | 69 | 79 | 48 | 56 | 14% | -40% | 1% | 14% | -39% | 17% | -8% | -11% | yes | |
| 17 | | | | District 4 | | | 85 | 64 | 52 | 87 | 56 | 58 | 34 | -25% | -19% | 67% | -36% | 4% | -41% | -12% | -15% | yes | |
| 18 | | | | District 5 | | | 61 | 39 | 37 | 103 | 80 | 49 | 39 | -36% | -5% | 178% | -22% | -39% | -20% | -6% | -21% | yes | |
| 19 | | | | outside city | | | 4 | 1 | 1 | 5 | 3 | 0 | 1 | -75% | 0% | 400% | -40% | -100% | N/A | -18% | -31% | yes | |
| 20 | | | | Unknown/NULL | | | . | 3 | 5 | 0 | 0 | 0 | 0 | . | 67% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 21 | 367 | a. 1 | UOF | Force type | yes | IAPro | | | | | | | | | | | | | | | | | These data are for all officers that used force. Multiple force types used by officers per citizen. 2015 total =1311; 2016 total=1210; 2017 total=1018; 2018 total=645 |
| 22 | | | | Balance Displacement | | | 76 | 1 | 0 | 0 | 0 | 7 | 10 | -99% | -100% | 0% | 0% | N/A | 43% | -25% | N/A | yes | |
| 23 | | | | Body Force/Body Weight | | | 477 | 176 | 191 | 64 | 86 | 78 | 54 | -63% | 9% | -66% | 34% | -9% | -31% | -27% | -14% | yes | Body force now includes body weight for 2015-2017 |
| 24 | | | | Control Hold-Restraint | | | 217 | 323 | 225 | 66 | 77 | 50 | 44 | 49% | -30% | -71% | 17% | -35% | -12% | -20% | -17% | yes | |
| 25 | | | | Control Hold-Takedown | | | 65 | 124 | 68 | 39 | 57 | 30 | 24 | 91% | -45% | -43% | 46% | -47% | -20% | -13% | -25% | yes | |
| 26 | | | | De-Escalation | | | . | . | . | 104 | 89 | 172 | 141 | . | . | . | . | 93% | -18% | N/A | 17% | yes | This category was new in 2018 2019: De-escalation attempt-89, CDP would like to move De-escalation to another section, since it is not technically a "force type". 2020: Accounts for Attempt, Other, and Unfeasible |
| 27 | | | | Firearm Discharge | | | | | | | 5 | 5 | 5 | | | | | 0% | 0% | N/A | 0% | | 2019: Firearm Discharge was taken out from "other" in previous years and put into separate category |
| 28 | | | | Firearm Point | | | . | . | . | 191 | 178 | 118 | 77 | . | . | . | . | -34% | -35% | N/A | -24% | yes | This category was new in 2018 |
| 29 | | | | Joint Manipulation | | | 137 | 159 | 93 | 36 | 58 | 39 | 39 | 16% | -42% | -61% | 61% | -33% | 0% | -16% | -12% | yes | |
| 30 | | | | Tackling/Takedown | | | 142 | 63 | 46 | 43 | 58 | 51 | 30 | -56% | -27% | -7% | 35% | -12% | -41% | -20% | -20% | yes | |
| 31 | | | | Taser | | | 44 | 36 | 47 | 27 | 22 | 20 | 18 | -18% | 31% | -43% | -19% | -9% | -10% | -12% | -6% | yes | Note: Taser includes when the taser was displayed or used. From 2019 onwards, this number will only include when the taser is used |
| 32 | | | | Verbal/Physical Gestures | | | 31 | 0 | 0 | 0 | 0 | 6 | 8 | -100% | 0% | 0% | 0% | N/A | 33% | -18% | N/A | yes | Might now be captured in de-escalation category which is new in 2018 |
| 33 | | | | Pressure Point/Pressure Point Control | | | 40 | 151 | 180 | 68 | 3 | 3 | 5 | 278% | 19% | -62% | -96% | 0% | 67% | -26% | 19% | yes | This category was in other in 2015 and 2016 and has now been broken out for all 3 years |
| 34 | | | | Push | | | 4 | 90 | 83 | 36 | 38 | 40 | 23 | 2150% | -8% | -57% | 6% | 5% | -43% | 28% | -15% | yes | This category was in other in 2015 and 2016 and has now been broken out for all 3 years |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | | | | Other (1-25 instance each) | | | 48 | 77 | 78 | 41 | 112 | 99 | 74 | 60% | 1% | -47% | 173% | -12% | -25% | 6% | -13% | yes | This is a designation created by the Monitoring Team and includes several categories with fewer than 25 instances. These are not classified as "Other" in IAPro or by the CPD. Others include, but not limited too: ASP Baton, Beanbag Shotgun, Chemical Agent-OC Spray, Feet/Leg Sweep, FIT-Confined-CBF, FIT-Head Strike, FIT-L2_Handcuffed Sub, Head Strike, Leg Restraint, Open Hand Strike, Pepperball-Saturation, Pressure Point, Punch/Elbow, Punching, Striking Muscle Groups, Striking, Pull |
| 36 | | | | Unknown/NULL/#N/A | | | 30 | 10 | 7 | 0 | 0 | 0 | 0 | -67% | -30% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 37 | 367 | a. 1 | UOF | Arrest Type | yes | IAPro | | | | | | | | | | | | | | | | | These data are for all UoF (2015 total UoF=774; 2016 total UoF=1110) not arrests (2015 total arrests=285; 2016 total arrests=244) and not charge types (2015 total charge types=350; 2016 total charge types=308) |
| 38 | | | | Violence toward Police Officer | | | 7 | 105 | 66 | 34 | 49 | 45 | 48 | 1400% | -37% | -48% | 44% | -8% | 7% | 32% | -1% | yes | |
| 39 | | | | Violence toward Others | | | 158 | 156 | 73 | 107 | 108 | 93 | 32 | -1% | -53% | 47% | 1% | -14% | -66% | -20% | -33% | yes | |
| 40 | | | | Damage to Property | | | 57 | 76 | 33 | 83 | 107 | 56 | 26 | 33% | -57% | 152% | 29% | -48% | -54% | -11% | -38% | yes | |
| 41 | | | | Obstructing Justice | | | 207 | 370 | 224 | 220 | 247 | 219 | 175 | 79% | -39% | -2% | 12% | -11% | -20% | -2% | -11% | yes | |
| 42 | | | | Crisis Intervention | | | 40 | 69 | 55 | 29 | 35 | 28 | 22 | 73% | -20% | -47% | 21% | -20% | -21% | -8% | -14% | yes | |
| 43 | | | | Drugs/Alcohol | | | 47 | 31 | 30 | 39 | 40 | 21 | 29 | -34% | -3% | 30% | 3% | -48% | 38% | -7% | -10% | yes | |
| 44 | | | | Cleveland Codified Ord. - Part 6 | | | 84 | 150 | 73 | 64 | 56 | 33 | 25 | 79% | -51% | -12% | -13% | -41% | -24% | -16% | -24% | yes | This category was in other in 2015 |
| 45 | | | | Miscellaneous offense | | | 18 | 39 | 33 | 45 | 69 | 50 | 29 | 117% | -15% | 36% | 53% | -28% | -42% | 7% | -25% | yes | This category was in other in 2015 |
| 46 | | | | NULL | | | 84 | 23 | 0 | 0 | 42 | 0 | 0 | -73% | -100% | 0% | 0% | -100% | N/A | -100% | -100% | yes | This category was in other in 2015 |
| 47 | | | | Other (1-25 instance each) | | | 72 | 63 | 34 | 43 | 48 | 21 | 22 | -13% | -46% | 26% | 12% | -56% | 5% | -16% | -23% | yes | All Data is compiled from categories in previous years. |
| 48 | 367 | a. 1 | UOF | Race | yes | IAPro | | | | | | | | | | | | | | | | | |
| 49 | | | | Black | | | 259 | 219 | 188 | 302 | 275 | 213 | 150 | -15% | -14% | 61% | -9% | -23% | -30% | -8% | -18% | yes | |
| 50 | | | | White | | | 77 | 69 | 68 | 49 | 67 | 62 | 42 | -10% | -1% | -28% | 37% | -7% | -32% | -8% | -14% | yes | |
| 51 | | | | Hispanic | | | 9 | 12 | 11 | 18 | 22 | 20 | 4 | 33% | 0% | 64% | 22% | -9% | -80% | -11% | -43% | yes | |
| 52 | | | | Asian | | | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0% | -100% | N/A | 0% | -100% | N/A | 0% | 0% | yes | |
| 53 | | | | Other | | | 1 | 3 | 5 | 4 | 2 | 1 | 14 | 200% | 67% | -20% | -50% | -50% | 1300% | 46% | 91% | yes | |
| 54 | | | | Unknown/NULL | | | 3 | 3 | 0 | 6 | 2 | 3 | 2 | 0% | -100% | N/A | -67% | 50% | -33% | -6% | 0% | yes | |
| 55 | 367 | a. 1 | UOF | Ethnicity | yes | IAPro | | | | | | | | | | | | | | | | | |
| 56 | | | | Hispanic/Latino | | | 9 | 12 | 11 | 18 | 22 | 19 | 4 | 33% | -8% | 64% | 22% | -14% | -79% | -11% | -43% | yes | |
| 57 | | | | Non-Hispanic/Latino | | | 338 | 292 | 261 | 362 | 355 | 182 | 207 | -14% | -11% | 39% | -2% | -49% | 14% | -7% | -16% | yes | |
| 58 | | | | Unknown/NULL | | | 3 | 3 | 0 | 0 | 2 | 88 | 2 | 0% | -100% | 0% | 0% | 4300% | -98% | -6% | 0% | yes | Unknown was combined in the non-hispanic data point up until 2020. The unknown totals are 136 in 2018 and 134 in 2019. Therefore the non-hispanic totals are lower in both 2018 and 2019 as well. |
| 59 | 367 | a. 1 | UOF | Age | yes | IAPro | | | | | | | | | | | | | | | | | For 2018, the categories have been changed to 17 and under (vs. under 21); then 18-29 (vs. 21-29); The data from 2015-2017 have been updated to reflect this change |
| 60 | | | | 17 and under (juveniles) | | | 31 | 36 | 16 | 28 | 28 | 24 | 22 | 16% | -56% | 75% | 0% | -14% | -8% | -5% | -8% | yes | |
| 61 | | | | 18-29 years | | | 166 | 148 | 117 | 167 | 161 | 122 | 79 | -11% | -21% | 43% | -4% | -24% | -35% | -10% | -21% | yes | |
| 62 | | | | 30-39 years | | | 68 | 59 | 86 | 96 | 101 | 71 | 62 | -13% | 46% | 12% | 5% | -30% | -13% | -1% | -15% | yes | |
| 63 | | | | 40-49 years | | | 39 | 26 | 27 | 42 | 51 | 45 | 25 | -32% | 4% | 56% | 21% | -12% | -44% | -6% | -21% | yes | |
| 64 | | | | 50-59 years | | | 18 | 16 | 11 | 27 | 11 | 14 | 14 | -11% | -31% | 145% | -59% | 27% | 0% | -4% | 8% | yes | |
| 65 | | | | 60+ years | | | 11 | 10 | 6 | 2 | 4 | 4 | 3 | -9% | -40% | -67% | 100% | 0% | -25% | -17% | -9% | yes | |
| 66 | | | | Unknown/NULL | | | 17 | 13 | 9 | 6 | 23 | 19 | 8 | -24% | -31% | -33% | 283% | -17% | -58% | -10% | -30% | yes | |
| 67 | 367 | a. 1 | UOF | Gender | yes | IAPro | | | | | | | | | | | | | | | | | |
| 68 | | | | Male | | | 265 | 223 | 212 | 338 | 334 | 270 | 187 | -16% | -5% | 59% | -1% | -19% | -31% | -5% | -18% | yes | |
| 69 | | | | Female | | | 82 | 82 | 60 | 42 | 45 | 29 | 26 | 0% | -27% | -30% | 7% | -36% | -10% | -15% | -17% | yes | |
| 70 | | | | Unknown/NULL | | | 3 | 2 | 0 | -12 | 0 | 0 | 0 | -33% | -100% | N/A | N/A | N/A | N/A | -100% | N/A | yes | |
| 71 | 367 | a. 1 | UOF | Mental State | yes | IAPro | | | | | | | | | | | | | | | | | Represents incident level data, each officer makes a selection, there may be multiple different selections made per citizen. For example, unimpaired and under influence-alcohol |
| 72 | | | | Mental Crisis | | | 42 | 0 | 0 | 0 | 0 | 0 | 0 | -100% | 0% | N/A | N/A | N/A | N/A | N/A | N/A | yes | more granular data collected in 2016 and 2017 |
| 73 | | | | Behavioral Crisis Event | | | 13 | 68 | 119 | 82 | 44 | 43 | 31 | 423% | 75% | -31% | -46% | -2% | -28% | 13% | -11% | yes | more granular data collected in 2016 and 2017 |
| 74 | | | | Medical Condition | no | IAPro | . | . | . | . | . | . | . | . | . | . | . | . | . | N/A | N/A | | . |
| 75 | | | | Drugs / ETOH | yes | IAPro | 138 | 131 | 223 | 184 | 132 | 98 | 75 | -5% | 70% | -17% | -28% | -26% | -23% | -8% | -17% | yes | Only drugs and alcohol as noted in IAPro |
| 76 | | | | Unimpaired/None Detected | yes (new) | | 67 | 102 | 150 | 309 | 212 | 178 | 116 | 52% | 47% | 106% | -31% | -16% | -35% | 8% | -18% | yes | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 77 | | | | Unknown/NULL | yes (new) | | 90 | 3 | 23 | 24 | 0 | 0 | 0 | -97% | 667% | 4% | -100% | N/A | N/A | -100% | N/A | yes | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 78 | | | | Known Medical Condition | yes (new) | | . | 3 | 1 | 3 | 0 | 2 | 3 | . | -67% | 200% | -100% | N/A | 50% | N/A | N/A | yes | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 79 | | | | Visible Physical Disability | yes (new) | | . | . | . | 5 | 0 | 0 | 0 | . | . | . | . | . | . | . | . | yes | New item CPD now collects |
| 80 | | | | | | | | | | | | | | | | | | | | | | | |
| 81 | 367 | a. 2 | UOF | Officer injuries | yes | IAPro | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 82 | | | | # officers injured | yes | | 134 | 192 | 212 | 58 | 74 | 32 | 38 | 43% | 10% | -73% | 28% | -57% | 19% | -16% | -20% | yes | 2018: Officers are advised to select "yes" to injury and/or hospitalization if at least 1 involved officer was injured and/or hospitalized. Therefore, 2018 data represent the number incidents in which at least 1 officer was injured and/or hospitalized. Officer injury is defined as the number of officers who were injured AND filled out an injury packet (31 officers) as well as those who did not fill out an injury packet but selected an injury type (12 officers) under the officer condition variable. CPD is moving away from capturing officer injury at the incident level and have advised officers to select "yes" to injury and/or hospitalization only in regards themselves. This means 2018 is not apples to apples with prior years and therefore % increases and CAGR in 2018 are not an accurate reflection of changes 2019- Officers were advised to select "yes" if she/he was injured during the use of force. Therefore, 2019 data provides the number of officers injured during use of force. This a shift from the previous definition. As a result, the data from 2019 will not be compared to prior years due to the utilization of a different definition. |
| 83 | | | | rate of officer injuries change overall | no | | . | -30% | -9% | -73% | 28% | -57% | 19% | . | -76% | N/A | N/A | -306% | -133% | N/A | -12% | yes | This represents the year over year rate of change. This number was incorrectly calculated for 2015-2018 and has now been updated |
| 84 | 367 | a. 2 | UOF | Officer injuries severity | yes | IAPro | . | . | . | 640 | 711 | 537 | 407 | . | . | . | | | | | -17% | . | New category added in 2018 |
| 85 | | | | No Injuries | | | . | . | . | 532 | 570 | 450 | 300 | . | . | . | 7% | -21% | -33% | . | -19% | . | New category added in 2018 |
| 86 | | | | Abrasion | | | . | . | . | 18 | 19 | 15 | 11 | . | . | . | 6% | -21% | -27% | . | -17% | . | New category added in 2018 |
| 87 | | | | Bodily Fluid/Exposure | | | . | . | . | 9 | 11 | 9 | 15 | . | . | . | 22% | -18% | 67% | . | 11% | . | New category added in 2018 |
| 88 | | | | Bruise | | | . | . | . | 7 | 11 | 8 | 6 | . | . | . | 57% | -27% | -25% | . | -18% | . | New category added in 2018 |
| 89 | | | | Concussion | | | | | | | 2 | 0 | 0 | | | | N/A | -100% | NA | | -100% | | |
| 90 | | | | Hospital | | | . | . | . | 22 | 30 | 19 | 22 | . | . | . | 36% | -37% | 16% | . | -10% | . | New category added in 2018, officer condition type = hospital age and hospital code |
| 91 | | | | Laceration | | | . | . | . | 6 | 5 | 2 | 4 | . | . | . | -17% | -60% | 100% | . | -7% | . | New category added in 2018 |
| 92 | | | | Puncture | | | | | | | 1 | 0 | 0 | | | | N/A | -100% | NA | | -100% | | |
| 93 | | | | Refused Treatment | | | . | . | . | 6 | 8 | 6 | 2 | . | . | . | 33% | -25% | -67% | . | -37% | . | New category added in 2018 |
| 94 | | | | Soft Tissue Damage | | | . | . | . | 9 | 4 | 4 | 2 | . | . | . | -56% | 0% | -50% | . | -21% | . | New category added in 2018 |
| 95 | | | | Sprain/Strain/Twist | | | . | . | . | 7 | 11 | 4 | 9 | . | . | . | 57% | -64% | 125% | . | -6% | . | New category added in 2018 |
| 96 | | | | Treated & Released | | | . | . | . | 13 | 22 | 16 | 20 | . | . | . | 69% | -27% | 25% | . | -3% | . | New category added in 2018 |
| 97 | | | | Unconscious | | | . | . | . | . | 1 | 0 | 0 | . | . | . | . | -100% | NA | . | -100% | | |
| 98 | | | | Other/. | | | . | . | . | 11 | 16 | 4 | 16 | . | . | . | 45% | -75% | 300% | . | 0% | . | New category added in 2018 (Respiratory Distress, Human Bite, Fracture, Dislocation, Concussion, and EMS) 2020 total should be 12, Human bite was 4, EMS was 8. |
| 99 | 367 | a. 2 | UOF | Public/subject injuries | yes | IAPro | | | | | | | | | | | | | | | | | |
| 100 | | | | # public/subject injuries | yes | | 77 | 69 | 98 | 75 | 85 | 88 | 114 | -10% | 42% | -23% | 13% | 4% | 30% | 6% | 10% | yes | Public injuries is citizen injuries. This was misreported as 112 in baseline, but corrected here. |
| 101 | | | | rate of subject injuries change overall | no | | . | -10% | -76% | 23% | -13% | -4% | -30% | . | N/A | N/A | -157% | N/A | N/A | N/A | 30% | yes | Need Clarification on how this is calculated |
| 102 | 367 | a. 2 | UOF | Public/Subject injuries severity | yes | IAPro | . | . | . | 663 | 884 | 695 | 638 | . | . | . | 33% | -21% | -8% | | -10% | . | New category added in 2018 |
| 103 | | | | No Injuries (No injuries noted) | | | . | . | . | 242 | 210 | 179 | 182 | . | . | . | -13% | -15% | 2% | . | -5% | . | New category added in 2018 |
| 104 | | | | Abrasion | | | . | . | . | 36 | 33 | 42 | 22 | . | . | . | -8% | 27% | -48% | . | -13% | . | New category added in 2018 |
| 105 | | | | Behavioral Crisis | | | . | . | . | 28 | 42 | 35 | 26 | . | . | . | 50% | -17% | -26% | . | -15% | . | New category added in 2018 |
| 106 | | | | Complaint | | | . | . | . | 21 | 38 | 31 | 37 | . | . | . | 81% | -18% | 19% | . | -1% | . | New category added in 2018 |
| 107 | | | | EMS | | | . | . | . | 77 | 111 | 77 | 72 | . | . | . | 44% | -31% | -6% | . | -13% | . | New category added in 2018 |
| 108 | | | | Hospital | | | . | . | . | 95 | 176 | 119 | 110 | . | . | . | 85% | -32% | -8% | | -15% | . | New category added in 2018 |
| 109 | | | | Laceration | | | . | . | . | 14 | 15 | 18 | 10 | . | . | . | 7% | 20% | -44% | . | -13% | . | New category added in 2018 |
| 110 | | | | Pre-Existing Medical Condition | | | . | . | . | 11 | 35 | 21 | 30 | . | . | . | 218% | -40% | 43% | | -5% | . | New category added in 2018 |
| 111 | | | | Puncture | | | . | . | . | 13 | 21 | 14 | 11 | . | . | . | 62% | -33% | -21% | . | -19% | . | New category added in 2018. This equals puncture and puncture taser |
| 112 | | | | Refused Medical Treatment | | | . | . | . | 12 | 10 | 11 | 11 | . | . | . | -17% | 10% | 0% | . | 3% | . | New category added in 2018 |
| 113 | | | | Self-Inflicted/Self-Induced | | | . | . | . | 15 | 15 | 12 | 15 | . | . | . | 0% | -20% | 25% | . | 0% | . | New category added in 2018 |
| 114 | | | | Treated & Released | | | . | . | . | 44 | 95 | 92 | 76 | . | . | . | 116% | -3% | -17% | . | -7% | . | New category added in 2018 |
| 115 | | | | None Identified | | | . | . | . | 34 | 22 | 8 | 1 | . | . | . | -35% | -64% | -88% | . | -64% | . | New category added in 2018 |
| 116 | | | | Unconscious | | | . | . | . | | 1 | 0 | 2 | . | . | . | . | -100% | NA | . | 26% | | |
| 117 | | | | Other/. | | | . | . | . | 21 | 60 | 36 | 33 | . | . | . | 186% | -40% | -8% | . | -18% | . | Other includes: Bruise, Confinement, Decontamination, Dislocation, Fracture, Gunshot, Ingested Drugs, Overdose, Respiratory Distress, Soft Tissue Damage, Sprain/Strain/Twist, TEMS, Dog Bite-Puncture, Alcohol |
| 118 | 367 | a. 2 | UOF | Force complaints | yes | IA | | | | | | | | | | | | | | | | | |
| 119 | | | | # of force complaints | | | 43 | 17 | 33 | 33 | 38 | 36 | 15 | -60% | 94% | 0% | 15% | -5% | -58% | -14% | -27% | yes | These data are by officer and not by case; These data are just from IA and does not include complaints through OPS 2020: May have involved 2019 incidents, but were investigsated in 2020. This is why "Force Complaints" and the "Disposition" below do not add up. |
| 120 | | | | # of non-force complaints | | | 73 | 93 | 96 | 119 | 121 | 132 | 168 | 27% | 3% | 24% | 2% | 9% | 27% | 13% | 12% | yes | These data are by officer and not by case; These data are just from IA and does not include complaints through OPS |
| 121 | 367 | a. 2 | UOF | disposition of force complaints | yes | IA | | | | | | | | | | | | | | | | | |
| 122 | | | | Substantiated/Sustained | | | 7 | 8 | 0 | 3 | 4 | 2 | 1 | 14% | -100% | N/A | 33% | -50% | -50% | -24% | -37% | yes | Includes category "Sustained Other" from 2015 |
| 123 | | | | Not Sustained | | | 0 | 0 | 0 | 3 | 1 | 1 | 0 | 0% | 0% | N/A | N/A | . | -100% | N/A | -100% | yes | This category was not in the 2015-2017 data |
| 124 | | | | Administrative Closure | | | 2 | 0 | 2 | 1 | 0 | 0 | 0 | -100% | N/A | -50% | -100% | N/A | N/A | -100% | N/A | yes | |
| 125 | | | | Exonerated/Within Policy | | | . | 1 | 0 | 3 | 11 | 24 | 11 | . | -100% | 0% | 0% | 118% | -54% | N/A | 0% | yes | |
| 126 | | | | Unfounded | | | 0 | 0 | 0 | 1 | 0 | 4 | 0 | 0% | 0% | N/A | N/A | N/A | -100% | N/A | N/A | yes | This category was not in the 2015-2017 data |
| 127 | | | | Open | | | 34 | 8 | 31 | 22 | 6 | . | 3 | -76% | 288% | -29% | -73% | . | N/A | -29% | -21% | yes | This includes 'Active' & 'Suspended' |
| 128 | 367 | a. 2 | UOF | source (in/ext.) force complaints | no | IA | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 129 | | | | Internal (CPD) | no | | . | . | . | 33 | 38 | 27 | 13 | . | . | | 15% | -29% | -52% | . | -30% | yes | New data captured in 2018; prior to 2018 Incomplete information; no systematic capturing of data through IA or OPS |
| 130 | | | | External (non-CPD/Civilian) | no | | . | . | . | 0 | 0 | 9 | 2 | . | . | | N/A | N/A | -78% | . | N/A | yes | New data captured in 2018; prior to 2018 Incomplete information; no systematic capturing of data through IA or OPS |
| 131 | 367 | a. 2 | UOF | force type | yes | IA, IAPro | | | | | | | | | | | | | | | | | lots of incomplete data (more than half data not present) from 2015-2017. Force Type is documented at the incident level |
| 132 | | | | Balance Displacement | | | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0% | 0% | 0% | 0% | 0% | N/A | N/A | N/A | yes | |
| 133 | | | | Body Force | | | 8 | 0 | 15 | 4 | 6 | 0 | 0 | -100% | N/A | -73% | 50% | -100% | N/A | -100% | -100% | yes | |
| 134 | | | | Control Hold-Restraint | | | 2 | 8 | 11 | 6 | 3 | 3 | 0 | 300% | 38% | -45% | -50% | 0% | -100% | -100% | -100% | yes | |
| 135 | | | | Control Hold-Takedown | | | 0 | 3 | 5 | 3 | 2 | 3 | 0 | N/A | 67% | -40% | -33% | 50% | -100% | N/A | -100% | yes | |
| 136 | | | | De-Escalation | | | . | . | . | 8 | 8 | 11 | 9 | . | . | . | 0% | 38% | -18% | N/A | 4% | yes | This category was new in 2018<br>2019: De-escalation attempt-8, CDP would like to move De-escalation to another section, since it is not technically a "force type". |
| 137 | | | | Firearm Point | | | . | . | . | 2 | 5 | 2 | 1 | . | . | . | 150% | -60% | -50% | N/A | -42% | yes | This category was new in 2018 |
| 138 | | | | Firearm | | | . | . | . | 1 | 4 | 2 | 2 | . | . | . | 300% | -50% | 0% | N/A | -21% | yes | This category was new in 2018 |
| 139 | | | | Joint Manipulation | | | 1 | 2 | 13 | 2 | 3 | 1 | 0 | 100% | 550% | -85% | 50% | 0% | -100% | N/A | -100% | yes | |
| 140 | | | | Tackling/Takedown | | | 0 | 0 | 5 | 4 | 4 | 6 | 0 | 0% | N/A | -20% | 0% | 50% | -100% | N/A | -100% | yes | |
| 141 | | | | Taser | | | 1 | 0 | 6 | 4 | 3 | 1 | 2 | -100% | N/A | -33% | -25% | -67% | 100% | 10% | -13% | yes | |
| 142 | | | | Verbal/Physical Gestures | | | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0% | 0% | N/A | N/A | N/A | N/A | N/A | N/A | yes | |
| 143 | | | | Pressure Point/Pressure Point Control | | | . | . | 15 | 5 | 0 | 0 | 0 | . | . | . | -100% | N/A | N/A | N/A | N/A | yes | This category was in other in 2015 and 2016 and has now been broken out 2017 |
| 144 | | | | Push | | | . | . | 5 | 5 | 5 | 4 | 3 | . | . | . | 0% | -20% | -25% | N/A | -16% | yes | This category was in other in 2015 and 2016 and has now been broken out for 2017 |
| 145 | | | | Other (1-25 instance each) | | | 7 | 10 | 13 | 7 | 11 | 9 | 14 | 43% | 30% | -46% | 57% | -18% | 56% | 10% | 8% | yes | |
| 146 | | | | Unknown/NULL | | | 27 | 5 | 4 | 0 | 2 | 0 | 0 | -81% | -20% | -100% | N/A | -100% | N/A | -100% | -100% | yes | |
| 147 | 367 | a. 2 | UOF | geographic area | yes | IA | | | | | | | | | | | | | | | | | |
| 148 | | | | District 1 | | | 2 | 0 | 4 | 0 | 3 | 2 | 2 | -100% | N/A | -100% | N/A | -33% | 0% | 0% | -13% | yes | |
| 149 | | | | District 2 | | | 0 | 4 | 3 | 6 | 4 | 10 | 4 | N/A | -25% | 100% | -33% | 150% | -60% | N/A | 0% | yes | |
| 150 | | | | District 3 | | | 4 | 4 | 5 | 7 | 5 | 14 | 4 | 0% | 25% | 40% | -29% | 180% | -71% | 0% | -7% | yes | |
| 151 | | | | District 4 | | | 4 | 3 | 1 | 2 | 2 | 5 | 2 | -25% | -67% | 100% | 0% | 150% | -60% | -9% | 0% | yes | |
| 152 | | | | District 5 | | | 3 | 0 | 4 | 1 | 6 | 3 | 2 | -100% | N/A | -75% | 500% | -50% | -33% | -6% | -31% | yes | |
| 153 | | | | outside city | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | N/A | N/A | N/A | yes | |
| 154 | | | | Unknown/NULL | | | 10 | 6 | 4 | 0 | 2 | 2 | 1 | -40% | -33% | -100% | N/A | 0% | -50% | -28% | -21% | yes | |
| 155 | 367 | a. 2 | UOF | demographics of complainant | yes | IA, IAPro | | | | | | | | | | | | | | | | | |
| 156 | | | | Black | | | 11 | 6 | 12 | 11 | 13 | 21 | 10 | -45% | 100% | -8% | 18% | 62% | -52% | -1% | -8% | yes | |
| 157 | | | | White | | | 2 | 2 | 5 | 3 | 7 | 6 | 3 | 0% | 150% | -40% | 133% | -14% | -50% | 6% | -25% | yes | |
| 158 | | | | Hispanic | | | 0 | 3 | 0 | 1 | 0 | 2 | 0 | N/A | -100% | N/A | -100% | N/A | -100% | N/A | N/A | yes | |
| 159 | | | | Asian | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | N/A | N/A | N/A | yes | |
| 160 | | | | Other | | | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0% | 0% | 0% | 0% | N/A | -100% | N/A | N/A | yes | |
| 161 | | | | Unknown/NULL | | | 10 | 6 | 4 | 1 | 2 | 0 | 3 | -40% | -33% | -75% | 100% | -100% | N/A | -16% | 14% | yes | |
| 162 | | | | | | | | | | | | | | | | | | | | | | | |
| 163 | 367 | a.3 | ECW usage | # ECW and changes over time | yes | IAPro | | | | | | | | | | | | | | | | | |
| 164 | | | | # of ECW | yes | IAPro | 44 | 36 | 47 | 27 | 22 | 21 | 16 | -18% | 31% | -43% | -19% | -5% | -24% | -13% | -10% | yes | Note: Taser includes when the taser was displayed or used. From 2019 onwards, this number will only include when the taser is used |
| 165 | | | | # of non-ECW UoF | yes | IAPro | 1267 | 1174 | 971 | 688 | 672 | 582 | 373 | -7% | -17% | -29% | -2% | -13% | -36% | -16% | -18% | yes | |
| 166 | | | | changes compared to UOF | no | | . | -11% | 44% | -33% | -20% | 11% | 25% | . | N/A | -174% | -38% | . | 132% | . | -207% | yes | In 2015 there were 1311 force types used. In 2016 there were 1210. This number therefore represents the change in non-taser force types between 2015 and 2016 relative to the change in taser force type; same calculation used for 2016 to 2017 |
| 167 | | | | changes compared to weapon/force instrument | no | | . | . | . | . | | | | . | . | . | . | | | | | N/A | Data are not collected in detail to calculate this value |
| 168 | | | | | | | | | | | | | | | | | | | | | | | |
| 169 | 367 | a.4 | UOF violating policy | # in violation | yes | Case Office | 9 | 16 | 6 | 6 | 15 | 17 | 11 | 78% | -63% | 0% | 150% | 13% | -35% | 3% | -10% | yes | This definition is all Use of Force incidents with any policy violation, which may include WCS, Other, UOF, ETC. |
| 170 | 367 | a.4 | UOF violating policy | force type | yes | Case Office, IAPro | | | | | | | | | | | | | | | | | |
| 171 | | | | Balance Displacement | | | 2 | 0 | 0 | 0 | 0 | 0 | 0 | -100% | 0% | 0% | 0% | 0% | N/A | -100% | #DIV/0! | yes | |
| 172 | | | | Body Force | | | 5 | 0 | 5 | 4 | 2 | 2 | 1 | -100% | N/A | -20% | -50% | 0% | -50% | -21% | -21% | yes | |
| 173 | | | | Control Hold-Restraint | | | 0 | 7 | 6 | 2 | 2 | 2 | 4 | N/A | -14% | -67% | 0% | 0% | 100% | N/A | 26% | yes | |
| 174 | | | | Control Hold-Takedown | | | 0 | 0 | 2 | 3 | 2 | 2 | 2 | N/A | 0% | 50% | -33% | 0% | 0% | N/A | 0% | yes | |
| 175 | | | | Joint Manipulation | | | 2 | 0 | 3 | 4 | 1 | 6 | 0 | -100% | N/A | 33% | -75% | 500% | -100% | -100% | -100% | yes | |
| 176 | | | | Tackling/Takedown | | | 0 | 3 | 0 | 0 | 5 | 2 | 0 | N/A | -100% | 0% | 0% | -60% | -100% | N/A | -100% | yes | |
| 177 | | | | Taser | | | 0 | 3 | 1 | 0 | 3 | 1 | 1 | N/A | -67% | -100% | N/A | -67% | 0% | N/A | -31% | yes | |
| 178 | | | | Verbal/Physical Gestures | | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | -100% | 0% | N/A | N/A | N/A | N/A | -100% | N/A | yes | |
| 179 | | | | Pressure Point/Pressure Point Control | | | . | . | 5 | 1 | 0 | 0 | 0 | . | . | -80% | -100% | N/A | N/A | N/A | N/A | yes | |
| 180 | | | | Push | | | . | . | 6 | 0 | 3 | 2 | 1 | . | . | -100% | N/A | -33% | -50% | N/A | -31% | yes | |
| 181 | | | | Other (1-25 instance each) | | | 2 | 13 | 5 | 4 | 12 | 22 | 9 | 550% | -62% | -20% | 200% | 83% | -59% | 24% | -9% | yes | 2019: Other-pull, fee/leg kick/knee, firearm point.<br>2020: punching, striking, body weight, leg restraint<br>2021: Pull, Firearm-Pistol-Point, Body Weight |
| 182 | | | | Unknown/NULL | | | 2 | 4 | 6 | 2 | 0 | 0 | 0 | 100% | 50% | -67% | -100% | N/A | N/A | -100% | N/A | yes | |
| 183 | 367 | a.4 | UOF violating policy | geography | yes | Case Office, IAPro | | | | | | | | | | | | | | | | | denotes district where incident occurred |
| 184 | | | | District 1 | | | 1 | 1 | 0 | 2 | 3 | 6 | 1 | 0% | -100% | N/A | 50% | 100% | -83% | 0% | -31% | yes | |
| 185 | | | | District 2 | | | 3 | 4 | 0 | 2 | 3 | 3 | 1 | 33% | -100% | N/A | 50% | 0% | -67% | -15% | -31% | yes | |
| 186 | | | | District 3 | | | 3 | 6 | 2 | 1 | 3 | 3 | 2 | 100% | -67% | -50% | 200% | 0% | -33% | -6% | -13% | yes | |
| 187 | | | | District 4 | | | 1 | 3 | 3 | 1 | 2 | 3 | 3 | 200% | 0% | -67% | 100% | 50% | 0% | 17% | 14% | yes | |
| 188 | | | | District 5 | | | 1 | 2 | 1 | 0 | 3 | 2 | 4 | 100% | -50% | -100% | N/A | -33% | 100% | 22% | 10% | yes | |
| 189 | | | | outside city | | | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0% | 0% | 0% | 0% | -100% | N/A | N/A | -100% | yes | |
| 190 | 367 | a.4 | UOF violating policy | arrest type | yes | Case Office, IAPro | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 191 | | | | Violence toward Police Officer | | | 0 | 2 | 2 | 0 | 1 | 3 | 1 | N/A | 0% | -100% | N/A | 200% | -67% | N/A | 0% | yes | |
| 192 | | | | Violence toward Others | | | 3 | 2 | 0 | 0 | 10 | 5 | 4 | -33% | -100% | 0% | 0% | -50% | -20% | 4% | -26% | yes | ORC - Assaults, ORC - Kidnapping, ORC - Offense against public peace, ORC - Offense Against the Family |
| 193 | | | | Damage to Property | | | 4 | 0 | 0 | 0 | 0 | 0 | 1 | -100% | 0% | 0% | 0% | N/A | N/A | -18% | N/A | yes | |
| 194 | | | | Obstructing Justice | | | 3 | 5 | 11 | 7 | 2 | 3 | 10 | 67% | 120% | -36% | -71% | 50% | 233% | 19% | 71% | yes | |
| 195 | | | | Crisis Intervention | | | 1 | 1 | 0 | 0 | 2 | 0 | 0 | 0% | -100% | 0% | 0% | -100% | N/A | -100% | -100% | yes | |
| 196 | | | | Drugs/Alcohol | | | 0 | 2 | 2 | 1 | 1 | 2 | 3 | N/A | 0% | -50% | 0% | 100% | 50% | N/A | 44% | yes | |
| 197 | | | | Other | | | 4 | 12 | 5 | 9 | 22 | 28 | 4 | 200% | -58% | 80% | 144% | 27% | -86% | 0% | -43% | yes | Other = Cleveland Codified Ord. - Part 4, Cleveland Codified Ord. - Part 6, ORC - Burglary, ORC - Miscellaneous Offense, ORC - Offense Against Justice, ORC - Theft, ORC - Weapons Offense, Resisting Arrest, Warrant-Misdemeanor, Warrant-Felony, No Charges |
| 198 | 367 | a.4 | UOF violating policy | race of subject | yes | Case Office, IAPro | | | | | | | | | | | | | | | | | 2015 data mistakenly reported the race of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 199 | | | | Black | | | 6 | 6 | 4 | 5 | 10 | 11 | 9 | 0% | -33% | 25% | 100% | 10% | -18% | 6% | -3% | yes | |
| 200 | | | | White | | | 1 | 2 | 1 | 1 | 3 | 6 | 2 | 100% | -50% | 0% | 200% | 100% | -67% | 10% | -13% | yes | |
| 201 | | | | Hispanic | | | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0% | -100% | N/A | N/A | -100% | N/A | -100% | -100% | yes | |
| 202 | | | | Asian | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | N/A | N/A | N/A | N/A | N/A | N/A | yes | |
| 203 | | | | Other | | | 0 | 2 | 0 | 0 | 1 | 0 | 0 | N/A | -100% | 0% | 0% | -100% | N/A | N/A | -100% | yes | |
| 204 | | | | Unknown/NULL | | | 0 | 0 | 1 | 6 | 0 | 0 | 0 | 0% | N/A | 500% | -100% | N/A | N/A | N/A | N/A | yes | |
| 205 | 367 | a.4 | UOF violating policy | ethnicity of subject | yes | Case Office, IAPro | | | | | | | | | | | | | | | | | 2015 data mistakenly reported the ethnicity of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 206 | | | | Hispanic/Latino | | | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0% | -100% | 0% | 0% | 0% | -100% | -100% | -100% | yes | |
| 207 | | | | Non-Hispanic/Latino | | | 7 | 10 | 5 | 6 | 14 | 13 | 7 | 43% | -50% | 20% | 133% | -7% | -46% | 0% | -21% | yes | |
| 208 | | | | Unknown/NULL | | | 0 | 0 | 1 | 0 | 0 | 3 | 4 | 0% | N/A | -100% | N/A | N/A | 33% | N/A | N/A | yes | |
| 209 | 367 | a.4 | UOF violating policy | age of subject | yes | Case Office, IAPro | | | | | | | | | | | | | | | | | 2015 data mistakenly reported the age of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 210 | | | | under 20 years | | | 3 | 0 | 0 | 1 | 4 | 1 | 2 | -100% | N/A | N/A | 300% | -75% | 100% | -6% | -21% | yes | |
| 211 | | | | 21-29 years | | | 2 | 3 | 2 | 3 | 4 | 8 | 3 | 50% | -33% | 50% | 33% | 100% | -63% | 6% | -9% | yes | |
| 212 | | | | 30-39 years | | | 0 | 4 | 2 | 2 | 5 | 6 | 3 | N/A | -50% | 0% | 150% | 20% | -50% | N/A | -16% | yes | |
| 213 | | | | 40-49 years | | | 2 | 1 | 1 | 0 | 2 | 2 | 1 | -50% | 0% | -100% | N/A | 0% | -50% | -9% | -21% | yes | |
| 214 | | | | 50-59 years | | | 0 | 1 | 0 | 0 | 0 | 0 | 2 | N/A | -100% | N/A | N/A | N/A | N/A | N/A | N/A | yes | |
| 215 | | | | 60+ years | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | N/A | N/A | N/A | N/A | yes | |
| 216 | | | | Unknown/NULL | | | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 100% | -50% | -100% | N/A | N/A | N/A | -100% | N/A | yes | |
| 217 | 367 | a.4 | UOF violating policy | gender of subject | yes | Case Office, IAPro | | | | | | | | | | | | | | | | | 2015 data mistakenly reported the gender of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 218 | | | | Male | | | 8 | 11 | 3 | 5 | 14 | 15 | 10 | 38% | -73% | 67% | 180% | 7% | -33% | 3% | -11% | yes | |
| 219 | | | | Female | | | 0 | 0 | 2 | 1 | 1 | 2 | 1 | 0% | N/A | -50% | 0% | 100% | -50% | N/A | N/A | yes | |
| 220 | | | | Unknown/NULL | | | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0% | N/A | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 221 | 367 | a.4 | UOF violating policy | condition | no | Case Office, IAPro | . | . | . | . | . | . | | . | . | . | . | . | | | | yes | |
| 222 | | | | Behavioral Crisis Event | no | Case Office, IAPro | . | . | . | . | 2 | 1 | | . | . | . | . | -50% | | | | yes | |
| 223 | | | | mental condition | no | | . | . | . | . | | | | . | . | . | . | . | | | | N/A | No data collected currently; Needs to be collected in the future<br>2019-CDP needs more information on this category. Was this previously used? |
| 224 | | | | medical condition | no | | . | . | . | . | 0 | | | . | . | . | . | . | | | | N/A | No data collected currently; Needs to be collected in the future<br>2019-Collected category name "Known Medical Condition" |
| 225 | | | | drugs/alcohol | no | | . | 6 | 4 | 3 | 6 | 6 | 3 | . | -33% | -25% | 100% | 0% | -50% | . | -21% | yes | Not collected in baseline, collected in 2016 based on 11 citizens |
| 226 | | | | Unimpaired | no | | . | 3 | 1 | 3 | 7 | 10 | 1 | . | -67% | 200% | 133% | 43% | -90% | . | -48% | yes | Not collected in baseline, collected in 2016 based on 11 citizens |
| 227 | | | | Unknown/NULL | no | | . | 2 | 1 | 0 | 0 | 0 | 0 | . | -50% | -100% | N/A | N/A | N/A | . | N/A | yes | Not collected in baseline, collected in 2016 based on 11 citizens |
| 228 | | | | presence of disability | no | | . | . | . | . | 0 | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future<br>2019-Collected category name "Visible Physical Disability" |
| 229 | | | | | | | | | | | | | | | | | | | | | | | |
| 230 | 367 | a. 5 | UOF violating policy | # of officers with > 1 UOF violating policy | yes | Case Office | 0 | 1 | 0 | 0 | 1 | 1 | 0 | N/A | -100% | 0% | 0% | 0% | -100% | . | . | yes | |
| 231 | | | | | | | | | | | | | | | | | | | | | | | |
| 232 | 367 | a. 6 | UOF violating policy | force reviews/investigations resulting in | yes | IA | | | | | | | | | | | | | | | | | |
| 233 | | | | policy deficiency | | | 5 | 11 | 3 | 1 | 11 | 17 | . | 120% | -73% | -67% | 1000% | 55% | . | . | . | yes | Examination of data received shows most of the policy deficiencies were administrative/technical (i.e. late forms) and not substantive or due to tactics.<br>2020: These categories were developed by the monitoring team. CDP will rely on the monitoring team to fill out this section and verify this information. Under the Force Review_Investigation Tab.<br>2021 - There were 8 "Policy Violation - Other" and 3 "Policy Violation - WCS" |
| 234 | | | | training deficiency | | | 2 | 0 | 0 | 0 | 1 | 1 | . | -100% | 0% | 0% | 0% | 0% | . | . | . | yes | |
| 235 | | | | tactics deficiency | | | 2 | 5 | 3 | 3 | 3 | 1 | . | 150% | -40% | 0% | 0% | -67% | . | . | . | yes | |
| 236 | | | | pending | | | 0 | 0 | 0 | 2 | 0 | 0 | . | 0% | 0% | N/A | -100% | 0% | . | . | . | yes | |
| 237 | 367 | a. 6 | UOF violating policy | Force policy violations resulting in | yes | IA | | | | | | | | | | | | | | | | | |
| 238 | | | | Policy Violation - WCS | | | | | | | | | 3 | | | | | | . | . | . | | |
| 239 | | | | Policy Violation - UOF | | | | | | | | | 0 | | | | | | . | . | . | | |
| 240 | | | | Policy Violation - Other | | | | | | | | | 9 | | | | | | . | . | . | | |

| | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 241 | 367 | a. 7 | quality of | investigations | no | | . | in written summary | . | . | . | . | . | . | . | . | . | . | . | . | . | yes | Random sample selected by Monitoring Team and reviewed to capture the quality of the investigations |
| 242 | 367 | a. 7 | quality of | review | no | | . | in written summary | . | . | . | . | . | . | . | . | . | . | . | . | . | yes | Random sample selected by Monitoring Team and reviewed to capture the quality of the investigations |
| 243 | 367 | a. 7 | quality of | # of investigations returned because incomplete | no | Chief's Office | . | . | . | . | | . | | . | . | | | | | | | no | Data has not been received as of June 2017 |
| 244 | 367 | b | addressing individuals in crisis | | | | | | | | | | | | | | | | | | | | |
| 245 | 367 | b. 1 | addressing individuals in crisis | # calls for service and incidents involving an individual in crisis | no | CI Unit | 10480 | 7890 | 8120 | 13460 | 24330 | 39490 | 49100 | -25% | 3% | 66% | 81% | 62% | 24% | 25% | 26% | | baseline, 2016, 2017, and 2018 aren't comparable. 2018: 1346 forms completed (reported quarterly) which is presumed to represent 10% of possible calls. 2017: 812 forms completed (which is 10% of total possible mental health calls); data from 11/1/16-11/30/17. 2016: 789 forms completed (which is 10% of total possible mental health calls); data from 10/1/15-10/31/16. 2015 Baseline: 1048 forms completed (which is 10% of total possible mental health calls); data from 1/1/14-9/30/15 2020: Data is from February-December. New data source. The total number of mental health call is an estimate based on the monitoring teams formula of 10% of total possible mental health calls. CDP is using the total number of Brazos CIT forms to get this number (3949). 2021: The total number of mental health call is an estimate based on the monitoring teams formula of 10% of total possible mental health calls. CDP is using the total number of Brazos CIT forms to get this number (4910) QUESTION-How is this operationalized? Where does |
| 246 | | | | Responded to by specialized CIT officer | no | | . | . | . | . | . | . | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 247 | | | | Responded to by other | no | | . | . | . | . | . | . | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 248 | 367 | b. 1 | addressing individuals in crisis | Direction of individuals in crisis | no | | | | | | | | | | | | | | | | | | |
| 249 | | | | directed to healthcare system | | | 1009 | 672 | 1012 | 1489 | 1896 | 3773 | 4,446 | -33% | 51% | 47% | 27% | 99% | 18% | 24% | 33% | yes | SUBJECT DISPOSITION (pink slipped or voluntarily to SVCH, private hospital ER, referred to mental health treatment, handled by EMS); 0 referrals to mental health treatment in 2016; 19 referrals in 2015 2020: Data is from February-December. New data source as well. The number represents the amount of individuals that were directed to the hospital from Brazos CIT forms. Question-Where does this information come from? MHRAC Annual Report (Check to see if ALL conveyed individuals were to healthcare) |
| 250 | | | | directed to judicial system | | | 12 | 2 | 8 | 7 | 8 | 68 | 116 | -83% | 300% | -13% | 14% | 750% | 71% | 38% | 144% | yes | # arrested Question-Where does this information come from? MHRAC Annual Report & Brazos Forms |
| 251 | | | | direction other | | | 230 | 7 | 0 | 0 | 0 | 55 | 356 | -97% | -100% | 0% | 0% | N/A | 547% | 6% | N/A | yes | other, complaint unfounded requiring no police action, subject stabilized; 0 complaint unfounded requiring no police action, subject stabilized in 2016; 18 in 2015 2020: Data is from February-December. New data source as well. |
| 252 | | | | rate - directed to healthcare system | | | 81% | 99% | 99% | 100% | 100% | 99% | 90% | 22% | 1% | 0% | 0% | -1% | -9% | 2% | -3% | yes | |
| 253 | | | | rate - directed to judicial system | | | 1% | 0% | 1% | 0% | 0% | 0% | 2% | -69% | 167% | -40% | -10% | N/A | N/A | 11% | N/A | yes | |
| 254 | | | | rate - direction other | | | 18% | 1% | 0% | 0% | 0% | 1% | 7% | -94% | -100% | 0% | 0% | N/A | 600% | -13% | N/A | yes | |
| 255 | | | | | | | | | | | | | | | | | | | | | | | |
| 256 | 367 | b. 2 | addressing individuals in crisis | # of UOF on individuals in crisis | | | 14 | . | . | . | 30 | 23 | 23 | . | . | . | . | -23% | 0% | . | -8% | | 2015 data -"Use of non-deadly force report made" 2019-30 incidents involving Use of Force and Crisis Intervention. 2020 and moving forward using Brazos as source DB for Force Type. 2019 not comparable |
| 257 | | | | type of force used | | | . | . | . | . | 78 | 33 | 31 | . | . | . | . | -58% | -6% | . | -26% | yes | poor data |
| 258 | | | | Balance Displacement | | | . | . | . | . | 0 | 0 | 0 | . | . | . | . | N/A | N/A | . | . | yes | poor data |
| 259 | | | | Body Force/Body Weight | | | . | . | . | . | 12 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | poor data |
| 260 | | | | Chemical Agent-Other | | | | | | | 1 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | |
| 261 | | | | Control Hold-Restraint | | | 166 | . | . | . | 11 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | 2015 data - "handcuffs" |
| 262 | | | | Control Hold-Takedown | | | . | . | . | . | 10 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | poor data |
| 263 | | | | Feet/Leg Sweep | | | | | | | 2 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | |
| 264 | | | | Firearm Point | | | | | | | 6 | 2 | 1 | . | . | . | . | -67% | -50% | . | -45% | yes | |
| 265 | | | | Joint Manipulation | | | . | . | . | . | 8 | 8 | 6 | . | . | . | . | 0% | -25% | . | -9% | yes | poor data |
| 266 | | | | Leg Restraint | | | | | | | 3 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | |
| 267 | | | | Pull | | | | | | | 9 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | |
| 268 | | | | Push | | | | | | | 6 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | |
| 269 | | | | Tackling/Takedown | | | . | . | . | . | 6 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | poor data |
| 270 | | | | Taser | | | 5 | . | . | . | 4 | 4 | 0 | . | . | . | . | 0% | -100% | . | -100% | yes | 2015 data - "taser stun" |
| 271 | | | | Verbal/Physical Gestures | | | . | . | . | . | 0 | 0 | 0 | . | . | . | . | N/A | N/A | . | . | yes | poor data |
| 272 | | | | Other (1-25 instance each) | | | 40 | . | . | . | | 19 | 15 | . | . | . | . | N/A | -21% | . | . | yes | 2015 data -"other, fired, OC pepper spray" |
| 273 | | | | Unknown/NULL | | | 186 | . | . | . | 0 | 0 | 0 | . | . | . | . | N/A | N/A | . | . | yes | 2015 data -"no response reported" |
| 274 | 367 | b. 2 | addressing individuals in crisis | reason for interaction | | | | | | | | | | | | | | | | | | | |
| 275 | | | | # subject armed | | | . | . | . | . | 65 | 144 | 184 | . | . | . | . | 122% | 28% | . | 41% | yes | new from Brazos - 2020 |
| 276 | | | | # subject not armed | | | . | . | . | . | 4 | 3782 | 4722 | . | . | . | . | 94450% | 25% | . | 957% | yes | new from Brazos - 2020 |
| 277 | | | | Not Recorded | | | . | . | . | . | 2364 | 8 | 0 | . | . | . | . | -100% | -100% | . | -100% | yes | new from Brazos - 2020 |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 278 | 367 | b. 2 | addressing individuals in crisis | Weapon Type | | | | | | | | | | | | | | | | | | | |
| 279 | | | | None | | | . | . | . | . | 2342 | 3790 | 4726 | . | . | . | . | 62% | 25% | . | 26% | yes | new from Brazos - 2020 |
| 280 | | | | Gun | | | . | . | . | . | 17 | 32 | 31 | . | . | . | . | 88% | -3% | . | 22% | yes | new from Brazos - 2020 |
| 281 | | | | Liquid or Chemical Agent | | | . | . | . | . | 0 | 4 | 4 | . | . | . | . | N/A | 0% | . | N/A | yes | new from Brazos - 2020 (includes gas, ink) |
| 282 | | | | Sharp Object | | | . | . | . | . | 57 | 100 | 115 | . | . | . | . | 75% | 15% | . | 26% | yes | new from Brazos - 2020 |
| 283 | | | | Blunt Object | | | . | . | . | . | 1 | 21 | 18 | . | . | . | . | 2000% | -14% | . | 162% | yes | new from Brazos - 2020 |
| 284 | | | | Hands | | | . | . | . | . | 1 | 2 | 0 | . | . | . | . | 100% | -100% | . | -100% | yes | new from Brazos - 2020 |
| 285 | | | | Rope | | | . | . | . | . | 0 | 0 | 0 | . | . | . | . | N/A | N/A | . | N/A | yes | new from Brazos - 2020 |
| 286 | | | | Not Recorded | | | . | . | . | . | 4 | 0 | 0 | . | . | . | . | -100% | N/A | . | -100% | yes | new from Brazos - 2020 Weapons listed but not included here |
| 287 | 367 | b. 2 | addressing individuals in crisis | Resistance Offered | | | | | | | | | | | | | | | | | | | |
| 288 | | | | No Resistance | | | . | . | . | . | . | 3492 | 4386 | . | . | . | . | . | 26% | . | . | yes | new from Brazos - 2020 |
| 289 | | | | Passive Resistance | | | . | . | . | . | . | 313 | 382 | . | . | . | . | . | 22% | . | . | yes | new from Brazos - 2020 |
| 290 | | | | Active Resistance | | | . | . | . | . | . | 95 | 107 | . | . | . | . | . | 13% | . | . | yes | new from Brazos - 2020 |
| 291 | | | | Aggressive Physical Resistance | | | . | . | . | . | . | 25 | 31 | . | . | . | . | . | 24% | . | . | yes | new from Brazos - 2020 |
| 292 | | | | Not Recorded | | | . | . | . | . | . | 9 | 4 | . | . | . | . | . | -56% | . | . | yes | new from Brazos - 2020 |
| 293 | 367 | b. 2 | addressing individuals in crisis | description of attempts to de-escalate | | | | | | | | | | | | | | | | | | | 809 CIT calls had a verbal de-escalation response from officers in 2015; 578 calls had a verbal de-escalation response from officers in 2016 |
| 294 | | | | Verbal de-escalation techniques | | | . | . | . | . | . | 2280 | 2742 | . | . | . | . | . | 20% | . | . | yes | new from Brazos - 2020 |
| 295 | | | | Allow Time and Opportunity to Comply | | | . | . | . | . | . | 1784 | 2536 | . | . | . | . | . | 42% | . | . | yes | new from Brazos - 2020 |
| 296 | | | | Listening and interacting in conversation | | | . | . | . | . | . | 1507 | 4591 | . | . | . | . | . | 205% | . | . | yes | new from Brazos - 2020 |
| 297 | | | | Use of Distance/Cover/Concealment | | | . | . | . | . | . | 1129 | 1524 | . | . | . | . | . | 35% | . | . | yes | new from Brazos - 2020 |
| 298 | | | | Strategic Communications/Voice Command | | | . | . | . | . | . | 1065 | 3538 | . | . | . | . | . | 232% | . | . | yes | new from Brazos - 2020 |
| 299 | | | | Increased Officer Presence | | | . | . | . | . | . | 646 | 1982 | . | . | . | . | . | 207% | . | . | yes | new from Brazos - 2020 |
| 300 | | | | Requested Supervisor | | | . | . | . | . | . | 281 | 851 | . | . | . | . | . | 203% | . | . | yes | new from Brazos - 2020 |
| 301 | | | | Requested CIT Specialist | | | . | . | . | . | . | 172 | 846 | . | . | . | . | . | 392% | . | . | yes | new from Brazos - 2020 |
| 302 | | | | De-Escalation Technique Not Recorded | | | . | . | . | . | . | 1212 | 1498 | . | . | . | . | . | 24% | . | . | yes | new from Brazos - 2020 |
| 303 | 367 c | | stop, search, arrest | | | | | | | | | | | | | | | | | | | | |
| 304 | 367 | c. 1 | stop, search, arrest | # of investigatory stop, search, arrest | no | Compliance | . | . | . | . | | . | . | . | . | . | . | . | | | | N/A | No data collected currently; Needs to be collected in the future |
| 305 | | | | # of investigatory stops | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 306 | | | | # of investigatory searches | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 307 | | | | # of investigatory arrests | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 308 | 367 | c. 1 | stop, search, arrest | % of investigatory stop, search, arrest | | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 309 | | | | # investigatory stops/# summons or arrest | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 310 | | | | # investigatory searches/# summons or arrest | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 311 | 367 | c. 1 | stop, search, arrest | District | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 312 | | | | District 1 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 313 | | | | District 2 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 314 | | | | District 3 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 315 | | | | District 4 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 316 | | | | District 5 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 317 | | | | outside city | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 318 | 367 | c. 1 | stop, search, arrest | Arrest type | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 319 | | | | Violence toward Police Officer | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 320 | | | | Violence toward Others | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 321 | | | | Damage to Property | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 322 | | | | Obstructing Justice | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 323 | | | | Crisis Intervention | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 324 | | | | Drugs/Alcohol | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 325 | | | | Other | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 326 | 367 | c. 1 | stop, search, arrest | Actual or perceived age | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 327 | | | | 17 and under (juveniles) | | | . | . | . | . | | | | . | . | . | . | | | | | | |
| 328 | | | | 18-29 years | | | . | . | . | . | | | | . | . | . | . | | | | | | |
| 329 | | | | 30-39 years | | | . | . | . | . | | | | . | . | . | . | | | | | | |
| 330 | | | | 40-49 years | | | . | . | . | . | | | | . | . | . | . | | | | | | |
| 331 | | | | 50-59 years | | | . | . | . | . | | | | . | . | . | . | | | | | | |
| 332 | | | | 60+ years | | | . | . | . | . | | | | . | . | . | . | | | | | | |
| 333 | | | | Unknown/NULL | | | . | . | . | . | | | | . | . | . | . | | | | | | |
| 334 | 367 | c. 1 | stop, search, arrest | race | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 335 | | | | Black | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 336 | | | | White | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 337 | | | | Hispanic | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 338 | | | | Asian | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 339 | | | | Other | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 340 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 341 | 367 | c. 1 | stop, search, arrest | ethnicity | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 342 | | | | Hispanic/Latino | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 343 | | | | Non-Hispanic/Latino | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 344 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 345 | 367 | c. 1 | stop, search, arrest | gender | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 346 | | | | Male | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 347 | | | | Female | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 348 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 349 | | | | | | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 350 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived race | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 351 | | | | Black | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 352 | | | | White | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 353 | | | | Hispanic | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 354 | | | | Asian | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 355 | | | | Other | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 356 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 357 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived ethnicity | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 358 | | | | Hispanic/Latino | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 359 | | | | Non-Hispanic/Latino | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 360 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 361 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived gender | no | | . | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 362 | | | | Male | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 363 | | | | Female | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 364 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 365 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived age | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 366 | | | | 17 and under (juveniles) | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 367 | | | | 18-29 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 368 | | | | 30-39 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 369 | | | | 40-49 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 370 | | | | 50-59 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 371 | | | | 60+ years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 372 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 373 | | | | | | | | | | | | | | | | | | | | | | | |
| 374 | 367 | c. 3 | searches finding contraband | # of searches finding contraband | no | | | | | | | | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 375 | 367 | c. 3 | searches finding contraband | # of searches finding contraband by district | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 376 | | | | District 1 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 377 | | | | District 2 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 378 | | | | District 3 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 379 | | | | District 4 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 380 | | | | District 5 | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 381 | | | | outside city | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 382 | 367 | c. 3 | searches finding contraband | Arrest type | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 383 | | | | Violence toward Police Officer | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 384 | | | | Violence toward Others | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 385 | | | | Damage to Property | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 386 | | | | Obstructing Justice | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 387 | | | | Crisis Intervention | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 388 | | | | Drugs/Alcohol | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 389 | | | | Other | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 390 | 367 | c. 3 | searches finding contraband | actual or perceived race | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 391 | | | | Black | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 392 | | | | White | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 393 | | | | Hispanic | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 394 | | | | Asian | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 395 | | | | Other | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 396 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 397 | 367 | c. 3 | searches finding contraband | actual or perceived ethnicity | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 398 | | | | Hispanic/Latino | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 399 | | | | Non-Hispanic/Latino | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 400 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 401 | 367 | c. 3 | searches finding contraband | actual or perceived gender | no | | . | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 402 | | | | Male | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 403 | | | | Female | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 404 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 405 | 367 | c. 3 | searches finding contraband | actual or perceived age | no | | | | | | | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 406 | | | | 17 and under (juveniles) | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 407 | | | | 18-29 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 408 | | | | 30-39 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 409 | | | | 40-49 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 410 | | | | 50-59 years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 411 | | | | 60+ years | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 412 | | | | Unknown/NULL | | | . | . | . | . | . | . | . | . | . | . | . | . | | | | | |
| 413 | 367 | d | bias free policing & community engagement | | | | | | | | | | | | | | | | | | | | |
| 414 | 367 | d.1 | bias free policing & community engagement | # of community partnerships | yes | District Commanders | 57 | 66 | 135 | 133 | 513 | 2484 | 10664 | 16% | 105% | -1% | 286% | | | 111% | 175% | | 2019: CDP calculates the number of events |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 415 | | | | District 1 | | | 0 | 13 | 58 | 32 | 9 | 328 | 311 | 0% | 346% | -45% | -72% | 3544% | -5% | N/A | 226% | yes | baseline data not received for District 1; 2017 data for District 1 overestimated. Included one-off events that were not necessarily partnerships<br>2020: Start of a new collection of data in regards to community engagement. Only accounts for February-December |
| 416 | | | | District 2 | | | 10 | 13 | 13 | 13 | 59 | 622 | 1445 | 30% | 0% | 0% | 354% | 954% | 132% | 103% | 190% | yes | |
| 417 | | | | District 3 | | | 11 | 0 | 12 | 13 | 45 | 758 | 7879 | . | . | 8% | 246% | 1584% | 939% | 156% | 459% | yes | 2016 data not received for District 3 |
| 418 | | | | District 4 | | | 22 | 28 | 40 | 58 | 157 | 341 | 740 | 27% | 43% | 45% | 171% | 117% | 117% | 65% | 68% | yes | |
| 419 | | | | District 5 | | | 14 | 12 | 12 | 17 | 174 | 435 | 289 | -14% | 0% | 42% | 924% | 150% | -34% | 54% | 18% | yes | |
| 420 | 367 | d. 1 | bias free policing & community engagement | # of community partnerships w/youth | yes | District Commanders | 14 | 17 | 30 | 57 | 162 | 216 | 264 | 50% | -33% | 90% | 184% | 33% | 22% | 52% | 18% | | represents partnerships specifically with youth, although youth may be included in other partnerships. 2021 Brazos is source of data, specifically 'Groups Present' = Youth |
| 421 | | | | District 1 | | | . | 3 | 9 | 14 | 1 | 33 | 25 | . | 200% | 56% | -93% | 3200% | -24% | N/A | 192% | yes | baseline data not received for District 1; 2017 data for District 1 overestimated. Included one-off events that were not necessarily partnerships<br>2020: Start of a new collection of data in regards to community engagement. Only accounts for February-December. Data from 2021 should not be compared to previous years due to changes in data collection process |
| 422 | | | | District 2 | | | 4 | 4 | 4 | 9 | 16 | 57 | 100 | 0% | 0% | 125% | 78% | 256% | 75% | 58% | 84% | yes | |
| 423 | | | | District 3 | | | 2 | . | 2 | 2 | 18 | 24 | 63 | . | . | 0% | 800% | 33% | 163% | 64% | 52% | yes | 2016 data not received for District 3 |
| 424 | | | | District 4 | | | 7 | 9 | 14 | 19 | 71 | 61 | 53 | 29% | 56% | 36% | 274% | -14% | -13% | 34% | -9% | yes | |
| 425 | | | | District 5 | | | 1 | 1 | 1 | 13 | 29 | 41 | 18 | 0% | 0% | 1200% | 123% | 41% | -56% | 51% | -15% | yes | |
| 426 | 367 | d. 1 | bias free policing & community engagement | variety of community partnerships | yes | District Commanders | | | | | | | | | | | | | | | | | |
| 427 | | | | District 1 | | | . | . | . | . | . | . | | . | . | . | . | . | | | | . | Can be calculated once adequate data for all Districts has been received |
| 428 | | | | District 2 | | | . | . | . | . | . | . | | . | . | . | . | . | | | | . | Can be calculated once adequate data for all Districts has been received |
| 429 | | | | District 3 | | | . | . | . | . | . | . | | . | . | . | . | . | | | | . | Can be calculated once adequate data for all Districts has been received |
| 430 | | | | District 4 | | | . | . | . | . | . | . | | . | . | . | . | . | | | | . | Can be calculated once adequate data for all Districts has been received |
| 431 | | | | District 5 | | | . | . | . | . | . | . | | . | . | . | . | . | | | | . | Can be calculated once adequate data for all Districts has been received |
| 432 | | | | | | | | | | | | | | | | | | | | | | | |
| 433 | 367 | d.2 | bias free policing & community engagement | homicide clearance rate DV Data no accurate yet | yes | Homicide Unit | 56% | 51% | 50% | 52% | 61% | 60% | 68% | -9% | -2% | 3% | 19% | -55% | | | | yes | |
| 434 | 367 | d.2 | bias free policing & community engagement | # of homicides | yes | | 127 | 139 | 130 | 120 | 122 | 178 | 174 | 9% | -6% | -8% | 2% | 46% | -2% | 5% | 13% | yes | |
| 435 | | | | # of homicides solved | | | 71 | 71 | 65 | 62 | 75 | 106 | 118 | 0% | -8% | -5% | 21% | -35% | 141% | 8% | 16% | yes | |
| 436 | | | | # of homicides unsolved | | | 56 | 68 | 65 | 58 | 47 | 72 | 56 | 21% | -4% | -11% | -19% | 174% | -57% | 0% | 6% | yes | |
| 437 | 367 | d.2 | bias free policing & community engagement | Type of homicide | yes | | | | | | | | | | | | | | | | | | |
| 438 | | | | # of domestic violence homicides | | | 12 | 18 | 6 | 6 | 14 | . | 20 | 50% | -67% | 0% | 133% | . | N/A | 8% | 13% | yes | Data is not accurate because DV homicide is based on the initial circumstances. If there is no suspect when officers arrive on scene, they cannont classify it as a DV homicide. Therefore the numbers are lower for DV homicies because in the system it is classified just has a homicide. |
| 439 | | | | # of non-domestic violence homicides | | | 115 | 121 | 124 | 114 | 108 | . | 154 | 5% | 2% | -8% | -5% | . | N/A | 4% | 13% | yes | |
| 440 | 367 | d.2 | bias free policing & community engagement | Homicide victims | yes | | | | | | | | | | | | | | | | | | |
| 441 | | | | Adult male victims | | | 95 | 110 | 102 | 88 | 93 | 150 | 140 | 16% | -7% | -14% | 6% | 61% | -7% | 6% | 15% | yes | |
| 442 | | | | Adult female victims | | | 23 | 18 | 12 | 18 | 18 | 17 | 28 | -22% | -33% | 50% | 0% | -6% | 65% | 3% | 16% | yes | |
| 443 | | | | Juvenile male victims | | | 7 | 7 | 11 | 5 | 7 | 10 | 5 | 0% | 57% | -55% | 40% | 43% | -50% | -5% | -11% | yes | |
| 444 | | | | Juvenile female victims | | | 2 | 2 | 2 | 2 | 3 | 0 | 1 | 0% | 0% | 0% | 50% | -100% | N/A | -9% | -31% | yes | |
| 445 | | | | unknown | | | . | . | 3 | 7 | 1 | 1 | 0 | . | N/A | 133% | -86% | 0% | -100% | N/A | -100% | yes | |
| 446 | | | | | | | | | | | | | | | | | | | | | | | |
| 447 | 367 | d.3 | bias free policing & community engagement | # civilian complaints for discrimination | no | OPS | . | . | . | . | | | | . | . | . | | | | | | | |
| 448 | 367 | d.3 | bias free policing & community engagement | disposition of discrimination complaints | no | OPS | . | . | . | . | | | | . | . | . | | | | | | | |
| 449 | 367 | d.3 | bias free policing & community engagement | analysis of biennial survey | yes | ISA hired | | | | | | | | | | | | | | | | | results are in a separate document |
| 450 | 367 | e | recruitment measures | | | | | | | | | | | | | | | | | | | | |
| 451 | 367 | e. 1 | recruitment measures | applicants | yes | City Hall Civil Service Commission (CSC) | 1410 | 1459 | 1180 | 2260 | 2343 | 893 | 837 | 3% | -19% | 92% | 4% | -62% | -6% | -7% | -29% | yes | 2018 data are only from tests taken in 2018 and includes officers with start dates in 2019; 2017 data are from the 2017 test although those hired include applicants from the 2016 list |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 452 | | | | # of qualified recruit applicants | | | 191 | 151 | 359 | 492 | 486 | 200 | 49 | -21% | 138% | 37% | -1% | -59% | -76% | -18% | -53% | yes | Category captured in data: "Name has been certified. Candidates are being vetted for the next Academy" (category 11) and "hired/currently in the academy" (category 4) or Not Hired; Left on Eligible List (category 15); declined offer (16); received offer but deferred (17)<br>2020: Declined offer (Category 13), Appointed/Hired (Category 14), Not Hired; Left on Eligible List (Category 15), Received Offer but deffered (Category 16), Withdrew or Failed to Complete Process after Offer (Category 18) NOTE: Only one recruitment/testing cycle in 2020, and .......... |
| 453 | | | | # of not qualified recruit applicants | | | 1219 | 1308 | 821 | 1768 | 1857 | 693 | 788 | 7% | -37% | 115% | 5% | -63% | 14% | -6% | -25% | yes | These are applicants who failed somewhere in the process |
| 454 | 367 | e. 1 | recruitment measures | applicants by race | yes | | | | | | | | | | | | | | | | | | |
| 455 | | | | White (W) | | | 781 | 693 | 526 | 984 | 1002 | 351 | 302 | -11% | -24% | 87% | 2% | -65% | -14% | -13% | -33% | yes | |
| 456 | | | | Black (B) | | | 409 | 518 | 440 | 891 | 941 | 383 | 367 | 27% | -15% | 103% | 6% | -59% | -4% | -2% | -27% | yes | |
| 457 | | | | Asian (A) | | | 13 | 11 | 12 | 23 | 26 | 5 | 10 | -15% | 9% | 92% | 13% | -81% | 100% | -4% | -27% | yes | |
| 458 | | | | Hispanic (H) | | | 154 | 148 | 127 | 204 | 216 | 90 | 94 | -4% | -14% | 61% | 6% | -58% | 4% | -7% | -24% | yes | |
| 459 | | | | Other (O) | | | 44 | 85 | 36 | 139 | 110 | 45 | 56 | 93% | -58% | 286% | -21% | -59% | 24% | 4% | -20% | yes | 2019/2020/2021: combined "other" and "two or more races" |
| 460 | | | | AI | | | 3 | 4 | 12 | 6 | 11 | 0 | 0 | 33% | 200% | -50% | 83% | -100% | N/A | -100% | -100% | yes | |
| 461 | | | | No Data (.) | | | 6 | 0 | 27 | 13 | 37 | 14 | 2 | -100% | N/A | -52% | 185% | -62% | -86% | -15% | -62% | yes | |
| 462 | 367 | e. 1 | recruitment measures | applicants by gender | yes | | | | | | | | | | | | | | | | | | |
| 463 | | | | Males | | | 1120 | 1163 | 873 | 1621 | 1692 | 644 | 626 | 4% | -25% | 86% | 4% | -62% | -3% | -8% | -28% | yes | |
| 464 | | | | Females | | | 290 | 296 | 298 | 629 | 639 | 240 | 205 | 2% | 1% | 111% | 2% | -62% | -15% | -5% | -32% | yes | |
| 465 | | | | Unknown | | | 0 | 0 | 9 | 10 | 12 | 9 | 6 | 0% | N/A | 11% | 20% | -25% | -33% | N/A | -21% | | |
| 466 | | | | | | | | | | | | | | | | | | | | | | | |
| 467 | 367 | e. 2 | recruitment measures | Where applicants heard of job | no | Civil Service Commission | | | | | | | | | | | | | | | | yes | No data on recruitment activities in baseline |
| 468 | | | | City Website | | | . | 40% | 54% | 52% | 49% | 49% | 49% | . | 36% | -3% | -6% | 0% | 0% | . | 0% | yes | |
| 469 | | | | Friend | | | . | 26% | 0% | 0% | 17% | 0% | 0% | . | -100% | 0% | 0% | 0% | N/A | . | -100% | yes | |
| 470 | | | | Google or other search | | | . | 19% | 3% | 0% | 0% | 0% | 0% | . | -85% | -100% | N/A | N/A | N/A | . | N/A | yes | |
| 471 | | | | Other | | | . | 14% | 14% | 17% | 17% | 33% | 34% | . | -1% | 24% | -3% | 94% | 3% | . | 26% | yes | 2020: Includes career boards and employee referrals |
| 472 | | | | Bulletin | | | . | 2% | 0% | 4% | 0% | 0% | 0% | . | -69% | 702% | -100% | N/A | N/A | . | N/A | yes | |
| 473 | | | | Word of mouth | | | . | 0% | 19% | 16% | 0% | 0% | 0% | . | N/A | -15% | -100% | N/A | N/A | . | N/A | yes | |
| 474 | | | | Social media | | | . | 0% | 6% | 6% | 10% | 16% | 13% | . | N/A | 3% | 60% | 60% | -19% | . | 9% | yes | |
| 475 | | | | Article or blog post | | | . | 0% | 0% | 0% | 0% | 0% | 0% | . | 0% | 0% | 0% | N/A | N/A | . | N/A | yes | |
| 476 | | | | Advertisement | | | . | 0% | 4% | 4% | 8% | 2% | 4% | . | N/A | 10% | 98% | -75% | 100% | . | -21% | yes | 2020: Category = Billboards/ TV or Radio |
| 477 | 367 | e. 2 | recruitment measures | Recruitment Activity | no | Civil Service Commission | | | | | | | | | | | | | | | | yes | No data on recruitment activities in baseline |
| 478 | | | | Billboards | | | . | 9 | 23 | 0 | 0 | 0 | 6 | . | 156% | -100% | N/A | N/A | N/A | . | N/A | yes | |
| 479 | | | | Billboard Impressions | | | . | 538043 | 1077439 | 0 | 0 | 0 | 598195 | . | 100% | -100% | N/A | N/A | N/A | . | N/A | yes | |
| 480 | | | | Regional Transit Bus Posters | | | . | 20 | 0 | 0 | 0 | 0 | 0 | . | -100% | N/A | N/A | N/A | N/A | . | N/A | yes | |
| 481 | | | | Regional Transit Stations Posters | | | . | 24 | 22 | 0 | 0 | 0 | 0 | . | -8% | -100% | N/A | N/A | N/A | . | N/A | yes | |
| 482 | | | | Mobile/digital video banner Ads | | | . | 50000 | 20000 | 200000 | 200000 | 50000 | 50000 | . | -60% | 900% | 0% | -75% | 0% | . | -37% | yes | |
| 483 | | | | Facebook, Twitter, Instagram Posts | | | . | 8 | 8 | 20 | 60 | 0 | 14 | . | 0% | 150% | 200% | -100% | N/A | . | -38% | yes | |
| 484 | | | | Blog posts/Websites | | | . | 60 | 90 | 260 | 260 | 0 | 6 | . | 50% | 189% | 0% | -100% | N/A | . | -72% | yes | |
| 485 | | | | Social Media Viewers/Likes | no | | . | . | 714547 | 117925 | . | . | | . | . | -83% | . | . | . | . | . | yes | New item CPD collects that has been added to 2017 but not specified in Consent Decree |
| 486 | | | | Social Media Shares | no | | . | . | 1278 | . | . | . | | . | . | . | . | . | . | . | . | yes | New item CPD collects that has been added to 2017 but not specified in Consent Decree |
| 487 | | | | Radio Station Spots | | | . | 4 | 4 | 7 | 3 | 9 | 3 | . | 0% | 75% | -57% | 200% | -67% | . | 0% | yes | |
| 488 | | | | Television | | | . | 0 | 0 | 1 | 1 | 1 | 1 | . | 0% | N/A | 0% | 0% | 0% | . | 0% | yes | |
| 489 | 367 | e. 2 | recruitment measures | # of Recruitment Partnerships | no | Civil Service Commission | . | 17 | 19 | 44 | 61 | 70 | 51 | . | 12% | 132% | 39% | 15% | -27% | | -6% | yes | No data on recruitment activities in baseline |
| 490 | | | | All Races | | | . | 8 | 15 | 32 | 36 | 14 | 36 | . | 88% | 113% | 13% | -61% | 157% | | 0% | yes | |
| 491 | | | | Black | | | . | 7 | 3 | 9 | 10 | 24 | 12 | . | -57% | 200% | 11% | 140% | -50% | | 6% | yes | |
| 492 | | | | Hispanic | | | . | 2 | 1 | 2 | 2 | 2 | 2 | . | -50% | 100% | 0% | 0% | 0% | | 0% | yes | |
| 493 | | | | Other | | | . | . | . | 1 | 13 | 30 | 1 | . | . | . | . | 131% | | | -57% | yes | New category added (Arab American)in 2018 |
| 494 | | | | | | | | | | | | | | | | | | | | | | | |
| 495 | 367 | e. 3 | recruitment measures | # of applicants who failed initial screening | yes | City Hall Civil Service Commission | 1219 | 1294 | 821 | 1768 | 1857 | 693 | 788 | 6% | -37% | 115% | 5% | -63% | 14% | -6% | -25% | yes | Same number as above (# of non-qualified applicants); considered anyone who is NOT hired (category 4) and anyone whose name has NOT been certified (category 11) |
| 496 | 367 | e. 3 | recruitment measures | reason for failures | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 497 | | | | 1- Application Rejected | | | . | 339 | 282 | 390 | 400 | 85 | 82 | . | -17% | 38% | 3% | -79% | -4% | N/A | -41% | yes | Application rejected - Not collected in 2015 |
| 498 | | | | 2-Failed agility test | | | 166 | 119 | 101 | 100 | 92 | 133 | 72 | -28% | -15% | -1% | -8% | 45% | -46% | -11% | -8% | yes | 2019:Code changed from 2 to 6 |
| 499 | | | | 3-No show for the Agility test | | | 85 | 113 | 90 | 165 | 61 | 31 | 46 | 33% | -20% | 83% | -63% | -49% | 48% | -8% | -9% | yes | 2019: Code changed from 3 to 5. 2020: Also includes Category 5A, Did Not Schedule Agiligty Test |
| 500 | | | | 4-Hired / Currently in the Academy | | | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | 49 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | yes | |
| 501 | | | | 5-No response to certification | | | 183 | 58 | 0 | 90 | 103 | 23 | 25 | -68% | -100% | N/A | 14% | -78% | 9% | -25% | -38% | yes | 2019: Code changed from 5 to 4 |
| 502 | | | | 6-Passed over | | | 13 | 8 | 0 | 108 | 155 | 0 | 35 | -38% | -100% | N/A | 44% | -100% | N/A | 15% | -39% | yes | The 2017 list reported no one who was passed over, however, the 2016 list was used to hire the 2017 class and 47 were passed over<br>2019: Code changed from 6 to 12 |
| 503 | | | | 7-Removed for background reason(s) | | | 66 | 39 | 0 | 15 | 5 | 0 | 30 | -41% | -100% | N/A | -67% | -100% | N/A | -11% | 82% | yes | The 2017 list reported no one who was removed for background reasons, however, the 2016 list was used to hire the 2017 class and 6 were removed for background reasons<br>2019: Code changed from 7 to 8 |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 504 | | | | 8-No show for the Psychological Exam | | | 1 | . | 0 | 4 | 0 | 0 | 4 | . | . | N/A | -1 | N/A | N/A | 22% | N/A | yes | 8 (no show for psych) and 13 (no PHS) are merged in 2016 data; The 2017 list reported no one was a no show, however, the 2016 list was used to hire the 2017 class and 1 was a no show<br>2019: Code changed from 8 to 7 (24 no PHS-row 469, no category for no show for psychological exam) |
| 505 | | | | 9-No longer interested | | | 19 | 26 | 4 | 62 | 48 | 10 | 24 | 37% | -85% | 1450% | -23% | -79% | 140% | 3% | -21% | yes | The 2017 list reported 4 people who were no longer interested, however, the 2016 list was used to hire the 2017 class and 10 were no longer interested |
| 506 | | | | 10-Waived | | | 17 | 102 | 10 | 61 | 115 | 42 | 44 | 500% | -90% | 510% | 89% | -63% | 5% | 15% | -27% | yes | |
| 507 | | | | 11-Name has been certified. Candidates are being vetted for the next Academy | | | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | yes | |
| 508 | | | | 12-No show for the test | | | 394 | 263 | 244 | 566 | 652 | 258 | 306 | -33% | -7% | 132% | 15% | -60% | 19% | -4% | -22% | yes | 2019: Code changed from 12 to 2 |
| 509 | | | | 13-Did not submit their Personal History Statement | | | 240 | 4 | 0 | 0 | 24 | 0 | 0 | -98% | -100% | 0% | 0% | -100% | N/A | -100% | -100% | yes | 2019: Code changed from 13 to 7 |
| 510 | | | | 14-Failed the test | | | 35 | 223 | 90 | 194 | 170 | 111 | 120 | 537% | -60% | 116% | -12% | -35% | 8% | 19% | -11% | yes | 2019: Code changed from 14 to 3 |
| 511 | 367 | e. 3 | recruitment measures | recruit failures by race | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 512 | | | | White (W) Failures | | | 658 | 594 | 323 | 742 | 750 | 253 | 277 | -10% | -46% | 130% | 1% | -66% | 9% | -12% | -28% | yes | |
| 513 | | | | Black (B) Failures | | | 375 | 492 | 341 | 733 | 802 | 317 | 358 | 31% | -31% | 115% | 9% | -60% | 13% | -1% | -24% | yes | 23% |
| 514 | | | | Asian (A) Failures | | | 12 | 9 | 8 | 17 | 17 | 3 | 10 | -25% | -11% | 113% | 0% | -82% | 233% | -3% | -16% | yes | |
| 515 | | | | Hispanic (H) Failures | | | 128 | 133 | 90 | 159 | 159 | 66 | 84 | 4% | -32% | 77% | 0% | -58% | 27% | -6% | -19% | yes | |
| 516 | | | | Other (O) Failures | | | 41 | 76 | 32 | 106 | 91 | 36 | 52 | 85% | -58% | 231% | -14% | -60% | 44% | 3% | -17% | yes | 2019: combined "other" and "two or more races" |
| 517 | | | | Native American (AI) Failures | | | 1 | 4 | 8 | 3 | 11 | 4 | 1 | 300% | 100% | -63% | 267% | -64% | -75% | 0% | -55% | yes | |
| 518 | | | | No Data (.) Failures | | | 4 | 0 | 19 | 8 | 27 | 14 | 6 | -100% | N/A | -58% | 238% | -48% | -57% | 6% | -39% | yes | |
| 519 | 367 | e. 3 | recruitment measures | recruit failures by ethnicity | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 520 | | | | Hispanic/Latino (H) | | | 128 | 133 | 90 | 159 | 159 | 66 | 84 | 4% | -32% | 77% | 0% | -58% | 27% | -6% | -19% | yes | It is unclear whether this information is captured adequately. 2021: Hispanic is now captured in the race category |
| 521 | | | | Non-Hispanic/Latino | | | 1091 | 1161 | 731 | 1609 | 1698 | 657 | 753 | 6% | -37% | 120% | 6% | -61% | 15% | -5% | -24% | yes | |
| 522 | 367 | e. 3 | recruitment measures | recruit failures by gender | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 523 | | | | Male Failures | | | 971 | 1032 | 592 | 1274 | 1351 | 486 | 591 | 6% | -43% | 115% | 6% | -64% | 22% | -7% | -24% | yes | |
| 524 | | | | Female Failures | | | 248 | 277 | 224 | 489 | 497 | 199 | 192 | 12% | -19% | 118% | 2% | -60% | -4% | -4% | -27% | yes | |
| 525 | | | | unknown gender | | | . | . | 5 | 5 | 9 | 8 | 5 | . | . | 0% | 80% | -11% | -38% | N/A | -18% | yes | unknown not captured in 2015 or 2016 |
| 526 | | | | recruit failures by self identified disability | no | City Hall Civil Service Commission | . | . | . | . | | | | . | . | . | . | | | | | N/A | Only have data on veterans; No data collected currently; Needs to be collected in the future |
| 527 | | | | | | | | | | | | | | | | | | | | | | | |
| 528 | 367 | e. 4 | recruitment measures | # of applicants with fluency in other language | no | City Hall Civil Service Commission | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 529 | | | | list of languages spoken by recruits | no | | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 530 | | | | | | | | | | | | | | | | | | | | | | | |
| 531 | 367 | e. 5 | recruitment measures | # of lateral candidates | yes | City Hall Civil Service Commission | 0 | 210 | 94 | 0 | 0 | 0 | 37 | N/A | -55% | -100% | N/A | | | | | yes | The Division did not recruit laterals in 2015 or 2018 |
| 532 | 367 | e. 5 | recruitment measures | laterals by race | yes | | | | | | | | | | | | | | | | | yes | The Division did not recruit laterals in 2015 or 2018 |
| 533 | | | | White (W) | | | 0 | 116 | 37 | 0 | 0 | 0 | 22 | N/A | -68% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 534 | | | | Black (B) | | | 0 | 57 | 37 | 0 | 0 | 0 | 13 | N/A | -35% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 535 | | | | Asian (A) | | | 0 | 1 | 1 | 0 | 0 | 0 | 0 | N/A | 0% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 536 | | | | Hispanic (H) | | | 0 | 18 | 7 | 0 | 0 | 0 | 1 | N/A | -61% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 537 | | | | Other (O) | | | 0 | 17 | 9 | 0 | 0 | 0 | 1 | N/A | -47% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 538 | | | | AI | | | 0 | 0 | 1 | 0 | 0 | 0 | 0 | N/A | N/A | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 539 | | | | No Data (.) | | | 0 | 1 | 2 | 0 | 0 | 0 | 0 | N/A | 100% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 540 | 367 | e. 5 | recruitment measures | ethnicity | yes | | | | | | | | | | | | | | | | | yes | The Division did not recruit laterals in 2015 or 2018 |
| 541 | | | | Hispanic/Latino | | | 0 | 18 | 7 | 0 | 0 | 0 | 1 | N/A | -61% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 542 | | | | Non-Hispanic/Latino | | | 0 | 192 | 87 | 0 | 0 | 0 | 36 | N/A | -55% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 543 | 367 | e. 5 | recruitment measures | laterals by gender | yes | | | | | | | | | | | | | | | | | | The Division did not recruit laterals in 2015 or 2018 |
| 544 | | | | Male | | | 0 | 174 | 74 | 0 | 0 | 0 | 33 | N/A | -57% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 545 | | | | Female | | | 0 | 35 | 19 | 0 | 0 | 0 | 4 | N/A | -46% | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 546 | | | | unknown | | | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0% | N/A | -100% | N/A | N/A | N/A | N/A | N/A | yes | |
| 547 | 367 | e. 5 | recruitment measures | Other information on laterals | yes | | | | | | | | | | | | | | | | | | The Division did not recruit laterals in 2015 or 2018 |
| 548 | | | | laterals with self identified disability | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | N/A | N/A | N/A | N/A | yes | |
| 549 | | | | list of laterals former agencies | | | 0 | 39 | 5 | 0 | 0 | 0 | 0 | N/A | -87% | -100% | N/A | N/A | N/A | N/A | N/A | yes | represents the number of PDs laterals worked for |
| 550 | | | | list of laterals years of service | | | 0 | 166 | 12 | 0 | 0 | 0 | 0 | N/A | -93% | -100% | N/A | N/A | N/A | N/A | N/A | yes | represents the number of years in which laterals worked for other PDs |
| 551 | | | | | | | | | | | | | | | | | | | | | | | |
| 552 | 367 | e. 6 | recruitment measures | applicant qualifications | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 553 | | | | # applicants with 2+ years college | yes | | 455 | 802 | 649 | 1172 | 1181 | 459 | 376 | 76% | -19% | 81% | 1% | -61% | -18% | -3% | -32% | yes | This category captures those who attended college for 2+ years, but did not obtain a BA degree (includes those with associates degrees) |
| 554 | | | | # applicants with college degree | yes | | 240 | 247 | 189 | 370 | 414 | 143 | 104 | 3% | -23% | 96% | 12% | -65% | -27% | -11% | -37% | yes | |
| 555 | | | | # applicants with 2+ years military | no | | . | . | . | . | | | | . | . | . | . | | | | | yes | No data collected currently; only have 180+days; Needs to be collected in the future |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 556 | | | | # applicants with 180+ days military | yes (new) | | 161 | 89 | 55 | 91 | 79 | 52 | 52 | -45% | -38% | 65% | -13% | -34% | 0% | -15% | -13% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 557 | | | | disabled veterans | yes (new) | | 14 | 2 | 3 | 2 | 4 | 0 | 1 | -86% | 50% | -33% | 100% | -100% | N/A | -31% | -37% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree; misreported in 2015 (was reported as 1235) |
| 558 | | | | | | | | | | | | | | | | | | | | | | | |
| 559 | 367 | e. 7 | recruitment measures | pass/fail rate in each phase of pre-employment process | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | pass calculated<br>Question-How is this section calculated? Seems more appriopriate to report this section as fail rate at every phase of pre-employment. 2019-Fail rate<br>2020: All Categories are N/A because the process is not complete. All are still in the academy. |
| 560 | | | | | | | | | | | | | | | | | . | | | | | | |
| 561 | | | | 1-Application rejected | | | | | | | 78.46% | N/A | 89.59% | . | . | . | . | . | . | . | 5% | | |
| 562 | | | | 2-Failed agility test | | | 86.38% | 90.24% | 87.70% | 94.34% | 95.05% | 80.81% | 90.86% | 4% | -3% | 8% | 1% | -15% | 12% | 1% | -1% | yes | pass rate calculated, 2019-fail rate |
| 563 | | | | 3-No show for the Agility test | | | 93.03% | 90.73% | 89.04% | 90.67% | 96.72% | 95.53% | 94.16% | -2% | -2% | 2% | 7% | -1% | -1% | 0% | -1% | yes | pass rate calculated, 2019-fail rate |
| 564 | | | | 4-Hired / Currently in the Academy | | | N/A | N/A | N/A | N/A | N/A | N/A | 93.78% | N/A | N/A | N/A | N/A | N/A | N/A | . | . | yes | pass rate calculated, 2019-fail rate |
| 565 | | | | 5-No response to certification | | | 84.99% | 95.24% | 100.00% | 94.91% | 94.45% | 96.68% | 96.83% | 12% | 5% | -5% | 0% | 2% | 0% | 2% | 1% | yes | pass rate calculated, 2019-fail rate |
| 566 | | | | 6-Passed over | | | 98.93% | 99.34% | 100.00% | 93.89% | 91.65% | 100.00% | 95.56% | 0% | 1% | -6% | -2% | 9% | -4% | 0% | 1% | yes | pass rate calculated, 2019-fail rate |
| 567 | | | | 7-Removed for background reason(s) | | | 94.59% | 96.80% | 100.00% | 99.15% | 99.73% | 100.00% | 96.19% | 2% | 3% | -1% | 1% | 0% | -4% | 0% | -1% | yes | pass rate calculated, 2019-fail rate |
| 568 | | | | 8-No show for the Psychological Exam | | | 99.92% | N/A | 100.00% | 99.77% | 100.00% | 100.00% | 99.49% | N/A | N/A | 0% | 0% | 0% | -1% | 0% | 0% | yes | pass rate calculated; merged with no PHS, 2019-fail rate |
| 569 | | | | 9-No longer interested | | | 98.44% | 97.87% | 99.51% | 96.49% | 97.42% | 98.56% | 96.95% | -1% | 2% | -3% | 1% | 1% | -2% | 0% | 0% | yes | pass rate calculated, 2019-fail rate |
| 570 | | | | 10-Waived | | | 98.61% | 91.63% | 98.78% | 96.55% | 93.81% | 93.94% | 94.42% | -7% | 8% | -2% | -3% | 0% | 1% | -1% | 0% | yes | pass rate calculated, 2019-fail rate |
| 571 | | | | 11-Name has been certified. Candidates are being vetted for the next Academy | | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | . | N/A | yes | pass rate calculated, 2019-fail rate |
| 572 | | | | 12-No show for the test | | | 67.68% | 78.42% | 70.28% | 67.99% | 64.89% | 62.77% | 61.17% | 16% | -10% | -3% | -5% | -3% | -3% | -1% | -2% | yes | pass rate calculated, 2019-fail rate |
| 573 | | | | 13-Did not submit their Personal History Statement | | | 80.31% | 99.67% | 100.00% | 100.00% | 98.71% | 100.00% | 100.00% | 24% | 0% | 0% | -1% | 1% | 0% | 3% | 0% | yes | pass rate calculated, 2019-fail rate |
| 574 | | | | 14-Failed the test | | | 97.13% | 81.71% | 89.04% | 67.99% | 90.85% | 83.98% | 84.77% | -16% | 9% | -24% | 34% | -8% | 1% | -2% | -2% | yes | pass rate calculated, 2019-fail rate |
| 575 | | | | 17-Failed Medical or Drug Test | | | | | | 100.00% | 100.00% | 100.00% | 100.00% | | | | 0% | 0% | 0% | . | 0% | | 2019-fail rate |
| 576 | | | | 18-Withdrew or Failed to Complete Process After Offer | | | | | | 89.03% | 59.61% | 63.49% | 64.85% | -16% | 9% | N/A | -33% | 7% | 2% | . | 3% | yes | 2019-new category, fail rate |
| 577 | 367 | e. 7 | recruitment measures | pass/fail rate by race | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 578 | | | | White (W) pass rate | | | 15.75% | 14.29% | 38.59% | 24.59% | 25.15% | 27.92% | 8.28% | -9% | 170% | -36% | 2% | 11% | -70% | -9% | -31% | yes | pass rate calculated |
| 579 | | | | Black (B) pass rate | | | 8.31% | 5.02% | 22.50% | 17.73% | 14.77% | 17.23% | 2.45% | -40% | 348% | -21% | -17% | 17% | -86% | -16% | -45% | yes | pass rate calculated |
| 580 | | | | Asian (A) pass rate | | | 7.69% | 18.18% | 33.33% | 26.09% | 34.62% | 40.00% | 0.00% | 136% | 83% | -22% | 33% | 16% | -100% | -100% | -100% | yes | pass rate calculated |
| 581 | | | | Hispanic (H) pass rate | | | 16.88% | 10.14% | 29.13% | 22.06% | 26.39% | 26.67% | 10.64% | -40% | 187% | -24% | 20% | 1% | -60% | -6% | -26% | yes | pass rate calculated |
| 582 | | | | Other (O) pass rate | | | 6.82% | 10.59% | 11.11% | 23.74% | 17.27% | 20.00% | 7.14% | 55% | 5% | 114% | -27% | 16% | -64% | 1% | -25% | yes | pass rate calculated |
| 583 | | | | AI pass rate | | | 66.67% | 0.00% | 33.33% | 50.00% | 0.00% | N/A | N/A | -100% | N/A | 50% | -100% | N/A | N/A | N/A | N/A | yes | pass rate calculated |
| 584 | | | | No Data (.) pass rate | | | 33.33% | . | 29.63% | 38.46% | 27.03% | 0.00% | N/A | . | . | 30% | -30% | -100% | N/A | N/A | N/A | yes | pass rate calculated |
| 585 | 367 | e. 7 | recruitment measures | pass/fail rate by ethnicity | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 586 | | | | Hispanic/Latino (H) pass rate | | | 16.88% | 10.14% | 29.13% | 22.06% | 26.39% | 26.67% | 10.64% | -40% | 187% | -24% | 20% | 1% | -60% | -6% | -26% | yes | pass rate calculated |
| 587 | | | | Non-Hispanic/Latino pass rate | | | 13.14% | 11.44% | 30.58% | 30.10% | 19.81% | 21.03% | 4.47% | -13% | 167% | -2% | -34% | 6% | -79% | -14% | -39% | yes | pass rate calculated |
| 588 | 367 | e. 7 | recruitment measures | pass/fail rate by gender | yes | City Hall Civil Service Commission | | | | | | | | | | | | | | | | | |
| 589 | | | | Male Pass Rate | | | 13.30% | 11.26% | 32.19% | 21.41% | 20.15% | 24.53% | 5.59% | -15% | 186% | -33% | -6% | 22% | -77% | -12% | -35% | yes | pass rate calculated |
| 590 | | | | Female Pass Rate | | | 14.48% | 6.42% | 24.83% | 22.26% | 22.22% | 17.08% | 6.34% | -56% | 287% | -10% | 0% | -23% | -63% | -11% | -34% | yes | pass rate calculated |
| 591 | | | | unknown gender pass rate | | | . | . | 44.44% | 50.00% | 25.00% | 11.11% | 16.67% | . | . | 13% | -50% | -56% | 50% | . | -13% | yes | pass rate calculated |
| 592 | 367 | e. 7 | recruitment measures | pass/fail rate by self identified disability | no | City Hall Civil Service Commission | . | . | . | . | | | | . | . | | | | | | | . | No data collected currently; Needs to be collected in the future |
| 593 | | | | | | | | | | | | | | | | | | | | | | | |
| 594 | 367 | e. 8 | recruitment measures | avg length of time to move through each phase of preemployment | no | | . | . | . | . | | | | . | . | | | | | | | . | No data collected currently; Needs to be collected in the future |
| 595 | | | | avg length of time to process applicants | | | . | . | . | . | | | | . | . | | | | | | | . | No data collected currently; Needs to be collected in the future |
| 596 | | | | | | | | | | | | | | | | | | | | | | | |
| 597 | 367 | e. 9 | recruitment measures | composition of recruit class | yes | | | | | | | | | | | | | | | | | | |
| 598 | 367 | e. 9 | recruitment measures | Initial Size of recruit class | yes | | 52 | 62 | 69 | 153 | 250 | 58 | 61 | 19% | 11% | 122% | 63% | TBD | N/A | 2% | -38% | yes | 2018 excludes names that were on the list given for 2017 report's recruit Class 140; All recruit class numbers reflect the number of officers hired based on the test taken that year even if the hire date is in the following year. So 2018 numbers reflect officers who took the police exam in 2018 even though their start date may not have been until 2019<br>2020: At the time this report was put together, data received from Recruitment contains information on individuals currently in the academy. As a result this section not filled out. |
| 599 | | | | Remained | yes (new) | | 44 | 51 | 65 | 140 | 202 | 42 | 39 | 16% | 27% | 115% | 44% | TBD | N/A | -2% | -42% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 600 | | | | Separated | yes (new) | | 8 | 11 | 4 | 13 | 48 | 16 | 22 | 38% | -64% | 225% | 269% | TBD | N/A | 16% | -23% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 601 | 367 | e. 9 | recruitment measures | Separated by Race | yes | | | | | | | | | | | | | | N/A | | | | |
| 602 | | | | Black | yes (new) | | 2 | 3 | 0 | 3 | 12 | 3 | 7 | 50% | -100% | N/A | 300% | TBD | N/A | 20% | -16% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 603 | | | | White | yes (new) | | 4 | 8 | 4 | 8 | 26 | 9 | 12 | 100% | -50% | 100% | 225% | TBD | N/A | 17% | -23% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 604 | | | | Hispanic | yes (new) | | 2 | 0 | 0 | 2 | 6 | 1 | 3 | -100% | 0% | N/A | 200% | TBD | N/A | 6% | -21% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 605 | | | | Asian | yes (new) | | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0% | 0% | 0% | 0% | TBD | N/A | N/A | -100% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 606 | | | | Other | yes (new) | | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0% | 0% | 0% | 0% | TBD | N/A | N/A | -100% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 607 | | | | Undisclosed | yes (new) | | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0% | 0% | 0% | 0% | TBD | N/A | N/A | -100% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 608 | 367 | e. 9 | recruitment measures | Separated by Gender | yes | | | | | | | | | | | | | | N/A | | | | |
| 609 | | | | Male | yes (new) | | 7 | 8 | 4 | 9 | 31 | 13 | 13 | 14% | -50% | 125% | | TBD | N/A | 9% | -25% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 610 | | | | Female | yes (new) | | 1 | 3 | 0 | 9 | 16 | 3 | 9 | 200% | -100% | N/A | | TBD | N/A | 37% | -17% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 611 | | | | Undisclosed | yes (new) | | | | | | 1 | 0 | 0 | | | | | TBD | N/A | N/A | -100% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 612 | 367 | e. 9 | recruitment measures | composition of recruit classes by race | | Command Staff/ Academy | | | | | | | | | | | | | | | | | |
| 613 | | | | Black | | | 8 | 10 | 16 | 40 | 64 | 16 | 15 | 25% | 60% | 150% | 60% | TBD | N/A | 9% | -38% | yes | |
| 614 | | | | White | | | 29 | 38 | 51 | 89 | 138 | 35 | 31 | 31% | 34% | 75% | 55% | TBD | N/A | 1% | -39% | yes | |
| 615 | | | | Hispanic | | | 12 | 2 | 2 | 8 | 26 | 5 | 10 | -83% | 0% | 300% | 225% | TBD | N/A | -3% | -27% | yes | |
| 616 | | | | Asian | | | 0 | 1 | 0 | 0 | 5 | 1 | 0 | N/A | -100% | 0% | 0% | TBD | N/A | N/A | -100% | yes | |
| 617 | | | | Other | | | 3 | 0 | 0 | 0 | 13 | 1 | 4 | -100% | 0% | N/A | N/A | TBD | N/A | 4% | -32% | yes | Other includes "Two or More" |
| 618 | | | | Undisclosed | | | | | | | 4 | 0 | 1 | | | | . | TBD | N/A | N/A | -37% | | |
| 619 | 367 | e. 9 | recruitment measures | composition of recruit classes by ethnicity | | Command Staff/ Academy | | | | | | | | | | | | | N/A | | | | |
| 620 | | | | Hispanic/Latino | | | 12 | 2 | 2 | 8 | 26 | 1 | 10 | -83% | 0% | 300% | 225% | TBD | N/A | -3% | -27% | yes | |
| 621 | | | | Non-Hispanic/Latino | | | 40 | 60 | 67 | 132 | 224 | 57 | 51 | 50% | 12% | 97% | 70% | TBD | N/A | 4% | -39% | yes | |
| 622 | 367 | e. 9 | recruitment measures | composition of recruit classes by gender | | Command Staff/ Academy | | | | | | | | | | | | | N/A | | | | |
| 623 | | | | Male | | | 44 | 43 | 54 | 106 | 177 | 42 | 44 | -2% | 26% | 96% | 67% | TBD | N/A | 0% | -37% | yes | |
| 624 | | | | Female | | | 8 | 19 | 15 | 106 | 70 | 16 | 16 | 138% | -21% | 607% | -34% | TBD | N/A | 10% | -39% | yes | |
| 625 | | | | Undisclosed | | | | | | | 3 | 0 | 1 | | | | . | TBD | N/A | N/A | -31% | | |
| 626 | | | | composition of recruit classes by self identified disability | | | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 627 | **367** | **f. 1** | **training measures** | | | | | | | | | | | | | | | | | | | | |
| 628 | 367 | f. 1 | training measures | # of officers provided training pursuant to this agreement | no | | . | . | 1354 | 1363 | 1369 | 1,477 | 1,324 | . | . | 1% | 0% | 8% | -10% | . | -1% | yes | No data collected in 2015 or 2016; 2017 includes UoF CIT not State Re-Qual |
| 629 | 367 | f. 1 | training measures | % of officers provided training pursuant to this agreement | no | | . | . | 94% | 96% | 94% | 96.78% | 97.35% | . | . | 2% | -2% | 3% | 1% | . | 1% | yes | No data collected in 2015 or 2016; 2017 includes UoF CIT not State Re-Qual<br>Q. Which session? Slight difference. |
| 630 | | | | | | | | | | | | | | | | | | | | | | | |
| 631 | 367 | f. 2 | training measures | students' evaluations of the adequacy of training in type and frequency | no | Training | | | | | | | | | | | | | | | | yes | No data collected in 2015, 2016, or 2018<br>Q. Which training session? In 2019, 3 sessions<br>2021- took the average for all three agree/strongly disagree for each category of pistol/shotgun/cew |
| 632 | | | | Instructor adequacy | | | . | . | 87% | | 74% | 77.80% | 83.16% | . | . | . | . | 5% | 7% | . | 4% | yes | 2017: instructor increased my knowledge of the course material (agree and strongly agree) |
| 633 | | | | Content adequacy | | | . | . | 87% | . | 77% | 80.50% | 83.85% | . | . | . | . | 5% | 4% | . | 3% | yes | 2017:scenarios were practical (agree and strongly agree) |
| 634 | | | | Future performance adequacy | | | . | . | 63% | . | 43% | 53.23% | 63.80% | . | . | . | . | 24% | 20% | . | 14% | yes | 2017: I will perform differently based on skills and knowledge gained (agree and strongly agree) |
| 635 | | | | Overall adequacy | | | . | . | 79% | . | 66% | 85.80% | 79.95% | . | . | . | . | 30% | -7% | . | 7% | yes | 2017: Overall I found this training to be valuable (agree and strongly agree) |
| 636 | | | | | | | | | | | | | | | | | | | | | | | |
| 637 | 367 | f. 3 | training measures | modifications or improvements to training resulting from the review and analysis required by this agreement | no | | . | . | see written report | see written report | | | | . | . | . | . | . | | | | yes | No data collected in 2015, 2016, or 2018; 2017 includes UoF CIT not State Re-Qual. See written report for details |
| 638 | | | | | | | | | | | | | | | | | | | | | | | |
| 639 | 367 | f. 4 | training measures | prevalence of training deficiencies as reflected by problematic incidents or performance trends | no | | . | . | see written report | see written report | | | | . | . | . | . | #DIV/0! | | | | yes | No data collected in 2015, 2016, or 2018; 2017 includes UoF CIT not State Re-Qual. See written report for details |
| 640 | **367** | **g.** | **officer assistance & support efforts** | | | | | | | | | | | | | | | | | | | | |
| 641 | 367 | g. 1 | officer assistance & support efforts | availability of officer assistance & support services | yes | EAP | see below | see below | see below | see below | see below | see below | see below | | | | | | | | | | |
| 642 | 367 | g. 1 | officer assistance & support efforts | use of officer assistance & support services | yes | EAP | 11 | 209 | 221 | 241 | 316 | 460 | 468 | 1800% | 6% | 9% | 31% | 46% | 2% | 71% | 14% | yes | 2015 baseline data is underreported as the use of service was not tracked.<br>2019-Number represents EAP |
| 643 | | | | | | | | | | | | | | | | | | | | | | | |
| 644 | 367 | g. 2 | officer assistance & support efforts | officer reports of adequacy of officer assistance & support svcs | no | EAP | . | . | 92% | 78% | | | | . | . | -15% | . | | | | | yes | No data collected in 2015 or 2016; 2017 includes ratings of agree and strongly agree on all items. 2019 and 2020, almost no response data from officers |
| 645 | 367 | g. 2 | officer assistance & support efforts | survey analysis of adequacy of officer assistance & support svcs | no | EAP | . | . | see written report | see written report | | | | . | . | . | . | | | | | N/A | No data collected in 2015 or 2016 |
| 646 | **367** | **h.** | **supervision measures** | | | | | | | | | | | | | | | | | | | | |
| 647 | 367 | h. | supervision measures | supervisors initial identification of officer violations | no | | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 648 | 367 | h. | supervision measures | supervisors initial identification of officer performance problems | no | | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 649 | 367 | h. | supervision measures | supervisors response to officer violations | no | | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 650 | 367 | h. | supervision measures | supervisors response to performance problems | no | | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 651 | **367** | **i.** | **civilian complaints & investigations & discipline** | | | | | | | | | | | | | | | | | | | | |
| 652 | 367 | i. 1 | civilian complaints & investigations & discipline | # of complaints | yes | IA, Inspections, OPS | 294 | 263 | 241 | 227 | 220 | 276 | 324 | -11% | -8% | -6% | -3% | 25% | 17% | 1% | 14% | yes | Of the 294 cases in 2015, only 45 were completed and only 4 went through the PRB |
| 653 | 367 | i. 1 | civilian complaints & investigations & discipline | increases/decreases related to access | no | IA, Inspections, OPS | . | . | . | . | | | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 654 | | | | | | | | | | | | | | | | | | | | | | | |
| 655 | 367 | i. 2 | civilian complaints & investigations & discipline | # sustained by complaint type | no | IA, Inspections, OPS | 2 | 7 | 26 | 110 | 75 | 80 | 90 | 250% | 271% | 323% | -32% | 7% | 13% | 72% | 6% | yes | PRB looked at 4 cases in 2015; 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CAGR not included |
| 656 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 657 | | | | Harassment | | | 0 | 0 | 3 | 1 | 1 | 0 | 1 | 0% | N/A | -67% | 0% | -100% | N/A | N/A | 0% | yes | |
| 658 | | | | Improper Procedure | | | 1 | 2 | 12 | 16 | 12 | 23 | 41 | 100% | 500% | 33% | -25% | 92% | 78% | 70% | 51% | yes | |
| 659 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0% | N/A | -100% | N/A | 0% | 0% | N/A | N/A | yes | |
| 660 | | | | Lack of Service | | | 0 | 1 | 4 | 22 | 19 | 12 | 20 | N/A | 300% | 450% | -14% | -37% | 67% | N/A | 2% | yes | |
| 661 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 662 | | | | Other | | | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0% | 0% | N/A | N/A | 0% | 0% | N/A | N/A | yes | Other includes missing property in 2018 |
| 663 | | | | Physical Abuse/Excessive Force | | | 0 | 1 | 0 | 0 | 1 | 2 | 0 | N/A | -100% | 0% | 0% | 100% | -100% | N/A | -100% | yes | |
| 664 | | | | Unprofessional | | | 1 | 3 | 6 | 68 | 41 | 39 | 23 | 200% | 100% | 1033% | -40% | -5% | -41% | 57% | -18% | yes | |
| 665 | | | | Biased Policing | | | N/A | N/A | N/A | 1 | 1 | 0 | 3 | N/A | N/A | N/A | N/A | -100% | N/A | N/A | 44% | yes | New Category added in 2018 |
| 666 | 367 | i. 2 | civilian complaints & investigations & discipline | # exonerated by complaint type | no | IA, Inspections, OPS | 0 | 8 | 61 | 220 | 126 | 95 | 94 | N/A | 663% | 261% | -43% | -25% | -1% | | -9% | yes | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 667 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 668 | | | | Harassment | | | 0 | 1 | 6 | 12 | 5 | 2 | 0 | N/A | 500% | 100% | -58% | -60% | -100% | N/A | -100% | yes | |
| 669 | | | | Improper Procedure | | | 0 | 3 | 23 | 93 | 12 | 45 | 42 | N/A | 667% | 304% | -87% | 275% | -7% | N/A | 52% | yes | |
| 670 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0% | N/A | -100% | 0% | 0% | 0% | N/A | N/A | yes | |
| 671 | | | | Lack of Service | | | 0 | 2 | 10 | 53 | 37 | 28 | 45 | N/A | 400% | 430% | -30% | -24% | 61% | N/A | 7% | yes | |
| 672 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 673 | | | | Other | | | 0 | 0 | 5 | 14 | 1 | 0 | 0 | 0% | N/A | 180% | -93% | -100% | 0% | N/A | -100% | yes | Other includes missing property in 2018 |
| 674 | | | | Physical Abuse/Excessive Force | | | 0 | 2 | 4 | 11 | 4 | 4 | 1 | N/A | 100% | 175% | -64% | 0% | -75% | N/A | -37% | yes | |
| 675 | | | | Unprofessional | | | 0 | 0 | 12 | 34 | 22 | 12 | 6 | 0% | N/A | 183% | -35% | -45% | -50% | N/A | -35% | yes | |
| 676 | | | | Biased Policing | | | N/A | N/A | N/A | 3 | 0 | 0 | 0 | N/A | N/A | N/A | N/A | 0% | 0% | 0% | 0% | yes | New Category added in 2018 |
| 677 | 367 | i. 2 | civilian complaints & investigations & discipline | # unfounded by complaint type | no | IA, Inspections, OPS | 2 | 13 | 16 | 159 | 86 | 69 | 101 | 550% | 23% | 894% | -46% | -20% | 46% | 75% | 6% | yes | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 678 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 679 | | | | Harassment | | | 0 | 1 | 0 | 8 | 1 | 0 | 7 | N/A | -100% | N/A | -88% | -100% | N/A | N/A | 91% | yes | |
| 680 | | | | Improper Procedure | | | 1 | 3 | 5 | 12 | 7 | 8 | 14 | 200% | 67% | 140% | -42% | 14% | 75% | 46% | 26% | yes | |
| 681 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | N/A | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 682 | | | | Lack of Service | | | 0 | 2 | 4 | 42 | 37 | 19 | 33 | N/A | 100% | 950% | -12% | -49% | 74% | N/A | -4% | yes | |
| 683 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 684 | | | | Other | | | 0 | 0 | 3 | 10 | 3 | 2 | 4 | 0% | N/A | 233% | -70% | -33% | 100% | N/A | 10% | yes | Other includes missing property in 2018 |
| 685 | | | | Physical Abuse/Excessive Force | | | 0 | 3 | 2 | 12 | 2 | 0 | 3 | N/A | -33% | 500% | -83% | -100% | N/A | N/A | 14% | yes | |
| 686 | | | | Unprofessional | | | 1 | 4 | 2 | 62 | 28 | 31 | 35 | 300% | -50% | 3000% | -55% | 11% | 13% | 66% | 8% | yes | |
| 687 | | | | Biased Policing | | | N/A | N/A | N/A | 13 | 8 | 9 | 5 | N/A | N/A | N/A | N/A | 13% | -44% | N/A | -15% | yes | New Category added in 2018 |
| 688 | 367 | i. 2 | civilian complaints & investigations & discipline | # not sustained by complaint type | no | OPS | . | . | . | . | 89 | 65 | 73 | . | . | . | . | -27% | 12% | | -6% | | No data collected currently; Needs to be collected in the future |
| 689 | | | | False Report | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 690 | | | | Harassment | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 691 | | | | Improper Procedure | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 692 | | | | Infraction Notice (UTT/PIN) | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 693 | | | | Lack of Service | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 694 | | | | Not Provided by Complainant | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 695 | | | | Other | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 696 | | | | Physical Abuse/Excessive Force | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 697 | | | | Unprofessional | | | . | . | . | . | | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 698 | 367 | i. 2 | civilian complaints & investigations & discipline | # of administratively dismissed | no | OPS | 39 | 90 | 126 | 58 | 54 | 72 | 75 | 131% | 40% | -54% | -7% | 33% | 4% | 4% | 12% | yes | |
| 699 | | | | False Report | | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | -100% | N/A | 0% | 0% | N/A | N/A | -100% | N/A | yes | |
| 700 | | | | Harassment | | | 4 | 14 | 43 | 15 | 0 | 0 | 0 | 250% | 207% | -65% | -100% | N/A | N/A | -100% | N/A | yes | |
| 701 | | | | Improper Procedure | | | 9 | 28 | 26 | 7 | 0 | 0 | 0 | 211% | -7% | -73% | -100% | N/A | N/A | -100% | N/A | yes | |
| 702 | | | | Infraction Notice (UTT/PIN) | | | 2 | 4 | 8 | 0 | 6 | 7 | 4 | 100% | 100% | -100% | N/A | 17% | -43% | 10% | -13% | yes | |
| 703 | | | | Lack of Service | | | 2 | 13 | 17 | 14 | 0 | 0 | 0 | 550% | 31% | -18% | -100% | N/A | N/A | -100% | N/A | yes | |
| 704 | | | | Not Provided by Complainant | | | 1 | 0 | 1 | 0 | 0 | 0 | 0 | -100% | N/A | -100% | N/A | N/A | N/A | -100% | N/A | yes | |
| 705 | | | | Other | | | 2 | 1 | 3 | 4 | 16 | 22 | 23 | -50% | 200% | 33% | 300% | 38% | 5% | 42% | 13% | yes | Other includes missing property and no jurisdiction in 2018 and on |
| 706 | | | | Physical Abuse/Excessive Force | | | 2 | 4 | 7 | 2 | 0 | 0 | 0 | 100% | 75% | -71% | -100% | N/A | N/A | -100% | N/A | yes | |
| 707 | | | | Unprofessional | | | 16 | 23 | 21 | 16 | 0 | 0 | 0 | 44% | -9% | -24% | -100% | N/A | N/A | -100% | N/A | yes | |
| 708 | | | | Unknown | | | 0 | 3 | 0 | 0 | 0 | 0 | 0 | N/A | -100% | 0% | 0% | N/A | N/A | N/A | N/A | yes | |
| 709 | | | | New Categories | | | . | . | . | . | 32 | 43 | 48 | | | | . | 34% | 12% | N/A | 14% | | What about these categories? Non-CDP employee-10, Unidentifiable Officer-18, Off-Duty Officer Conduct-0, Duplicate-6, and No Misconduct Alleged-9<br>2021 - Non-CDP Employee - 14, Unidentifiable officer - 16, Duplicate - 3, No Misconduct Alleged - 7, Merge and Consolidate - 4, Reitred Officer - 4. |
| 710 | 367 | i. 2 | civilian complaints & investigations & discipline | # of insufficient evidence | no | OPS | 2 | 33 | 93 | 108 | 71 | 42 | 28 | 1550% | 182% | 16% | -34% | -41% | -33% | 46% | -27% | yes | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 711 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 712 | | | | Harassment | | | 0 | 7 | 24 | 7 | 5 | 1 | 2 | N/A | 243% | -71% | -29% | -80% | 0% | N/A | -26% | yes | |
| 713 | | | | Improper Procedure | | | 0 | 7 | 15 | 11 | 5 | 3 | 4 | N/A | 114% | -27% | -55% | -40% | 33% | N/A | -7% | yes | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 714 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 4 | 0 | 0 | 0 | 0 | N/A | N/A | -100% | N/A | 0% | 0% | N/A | N/A | yes | |
| 715 | | | | Lack of Service | | | 1 | 5 | 9 | 12 | 14 | 8 | 6 | 400% | 80% | 33% | 17% | -43% | -25% | 29% | -25% | yes | |
| 716 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 717 | | | | Other | | | 0 | 0 | 4 | 3 | 2 | 0 | 2 | 0% | N/A | -25% | -33% | -100% | 0% | N/A | 0% | yes | Other includes missing property in 2018 |
| 718 | | | | Physical Abuse/Excessive Force | | | 0 | 5 | 11 | 14 | 10 | 2 | 0 | N/A | 120% | 27% | -29% | -80% | -100% | N/A | -100% | yes | |
| 719 | | | | Unprofessional | | | 1 | 9 | 26 | 49 | 32 | 24 | 12 | 800% | 189% | 88% | -35% | -25% | -50% | 43% | -28% | yes | |
| 720 | | | | Biased Policing | | | . | . | . | . | 3 | 4 | 2 | . | . | | . | 33% | -50% | N/A | -13% | yes | |
| 721 | | | | | | | | | | | | | | | | | | | | | | | |
| 722 | 367 | i. 3 | civilian complaints & investigations & discipline | # of complaint allegations supported by a preponderance of the evidence | no | OPS | . | . | . | | 75 | 80 | | . | . | | . | 7% | | | | | No data collected currently; Needs to be collected in the future |
| 723 | | | | | | | | | | | | | | | | | | | | | | | |
| 724 | 367 | i. 4 | civilian complaints & investigations & discipline | average length of time to complete by complaint type | yes | OPS | 137 | 409 | 232 | 75 | 64 | 78 | 58 | 198% | -43% | -68% | -15% | 22% | -26% | -12% | -3% | yes | Average number of days, but depends on completed cases |
| 725 | | | | False Report | | | 293 | . | . | . | 0 | . | . | . | . | . | . | . | . | N/A | N/A | yes | |
| 726 | | | | Harassment | | | 158 | 383 | 171 | 61 | 44 | 76 | 62 | 142% | -55% | -64% | -28% | 73% | -18% | -13% | 12% | yes | |
| 727 | | | | Improper Procedure | | | 134 | 354 | 213 | 115 | 55 | 75 | 53 | 164% | -40% | -46% | -52% | 36% | -29% | -12% | -1% | yes | |
| 728 | | | | Infraction Notice (UTT/PIN) | | | 84 | 303 | 204 | . | 0 | . | . | 261% | -33% | . | . | . | . | N/A | N/A | yes | |
| 729 | | | | Lack of Service | | | 179 | 352 | 193 | 88 | 111 | 95 | 56 | 97% | -45% | -54% | 26% | -14% | -41% | -15% | -20% | yes | |
| 730 | | | | Not Provided by Complainant | | | 105 | . | . | . | 0 | . | . | . | . | . | . | . | . | N/A | N/A | yes | |
| 731 | | | | Other | | | 35 | . | 231 | 20 | 6 | 87 | 62 | . | . | -91% | -70% | 1350% | -29% | 9% | 118% | yes | 2017 and 2018 other = missing property |
| 732 | | | | Physical Abuse/Excessive Force | | | 130 | 730 | 410 | 96 | 123 | 75 | 41 | 462% | -44% | -77% | 28% | -39% | -45% | -15% | -31% | yes | |
| 733 | | | | Unprofessional | | | 117 | 329 | 203 | 70 | 76 | 61 | 76 | 181% | -38% | -66% | 9% | -20% | 25% | -6% | 0% | yes | |
| 734 | | | | Biased Policing | | | | | | | 30 | N/A | N/A | | | | . | . | . | N/A | N/A | | |
| 735 | | | | | | | | | | | | | | | | | | | | | | | |
| 736 | 367 | i. 5 | civilian complaints & investigations & discipline | # of officers w/multiple complaints | yes | OPS | 34 | 38 | 27 | 10 | 18 | 31 | 49 | 12% | -29% | -63% | 80% | 72% | 58% | 5% | 40% | yes | |
| 737 | | | | District 1 | | | 1 | 1 | 5 | 0 | 0 | 2 | 6 | 0% | 400% | -100% | N/A | N/A | 200% | 29% | N/A | yes | |
| 738 | | | | District 2 | | | 4 | 4 | 1 | 1 | 6 | 7 | 9 | 0% | -75% | 0% | 500% | 17% | 29% | 12% | 14% | yes | |
| 739 | | | | District 3 | | | 4 | 4 | 6 | 2 | 4 | 3 | 4 | 0% | 50% | -67% | 100% | -25% | 33% | 0% | 0% | yes | |
| 740 | | | | District 4 | | | 1 | 9 | 8 | 3 | 2 | 5 | 13 | 800% | -11% | -63% | -33% | 150% | 160% | 44% | 87% | yes | |
| 741 | | | | District 5 | | | 5 | 2 | 2 | 1 | 2 | 7 | 11 | -60% | 0% | -50% | 100% | 250% | 57% | 12% | 77% | yes | |
| 742 | | | | outside city/other units | | | 4 | 5 | 5 | 3 | 4 | 7 | 6 | 25% | 0% | -40% | 33% | 75% | -14% | 6% | 14% | yes | |
| 743 | | | | # of officers w/repeated sustained complaints | yes | IA, Inspections, OPS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | 0% | N/A | N/A | yes | |
| 744 | | | | | | | | | | | | | | | | | | | | | | | |
| 745 | 367 | i. 6 | civilian complaints & investigations & discipline | arrests of officers for conduct | yes | IA | | | | | | | | | | | | | | | | | |
| 746 | | | | on duty | | | 1 | 2 | 1 | 0 | 0 | 0 | 2 | 100% | -50% | -100% | N/A | N/A | 100% | | | yes | |
| 747 | | | | off duty | | | 14 | 11 | 10 | 19 | 13 | 22 | 9 | -21% | -9% | 90% | -32% | 69% | -59% | | -12% | yes | |
| 748 | | | | | | | | | | | | | | | | | | | | | | | |
| 749 | 367 | i. 7 | civilian complaints & investigations & discipline | criminal prosecutions for conduct | yes | IA | | | | | | | | | | | | | | | | | |
| 750 | | | | on duty | | | 1 | 2 | 0 | 0 | 0 | 0 | 3 | 100% | -100% | 0% | 0% | N/A | | 17% | N/A | yes | "Not Prosecuted" is not a category used. Completed and Suspended added in 2020. |
| 751 | | | | off duty | | | 11 | 10 | 8 | 18 | 13 | 22 | 16 | -9% | -20% | 125% | -28% | 69% | | 5% | 7% | yes | Spell out what is in each category****** |
| 752 | | | | Completed | | | . | . | . | . | . | 18 | | | | | | N/A | | . | . | | |
| 753 | | | | Suspended | | | . | . | . | . | . | 1 | 3 | | | | | N/A | | . | . | | |
| 754 | | | | not prosecuted | | | 2 | 1 | 1 | 0 | 0 | . | . | -50% | 0% | -100% | N/A | N/A | | . | . | yes | |
| 755 | | | | open | | | 1 | 0 | 2 | 1 | 0 | 3 | | -100% | N/A | -50% | -100% | N/A | | . | . | yes | |
| 756 | | | | | | | | | | | | | | | | | | | | | | | |
| 757 | 367 | i. 8 | civilian complaints & investigations & discipline | # of civil suits against the City or CDP for work related conduct | yes | City Law Department | 8 | 12 | 52 | 35 | 27 | 30 | 34 | 50% | 333% | -33% | -23% | 11% | 13% | 23% | 8% | yes | |
| 758 | | | | settled | | | 3 | 3 | 42 | 6 | 9 | 9 | 17 | 0% | 1300% | -86% | 50% | 0% | 89% | 28% | 24% | yes | As of April 2018 |
| 759 | | | | not yet settled | | | 5 | 9 | 10 | 29 | 18 | 21 | 17 | 80% | 11% | 190% | -38% | 17% | -19% | 19% | -2% | yes | As of April 2018 |
| 760 | 367 | i. 8 | civilian complaints & investigations & discipline | nature of the suits | yes | City Law Department | | | | | | | | | | | | | | | | | There can be multiple natures of suits for each suit 2019-This will be initially completed by the Monitoring Team and then reviewed by CDP |
| 761 | | | | excessive force (including deadly force) | | | 5 | 6 | 2 | 3 | | 5 | 2 | 20% | -67% | 50% | . | | | . | . | yes | 2020 - Please contact Frieda Mathew for this section of data |
| 762 | | | | unlawful search & seizure | | | 1 | 1 | 4 | 3 | | 1 | 1 | 0% | 300% | -25% | . | | | . | . | yes | |
| 763 | | | | false arrest | | | 1 | 2 | 5 | 3 | | 4 | | 100% | 150% | -40% | . | | | . | . | yes | |
| 764 | | | | discrimination/bias | | | 0 | 3 | 0 | 2 | | 1 | | N/A | -100% | N/A | . | | | . | . | yes | |
| 765 | | | | other violation of constitutional rights (e.g., 1st amendment) | | | 1 | 1 | 6 | 7 | | 6 | | 0% | 500% | 17% | . | | | . | . | yes | |
| 766 | | | | Harassment | | | 0 | 0 | 0 | 0 | | 0 | | 0% | 0% | 0% | . | | | . | . | yes | |
| 767 | | | | improper handling/disposition of property | | | 1 | 0 | 3 | 6 | | 0 | | -100% | N/A | 100% | . | | | . | . | yes | |
| 768 | | | | contempt of cop | | | 1 | 0 | 0 | 0 | | 0 | 0 | -100% | 0% | 0% | . | | | . | . | yes | |
| 769 | | | | failure to provide medical assistance | | | 1 | 1 | 0 | 1 | | 1 | 0 | 0% | -100% | N/A | . | | | . | . | yes | |
| 770 | | | | other | | | 0 | 3 | 12 | 25 | | 20 | | N/A | 300% | 108% | . | | | . | . | yes | 2021 Other categories - Civil Rights: 550 Prisoner: Civil Rights, (Denial of Due Process, Fraud, Malice abuse of Process), (Wrongful Imprisonment), Petition for Writ of Mandamus,(Petition for the Return of Property), (Whistle Blower), TORT-M.V. ACCIDENT, (Denied FMLA) |
| 771 | 367 | i. 8 | civilian complaints & investigations & discipline | amount of judgments against | yes | City Law Department | | | | | | | | | | | | | | | | | |
| 772 | | | | number of judgments | | | 23 | 29 | 52 | 35 | 27 | 30 | 34 | 26% | 79% | -33% | -23% | 11% | 13% | 6% | 8% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 773 | 367 | i. 8 | civilian complaints & investigations & discipline | | yes | City Law Department | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **774** | | | | number of judgments (closed) | | | 22 | 21 | 42 | 6 | 9 | 9 | 17 | -5% | 100% | -86% | 50% | 0% | 89% | -4% | 24% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| **775** | | | | number of judgments (active) | | | 1 | 8 | 10 | 29 | 18 | 21 | 17 | 700% | 25% | 190% | -38% | 17% | -19% | 50% | -2% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| **776** | 367 | i. 8 | civilian complaints & investigations & discipline | | yes | City Law Department | | | | | | | | | | | | | | | | | |
| **777** | | | | amount of judgments (closed) | | | $ 20,136.82 | $ 1,822.16 | $ 9,000.00 | $ - | . | . | . | -91% | 394% | -100% | N/A | | | N/A | N/A | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| **778** | | | | amount of judgments (active) | | | TBD | TBD | TBD | TBD | TBD | TBD | TBD | N/A | N/A | N/A | N/A | | | N/A | N/A | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| **779** | 367 | i. 8 | civilian complaints & investigations & discipline | amount of settlements | yes | City Law Department | | | | | | | | | | | | | | | | | |
| **780** | | | | settled | | | $ 20,136.82 | $ 1,822.16 | $ 9,000.00 | $ - | . | . | . | -91% | 394% | -100% | N/A | | | N/A | N/A | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| **781** | | | | not yet settled | | | TBD | TBD | TBD | TBD | TBD | TBD | TBD | N/A | N/A | N/A | N/A | | | N/A | N/A | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |