**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| Jennifer Kilnapp | ) | CASE NO. 1:22-CV-01225 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | **Plaintiff Jennifer Kilnapp's opposition to** |
| | ) | **Defendant Gannon's motion for** |
| City of Cleveland, *et al.*, | ) | **judgment on the pleadings** |
| | ) | |
| Defendants. | ) | |

In July 2020, rookie police officer Bailey Gannon shot his partner. Screaming as he fled down a flight of stairs from a man who was neither chasing nor threatening him, Gannon pointed his gun over his head—in the opposite direction he was running—and began firing blindly behind him. One of his bullets hit Officer Jennifer Kilnapp. That violated her clearly established constitutional rights. For the reasons that follow, the motion for judgment on the pleadings should be denied.

## Table of contents


Table of authorities ........ iii

Statement of the issues ........ 1

Summary of the argument ........ 1

Factual background ........ 2

A. Rookie officer Bailey Gannon shoots his partner while firing blindly over his head and running away from someone who was neither chasing nor threatening him. ........ 2

B. Forensics proves Gannon shot Kilnapp and misled investigators, but the City chooses not to discipline him. ........ 4

Law and analysis ........ 6

I. Precedent precludes Gannon from asserting the state-law defenses he cites. ........ 6

II. Gannon violated the Fourth Amendment when he shot his partner without probable cause. ........ 7

A. The Fourth Amendment applies when a police officer shoots another officer due to mistaken identity. ........ 8

B. As a matter of common sense and law, Gannon seized Kilnapp by shooting her. ........ 9

1. Shooting Kilnapp was a seizure by "force," as opposed to by "control." . 10

2. Even if this were a seizure "by control" case, Kilnapp was seized that way. ........ 13

C. Gannon used unreasonable force when he blindly fired his gun without probable cause to believe deadly force was necessary. ........ 17

III. Gannon violated the Fourteenth Amendment by blindly shooting at Kilnapp, knowing she was in his line of fire. ........ 20

IV. It has been "clearly established for some time" that the police may not shoot someone who is not a threat to the officer or others. ........ 23

Conclusion ........ 29

## Table of authorities

### Cases

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .... 24
*Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015) .... 24
*Bell v. Wolfish*, 441 U.S. 520 (1979) .... 21
*Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011) .... 20, 25
*Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007) .... 18, 19, 25
*Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989) .... 20
*Brendlin v. California*, 551 U.S. 249 (2007) .... 13, 16
*Brosseau v. Haugen*, 543 U.S. 194 (2004) .... 25
*Brower v. County of Inyo,* 489 U.S. 593 (1989) .... 11, 13, 14, 16
*Buck v. City of Highland Park*, 733 Fed. Appx. 248 (6th Cir. 2018) .... 23
*Callahan v. State*, 21 Ohio St. 306 (1871) .... 22
*Campbell v. Cheatham Cty. Sheriff's Dep't*, 2022 U.S. App. LEXIS 2429 (6th Cir. Aug. 29, 2022) .... passim
*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) .... 27
*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) .... 25
*Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000) .... 16, 20
*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) .... 11, 20, 21, 23
*Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002) .... 8, 9, 15, 27
*Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016) .... 14
*Davenport v. Borough of Homestead*, 870 F.3d 273 (3d Cir. 2017) .... 14, 16
*David v. City of Bellevue*, 706 Fed. Appx. 847 (6th Cir. 2017) .... 20
*Davies v. City of Lakewood*, 2016 U.S. Dist. LEXIS 18355 (D. Colo. Feb. 16, 2016) 8, 9, 26, 27
*Dean v. Byerley*, 354 F.3d 540 (6th Cir. 2004) .... 7
*Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) .... 18, 25
*Doe v. Boland*, 946 F.3d 335 (6th Cir. 2020) .... 12, 21
*Estate of Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008) .... 18
*Felder v. Casey*, 487 U.S. 131 (1988) .... 6
*Ferreri v. City of Strongsville*, 2011 U.S. Dist. LEXIS 3456 (N.D. Ohio Jan. 13, 2011) .... 7
*Fisher v. City of Memphis*, 234 F.3d 312 (6th Cir. 2000) .... 14, 16
*Garrity v. New Jersey*, 385 U.S. 493 (1967) .... 8
*Graham v. Connor*, 490 U.S. 386 (1989) .... 8, 17
*Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) .... 24
*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .... 24
*Harrison v. Maryland*, 855 A.2d 1220 (Md. 2004) .... 22
*Hearring v. Sliwowski*, 712 F.3d 275 (6th Cir. 2013) .... 24
*Heien v. North Carolina*, 574 U.S. 54 (2014) .... 11
*Hill v. Woods*, 2014 U.S. Dist. LEXIS 20107 (E.D. Mich. Feb. 19, 2014) .... 22

*Hope v. Pelzer*, 536 U.S. 730 (2002) ..... 24
*Howlett v. Rose*, 496 U.S. 356 (1990) ..... 6, 7
*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ..... 6
*Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019) ..... passim
*Jensen v. City of Oxnard*, 145 F.3d 1078 (9th Cir. 1998) ..... 8, 9, 26
*Jordan v. Howard*, 987 F.3d 537 (6th Cir. 2021) ..... 10
*K.H. v. Morgan, 914* F.2d 846 (7th Cir. 1990) ..... 25
*King v. Taylor*, 694 F.3d 650 (6th Cir. 2012) ..... 20, 25
*Knowlton v. Richland Cty.*, 726 Fed. Appx. 324 (6th Cir. 2018). ..... 6, 20, 24, 28
*Leary v. Livingston Cty.*, 528 F.3d 438 (6th Cir. 2008) ..... 21
*Massachusetts v. Jenks*, 689 N.E.2d 820 (Mass. 1998) ..... 22
*McCottrell v. White*, 933 F.3d 651 (7th Cir. 2019) ..... 21
*McMillian v. Monroe Cty.*, 520 U.S. 781 (1997) ..... 6
*Melgar v. Greene*, 593 F.3d 348 (4th Cir. 2010) ..... 15
*Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015) ..... 17
*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ..... 15
*Ngo v. Storlie*, 2006 U.S. Dist. LEXIS 36474 (D. Minn. June 2, 2006) ..... 8, 9, 27
*Ortega v. U.S. Immig. & Customs Enforcement*, 737 F.3d 435 (6th Cir. 2013) ..... 25
*Pennsylvania v. Packer*, 168 A.3d 161 (Pa. 2017) ..... 22
*Redrick v. City of Akron*, 2021 U.S. App. LEXIS 33892 (6th Cir. Nov. 15, 2021) ..... passim
*Rodriguez v. Passinault*, 637 F.3d 675 (6th Cir. 2011) ..... 8, 14, 16
*Safford Unified School Dist. #1 v. Redding*, 557 U.S. 364 (2009) ..... 25
*Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005) ..... 17, 25
*Saucier v. Katz*, 533 U.S. 194 (2001) ..... 24, 28
*Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005) ..... 10, 18
*Smith v. LHC Group, Inc.*, 727 Fed. Appx. 100 (6th Cir. 2018) ..... 12
*Smyczek v. Hovan*, 8th Dist. Cuyahoga No. 80180, 2002-Ohio-2261 ..... 7
*Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998) ..... 20, 26
*State v. Conway*, 108 Ohio St. 3d 214, 2006-Ohio-791 ..... 21
*State v. Dean*, 146 Ohio St. 3d 106, 2015-Ohio-4347 ..... 21
*State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735 ..... 22
*State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419 ..... 22
*State v. Ivory*, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-296 ..... 22
*State v. Johnson*, 56 Ohio St.2d 35, 39 (1978) ..... 21
*State v. Parsley*, 1st Dist. Hamilton No. C-74119, 1975 Ohio App. LEXIS 7438 ..... 22
*State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375 ..... 22
*Stewart v. City of Euclid,* 970 F.3d 667 (6th Cir. 2020) ..... 10
*Torchik v. Boyce*, 121 Ohio St.3d 440, 2009-Ohio-1248 (2009) ..... 7
*Torres v. Madrid*, 141 S. Ct. 989 (2021) ..... 10, 11, 13

*Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003) ........ 15
*Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021) ........ 14
*Wallin v. Norman*, 317 F.3d 558 (6th Cir. 2003) ........ 6
*Wenk v. O'Reilly*, 783 F.3d 585 (6th Cir. 2015) ........ 7, 24
*Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003) ........ 8, 9, 26
*Wilson v. Layne*, 526 U.S. 603 (1999) ........ 24
*Yates v. Cleveland*, 941 F.2d 444 (6th Cir. 1991) ........ 20
*Yatsko v. Graziolli*, 2021 U.S. App. LEXIS 36006 (6th Cir. Dec. 6, 2021) ........ 10
*Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4 (1st Cir. 2005) ........ 8, 9
*Zulock v. Shures*, 441 Fed. Appx. 294 (6th Cir. 2014) ........ 18, 25

**Statutes**

42 U.S.C. § 1983 ........ 6, 7
42 U.S.C. § 1997e ........ 6

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........ 12
Restatement (Second) of Torts § 8A ........ 12, 21

## Statement of the issues

1. The Supremacy Clause precludes Gannon from asserting state-law defenses in this federal constitutional case.
2. Gannon seized Kilnapp for purposes of the Fourth Amendment either because he shot her in a case of mistaken identity, or because shooting her was a seizure by "force" as a general principle, or because he seized her by "control."
3. Gannon used force unreasonably when he shot blindly over his head behind him while nobody was threatening or even chasing him.
4. By intentionally firing blindly while knowing Kilnapp was in the line of fire, Gannon violated the Fourteenth Amendment.
5. It has been "clearly established for some time" that police may not shoot someone who is not a threat. Because Officer Kilnapp was not a threat, Gannon violated her clearly established constitutional rights when he shot her.

## Summary of the argument

At the start, binding precedent bars the state-law defenses Gannon asserts. Although he fails to cite that precedent, the Supremacy Clause forbids their use to avoid a federal constitutional claim.

That aside, the complaint properly alleges a Fourth Amendment violation. In cases like this, when a police officer shoots another officer due to mistaken identity, courts typically hold that a Fourth Amendment seizure has occurred. It is then left to a jury to decide whether that seizure was reasonable. More generally, a seizure occurs in either of two ways, by "force" or by "acquisition of control." When an officer intends to fire his weapon and shoots someone, a seizure by "force" occurs. That is what Gannon did here. His argument that he did not seize Officer Kilnapp by "control" not only neglects the distinction between the two types of seizures, it also misinterprets the law. Even if this were a seizure-by-control case, a reasonable jury could find Gannon did so, because "an unintended person or thing" may be the "object of the detention" so long

as the exertion of force itself was not accidental. Gannon's decision to fire was not accidental. And that decision was unreasonable for any number of reasons—because he lacked probable cause to fire *at anyone*; because he unreasonably misidentified his partner and shot at her; or, because of the blind manner in which he chose to fire. Viewing the facts in the light most favorable to Officer Kilnapp, Gannon violated the Fourth Amendment.

Alternatively, he violated the Fourteenth Amendment's ban on excessive force. The question there is whether Gannon's conduct was arbitrary or conscience-shocking. It was. Hornbook law holds that when someone shoots randomly into a crowd it is inferred they intend to hit anyone in the range of fire. That is exactly what Gannon did. Despite knowing Officer Kilnapp was in the range of fire, he shot blindly right in her direction. When he hit her as a result, he violated the Fourteenth Amendment.

It has been clearly established for decades that people have the right not to be shot by police unless they pose a threat to the officers or others. Police officers themselves have this right too; they are not relegated to a "watered-down version" of their constitutional rights. Officer Kilnapp posed no threat to Gannon. By choosing to fire, and by choosing to fire in the unreasonable way he did, Gannon violated her clearly established constitutional rights.

## <u>Factual background</u>

*A. Rookie officer Bailey Gannon shoots his partner while firing blindly over his head and running away from someone who was neither chasing nor threatening him.*

Jennifer Kilnapp became a City of Cleveland police officer in August 2017. (Complaint at ¶ 14). In the Summer of 2020, the Division of Police assigned her to

partner with a rookie officer, Bailey Gannon. (*Id*. at ¶ 15). Gannon, whose father is a sergeant with CDP, entered the field in January 2020. (*Id*. at ¶ 16).

In the early hours of July 20, 2020, Officers Kilnapp and Gannon responded to a call on the east side of Cleveland about an emotionally disturbed man with a gun in a boarding house. (*Id*. at ¶ 17). There was no report of the man shooting at anyone or otherwise being physically violent. (*Id*. at ¶ 18). After learning the man, Darryl Borden, was in a second-floor bathroom, the two went upstairs to the hallway. (*Id*. at ¶ 19). Gannon took the lead, standing offset from the bathroom door with Kilnapp a few feet behind. The staircase was between the two. (*Id*. at ¶ 20). As he stood outside the door, Gannon didn't knock and announce their presence as police officers or ask Borden to come out. (*Id*. at ¶¶ 21–22). Still in the bathroom, Borden made no threatening statements to them. (*Id*. at ¶ 23). At that point, Gannon had time to:

- knock and announce himself;
- ask Borden to come out or try and de-escalate by talking to him;
- withdraw from the area to establish a perimeter;
- attempt surveillance into the bathroom;
- wait for Borden to come out voluntarily; or,
- call for backup, SWAT, or the specialized Crisis Intervention Team.

(*Id*. at ¶ 24). Gannon chose not to do any of those things. (*Id*. at ¶ 25).

Despite no need for immediate engagement, Gannon instead chose to just open the bathroom door. (*Id*. at ¶ 26). When he did, Borden was standing there. (*Id*. at ¶ 27). He was apparently holding a firearm but it was down at his side, pointed at the ground. It was not raised or pointed at Gannon. (*Id*. at ¶ 28). He didn't step towards Gannon or make any other threatening gestures or statements. (*Id*. at ¶ 29). Rather than order

Borden to drop his weapon or get on the floor Gannon panicked. (*Id*. at ¶¶ 30–31). He spun out of the doorway. (*Id*. at ¶ 32). At that point, he was no longer in the line of sight between himself and Borden. (*Id*. at ¶ 32). Yet Gannon still chose not to stop and order Borden to put down his weapon or get on the floor. (*Id*. at ¶ 33). Rather, he turned and ran towards the stairs. (*Id*. at ¶ 34). Borden didn't flee, chase Gannon out of the bathroom, or open fire. (*Id*.). He stayed in the bathroom. (*Id*.).

Kilnapp was near the top of the stairs when Gannon bolted down them, screaming as he fled. (*Id*. at ¶ 35–36). As he ran, Gannon pointed his gun over his head behind him—in the opposite direction he was running—and began shooting. (*Id*. at ¶ 37). He wasn't looking where he was shooting. (*Id*. at ¶ 38). As a result, Gannon shot Kilnapp. (*Id*. at ¶ 39). His bullet ripped through her right forearm and fragmented. (*Id*. at ¶ 40). One fragment punctured her bicep, while another struck her in the armpit before tearing through her chest and lodging near her spine. (*Id*. at ¶ 41). Kilnapp was able to get out of the house on her own, but quickly realized she had been shot and thought she was about to die. (*Id*. at ¶ 42). Gannon's body camera footage shows him running away while Kilnapp yells after him, "I'm shot. I'm shot. Don't leave me." (*Id*. at ¶ 43). EMS ultimately rushed her to the hospital. (*Id*. at ¶ 43). Gannon never apologized for shooting her. (*Id*. at ¶ 45).

*B. Forensics proves Gannon shot Kilnapp and misled investigators, but the City chooses not to discipline him.*

Within hours of the shooting, Cleveland Police Detectives and the Ohio Bureau of Criminal Investigations conducted a forensic examination of the scene. (*Id*. at ¶ 47). BCI took 12 laser scans to determine bullet trajectories and then used computer

software to create 3D models showing the bullet trajectories. (*Id*. at ¶¶ 48-49). The laser scans and modeling show one of Gannon's bullets (not the one that hit Kilnapp) entering the wall near the top of the staircase on a slight downward angle. (*Id*. at ¶ 50). Because he was running down the stairs at the time, the BCI model shows Gannon was holding his gun above his head when he fired. (*Id*. at ¶ 51).

Gannon claimed to investigators that when he opened the door, Borden was holding a gun in two hands, pointing it at the door. (*Id*. at ¶ 55). The investigation proved that his account could not possibly be true. (*Id*. at ¶ 56). Even so, CDP took no disciplinary action against Gannon for misleading investigators or shooting his partner. (*Id*. at ¶¶ 70–71). Instead, three months after the shooting, CDP gave Gannon an annual performance review describing him as exceeding expectations. (*Id*. at ¶ 72). His supervising officers called the shooting a "minor set back." (*Id*.).

Meanwhile, nearly two years later, Kilnapp is still unable to return to work. (*Id*. at ¶ 74). Gannon's bullet caused nerve damage to her dominant arm. (*Id*. at ¶ 75). She continues to have physical pain, weakness, numbness, and tingling in her arm, wrist, and hand. (*Id*.). It took her well over a year just to regain full range of motion. (*Id*.). Perhaps worse, Kilnapp has been diagnosed with post-traumatic stress disorder from being shot. (*Id*. at ¶ 78). For more than a year after Gannon shot her, she suffered frequent flashbacks and near-nightly nightmares. (*Id*. at ¶ 79). It is unlikely she will ever be able to return to duty as a full-time patrol officer. (*Id*. at ¶ 80).

## Law and analysis

In ruling on a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), a court is required to "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). A court must also "draw all reasonable inferences from the relevant record in favor of the non-movant." *Wallin v. Norman*, 317 F.3d 558, 561 (6th Cir. 2003). When a defendant-officer's motion is based on qualified immunity, the officer "must be willing to concede the plaintiff's version of the facts." *Knowlton v. Richland Cty.*, 726 Fed. Appx. 324, 328 (6th Cir. 2018).

### I. Precedent precludes Gannon from asserting the state-law defenses he cites.

Gannon argues that Ohio's Fireman's Rule and workers' compensation immunity override the federal constitutional claims in this case. Whether his assertion of these state-law defenses can be made in good faith is up for debate. Either way, he fails to cite the string of binding Supreme Court and Sixth Circuit authority directly contrary to his position.

The Supreme Court has repeatedly held that the Supremacy Clause bars such state-law defenses in § 1983 cases: "Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law." *Howlett v. Rose*, 496 U.S. 356, 376–77 (1990); *Felder v. Casey*, 487 U.S. 131, 139 (1988) (partially superseded on other grounds by 42 U.S.C. § 1997e) ("state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted"); *McMillian v. Monroe Cty.*, 520 U.S. 781, 798–99 (1997). The Sixth Circuit has repeatedly held the same.

*Wenk v. O'Reilly*, 783 F.3d 585, 599 (6th Cir. 2015); *Dean v. Byerley*, 354 F.3d 540, 555 (6th Cir. 2004) ("the Supreme Court has held that state-law immunities are irrelevant in § 1983 actions"). Were it otherwise, states would "be free to nullify" federal rights. *Howlett,* 496 U.S. at 383. To put it plainly, "[a]pplying Ohio state affirmative defenses to bar liability for federal constitutional violations would be a clear violation of the Supremacy Clause and is not constitutionally permissible." *Ferreri v. City of Strongsville*, 2011 U.S. Dist. LEXIS 3456, at *37 (N.D. Ohio Jan. 13, 2011). The Supremacy Clause preempts Gannon's defenses predicated on the Fireman's Rule and Ohio's workers compensation system. He may not assert them at all, and the Court should reject them without further analysis.

Even if Gannon's argument were not precluded, it would still be without merit. The Ohio Fireman's Rule "is a principle that limits a *landowner's* duty to police officers and firefighters in certain circumstances." *Torchik v. Boyce*, 121 Ohio St.3d 440, 2009-Ohio-1248 (2009), ¶ 6 (emphasis added). It applies only in cases of ordinary negligence. *See, e.g., Smyczek v. Hovan*, 8th Dist. Cuyahoga No. 80180, 2002-Ohio-2261, ¶ 12 (citation omitted). A Section 1983 claim is not a negligence claim; the Fireman's Rule does not apply to them. Nor does it shield *co-workers* on another's property. There is no set of facts under which the Fireman's Rule applies to the constitutional claims in this case.

## II. Gannon violated the Fourth Amendment when he shot his partner without probable cause.

The complaint states a valid excessive force claim under the Fourth Amendment. Proving such a claim entails showing "that a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable." *E.g., Rodriguez v. Passinault*, 637

F.3d 675, 680 (6th Cir. 2011) (*citing Graham v. Connor*, 490 U.S. 386, 395 (1989)). Kilnapp can do so. Construing the facts in the light most favorable to her and drawing all reasonable inferences in her favor, a reasonable jury could find Gannon seized her and used excessive force when he shot her without probable cause. His argument to the contrary reflects a misapprehension of both the facts alleged and the law.

*A. The Fourth Amendment applies when a police officer shoots another officer due to mistaken identity.*

As to the facts, the motion overlooks the allegation that "Gannon shot Kilnapp incorrectly believing she was Borden following him."[1] (Complaint at ¶ 101). Courts in similar "friendly fire" cases have consistently held that the Fourth Amendment's reasonableness standard applies to such mistaken-identity shootings. *E.g., Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 21–23 (1st Cir. 2005); *Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003); *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002); *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998); *Davies v. City of Lakewood*, 2016 U.S. Dist. LEXIS 18355 (D. Colo. Feb. 16, 2016); *Ngo v. Storlie*, 2006 U.S. Dist. LEXIS 36474 (D. Minn. June 2, 2006). Rightfully so, because police officers "are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). Thus, the "Fourth Amendment bars the use of deadly force against a fellow police officer effecting an arrest … there could be no reasonable mistake about this prohibition." *Wilkins*, 350 F.3d at 955; *Davies*, 2016 U.S. Dist. LEXIS 18355, at *20

[1] Unless Gannon concedes he knew it was Kilnapp behind him and shot at her anyway, there is perhaps no other reasonable conclusion to draw. Either way, that fact is to be accepted as true for purposes of the present motion.

(holding it "beyond debate" that an officer violates the Fourth Amendment by shooting "a fellow officer who posed absolutely no threat to the officer or others"). It is "clearly established, both by common sense and by precedent," that police officers have the right not to be unreasonably shot by other officers. *Jensen*, 145 F.3d at 1086. That is exactly what happened here though.

While the Fourth Amendment applies to friendly fire cases based on mistaken identity, qualified immunity does not. Courts in these cases consistently refuse to dismiss based on qualified immunity because the claims hinge on the reasonableness of the defendant's actions—a question of fact. *See Wilkins*, 350 F.3d at 955 (denying qualified immunity where "whether this mistake of fact was reasonable depends on which version of the facts is accepted by a jury"); *Curley*, 298 F.3d at 283; *Jensen*, 145 F.3d at 1087; *Davies*, 2016 U.S. Dist. LEXIS 18355, at *18; *Ngo*, 2006 U.S. Dist. LEXIS 36474, at *23–24; *see Young*, 404 F.3d at 23 (finding question of fact whether the defendant unreasonably misidentified the plaintiff). Whether Gannon acted unreasonably and therefore violated the Fourth Amendment is a question of fact. If nothing else, there is a question whether Gannon mistakenly believed it was Borden and not Kilnapp behind him when he opened fire. These facts are not susceptible to resolution at the pleadings stage. The Court need go no further in its analysis; the motion should be denied.

*B. As a matter of common sense and law, Gannon seized Kilnapp by shooting her.*

In arguing no seizure occurred, Gannon ignores the mistaken-identity allegation. He instead addresses only the alternative allegation that Gannon fired blindly in her direction "despite knowing she was in the range of fire." (Complaint at ¶

103). Even if that were the sole basis for her argument, Gannon still seized her. The motion omits the applicable case law in this respect, and it misinterprets the precedent it does cite.

1. Shooting Kilnapp was a seizure by "force," as opposed to by "control."

A Fourth Amendment seizure "can occur in one of two ways: (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control." *Campbell v. Cheatham Cty. Sheriff's Dep't*, 2022 U.S. App. LEXIS 2429, *7 (6th Cir. Aug. 29, 2022) (*citing Torres v. Madrid*, 141 S. Ct. 989, 998–1001 (2021)). "The first type covers uses of physical force, such as when an officer shoots an individual." *Campbell*, 2022 U.S. App. LEXIS 2429, at *7 (*citing Torres*, 141 S. Ct. at 999). The Sixth Circuit has held over and over that "[a] seizure occurs when an officer shoots someone, regardless of whether the officer is also arresting, restraining, or searching the victim at the time." *E.g., Yatsko v. Graziolli*, 2021 U.S. App. LEXIS 36006, *22 (6th Cir. Dec. 6, 2021); *Jordan v. Howard*, 987 F.3d 537, 543 (6th Cir. 2021); *Stewart v. City of Euclid,* 970 F.3d 667, 672 (6th Cir. 2020); *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005). The friendly-fire cases hold the same. Gannon's motion does not distinguish between seizures by use of force and seizures by acquisition of control. Though the Supreme Court admits having itself "not always been attentive" to the distinction, "each type of seizure enjoys a separate common law pedigree that gives rise to a separate rule." *Torres*, 141 S.Ct. at 1001.

When he shot Kilnapp, Gannon seized her by "force." In seizure-by-force cases, "the appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain, *for we rarely probe the subjective motivations of police officers in the Fourth*

*Amendment context*." *Id*. at 998 (emphasis added). When he ran down the stairs, "Gannon intended to fire his weapon; he did not fire it accidentally." (Complaint at ¶ 104). That suffices as "intent" under *Torres* for purposes of a seizure by force. His "subjective motivation" about whom he was aiming is beside the point.[2] Even if it were otherwise there would still be a question of fact whether Gannon intended to hit Kilnapp under the mistaken belief she was Borden.

Explaining what constitutes a seizure by force, *Torres* contrasted a seizure with intent to restrain from the sort of "[a]ccidental force" that is not a seizure. *See Torres*, 141 S.Ct. at 998. To draw that contrast, the Court referenced a hypothetical from *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998). In *Lewis*, the Court recognized that there would be no seizure if police "sought to stop" a suspect only by pursuing with flashing lights "but accidentally stopped the suspect by crashing into him." *Id*. (*citing Brower v. County of Inyo,* 489 U.S. 593, 597 (1989)). On the other hand, if "the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." *Brower*, 489 U.S. at 597. In other words, whether there is an "intent to restrain" depends on whether the officer intended to exert the force that caused the injury, not whether he intended the particular injury that ultimately occurred. In this case, the question is whether Gannon intended the act of firing his gun, not whether he intended that act

[2] In a related context, the Supreme Court has recognized that arrests due to mistaken identity are Fourth Amendment seizures. *E.g., Heien v. North Carolina*, 574 U.S. 54, 61 (2014). There is no reason to hold otherwise when the seizure is by bullet instead of handcuffs.

injure Kilnapp. Construing the facts in the light most favorable to Kilnapp, a reasonable jury could conclude that Gannon intended to fire his gun (akin to sideswiping a fleeing suspect's car). That establishes a seizure by force under *Torres*.

This conclusion is consistent with the ordinary definition of "intent" that courts employ. As the Sixth Circuit has held, in "tort law, intent is not 'limited to consequences which are desired.'" *Doe v. Boland*, 946 F.3d 335, 341 (6th Cir. 2020) (*quoting* Restatement (Second) of Torts § 8A, cmt. b). "If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Smith v. LHC Group, Inc.*, 727 Fed. Appx. 100, 104–05 (6th Cir. 2018); *Boland*, 946 F.3d at 341. The Restatement itself offers an apt illustration:

> A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.

Restatement (Second) of Torts at § 8A. The illustration rings true here. Instead of a bomb, Gannon used a gun. Instead of stenographer, it was Gannon's partner. And instead of an office, it was a confined hallway and staircase. Just as "A" is deemed to have acted with "intent" towards a victim he did not desire to harm, Gannon can be deemed to have acted with similar intent. *See* Black's Law Dictionary (11th ed. 2019) (defining "general intent" as the "intent *to perform an act even though the actor does not desire the consequences that result*") (emphasis added).

2. Even if this were a seizure "by control" case, Kilnapp was seized that way.

The motion's reference to *Brower v. County of Inyo* is misplaced because that case does not apply to seizures by force. The Court said exactly that in *Torres v. Madrid*, pointing out that seizures by force and seizures by control are two different things with different legal standards. 141 S.Ct. at 1001. A seizure by control occurs "'only when there is a governmental termination of freedom of movement through means intentionally applied.'" *Id.* (*quoting Brower*, 489 U.S. at 597). The same is not true for seizures by force: the "requirement of control or submission never extended to seizures by force." *Torres*, 141 S.Ct. at 1001 (citation omitted). Applying *Brower* to seizures by force "improperly erases the distinction between seizures by *control* and seizures by *force*." *Id*. at 1001 (emphasis in original). So *Brower* does not apply here.

But even if it did, there would still be a question of fact for trial. A seizure by control is "a governmental termination of freedom of movement through means intentionally applied." *Brower*, 489 U.S. at 596. Under that standard, a "seizure occurs **even when an unintended person or thing is the object of the detention or taking** … but the detention or taking itself must be willful." *Id.* (emphasis added). The *Brower* Court used the car-chase hypothetical discussed above to illustrate. It explained that intentionally sideswiping the fleeing car is a "means intentionally applied," regardless of whether the police intended the consequences that ultimately occurred. *Id*. at 597. The Supreme Court reaffirmed that holding in the 2007 case *Brendlin v. California*, 551 U.S. 249 (2007). There, the Court explained that an unintended person may be seized so long as the seizure is not the result of "'an unknowing act.'" *Id*. at 254 (*quoting Brower*,

498 U.S. at 596). When Gannon fired, it was not an unknowing act; he chose to fire. As a result, he seized Kilnapp by the means (a gun) that he intentionally applied.

The Sixth Circuit has repeatedly followed the Supreme Court's command that the police seize an "unintended person" when they intend the act that unintentionally caused injury. It has explained that "**the intent in question is the intent to commit the act, not the intent that a certain result be achieved**." *Rodriguez*, 637 F.3d at 680 (*quoting Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000) (emphasis added). The Sixth Circuit cases since *Brendlin* hold that when an officer intentionally uses force, even an inadvertent recipient of that force may be seized by it. *Rodriguez*, 637 F.3d at 687; *see Fisher*, 234 F.3d at 317 (holding the same pre-*Brendlin*). The Court has applied this principle in cases involving spaces as confined as a car and as big as a house. *Compare Fisher*, 234 F.3d at 312 *with Campbell*, 2022 U.S. App. LEXIS 2429, at *12. It has even held as much where the officer didn't know the victim was there. *See id.* If the police seize unintended persons by shooting into a car or at an entire house, the same holds true when an officer intentionally shoots down a cramped hallway.

Other courts of appeal apply the same reasoning, holding that the question of "intent" is whether the officer intended to exert force, not whether he intended to exert it on a specific person. *E.g., Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) (rejecting the argument that the police did not seize the plaintiff by shooting him because they intended to shoot someone else); *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017); *Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016) ("as long as an officer deliberately performed acts that constitute a seizure, the Fourth

Amendment has been triggered, regardless of whether it was accomplished by the exact method intended"); *Vaughan v. Cox*, 343 F.3d 1323, 1329 (11th Cir. 2003); *Curley*, 298 F.3d at 279 ("The detention must be willful, but it is of no import that the detention is of an unintended person."); *cf. Melgar v. Greene*, 593 F.3d 348, 354 (4th Cir. 2010) (officer seized plaintiff by using his K9 even though "the seizure did not occur in quite the manner" he intended).

The Ninth Circuit case *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), is particularly instructive. There, police officers "intentionally fired" pepper balls "in the direction" of a group of partying college students. *Id*. at 872, 877. One accidentally hit the plaintiff in the eye. *Id*. at 872. The Court rejected the argument that no seizure occurred because the plaintiff "was not individually targeted," holding that it "misapprehends" the difference between intentional and unintentional conduct. *Id*. at 876. It explained that force is unintentional only if it lacks "the element of volition; an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition." *Id*. Because firing the pepper balls was volitional, the officers seized the plaintiff when they hit him accidentally, "[r]egardless of their motives." *Id*. at 877. The same reasoning applies here. Gannon intentionally fired his gun. His "absence of concern" regarding whom he hit "does not negate volition." Construing the facts in the light most favorable to Kilnapp that is a seizure, regardless of his motives.

Arguing otherwise, Gannon focuses on the penultimate word of *Brower's* test—and only that word. He argues he did not seize Kilnapp because he did not desire the consequences that ultimately followed from his act. His argument is mistaken for a host

of reasons. First, *Brower* involved the "accidental effects of *otherwise lawful* government conduct." *Id*. at 596. As explained in part II.C. below, Gannon's conduct was not lawful: he lacked probable cause to use deadly force *against anyone*, let alone his partner. No matter whom he planned to shoot, firing his weapon in the first place was not "otherwise lawful." Second, his interpretation takes the word "intentionally" out of context. It ignores the Supreme Court's qualifying words, "means" and "applied." The question is whether the officer intended to *apply* a particular *means* of force, not whether he intended the eventual consequences. Gannon's reading to the contrary can't be squared with the Court's holding that an "unintended person" may be seized by force. And most importantly, the Court considered—and explicitly rejected—Gannon's interpretation of *Brower* in *Brendlin v. California*. In so doing, it rejected the argument that a person is seized only if they were the specific target of the force. *See Brendlin*, 551 U.S. at 261.

Gannon's citation to *Claybrook v. Birchwell*, 199 F.3d 350, 360 (6th Cir. 2000), is misplaced as well. The Sixth Circuit has repeatedly held since that the intent in question is the intent to commit the act, not to achieve the result. *See Rodriguez*, 637 F.3d at 680; *Fisher*, 234 F.3d at 317. More importantly, *Claybrook* precedes *Brendlin*. As Supreme Court authority, *Brendlin* of course controls. *Cf. Davenport*, 870 F.3d at 279 (holding a seizure occurred when an officer shot a car passenger during a pursuit and recognizing that "those circuits that have suggested otherwise reached their decisions on this issue before the Supreme Court decided *Brendlin*").

If Gannon's finger had slipped, firing his gun purely by accident, there would be no seizure by control. That is not what happened though. Because he fired intentionally, Gannon seized Kilnapp when he hit her. To hold otherwise would ignore the Court's admonition that an "unintended person" may be the "object of the detention."

*C. Gannon used unreasonable force when he blindly fired his gun without probable cause to believe deadly force was necessary.*

Gannon used force unreasonably by shooting blindly over his head with nobody pointing a gun at him or even chasing him. It is axiomatic that the use of deadly force is permissible "only in rare circumstances." *E.g., Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019); *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (citations omitted). An officer may use deadly force "only" when there is "probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). To determine whether that high bar is met, courts look to the totality of circumstances and consider "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Redrick v. City of Akron*, 2021 U.S. App. LEXIS 33892, *8 (6th Cir. Nov. 15, 2021) (*quoting Graham*, 490 U.S. at 396). "In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force.'" *Jacobs*, 915 F.3d at 1040 (*quoting Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (emphasis in original). A court should "make an objective assessment based on the perspective of a reasonable officer." *E.g., Campbell*, 2022 U.S. App. LEXIS 2429, at *38. But "the fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force.'" *Estate of*

*Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (*quoting Smith*, 430 F.3d at 775); accord *Zulock v. Shures*, 441 Fed. Appx. 294, 302 (6th Cir. 2014). In any event, a court "must conduct the reasonable officer analysis using the facts in the light most favorable to plaintiff." *Jacobs*, 915 F.3d at 1041.

Viewed in that light, Gannon acted unreasonably when he pointed his gun over his head behind him—in the opposite direction he was running—and began firing blindly. Any reasonable officer would know it is never acceptable to fire a gun without looking where he was shooting, and without regard for who might be in the line of fire. (*See* Complaint at ¶ 71). That goes double here, where nobody was even pointing a gun at Gannon, let alone firing at him. Nor was anyone threatening or chasing him. It cannot be said that Gannon acted reasonably as a matter of law under those circumstances.

Gannon's choices before he opened fire bolster the conclusion. It is beyond dispute that "**where it is feasible, non-lethal means must be utilized before resorting to deadly force**." *Redrick*, 2021 U.S. App. LEXIS 33892, at *13 (*citing Garner*, 471 U.S. at 11–12) (emphasis added); *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996). One of those non-lethal means is giving a warning; where feasible, an officer must give one before resorting to deadly force. *Redrick*, 2021 U.S. App. LEXIS 33892, at *8 (*citing Garner*, 471 U.S. at 11–12); *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). Gannon gave no warning either before or after he opened the bathroom door. For that matter, he failed to use any non-lethal means at all. There is no reason why it was not feasible for him to have done so.

When he learned Borden was in the bathroom, Gannon had any number of protective and appropriate options. He could have knocked and announced his presence as an officer. He didn't. He could have asked Borden to come out. He didn't do that either. Gannon also could have tried to de-escalate by talking to Borden. Or he could have withdrawn and established a perimeter; or tried surveillance; or called for backup, the SWAT team, or a member of the Division of Police's specialized Crisis Intervention Team. Gannon chose not to do any of those things. Despite no need for immediate engagement, Gannon instead chose to just open the bathroom door.

When he did, Borden didn't step towards him or make any threatening gestures. Even then, Gannon failed to try any non-lethal means before resorting to deadly force. Once out of Borden's line of sight, Gannon could have ordered him to drop the gun, put his hands up, get on the floor, or come out. He could have done any of these things without risking imminent harm, as officers typically do in those situations. Gannon chose not to, instead deciding to shoot first and ask questions later. Given these facts, a jury could find he acted unreasonably.

That Borden had a gun does not alter the conclusion. For one thing, there is a dispute of fact whether Borden's gun was pointed at the floor or the door. For another, the Sixth Circuit has held time and again that "mere possession of a weapon without more is insufficient to justify deadly force." *Redrick*, 2021 U.S. App. LEXIS 33892, at *11; *Bouggess,* 482 F.3d at 896; *Jacobs*, 915 F.3d at 1040; *Campbell*, 2022 U.S. App. LEXIS 2429,

at *17. Construing the facts in the light most favorable to Kilnapp, that Borden simply had a weapon did not justify Gannon opening fire.[3]

As a rule, the Sixth Circuit refuses to grant dispositive motions in excessive force cases where there are questions of fact whether someone objectively posed a serious threat of immediate harm. *See, e.g., Jacobs*, 915 F.3d at 1040 (collecting cases); *Knowlton,* 726 Fed. Appx. at 330; *Bletz v. Gribble*, 641 F.3d 743, 753 (6th Cir. 2011); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). That remains true where there is a dispute whether the individual pointed a gun at the police. *Redrick*, 2021 U.S. App. LEXIS, at *11; *David v. City of Bellevue*, 706 Fed. Appx. 847, 852 (6th Cir. 2017); *King v. Taylor*, 694 F.3d 650, 662 (6th Cir. 2012); *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989). In the light most favorable to Kilnapp, it cannot be said as a matter of law that Gannon's actions were reasonable. The motion for judgment on the pleadings should be denied.

## III. Gannon violated the Fourteenth Amendment by blindly shooting at Kilnapp, knowing she was in his line of fire.

Pleaded in the alternative, the complaint alleges a valid claim for excessive force under the Due Process Clause of the Fourteenth Amendment. The police violate the Due Process Clause when their actions "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847. In evolving situations, the police violate the Fourteenth Amendment when they act with "malice or sadism towards the unintended shooting victim." *Claybrook*, 199 F.3d at 360 (*citing*

[3] The fact that it was at night does not avail Gannon either. It is unreasonable for an officer to "enter a dark hallway" at night "without identifying himself as a police officer" before using deadly force. *See Yates v. Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991). Besides, police routinely work at night. There is nothing inherent about the time of day that justifies using deadly force.

*Lewis*, 523 U.S. at 855). Gannon's behavior meets that standard. Contrary to rudimentary gun-safety standards, common sense, and concern for his partner's life, Gannon chose to shoot right in Officer Kilnapp's direction, at close range. He did so without so much as turning his head to see where he was shooting. Few police actions could be more "arbitrary" than an officer blindly firing a gun over his head behind him while running the other way, knowing there are innocent people nearby. Gannon's conduct shocks the conscience and violated the Fourteenth Amendment.

Disregarding the arbitrariness of his conduct and focusing solely on whether Gannon acted with "malice or sadism" does not counsel a contrary conclusion. In Fourteenth Amendment Due Process cases, intent may be inferred from circumstances. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *accord Leary v. Livingston Cty.*, 528 F.3d 438, 451 (6th Cir. 2008); *see McCottrell v. White*, 933 F.3d 651, 665 (7th Cir. 2019) (inferring intent in an Eighth Amendment excessive force case where the officer sprayed buckshot into a crowded room). That is consistent with the traditional rule that in "tort law, intent is not 'limited to consequences which are desired.'" *Boland*, 946 F.3d at 341 (*quoting* Restatement (Second) of Torts § 8A, cmt. b)).

It is true in criminal law as well, where a "'person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.'" *State v. Dean*, 146 Ohio St. 3d 106, 2015-Ohio-4347, ¶ 140 (*quoting State v. Conway*, 108 Ohio St. 3d 214, 2006-Ohio-791, ¶ 143 and *State v. Johnson*, 56 Ohio St.2d 35, 39 (1978)). It is axiomatic that "'**shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly**.'" *State v. Robinson*, 8th Dist.

Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 38 (*quoting State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19) (emphasis added); *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 23 ("When a person fires a gun into a group of people, one can infer intent to cause death."); *State v. Parsley*, 1st Dist. Hamilton No. C-74119, 1975 Ohio App. LEXIS 7438, *10 (Mar. 10, 1975); *see Callahan v. State*, 21 Ohio St. 306, 309 (1871) (criminal intent may be inferred "[w]here a shot discharged at one injures another, who is at the time known to be in such position or proximity that his injury may be reasonably apprehended as a probable consequence of the act."). "Even firing a weapon randomly at victims arguably within range of the shooter is sufficient to demonstrate actual intent to cause physical harm." *State v. Ivory*, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-2968, ¶ 6). In short, when a person fires into a crowd, "**anyone standing within that wider target range can be an intended target, regardless of whether the shooter hits the mark**." *Ivory*, 2004-Ohio-2968 at ¶ 8 (emphasis added).

These cases describe exactly what Gannon did. He fired blindly over his head when he knew or should have known Kilnapp was in the line of fire. If that would be enough to show "actual intent to cause physical harm" for criminal purposes, it supports the lesser inference of malice in the constitutional sense as well.[4] No matter the

[4] Of course, Ohio law is not unique on this issue. *See, e.g., Pennsylvania v. Packer*, 168 A.3d 161, 169 (Pa. 2017) (firing into a crowd is the "quintessential example" of malice); *Hill v. Woods*, 2014 U.S. Dist. LEXIS 20107, *10 (E.D. Mich. Feb. 19, 2014) (firing into a crowded store "satisfies the malice necessary for second-degree murder"); *Harrison v. Maryland*, 855 A.2d 1220 (Md. 2004) (a jury could find "intent to kill everyone in the path of the bullets" when the defendant fired into a crowd); *Massachusetts v. Jenks*, 689 N.E.2d 820 (Mass. 1998) (firing into a crowded room is "malicious conduct in the plainest sense").

consequences he "desired," Gannon's conduct would permit a reasonable jury to infer the requisite constitutional intent.

Cited by Gannon, *Buck v. City of Highland Park*, 733 Fed. Appx. 248 (6th Cir. 2018), is distinguishable in several respects. There, the suspect was armed, "had just shot" the officer's partner, and was attempting to escape "out into the community." *Id*. at 254. When the officer returned fire, she hit a civilian "twice in the buttocks." *Id*. at 250. That's not what happened here. Gannon was not returning fire; he opened fire. Nobody was shooting at him or his partner. Nobody was trying to escape "out into the community." And unlike the officer in *Buck*, Gannon wasn't even looking where he was shooting. If Borden had opened fired on Gannon and Kilnapp while they were standing exposed in the open and Gannon returned fire in self-defense, his reference to *Buck* might be apt. Those things didn't happen though, and *Buck* is of no import here.

Whether Gannon desired to shoot Killnap is not the question under the Fourteenth Amendment. Rather, it is whether his conduct was "arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847. Shooting blindly over one's head without regard for who might be hit is arbitrary under any standard. It would shock the conscience of any reasonable juror. When Gannon opened fire, he threw the Restatement's proverbial bomb into the office building. That violated the Fourteenth Amendment.

## IV. It has been "clearly established for some time" that the police may not shoot someone who is not a threat to the officer or others.

Qualified immunity does not apply here because under either the Fourth or Fourteenth Amendments, Gannon violated Officer Kilnapp's "clearly established

statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The touchstone of the clearly established prong is whether an official had 'fair warning' of the illegality of his actions." *Redrick*, 2021 U.S. App. LEXIS, at *7 (*quoting Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013)). It is not necessary that "the very action in question has previously been held unlawful…" *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *accord Wenk*, 783 F.3d at 598. The Supreme Court warns against a "rigid, overreliance on factual similarity." *Hope v. Pelzer*, 536 U.S. 730, 742 (2002); *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015) ("a requirement that a prior case be 'fundamentally' or 'materially' similar to the present case would be too rigid an application of the clearly established inquiry"); *accord Grawey v. Drury*, 567 F.3d 302, 313–14 (6th Cir. 2009). There can be "notable factual distinctions between the precedents relied on ... so long as the prior decisions give reasonable warning that the conduct then at issue violated constitutional rights." *Hope*, 536 U.S. at 740 (internal quotation omitted). Thus, a "'case directly on point'" is not required. *Baynes*, 799 F.3d at 613 (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Ultimately, "'[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Knowlton*, 726 Fed. Appx. at 340 (*quoting Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

In fact, government actors "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. In an "obvious case" the basic prohibition against excessive force "can 'clearly establish' the

answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). "The unconstitutionality of outrageous conduct obviously will be unconstitutional . . . [because the] easiest cases don't even arise.'" *Safford Unified School Dist. #1 v. Redding*, 557 U.S. 364, 377–78 (2009) (*quoting K.H. v. Morgan,* 914 F.2d 846, 851 (7th Cir. 1990)). Accordingly, Sixth Circuit has held that some cases can be so obvious under *Garner* and governing circuit precedent that officers should be presumed to have been aware that their conduct violated constitutional standards." *E.g., Bouggess,* 482 F.3d at 895; *Ortega v. U.S. Immig. & Customs Enforcement*, 737 F.3d 435, 442 (6th Cir. 2013). This is one such case.

Dating back "as early as 1984" the Sixth Circuit has held that "persons have a clearly established right not to be shot unless they posed a threat to a pursuing officer or others." *Dickerson*, 101 F.3d at 1163. It has said so repeatedly. *E.g., Campbell*, 2022 U.S. App. LEXIS 2429, at *18–19 ("It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."); *Jacobs*, 915 F.3d at 1040; *King*, 694 F.3d at 654; *Zulock*, 441 Fed. Appx. at 302; *Bletz*, 641 F.3d at 752; *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006). That is true "regardless of whether the incident took place at day or night, in a building or outside, whether the suspect is fleeing or found, armed or unarmed, intoxicated or sober, mentally unbalanced or sane…." *Sample*, 409 F.3d at 699. Officer Kilnapp posed no threat to Gannon, and he violated her clearly established rights by shooting her without probable cause.

For that matter, there is at least a question whether Gannon had probable cause to use deadly force in the first place. As a rule, the Sixth Circuit denies qualified immunity where, as here, there are questions of fact whether the officer had probable cause to use deadly force. "Our caselaw is replete with instances in which we have denied officers qualified immunity when the facts suggest—at least taking them in the light most favorable to the plaintiff—that the suspect did not pose a serious threat to the officer." *Jacobs*, 915 F.3d at 1041 (collecting cases); *cf. Sova*, 142 F.3d at 903 ("This Court has established that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force."). If there is a question whether a reasonable officer "could believe deadly force was justified," qualified immunity is inappropriate. *See Redrick*, 2021 U.S. App. LEXIS at *14. That question exists in this case. And it would be perverse to hold that Gannon lacked probable cause to use deadly force against Borden, but did have probable cause to use it against his own partner. That would mean an indisputably innocent person enjoys lesser constitutional protection from the use of deadly force than a suspected criminal.

Even if he had probable cause to use deadly force, a separate fact question remains: whether Gannon acted reasonably when he mistook Kilnapp for Borden. It is "clearly established that police officers retain their Fourth Amendment rights." *Jensen*, 145 F.3d at 1085. It is "obvious from common sense" that the "Fourth Amendment bars the use of deadly force against a fellow police officer effecting an arrest, and that there could be no reasonable mistake about this prohibition." *Wilkins*, 350 F.3d at 955; *Davies*, 2016 U.S. Dist. LEXIS 18355, at *20 ("It is obvious that a reasonable officer would have

known that shooting [] a fellow officer who posed absolutely no threat to the officer or others would violate the Constitution. It is 'beyond debate' that the use deadly force constitutes excessive force under these circumstances."); *see* section II.A., above. In friendly fire cases like this one, courts refuse to dismiss based on qualified immunity because liability hinges on questions of fact:

> In cases involving a police officer shooting another police officer, courts have generally concluded that the shooting officer is not entitled to qualified immunity because the court cannot say, as a matter of law, that the shooting officer made a reasonable mistake in shooting a fellow officer; courts allow a jury to decide whether the shooting officer's actions were objectively reasonable.

*Ngo*, 2006 U.S. Dist. LEXIS 36474 (collecting cases); *accord Davies*, 2016 U.S. Dist. LEXIS 18355 at *17–18. In these cases, "the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue." *Curley*, 298 F.3d at 278. If a jury concluded Gannon acted unreasonably when he mistook Kilnapp for Borden, he violated her clearly established rights. Because that fact remains in dispute, qualified immunity is inappropriate.

A third fact question also precludes the grant of qualified immunity. Regardless of whether Gannon had probable cause to use deadly force in the first place, any reasonable officer would know the *manner* in which he chose to use it was constitutionally impermissible. Within the Sixth Circuit, officer training is a source that may give an officer notice that his conduct is unconstitutional. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) ("In addition to prior precedent, the Officers' training demonstrates that they were aware of Champion's clearly established right to be free from this type of excessive force."). Shooting blindly over his head while

running in the other direction violates the most rudimentary standards of gun safety and police training. No reasonable officer would think Gannon's choice to shoot the way he did was permitted. It is the sort of "outrageous conduct" that "obviously will be unconstitutional" to any reasonable officer. For that reason, qualified immunity is inappropriate.

The essence of Gannon's argument to the contrary is that a reasonable officer would not know whether it is permissible to shoot blindly over his head down a hallway when he is not being chased, threatened, or fired upon and there are innocent people in the line of fire. To state the argument out loud is to refute it. All the same, the argument ignores the basic command that a case directly on point is not required and that the dispositive question is whether "it would be clear to a reasonable officer that his *conduct* was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (emphasis added). A reasonable officer here would know Gannon's behavior was impermissible under the circumstances. His mere assertion of an honest mistake is not a magic phrase that automatically absolves him of responsibility. "Plainly, not all mistakes—even honest ones—are objectively reasonable." *Knowlton*, 726 Fed. Appx. at 332 (quotation omitted). Because there is at least a question of fact regarding the reasonableness of his actions, qualified immunity does not apply.

No reasonable officer would believe Gannon's conduct reasonable. It is "obvious" that an officer who uses deadly force the way he did does so excessively. At the bare minimum, there are questions of fact whether Gannon had probable cause to use deadly force at all, whether the manner in which he used it was unreasonable, and

whether he acted unreasonably by shooting his partner in a case of mistaken identity. Any of those fact questions preclude dismissal at the pleadings stage. All three are present here.

**Conclusion**

For the reasons outlined above, the motion for judgment on the pleadings is without merit and should be denied.

Respectfully submitted,

/s/Matthew D. Besser

Cathleen M. Bolek (0059884)
Matthew D. Besser (0078071)
**BOLEK BESSER GLESIUS LLC**
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*

**Certificate of service**

The undersigned hereby certifies that a copy of the foregoing was filed electronically this 18th day of October, 2022 and served by operation of the Court's electronic filing system upon:

Amanda M. Boutton (aboutton@clevelandohio.gov)
Michael J. Pike (MPike@clevelandohio.gov)
James R. Russell, Jr. (jrussell2@clevelandohio.gov)
Craig J. Morice (CMorice@clevelandohio.gov)

*Counsel for Defendants*

**Local Rule 7.1 certification**

This case has been assigned to the standard track. This brief complies with the page limits set forth in Local Rule 7.1 as modified by leave of the Court.

/s/ Matthew D. Besser
*Counsel for Plaintiff*