IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER KILNAPP, | ) | CASE NO.:  1:22-CV-01225-CAB |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION OF DEFENDANT BAILEY GANNON FOR SUMMARY JUDGMENT

Now comes Defendant Bailey Gannon ("Officer Gannon"), in his individual capacity, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully requests that this Court grant him judgment on the two claims filed by Plaintiff Jennifer Kilnapp, nka Webb ("Kilnapp") (*Doc. 1*). Plaintiff cannot obtain the relief that she seeks against him as a matter of law. Officer Gannon is shielded from suit and liability by qualified immunity because: 1) Plaintiff cannot demonstrate a violation of her constitutional rights under the Fourth or the Fourteenth Amendments for an unintentional injury that he may have caused; and 2) any alleged constitutional violation was not clearly established at the time of the conduct.

The Court should enter judgment in favor of Officer Gannon on both counts of Kilnapp's Complaint.

Respectfully submitted,


By:    /s/ J.R. Russell
       James R. Russell, Jr. (0075499)
       Chief Assistant Director of Law
       Affan Ali (0085698)
       Assistant Director of Law
       City of Cleveland, Dept. of Law
       601 Lakeside Avenue, Room 106
       Cleveland, Ohio 44114-1077
       Tel: (216) 664-2800
       JRussell2@clevelandohio.gov
       Aali2@clevelandohio.gov
       *Attorneys for Defendant Officer Bailey Gannon*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………….……iv

STATEMENT OF ISSUES………………………………………………...……………vii

SUMMARY OF THE ARGUMENT PRESENTED...………………….……………viii

STATEMENT OF THE FACTS…………………………………….………………………1

ARGUMENT……………………………………………………..…….……………....….7

    I.   Legal Standard for Qualified Immunity Motions…………………….….……7

    II.  The Fourth Amendment does not govern the analysis of Officer Gannon's actions because a Fourth Amendment seizure requires an intent to seize rather than unintended consequences of an action directed at another…………….……….…8

    III. Kilnapp is unable to establish a constitutional violation of her Fourteenth Amendment rights……………………………………………………………..14

    IV. Even if Officer Gannon's actions were considered a seizure of Kilnapp under the Fourth Amendment, Officer Gannon's actions were objectively reasonable under the circumstances…………………………………………….………………16

    V.  Even if Kilnapp could meet the first element necessary to overcome qualified immunity, there were no clearly established violations of rights…………..……20

CONCLUSION………….…………………………………………….…………...…..24

CERTIFICATE OF LOCAL RULE COMPLIANCE……………...……..………..25

CERTIFICATE OF SERVICE……………………………………….…………………25

iii

# TABLE OF AUTHORITIES

**Cases Cited**                                                                                      **Page**

*Ansley v. Heinrich*, 925 F.2d 1339 (11th Cir. 1991)……...……………………….………...10

*Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074 (2011)………………………..………8

*Baker v. City of Trenton*, 936 F.3d 523 (6th Cir. 2019)…………………………………..19

*Barrera v. City of Mount Pleasant*, 12 F.4th 617 (6th Cir. 2021)……………………..7, 23

*Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400 (2007)…………………………...14

*Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378 (1989)………………....8, 10, 11

*Buck v. City of Highland Park, Michigan*, 733 Fed. Appx. 248
(6th Cir. 2018)……………………………………………………………..………15, 22

*Campbell v. Cheatham County Sheriff's Dep't*, 47 F.4th 468
(6th Cir. 2022)……………………………………………………………11, 12, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986)…………………………..7

*Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009)………………….…………19

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006)…………………………………....7, 9

*City of Escondido v. Emmons*, 586 U.S. 38, 139 S.Ct. 1148 (2019)………………….8, 20

*Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000)………...9, 10, 11, 12, 14, 15, 16, 22

*Corbitt v. Vickers*, 929 F.3d 1304 (11th Cir. 2019)………………………...……10, 11, 21

*County of Sacramento v. Lewis*, 523 U.S. 833,
118 S.Ct. 1708 (1988)……………………………………….………………...13, 14, 15

*District of Columbia v. Wesby*, 583 U.S. 48, 138 S. Ct. 577 (2018)………………..…8

*Durham v. Estate of Losleben*, 744 Fed. Appx. 268 (6th Cir. 2018)…………………..8, 14

*Fannon v. Shewell*, 37 Fed.Appx. 744 (6th Cir. 2002)………………….………...20, 21

*Fisher v. City of Memphis*, 234 F.3d 312 (6th Cir. 2000)………………….…………11

*Gallup v. Exxon Corp.*, 70 Fed. Appx. 737 (5th Cir. 2003)………………...……...9

*Gambrel v. Knox Cnty.*, 25 F.4th 391 (6th Cir. 2022)……………………………………....18

*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865 (1989)………………….....14, 17, 18

*Hein v. North Carolina*, 574 U.S. 54, 135 S.Ct. 530 (2014)………..............................23

*Hood v. City of Columbus*, 827 Fed. Appx. 464, 469 (6th Cir. 2020)…………………....18

*Jordan v. Howard*, 987 F.3d 537 (6th Cir. 2021)…………………………………………...17

*Kilnapp v. City of Cleveland*, 2023 WL 4678994 (6th Cir. July 21, 2023)……………....14

*Kisela v. Hughes*, 584 U.S. 100, 138 S.Ct. 1148 (2018)…………………………...………20

*LaRocca v. City of Los Angeles*, 2024 WL 1635908 (C.D. Cal. Mar. 14, 2024)………...22

*Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758 (6th Cir. 2008)…………………...….7

*Moore v. Indehar*, 514 F.3d 756 (8th Cir. 2008)…………………………………………10

*Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015)…………………………………..………18

*Napper v. Hankinson*, 617 F.Supp.3d 703 (W.D. Ky. 2022)………..…...10, 15, 16, 21, 22

*Nelson v. City of Battle Creek*, 802 Fed. Appx. 983 (2020)…………………………..……20

*Pearson v. Calahan*, 555 U.S. 223, 129 S.Ct. 808 (2009)…………………………...………7

*Peete v. Metro. Gov't of Nashville & Davidson County*,
486 F.3d 217 (6th Cir. 2007)……………………………………………………………8, 9

*Perkins v. City of Des Moines*, --- F. Supp.3d ---- (S.D. Iowa Jan. 22, 2024)…….....……22

*Puskas v. Delaware Cnty., Ohio*, 56 F.4th 1088 (6th Cir. 2023)…………………....………17

*Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831 (8th Cir. 2021)………………….....10

*Railroad Co. v. Baugh*, 149 U.S. 368, 13 S.Ct. 914 (1893)…………………………..………9

*Rodriguez v. Passinault*, 637 F.3d 675 (6th Cir. 2011)……………………………...………9

*Rucinski v. County of Oakland*, 655 Fed. Appx. 338 (6th Cir. 2016)…………………...…19

*Rucker v. Harford County*, 946 F.2d 278 (4th Cir. 1991)……………………………10, 12

*Sawyer v. City of Soddy Daisy, Tennessee*, 2023 WL 1800270 (6th Cir. Feb. 7, 2023).....18

v

*Scott v. Clay County,* 205 F.3d 867 (6th Cir. 2000)………………………….…………...9, 18

*Simpson v. City of Fork Smith*, 389 Fed. Appx. 568 (8th Cir. 2010)……………………10

*Stewart v. City of Euclid*, 970 F.3d 667 (6th Cir. 2020)…………………………….……21

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989)……………………….....7

*Thomas v. City of Columbus*, 854 F.3d 361 (6th Cir. 2017)……………...………..21, 23

*Torres v. Madrid*, 592 U.S. 306, 141 S. Ct. 989 (2021)……………….…………9, 13, 14

*White v. Pauly*, 580 U.S. 73, 137 S.Ct. 548 (2017)………………………………….……8

*Williams v. City of Chattanooga, Tennessee*, 772 Fed. Appx. 277 (6th Cir. 2019)……...18

*Woods v. Reeve*, 2023 WL 3454922 (S.D. Fla. May 15, 2023)……………….....11, 18, 22

**Statutes Cited**

*42 U.S.C. § 1983*…………………………………………...…………………......8, 9, 14, 23

## STATEMENT OF THE ISSUES

1. The are no issues of material fact to dispute that Kilnapp was a bystander inadvertently struck by an errant bullet during a shootout with an armed man. Whether Kilnapp can demonstrate under these circumstances that she can overcome qualified immunity by demonstrating that Officer Gannon seized Kilnapp as contemplated by the Fourth Amendment?

2. There are no issues of material fact to create a genuine dispute that this was anything other than a rapidly evolving and fluid situation with little time for deliberation after Borden brandished a firearm at Officer Gannon. Whether there are sufficient facts to establish that Officer Gannon acted maliciously and sadistically for the very purpose of causing harm in order for Kilnapp to make an excessive force claim in violation of her Fourteenth Amendment rights as a matter of law?

3. Even if Kilnapp could present facts that she was seized within the meaning of the Fourth Amendment, there are no issues of material fact to dispute that Officer Gannon was surprised by a disturbed gunman brandishing a weapon and Officer Gannon fired to protect himself and Kilnapp. Whether the accidental shooting by Officer Gannon can be an unintentional seizure of Kilnapp that is objectively unreasonable under the circumstances?

4. At the time of this incident the unanimous approach directed by the Sixth Circuit was that bystanders inadvertently harmed by state use of force could not be a Fourth Amendment violation. There was no robust consensus of cases finding a violation of constitutional rights under similar circumstances. Whether Kilnapp

can present the applicable precedent relating to this particular circumstance to show that Officer Gannon violated clearly established law to overcome qualified immunity?

## SUMMARY OF THE ARGUMENT PRESENTED

Plaintiff's Complaint asserts two causes of action under 42 U.S.C. §1983, one based on a violation of the Fourth Amendment to the U.S. Constitution and the second for a violation of the Fourteenth Amendment (*Doc. 1, PageID #16-20*). In order to overcome qualified immunity, she has the burden to prove that Officer Gannon violated her constitutional rights, and that the violation was clearly established at the time of the challenged conduct. Like in the innocent bystander cases previously decided by the Sixth Circuit and federal courts around the country, Kilnapp is unable to meet this burden. Under long-standing Sixth Circuit precedent, there can be no seizure based on a claim for physical injuries inadvertently inflicted upon an innocent third party struck by an errant bullet in a shootout with another. The Sixth Circuit's decisions in *Claybrook* and *Buck* are controlling. The Sixth Circuit in this case agreed with this Court that the factual record was too undeveloped at the pleading stage to determine whether there were clearly established constitutional violations of rights.

Officer Gannon's accidental shooting of an individual who is not the intended target of physical restraint is not a constitutional violation for an excessive force claim under the Fourth Amendment. To establish a §1983 claim under the Fourth Amendment, the seizure must be an intentional, not unintended, consequence of the official's actions. Kilnapp cannot establish a use of force with intent to restrain by an errant bullet.

As a matter of law, Kilnapp can only attempt to establish a constitutional violation under the heightened standard of the Fourteenth Amendment. In this case, Officer Gannon is entitled to all the deference that comes with a rapidly evolving, fluid, and dangerous predicament. His actions did not shock the conscience under the circumstances as a matter of law. Even if the Fourth Amendment analysis applies, Gannon's actions were objectively reasonable because he faced a threat of imminent harm from an armed and dangerous suspect.

Finally, even if Kilnapp could meet the first element necessary to overcome qualified immunity under either Amendment, there were no clearly established violations of Kilnapp's rights. All federal cases decided shortly before or after this incident demonstrate there cannot be a clearly established constitutional violation for an accidental shooting of another during an active threat situation. Officer Gannon's arguable negligence cannot be deemed a clearly established violation of the Fourth or the Fourteenth Amendment. There are no genuine disputes of material facts that could affect this case. Officer Gannon is entitled to qualified immunity as a matter of law.

**STATEMENT OF FACTS**

Kilnapp became a certified peace officer in the State of Ohio on January 5, 2016 and then she started her employment as a police officer with the City of Cleveland in August of 2017 (*Kilnapp Dep.* 15:10-14, 16:10-12, 23:19-24). She moved to the Cleveland Division of Police because she wanted "more opportunities" and not to deal "with the same type of crime over and over." *Id.*, 17:7-10. Officer Gannon started his career with the City of Cleveland and became a certified peace officer in May of 2020 (*Gannon Dep.* 18:20-24, 20:19-25, 21:1-12). He wanted a more fulfilling job where he had an opportunity to serve the community. *Id.*, 10:21-25, 12:13-20.

In early June of 2020, Kilnapp was paired with Officer Gannon as his field training officer (*Kilnapp Dep.* 25:1-3, 178:15-16). Kilnapp was the superior officer on scene during the incident. Kilnapp viewed her role as someone to guide and teach the patrol officer with whom she was partnered. *Id.*, 21-22:25, 22:1. She intended to teach him what she knew and the right protocols for responding to calls on duty. *Id.*, 26:15-20. Officer Gannon understood their respective roles as: she would continue to help him with field work and he had to follow "any lawful order" and direction that she gave him when they were on duty (*Gannon Dep.* 54:16-21, 55:8-15, 62:6-10, 103:5).

A.    **Police Officers Kilnapp and Gannon Responded to a call regarding an armed suspect in a boarding house.**

Around 3:00 a.m. on July 20, 2020, Officer Gannon and Kilnapp responded to a residence at 2023 E. 81st Street in Cleveland, Ohio (*Kilnapp Dep.* 29:13-17, 31:10-14, 34:1-6, *Exhibit B*, 00:23).[1] They responded to a call about potentially emotionally

---

[1] *Exhibit B* is a redacted copy of the WCS first published by the news media, known as *Extraction_1.1)_(Clip 1.1)_2003_E._81_UDFIT_#20-03_Gannon_#1579* (*Kilnapp Dep.*

1

disturbed individuals and a man armed with a gun, Darryl Borden ("Borden"), who refused to leave the boarding home in which he was staying (*Kilnapp Dep.* 32:19-25, 33:6-24, *Gannon Dep.* 61:10-22, *Exhibit C*).[2] Both officers were told that Borden shot a hole in the floorboard before they entered the structure. *Id.*; *Kilnapp Dep.* 84:1-5. Indeed, investigators subsequently confirmed that Borden discharged five total rounds that evening. *Id., PageID #78*; *PageID #8*.

The female who initiated the call, Ms. Kenya Watts, approached them on the front porch from the backyard when the two arrived on the scene (*Kilnapp Dep.* 35:1-4, 74:14-17). She "seemed frantic." (*Gannon Dep.* 62:1-2). She informed the officers that Borden had a firearm and conveyed that he could shoot at them. *Id., Kilnapp Dep.* 35:13-20, 35:24-25, 36:1-5. She told them that Borden was inside (*Exhibit B*, 00:23).

The structure operated as a boarding house with multiple occupants. It was confined quarters and completely dark inside. *Id.*; *Kilnapp Dep.* 36:18-20, 37:5-11, 37:17-18, 172, 12-20. There are multiple doorways on the first floor, with a set of stairs leading to the second floor immediately upon entering the structure through the front of the door (*Kilnapp Dep.* 37:5-11). There is a small landing at the end of the first flight of stairs (*Kilnapp Dep.* 37:24-25, 38:1-6). Then, the second set of stairs leads up in the opposite direction to the hallway on the second floor. *Id.*, 68:15-17. The individual occupants have a room and access to all common areas.

---

73:1-25, 74:1-10, 121:20-25). A copy will be manually filed with Clerk. *See also Doc. 14-2, PageID #80*).

[2] *Exhibit C* is Kilnapp's interview with Det. David Borden that took place on July 30, 2020, *2023_E_81_Interview_PO_Kilnapp_775* (*Kilnapp Dep.* 30:1-25, 31:1-9). She testified that her memory during this interview was better than it is now. *Id.*, 41:19-20. A copy will be manually filed.

Kilnapp knew there was a man inside who may shoot at them, but she led them inside the structure all the same (*Kilnapp Dep.* 36:1-16, *Gannon Dep.* 62:3-10). Officer Gannon then entered the boarding house behind her; both had their weapons drawn in hand (*Kilnapp Dep.*36:14-16, 74:18-25, *Exhibit B*, 00:07-00:21). The front screen door from the downstairs patio was unlocked. *Id.* Officer Gannon had his firearm in his dominant left hand and a flashlight in his other. *Id.*, 62:16-19, *Gannon Dep.* 63:19-25. Kilnapp had a flashlight in her left hand and her city issued firearm with a combined gun light in her right hand (*Exhibit B*, 00:20-27, *Kilnapp Dep.* 45:11-21, 75:1-5, 76:21-23, 175:12-15).

Ms. Watts yelled to Kilnapp and Officer Gannon that Borden was "in room 4, he's got a gun, he's got a gun!" (*Exhibit B*, at 00:37-40, *Kilnapp Dep.* 75:7-15). Kilnapp briefly looked in the first-floor open bedroom for Borden, known by the nickname "Moose." (*Kilnapp Dep.* 38:7-24, 39:13-19, *Gannon Dep.* 63:7-13). Kilnapp then told Officer Gannon, "he's upstairs." *Id.* 00:51-55, *Kilnapp Dep.* 75:17-19. Kilnapp later described the situation they faced as "a priority, intense situation with potential for violence." *Id.*, 98:2-11.

Kilnapp directed Officer Gannon to go up the stairs first (*Gannon Dep.* 62:23-25, 102:18-20, *Kilnapp Dep.* 75:20-22). "At the time [she] thought it was a good training opportunity." (*Kilnapp Dep.* 76:7-9). The officers climbed the staircase in the dark house, first up to the landing after the first set of stairs, then up and around to the second floor at the end of the second set of stairs (*Exhibit B*, 01:00-01:32; *Kilnapp Dep.* 68:12-17). Kilnapp called out "Moose?" in order to see if he would identify himself so the officers could see him. *Id.*, 76:11-17.

After they reached the second floor, Kilnapp called again for Borden to identify himself (*Exhibit B*, 01:35). No one responded. *Id.*

Ms. Watts shouted that Borden was likely in the bathroom (*Exhibit B*, 01:40-43; *Gannon Dep.* 63:10-20). Officer Gannon then moved into the dark hallway in which the bathroom was located (*Exhibit B*, 01:43-01:50, *Kilnapp Dep.* 40:12-25). His firearm was still in his left hand. *Id.* Kilnapp stood back with her firearm in her right hand, a few feet to the other side of the staircase. *Id.*, 60:5-10. Officer Gannon did not know which door was the bathroom (*Gannon Dep.* 63:14-18). The first door that he came to was the one where Borden was standing behind in wait. *Id.*, 63:19-25, 64:1-7, *Kilnapp Dep.* 62:13-14, 167:22-25, 168:1-4.

**B.      Borden surprised Officer Gannon with a weapon aimed at him and fired at Officers.**

As soon the door opened, he saw Borden standing feet away with "full presentation" of a firearm in a "firing range position." (*Kilnapp Dep.* 167:13-15, *Gannon Dep.* 64:1-7, 77:18-23, *Exhibit B*, 1:47-1:50). Borden brought his right arm up with a firearm and pointed it toward Officer Gannon's direction. *Id.* Officer Gannon recounted that he was "never been more scared in [his] life." *Id.* He immediately jumped back and yelled (*Exhibit B*, 01:49-1:51, *Kilnapp Dep.* 41:24-25, 42:1-5). Kilnapp's first reaction at the time was that Borden had a gun and he is trying to shoot them. *Id.*, 63:18-25, 64:-10. Kilnapp never saw Borden that night or whether he exited the bathroom that night (*Kilnapp Dep.* 59:17-21, 60:15-18, 168:1-4, 176:21-24).

Then, Kilnapp heard shots fired "before [she] really started going down the stairs" from the landing on the second floor (*Kilnapp Dep.* 42:3-7, 42: 17-21, 63:18-21). Borden indeed fired at least two of the five rounds he fired that day into the bathroom door where

4

Officer Gannon stood seconds beforehand (*Exhibit A*, *PageID #9*, *Bennett Dep.* 44:2-23, 45:4-10; *Exhibit B*, 01:43-01:50). Officer Gannon continued his retreat down the staircase (*Gannon Dep.* 64:13-23, *Kilnapp Dep.* 41:24-25). After Officer Gannon made the turn toward Borden's direction, he returned fire to protect himself and Kilnapp (*Gannon Dep.* 64:13-17, 69:20-25, 114:19-25). He shot one round with his dominant left hand, raised in front of his body, toward where Borden was located (*Exhibit B*, 01:50-53, *Kilnapp Dep.* 66:4-8, 77:12-21, 171:12-19, 172:7-24, 173:10-25, 174:1-6, *Bennett Dep.* 43:6-20, 85:9-18). As Officer Gannon returned fire, Kilnapp started down the stairs facing Officer Gannon in the path of his return fire. *Id.*

Kilnapp felt extreme pain that caused her to drop her firearm that she held with her right hand when she started to go down the stairs. *Id.*, 44:22-25, 45:18-24, 66:1-3, 67:3-18. Kilnapp was hit with at least one bullet that lodged into her armpit. *Id.*, 56:10-17. At the time, she thought she had been shot twice. *Id.*, 57:25, 58:1-2. Kilnapp's physician later removed a single bullet from her back that was fired from Officer Gannon's service weapon. *Id.*, 54:12-25, 55:1-22, 99:2-8, 100:1-4, *Gannon Dep.* 72:1-19. Officer Gannon then continued to flea down toward the front door, and because he feared "more shots may come," he ducked his head down (*Gannon Dep.* 68:7-11). As he raised his hands up toward his head, he inadvertently fired a second round that struck the door frame above the lower staircase (*Gannon Dep.* 64:18-23, 71:1-4, 72:20-25, *Bennett Dep.* 83:8-10, 85:13-18). Officer Gannon fired a total of two shots, the second one of which did not strike any person. *Id.* It was recovered in the doorframe. *Id.*

Officer Gannon retreated to outside of the structure to find cover (*Exhibit B*, 02:06). He shouted, "Kilnapp! Let's go!" *Id.*, 02:18, *Kilnapp Dep.* 47:1-3. He later

discovered that his partner was struck by a bullet. *Id.*, 02:28-2:33. Kilnapp was able to get out of the house on her own. *Id.*, 46:21-25. Officer Gannon tried to get Kilnapp further down the street away from the home to the CDP zone car. *Id.*, 47:18-21, *Gannon Dep.* 66:1-7. Both Officer Gannon and Kilnapp were worried that Borden would exit the home and continue to shoot at them (*Gannon Dep.* 65:3-21, *Kilnapp Dep.* 48:1-7).

Officer Gannon determinedly intended to take his partner to the hospital, if necessary, before reaching assistance by radio (*Exhibit B, Gannon Dep.* 67:4-21, *Kilnapp Dep.* 49:17-25, 50:1-20). He waited with her until EMS arrived, reassuring her, "we're going to take care of you, okay." *Id.*, 07:14. EMS arrived and loaded Kilnapp in the back to begin treatment and take her to the hospital (*Gannon Dep.*150:7-25, 151:1-25, *Kilnapp Dep.* 53:1-23). Officer Gannon got into the ambulance with her. *Id.* He assisted EMS with her treatment. *Id.* Immediately after they arrived at the hospital, physicians took Kilnapp into the trauma room for surgery. *Id.* The hospital discharged Kilnapp on July 22, 2020 (*Exhibit C*, *Kilnapp Dep.* 54:8-25). She returned on August 11, 2020, and physicians removed the bullet. *Id.*, 92:18.

### C.  Borden pleaded guilty to attempted felonious assault on a peace officer.

Kilnapp followed Borden's criminal proceedings (*Kilnapp Dep.* 99:17-24, 100:1-15). Borden subsequently pled guilty to "attempted Felonious Assault (Peace Officer)***(P.O. Bailey Gannon #1579)" in *State v. Borden*, Cuyahoga County Case No. CR-20-651870-A (*Exhibit A*, *Kilnapp Dep.* 110:19-22, 124:3-23). Kilnapp attended his sentencing in July of 2021. *Id.* Before the conclusion of Borden's criminal case, the investigation revealed that the bullet recovered from her was fired from Officer Gannon's

service weapon (*Kilnapp Dep.*99-2-5, 118:9-25, 119:1-9).[3] Kilnapp acknowledged that Officer Gannon's actions were an accident (*Kilnapp Dep.* 119:10-13, 122:16-25, 123:1-10).

## ARGUMENT

### I.    Legal Standard for Qualified Immunity Motions.

"[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 764 (6th Cir. 2008) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986)). "Not every issue of fact or conflicting inference presents a genuine issue of material fact which requires the denial of a summary judgment motion." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

Once raised, the plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). To meet this burden, a plaintiff must establish: 1) whether the facts show the officers violated a constitutional right, and 2) whether the violations were clearly established at the time of the challenged conduct. *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (*citing Pearson v. Calahan*, 555 U.S. 223, 232, 129 S.Ct. 808 (2009)). These elements may be addressed in any order. *Pearson, Id.*, 555 U.S. at 236 (officers are entitled to rely on existing lower court cases at the time of the conduct).

---

[3] Although Borden and his legal counsel knew the bullet recovered from Kilnapp was not fired from his weapon, he nonetheless conceded that he shot at the officers, albeit unsuccessfully.

The Supreme Court reiterated "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S.73, 79, 137 S.Ct. 548, 552 (2017) (lower court failed to identify a case where an officer acting under similar circumstances as the one at issue was held to violate the Fourth Amendment) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074 (2011)). Clearly established means courts must examine the particular situation that the defendant officers confronted and identify "a controlling case or robust consensus of cases – finding a Fourth Amendment violation under similar circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 65, 138 S. Ct. 577, 589-590 (2018). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue…" *City of Escondido v. Emmons*, 586 U.S. 38, 42, 139 S.Ct. 1148, 1153 (2019).

## II. The Fourth Amendment does not govern the analysis of Officer Gannon's actions because a Fourth Amendment seizure requires an intent to seize rather than unintended consequences of an action directed at another.

To prevail on her §1983 claim for excessive force, Plaintiff must establish that the defendant deprived her of her constitutional rights and that, as a proximate cause, she suffered injury. *Durham v. Estate of Losleben*, 744 Fed. Appx. 268, 270 (6th Cir. 2018); *42 U.S.C. §1983*. Generally, a seizure within the context of the Fourth Amendment only occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596-597, 109 S.Ct. 1378 (1989) (*emphasis in original*) (*cited by Peete v. Metro. Gov't of Nashville & Davidson County*, 486 F.3d 217, 220-221 (6th Cir. 2007) (when the intent is not "to

enforce the law, punish, deter, or incarcerate, there is no federal case authority creating a constitutional liability for the negligence, deliberate indifference, and incompetence…")).

Bystanders, as opposed to suspects, generally cannot maintain a cause of action under the Fourth Amendment because they are not typically seized within the meaning of the Constitution. *See, e.g. Rodriguez v. Passinault*, 637 F.3d 675, 683 (6th Cir. 2011) ("Fourth Amendment requires an intentional acquisition of physical control"); *Scott v. Clay County*, 205 F.3d 867, 876 (6th Cir. 2000) ("excessive force claim asserted against public servants by a *premeditated target* of official compulsion designed to consummate a seizure are analyzed under Fourth Amendment 'reasonableness' strictures"). When the Fourth Amendment was adopted, a seizure "of a 'person' plainly refers to an arrest." *Torres v. Madrid*, 592 U.S. 306, 312, 141 S.Ct. 989, 996 (2021).[4]

On July 20, 2020, at the time Officer Gannon accidentally shot his partner, the law in this Circuit was clear that the "Fourth Amendment 'reasonableness' standard does not apply to section 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator, because the authorities could not 'seize' any person other than one who was a deliberate object of their exertion of force." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (*emphasis in original*). *See Ciminillo v. Streicher, supra.*, 434 F.3d 461, 465 (6th Cir. 2006).

---

[4] The historical understanding of a seizure and common law tort principles do not provide a basis for a cause of action between two peace officers for events occurring during the scope of employment. *See Railroad Co v. Baugh*, 149 U.S. 368, 390, 13 S.Ct. 914 (1893) (fellow servant rule); *Gallup v. Exxon Corp.*, 70 Fed. Appx. 737, 738 (5th Cir. 2003) (common law doctrine of the "Fireman's Rule").

The prevailing rule – and the only rule in 2020 – is that "bystanders are not seized for Fourth Amendment purposes when struck by an errant bullet in a shootout." *Simpson v. City of Fork Smith*, 389 Fed. Appx. 568, 571 (8th Cir. 2010) (*quoting Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008)). "The Sixth Circuit applied *Brower* in *Claybrook* to hold that an innocent bystander was not 'seized' within the meaning of the Fourth Amendment when she was inadvertently shot by an errant bullet." *Napper v. Hankison*, 617 F.Supp.3d 703, 740 (W.D. Ky. 2022). "In other words, the use of force must amount to an intentional seizure of a suspect or target, not the incidental restraint of a bystander, before courts asses its reasonableness." *Id.*

A seizure occurs only when "one is the intended object of a physical restraint by an agent of the state." *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991). Accordingly, a "seizure" does not occur even if the act of the restraint itself is intended (such as the firing of a weapon), when it restrains one not intended to be restrained. *Id.* at 281 (*citing Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir.1991) (holding that "unintended consequences of government action [cannot] form the basis for a Fourth Amendment violation.")); *Corbitt v. Vickers*, 929 F.3d 1304, 1318 (11th Cir. 2019) ("in order to state a violation of Fourth Amendment rights, that the officer's actions must have been intended to stop the plaintiff, the party suing the officer."); *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 840 (8th Cir. 2021) (there was no consensus of authority that deploying tear gas to disperse individuals was a seizure).

In *Claybrook v. Birchwell*, the Sixth Circuit determined that police officers who unintentionally shot and injured an innocent bystander while confronting an armed suspect did not commit a Fourth Amendment "seizure" of the bystander. *Claybrook,*

10

*supra.*, 199 F.3d 350. In that case, police officers unintentionally shot the bystander plaintiff when they confronted an armed man near her vehicle. *Id.* at 355. In finding that the plaintiff was not "seized," the Sixth Circuit noted the detention must be the deliberate object of the exertion of force. *Id.* at 359 (*citing Brower, supra.*, at 596).

An officer does not violate the constitutional rights of another when he accidently shoots a fellow officer during a shootout with an armed suspect potentially threatening the officer. *Neal v. St. Louis Cnty. Bd. of Police Comm'rs*, 217 F.3d 955, 960 (8th Cir. 2000). In *Neal*, an undercover drug transaction ended when the suspect fired his weapon at one of the officers. *Id.*, 957. When the officer's partner returned fire, two of his rounds struck the other officer. *Id.* His estate could not recover from the officer who fired his weapon because there was no "seizure." *Id.*, 960.

In *Corbitt v. Vickers*, an officer accidentally struck a child outside with a bullet intended for a dog inside a structure. *Id.*, 929 F.3d 1304, 1308 (11th Cir. 2019). The Eleventh Circuit found that the child was already seized in the yard before the officer fired at the dog. *Id.*, at 1314. However, the fact that the child was not the intended target of the arrest operation and not the intended target of the gunshot took it out of "a run-of-the-mill Fourth Amendment violation." *Id.*, at 1316. *See also Woods v. Reeve*, Case No. 21-14001-CIV, 2023 WL 3454922 *8 (S.D. Fla. May 15, 2023) (a bystander, asleep in her bed, and accidentally harmed during the crossfire between the police and someone else likely cannot assert a Fourth Amendment claim). *Compare with Fisher v. City of Memphis*, 234 F.3d 312, 318-319 (6th Cir. 2000) ("shooting at the driver of the moving car, he intended to stop the car, effectively seizing everyone inside, including the Plaintiff."); *Campbell v. Cheatham County Sheriff's Dept.*, 47 F.4th 468, 477 (6th Cir.

2022) (the Sixth Circuit determined that shooting into the house in a manner that prevented all occupants from being free to leave the house was a seizure in that case).

Here, as in *Claybrook, Rucker,* and *Neil,* Kilnapp was not "seized" under the Fourth Amendment. Kilnapp was an innocent bystander who was unintentionally shot in a crossfire. In dealing with a rapidly evolving situation, Officer Gannon's only "intentions were to try to stop the threat of Mr. Borden and protect [himself] and [his] training officer, Officer Kilnapp." (*Gannon Dep.* 130:11-15). When Officer Gannon encountered Borden, the suspect "was already presenting the weapon" and Officer Gannon only wanted "to protect [himself] and Officer Kilnapp by returning fire." *Id.*, 108:3-4, 69:20-25, 113:9-12, 78:4-9. "Borden fired from inside the bathroom into the bathroom door before the bullets landed in the wall opposite him." (*Doc. 14, PageID #72, Exhibit A*, *Doc. 1, PageID #9*). Officer Gannon accidentally shot her (*Kilnapp Dep.* 89:1-6, 90:1-7, 119:1-3, 119:10-13, 122:16-23). She acknowledged that she knew it was an accident. *Id.* And, Officer Gannon never attempted to exert any force towards her specifically (*Gannon Dep.* 77:8-23). The fact that Officer Gannon returned fire toward Borden cannot satisfy the requirements for a seizure of Kilnapp.

"Kilnapp was able to get out of the house on her own but quickly realized she had been shot." *Id. PageID #6*, *PageID #72*. Officer Gannon did not prevent her from leaving the residence where Borden hid in wait (*Exhibit B, PageID #80, #110, #115-116*, 2:06-2:33, *Kilnapp Dep.* 78:10-22, 79:1-4). Moreover, Officer Gannon intended to get Kilnapp as far away from the dangerous situation as quickly as possible. *Id.* Officer Gannon removed Kilnapp because they were both concerned that Borden would exit the house and continue shooting at them (*Gannon Dep.* 65:3-21, *Kilnapp Dep.* 48:1-7). Officer

12

Gannon did not restrain her by a show of force. Officer Gannon helped Kilnapp into the emergency transportation away from the scene (*Exhibit B*, 7:16, *Kilnapp Dep.* 53:1-23). Accordingly, because there can be no Fourth Amendment seizure for the unintentional injury of a person who is not the intended object of physical restraint, Kilnapp cannot succeed on her Fourth Amendment excessive force claim as a matter of law.

Finally, the U.S. Supreme Court's decision in *Torres v. Madrid* does not place this case within the ambit of the Fourth Amendment.  *Id.*, 592 U.S. 306, 141 S.Ct. 989 (2021).[5] *Torres* is inapposite here. In *Torres,* the central question was whether the application of physical force could be a seizure "if the force, despite hitting its target, fails to stop the person." *Id.*, 592 U.S. 306, 311, 995 (2021). The Court held "that the application of physical force to the body of a person **with intent to restrain** is a seizure even if the person does not submit and is not subdued." *Id.*, 592 U.S. at 325, 1003 (*emphasis added*). Critical in *Torres* and, consequently in this case, is the intent to restrain.  Officer Gannon never intended to restrain Kilnapp.

All that the *Torres* Court decided was that "the officers seized Torres by shooting her with intent to restrain her movement." *Id.* Thus, the Court clarified that a seizure can occur in one of two ways: 1) use of force with intent to restrain; or 2) show of authority with acquisition of control. *Campbell, supra.*, 47 F.4th 468, 476 (6th Cir. 2022) (*citing Torres, Id.*). Specifically, the Supreme Court mentioned:

> "We stress, however, that the application of the common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify***Nor will force intentionally applied for some other purpose

---

[5] It should be noted that the Supreme Court decided *Torres* after the incident that formed the basis of Kilnapp's Complaint.

> satisfy this rule. In this opinion, we consider only force used to apprehend."

*Id.*, 317, 998 (*citing County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708 (1988)); *Brendlin v. California*, 551 U.S. 249, 260-261, 127 S.Ct. 2400 (2007) ("The intent that counts is the intent [that] has been conveyed to the person confronted."). *Compare Kilnapp v. City of Cleveland*, No. 22-4559, 2023 WL 4678994*4 (6th Cir. July 21, 2023) (Sixth Circuit agreed that "the factual record is currently undeveloped" at the time and it could not determine whether there was a clearly established constitutional right violated "at this stage of the litigation").

For these reasons, Kilnapp was never seized and her Fourth Amendment right to freedom from excessive force was never violated. The analysis, rather, turns on whether her rights under the Fourteenth Amendment were violated.

## III. Kilnapp is unable to establish a constitutional violation of her Fourteenth Amendment rights.

When there is not a specifically applicable constitutional right one can seek relief pursuant to 42 U.S.C. §1983 under the substantive component of the Fourteenth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S.Ct. 1708, 1715–1716, (1998); *Durham, supra.*, 744 Fed. Appx. 268, 270 (6th Cir. 2018); *Claybrook v. Birchwell, supra.*, 199 F.3d 350, 359. In Fourteenth Amendment cases, the plaintiff must overcome a substantially higher hurdle than that which is required under the "objective reasonableness" test of *Graham. Id.*, at 359. The Supreme Court's test to determine when governmental conduct reaches this threshold is to ask whether the alleged conduct "shocks the conscience." *Id.* (*citing Lewis, supra.* at 846, 1717).

The Supreme Court, in *Lewis,* explained that whether governmental conduct shocks the conscience depends on the factual circumstances of the case, but also that

different conscience-shocking standards apply depending on the circumstances in which the governmental action occurred. *Id*., *Lewis,* at 851–853. There is more deference toward an officer if the case involved "one of those 'rapidly evolving, fluid, and dangerous predicament[s] which precludes the luxury of calm and reflective pre-response deliberation[.]'" *Claybrook, supra.*, 359. In such rapidly evolving predicaments, an officer's reflexive actions "shock the conscience" only if the employed force is "maliciously and sadistically for the very purpose of causing harm." *Id.*; *Napper v. Hankison, supra.*, 617 F. Supp.3d 703, 743 (W.D. Ky. 2002) (action must be so brutal and offensive that it did not comport with traditional ideas of fair play and decency).

In *Buck v. City of Highland Park, Michigan*, the Sixth Circuit found that a police officer's inadvertent shooting of an innocent bystander while firing at an armed assailant who was robbing a store did not shock the conscious under this applicable standard. *Id.*, 733 Fed. Appx. 248, 250 (6th Cir. 2018). In *Buck,* officers arrived at a pawnshop after a silent alarm alerted them. *Id.* at 250. While there, an armed person startled the officers and shot at them. *Id.* One of the officers returned fire, and inadvertently struck an innocent bystander, the plaintiff in that case. *Id.*

Considering the circumstances under which the officer unintentionally shot the plaintiff, the Sixth Circuit affirmed that the officers' actions did not shock the conscience because the officers had no opportunity to ponder or debate the "dangerous actions of [an] armed man." *Id.* at 253. As such, there were insufficient factual allegations that the officers used force maliciously and sadistically for the very purpose of causing harm. *Id.* *See also Claybrook, supra.*, 199 F.3d 350, 360 (officers could not be held liable because the actions were not with "conscience shocking malice or sadism" towards the

15

unintended shooting victim); *Napper, supra.*, at 746 (the bullets flew "in the context of a fast-evolving firefight following Walker's shooting at police officers."); *Neal v. St. Louis Cnty., supra.*, 217 F.3d 955, 959 (8th Cir. 2000) (given the facts of the case, it was inappropriate to look outside of the time period immediately preceding the officer's decision to fire his gun to determine whether the conduct was truly conscience shocking).

Here, these circumstances are similar to the four aforementioned cases where there was no constitutional violation. Officer Gannon was in fear for his life and had no time to ponder or deliberate in the "rapidly evolving situation." (*Gannon Dep.* 64:19-20, 77:2-23, 82:10-11, 118:9-14). Officer Gannon "saw the weapon. Immediately retreated. Heard the gunfire. And then from there [he] attempted to protect [himself] and Officer Kilnapp." (*Gannon Dep.*81:22-25, 82:1). Officer Gannon raised his firearm with his dominant hand in front of him and returned fire one time. *Id.*, 82:12-14. At most, he had seconds to respond to a threat posed by Borden (*Exhibit B*, 01:50-01:53).

Accordingly, Officer Gannon's conduct can only be a violation of Kilnapp's Fourteenth Amendment rights if he acted with conscience-shocking malice or sadism toward her. Kilnapp states in a conclusory fashion that he "used force against Kilnapp maliciously and sadistically." (*Doc. 1, PageID #18*). There is no evidence to support a finding of a sadistic intent to do harm. It was a very unfortunate accident triggered by a disturbed man illegally possessing and shooting a firearm (*Kilnapp Dep.* 119:10-13, 122:16-25, 123:1-10, 124:16-20). Officer Gannon reacted to a deadly, fast-paced, and changing situation (*Exhibit B*, 02:25-07:15, *Gannon Dep.* 114:15-25, 65:17-21, 69:20-25). Kilnapp acknowledged that this was an "accident." (*Kilnapp Dep.* 89:1-6, 90:1-7,

119:1-3, 119:10-13, 122:16-23). There is no evidence of malice and intent to harm

Kilnapp. She cannot establish a violation of her Fourteenth Amendment rights.

**IV.    Even if Officer Gannon's actions were considered a seizure of Kilnapp under the Fourth Amendment, Officer Gannon's actions were objectively reasonable under the circumstances.**

Assuming *arguendo* that the Fourth Amendment objective reasonableness

standard applies in this case, Officer Gannon's actions were objectively reasonable under

the circumstances. When an arrestee is "seized" by means of deadly force, the plaintiff

must prove that, under the pertinent circumstances, the means used to detain the suspect

were objectively unreasonable. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865,

1871 (1989) (excessive force claims in a seizure of a free citizen should be analyzed

under the Fourth Amendment and its "reasonableness" standard).

Whether a seizure is reasonable depends on the totality of the circumstances in an

uncertain and rapidly evolving situation, including the severity of the crime at issue by

the suspect, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether the suspect is actively resisting arrest or attempting to evade arrest by

flight. *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1093-1094 (6th Cir. 2023) (*citing

Graham, supra.*, 490 U.S. at 396)). Particularly as it relates to a qualified immunity

defense, reasonableness must be judged from the perspective of a reasonable officer on

the scene, not with "the 20/20 vision of hindsight." *Id.*, 1094. This standard contains a

built-in measure of deference to the officer's on-the-spot judgment in "tense, uncertain,

and rapidly evolving" circumstances and courts "do not second guess such split-second

decisions." *Id.*, 1096. *See Jordan v. Howard*, 987 F.3d 537, 544 (6th Cir. 2021) (officer

"need not wait for the suspect to open fire on him…before the officer may fire back.")

(*collecting cases*).

The undisputed facts in this case establish that Officer Gannon's actions were reasonable in light of the *Graham* factors. In countless cases, courts found officers have "probable cause that made their shooting lawful when they could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong)." *Sawyer v. City of Soddy Daisy, Tennessee*, Case No. 22-5568, 2023 WL 1800270, *3 (6th Cir. Feb. 7, 2023) (*quoting Gambrel v. Knox Cnty.*, 25 F.4th 391, 405-406 (6th Cir. 2022)).

The Sixth Circuit routinely holds that police officers who discharged their weapon in response to an armed suspect acted reasonably under the Fourth Amendment. *Williams v. City of Chattanooga*, 772 Fed. Appx. 277, 281 (6th Cir. 2019) (because officers could have reasonably believed the suspect was reaching for his gun or was a threat of harm to them or others, they had probable cause to shoot the suspect); *Hood v. City of Columbus*, 827 Fed. Appx. 464, 469 (6th Cir. 2020) ("objectively reasonable officers could have viewed Green, who pointed and fired a gun at the Officers in close proximity, as a serious and immediate safety threat to themselves and others."); *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) (officer acted reasonably when he shot twice at a suspect who had a firearm in a rapidly escalating situation that he believed posed a severe threat to himself and others). *See also Woods v. Reeve, supra.*, 2023 WL 3454922 *9 (S.D. Fla. May 15, 2023) (officers used reasonable force when returning fire inside home).

This applies to other types of surprising threats as well. *See Scott v. Clay County, supra.*, 205 F.3d 867, 878 (6th Cir. 2000) (holding that deputy's actions in firing at fleeing vehicle in order to seize its occupants, which resulted in unintentional injury to the plaintiff's passenger, were objectively reasonable and did not violate the plaintiff's

rights); *Chappell v. City of Cleveland*, 585 F.3d 901, 916 (6th Cir. 2009) (finding that police officers did not use excessive force or act unreasonably when they shot and killed a suspect armed with a knife who startled the officers by jumping out of a bedroom closet); *Baker v. City of Trenton*, 936 F.3d 523, 534 (6th Cir. 2019) (holding that a police officer who discharged his gun when confronted by a blade-wielding man in a confined area acted reasonably); *Rucinski v. County of Oakland*, 655 Fed. Appx. 338, 343 (6th Cir. 2016) (officers acted reasonably in response to suspect who brandished a knife within feet of them).

Accordingly, Officer Gannon acted reasonably from a Fourth Amendment analysis as a matter of law. Both Kilnapp and Officer Gannon were in a confined area with a disturbed suspect, known to be armed; Kilnapp knew it was a "high priority, intense situation with potential for violence." (*Kilnapp Dep.* 35:3-25, 36:1-5, 98:1-11). It was dark with lots of doors. *Id.*, 40:18-25, 59:25, 60:1-3. Borden did not respond to Kilnapp's shouts for him inside the residence (*Exhibit B*, 01:00-01:32). Borden hid with a firearm in the close confines of the upstairs bathroom. *Id.* When Officer Gannon encountered Borden the man pointed a gun at the officer's face and body (*Gannon Dep.* 64:1-7, 77:18-23, *Kilnapp Dep.* 167:13-24). There was no time for de-escalation (*Gannon Dep.* 94:6-9, 95:20-21). There "wasn't exactly time to process the situation" because Borden fired his weapon where Officer Gannon stood seconds before (*PageID #9, PageID #78-79, Gannon Dep.* 16-25). The armed and disturbed man surprised Officer Gannon with a firearm. It all happened within a matter of seconds (*Exhibit B*, 01:50-01:53). He presented a threat of imminent bodily harm and indeed fired upon them (*Exhibit A*). Like in the aforementioned cases, Officer Gannon did not act unreasonably

19

from a Fourth Amendment perspective when he discharged his weapon in response to a threat confronting him.

For these reasons, Officer Gannon's use of force was objectively reasonable because he was confronted with the rapidly evolving events and a threat of deadly force to him and his partner.

**V.    Even if Kilnapp could meet the first element necessary to overcome qualified immunity, there were no clearly established violations of rights.**

Kilnapp cannot present any Sixth Circuit case law placing a reasonable official on notice that accidentally wounding his or her partner and fellow police officer in the situation like this is a firmly established violation of either the Fourth or the Fourteenth Amendment rights. This is because there is no such applicable case law.

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus **police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.**" *Nelson v. City of Battle Creek*, 802 Fed.Appx. 983, 987 (2020) (*quoting Kisela v. Hughes*, 584 U.S. 100, 104, 138 S.Ct. 1148, 1153 (2018) (*internal quotations and internal citations omitted*, *emphasis added*). Unless it is an "obvious case," the general principles of *Garner* do not apply. *Nelson, supra.*, at 988 (it was not "objectively unreasonable for Rivera to decide to shoot N.K. as he saw N.K. grip and raise his gun…").

It "does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *City of Escondido v. Emmons*, 586 U.S. 38, 42-43, 139 S.Ct. 1148, 1153 (2019) (*citing Kisela, supra.*, at 105). A right is clearly

established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or if there is case law from other circuits directly on point. *Fannon v. Shewell*, 37 Fed.Appx. 744, 747 (6th Cir. 2002).

The relevant cases have held that "[the officer's] choice to enter [the closed area], and his choice not to exit the [area]…is irrelevant in assessing the reasonableness of his use of force." *Stewart v. City of Euclid*, 970 F.3d 667, 673 (6th Cir. 2020) (*citing Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (courts "do not scrutinize whether it was reasonable for the officer to create the circumstances")). Even if the officer's actions increased the likelihood that force would be necessary, the reasonableness of those actions are not the issues. *Thomas, Id.*, 854 F.3d at 365 (although officer's decision to rush toward the apartment without backup may have violated department procedures and may have increased the likelihood of the use of force, the use of force itself was not unconstitutional). Courts consider the circumstances that the officer "faced in the moment he decided to use force." *Id.*

Officer Gannon could not locate a single case that was decided around or prior to the time of this incident that found the accidental shooting of an innocent bystander under these circumstances to be a clearly established constitutional violation under either the Fourth or the Fourteenth Amendment. *Corbitt v. Vickers, supra.*, 929 F.3d 1304, 1320 ("the law is not clearly established that there is a Fourth Amendment violation when an already-seized bystander, as in this instant case, is accidentally harmed as an unintended consequence of an officer's intentional shot at something else entirely."); *Napper, supra.*, 617 F.Supp.3d 703, 740 (at the time the unanimous approach of the courts of appeals did not allow bystanders inadvertently harmed by state force to assert Fourth Amendment

21

claims); *Perkins v. City of Des Moines*, --- F. Supp.3d ----, 2024 WL 756283 *12 (S.D. Iowa Jan. 22, 2024) (force used to disperse under the circumstances of the case could not be a clearly established seizure or conduct that shocked the conscience); *Woods v. Reeve, supra.*, 2023 WL 3454922 *10 ("it is far from clear whether this type of accidental conduct can even sustain a Fourth Amendment violation***[and] is not clearly established that there is a Fourth Amendment violation when officers accidentally shoot and kill an innocent bystander in the course of defending themselves from an active shooter."); *LaRocca v. City of Los Angeles*, No. 2:22-CV-06948, 2024 WL 1635908, *15 (C.D. Cal. Mar. 14, 2024) ("the fact that multiple other circuits have concluded otherwise supports the conclusion that it is not clearly established that Plaintiff was seized in this case…" and thus could not prove a clearly established violation).

Kilnapp attempts to meet her burden of establishing a clearly established violation by using an improperly high level of generality. As discussed throughout this memorandum, the cases from the Sixth Circuit decided before July 20, 2020 did not find a clearly established violation for an accidental shooting. *See Claybrook, supra.*, 199 F.3d 350; *Buck, supra.*, 733 Fed. Appx. 248. The controlling case law is that an innocent bystander cannot sustain a Fourth Amendment claim or a Fourteenth Amendment claim in these circumstances for an officer's response to an active shooter situation.

Further, Kilnapp cannot argue that the facts relating to when she led Officer Gannon into the residence has any relevance to this situation. If one puts aside for a moment that she led them into the structure and told Officer Gannon to ascend the stairs for a "training opportunity," this Court must analyze the facts that Officer Gannon

encountered during those split seconds when he encountered a gunman who then shot at them both (*Kilnapp Dep.* 76:3-10, *Gannon Dep.* 99:5-21, 114:10-25).

In responding to a dangerous call, where an individual runs toward the officer with a gun, at a short range, the officer's decision to fire is objectively reasonable and protected by qualified immunity. *Thomas, Id.*, at 365-366. This is objectively reasonable, "even if facts beyond his knowledge meant that he actually faced no threat." *Id.*, at 367. To be reasonable is not to be perfect, "the Fourth Amendment allows for some mistakes on the part of government officials." *Barrera v. City of Mount Pleasant, supra.*, 12 F.4th 617, 621 (6th Cir. 2021) (*quoting Hein v. North Carolina*, 574 U.S. 54, 60-61, 135 S.Ct. 530 (2014)).

Kilnapp alleges "Gannon panicked." (*Doc. 1, PageID #6*). She claims there is a clearly established violation because Officer Gannon inadvertently struck her with a bullet when he returned fire to protect her. It is insufficient to merely apply a general principle such as a police officer-involved shooting can be an excessive use of force. The analogous case law supports a finding of qualified immunity, *i.e.* the accidental shooting of someone other than a suspect is actionable only if the officer's actions were in the most malicious fashion designed to cause harm.

It is readily apparent that in a split-second decision, Officer Gannon reacted to a threat of deadly force. Kilnapp may question some of his decisions in hindsight. Mere mistakes do not give rise to a claim under §1983. There is no precedent that negligent conduct that accidentally injures a co-employee could conceivably establish a violation of constitutional rights in this particular circumstance.  Kilnapp cannot meet the elements necessary to overcome Officer Gannon's qualified immunity.

## CONCLUSION

For all of the above reasons, Kilnapp cannot maintain her two excessive force claims against Officer Gannon as a matter of law. There are no genuine issues of material fact that could support her claims. This Honorable Court should grant summary judgment in favor of Officer Gannon.

<div style="margin-left: 40%;">

Respectfully submitted,

</div>

By:     */s/ J.R. Russell*
        James R. Russell, Jr. (0075499)
        Chief Assistant Director of Law
        Affan Ali (0085698)
        Assistant Director of Law
        City of Cleveland, Dept. of Law
        601 Lakeside Avenue, Room 106
        Cleveland, Ohio 44114-1077
        Tel: (216) 664-2800
        Fax: (216) 664-2663
        JRussell2@clevelandohio.gov
        Aali2@clevelandohio.gov
        *Attorneys for Defendant Officer Bailey*
        *Gannon*

## LOCAL RULE CERTIFICATION

This case is currently assigned to the standard track.  The Memorandum relating to the dispositive motion conforms to the page limitations as set by order from a Judicial Officer, granting leave to exceed page limitations in the standard track, in compliance with Local Rule 7.1(f).

*/s/ J.R. Russell*
James R. Russell, Jr. (0075499)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was filed electronically on the 6th day of September, 2024.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ J.R. Russell*
James R. Russell, Jr. (0075499)