IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER KILNAPP, | ) | CASE NO.:  1:22-CV-01225-CAB |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANT CITY OF** |
| CITY OF CLEVELAND, *et al.*, | ) | **CLEVELAND'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendants. | ) | |
| | ) | |

Defendant City of Cleveland, pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves this Honorable Court for an order granting it summary judgment as to both counts alleged in Plaintiff's Complaint. There are no material facts in dispute and the City of Cleveland is entitled to judgment as a matter of law. A memorandum in support of this motion is attached and incorporated by reference. Co-Defendant Bailey Gannon is filing a separate Motion for Summary Judgment which is also incorporated by reference.

Respectfully Submitted,

MARK GRIFFIN (0064141)
Director of Law

By: s/*Michael J. Pike*
    WILLIAM MENZALORA (0061136)
    Chief Assistant Director of Law
    MICHAEL J. PIKE (0074063)
    Assistant Director of Law
    CARLI YOUNG (0095433)
    Assistant Director of Law
    City of Cleveland, Department of Law
    601 Lakeside Avenue, Room 106
    Cleveland, Ohio  44114
    Tel:    (216) 664-2800
    Email: WMenzalora@clevelandohio.gov
    Email: MPike@clevelandohio.gov
    Email: CYoung2@clevelandohio.gov
    *Attorneys for Defendant City of Cleveland*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT OF THE ISSUES.............................................................................v

SUMMARY OF THE ARGUMENT. ..................................................................... vi

MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT ................................1

I. STATEMENT OF FACTS ..................................................................................1

    A.    The Call and Initial Response ...............................................................1

    B.    The Armed Encounter............................................................................3

    C.    The City's Investigation.........................................................................5

    D.    The Cleveland Police Academy's Training Program ..............................8

II. LEGAL STANDARD OF REVIEW ...................................................................9

III. LAW AND ARGUMENT ...............................................................................10

    A.    There Was No Constitutional Violation by Gannon.............................10

    B.    No Municipal Policy or Custom Directly Caused a Constitutional Violation.......11

        1.    No Official City of Cleveland Policy Was the Moving Force For Any Alleged Constitutional Violation. ......................................13

        2.    No City of Cleveland Official With Final Decision-Making Authority Ratified Any Prior Similar Unconstitutional Acts ...................14

        3.    Plaintiff's "Inadequate Training" Theory Fails as a Matter of Law. .........17

        4.    The City of Cleveland Did Not Have a Custom of Tolerance of Unconstitutional Use of Deadly Force Prior to the July 20, 2020 Incident. ...........................................................................22

    C.    Count One Must be Dismissed as Plaintiff Cannot Pursue a Direct Fourth Amendment Violation Against a Local Municipality .............................. 23

IV. CONCLUSION ............................................................................................24

CERTIFICATE OF COMPLIANCE...................................................................25

CERTIFICATE OF SERVICE ...........................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Alphabet v. City of Cleveland*, No. 1:05CV1792, 2006 WL 3241785, at *15 (N.D.Ohio  Nov. 7, 2006).18

*Alsaada v. City of Columbus*, 536 F.Supp.3d 216, 270-71 (S.D.Ohio 2021). ...........................................15

*Arendale v. City of Memphis*, 519 F.3d 587, 599-600 (6th Cir. 2008) ......................................................22

*Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017)...................................................11

*Barron v. Baltimore*, 32 U.S. 243, 247, 7 Pet. 243, 8 L.Ed. 672 (1833)—...................................................24

*Berry v. Delaware Cnty*. Sheriff's Off., 796 F. App'x 857, 862 (6th Cir. 2019).........................................20

*Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1255 (M.D. Ala. 2010)...................................................16

*Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002) ...................................................................................9

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013)......................................................... 12, 15, 18, 20

*Campbell v. Hamilton Cnty*., 2023 WL 6295803, at *9 (S.D. Ohio Sept. 27, 2023)..................................20

*Cherrington v. Skeeter*, 344 F.3d 631, 645 (6th Cir. 2003) ........................................................................11

*City of Canton v. Harris*, 489 U.S. 378, 388-390 (1989)................................................... 10, 12, 17, 18, 19

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). ........17

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).........................................................................14

*Claybrook v. Birchwell*, 199 F.3d 350, 359-60 (6th Cir. 2000) .................................................................11

*Connick v. Thompson*, 563 U.S. 51, 61 (2011) ............................................................................ 18, 19, 20

*Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 (6th Cir. 2006)......................20

*Est. of Frerichs by Dunn v. Knox Cnty., Tennessee*, No. 3:16-CV-693-TAV-CCS, 2017 WL 3160568, at
  *10 (E.D.Tenn. July 25, 2017);....................................................................................................................16

*Est. of Hickman v. Moore*, 502 F. App'x 459, 469 (6th Cir. 2012) ............................................................20

*Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).............................................................15

*Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 941 (6th Cir. 2004) .......................................................23

*Fox v. Van Oosterum*, 987  F.Supp. 597, (W.D.Mich. 1997), aff'd, 176 F.3d 342 (6th  Cir.1999) ......15, 16

*Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) ...........................................................13

*Graham v. Connor*, 490 U.S. 386, 359, 109 S.Ct. 1865 (1989)..................................................................10

*Greenlee v. Miami Twp, Ohio*, No. 3:14-CV-173, 2015 WL 631130 (S.D. Ohio Feb. 12, 2015 ...............16

*Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 1996).........................................................11, 12

*Hood v. City of Columbus, Ohio*, 827 F. App'x 464, 469 (6th Cir. 2020) ............................................10, 21

*Hopson v. Daimler Chrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002 .........................................................9

*Houpt v. City of Cleveland*, No. 1:13 CV 1836, 2013 WL 6330905, at *2 (N.D.Ohio Dec. 5, 2013)...13, 18

*Hunter v. District of Columbia*, 824 F.Supp. 125, 133 (D.D.C. 2011) ........................................................22

*Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) ...............................................................12

*James Edwards  V. Craig Alan Matthews, Et Al.*, Guernsey Cnty., No. 2:17-CV-236, 2018 WL 3462506,
  at *8 (S.D. Ohio July 17, 2018) ...................................................................................................................16

*Jocke v. City of Medina*, 2023 WL 5167326, at *4 (6th Cir.).....................................................................10

*Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010)......................................................... 13, 22, 23

*LaBorde v. City of Gahanna*, 946 F. Supp. 2d 725, 731 (S.D. Ohio 2013), aff'd, 561 F. App'x 476 (6th
  Cir. 2014).....................................................................................................................................................24

*M.P. by Next Friend Williams v. Oak Park*, No. 19-13501, 2021 WL 3566281, at *9 (E.D.Mich. Aug. 12,
  2021). ...........................................................................................................................................................21

iii

*Miller v. Sanilac Cty.* 606 F.3d 240, 255 (6th Cir. 2010) ............................................................. 12

*Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690-692 (1978) ...................................................... passim

*Neal v. St. Louis Cnty. Bd. of Police Comm'rs*, 217 F.3d 955, 960 (8th Cir. 2000) .................................. 10

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). ..................................................... 12, 13, 15, 16

*Robertson v. Taylor*, 2024 WL 519891, at \*4 (N.D.Ohio February 8, 2024) ............................................... 17

*Robertson v. Taylor*, No. 1:23 CV 891, 2024 WL 519891, at \*4 (N.D.Ohio Feb. 8, 2024), ...................... 18

*Stewart v City of Memphis*¸ 788 F.Appx. 341, 346-47 (6th Cir. 2019) ....................................................... 22

*Teare v. Indep. Loc. Sch. Dist. Bd. of Educ.*, No. 1:10-CV-01711, 2011 WL 4633105, at \*8 (N.D. Ohio Aug. 18,  2011), ......................................................................................................................... 16

*Thomas v. Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2006) ................................................... 11, 13, 18, 24

*Thomas v. Shipka*, 818 F.2d 496, 503 (6th Cir.) ........................................................................................... 24

*Tompkins v. Frost*, 655 F.Supp. 468, 472 (E.D.Mich. 1987) ....................................................................... 15

*United States of America v. City of Cleveland*, 1:15-CV-01046-SO .............................................................. 8

*Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020) ............................................................. 17

*Wright v. Euclid*, 962 F.3d 852 (6th Cir. 2020) ........................................................................................... 16

*Zavatson v. City of Warren, Michigan*, 714 F. App'x 512, 526 (6th Cir. 2017) ................................... 17, 21

## Statutes

U.S.C. 18 § 1983 ............................................................................................................... 10, 11, 12, 23

Ohio Revised Code § 135.09(a) .................................................................................................... 15

## Other Authorities

Fed.R.Civ.P.56 ............................................................................................................................. 12

Fed. R.Civ.P.56(c)(1)(A) ................................................................................................................ 9

Fed. R.Civ.P.56(c)(1)(B) ................................................................................................................ 9

## STATEMENT OF THE ISSUES

1.      Whether Plaintiff sustained a constitutional violation?

2.      Whether Plaintiff's assertion of a direct Fourth Amendment claim against the City fails to state a claim upon which relief can be granted?

3.      Whether Plaintiff can prove any of the four theories of *Monell* liability against the City?

## SUMMARY OF THE ARGUMENT

Plaintiff filed suit in this Court on July 13, 2022, alleging two causes of action against Defendant City of Cleveland and Co-Defendant Officer Bailey Gannon, namely excessive force under the Fourth Amendment and excessive force under the Fourteenth Amendment (pled in the alternative) of the U.S. Constitution  (ECF Doc. 1, Page ID #1-20).

The City is entitled to judgment in its favor because Defendant Bailey Gannon's use of force during the subject incident was reasonable and not excessive under the circumstances he faced. Defendant Bailey Gannon is therefore entitled to qualified immunity as there was no constitutional violation or clearly established violation of Plaintiff's rights. The facts demonstrate that Gannon's actions were both reasonable and constitutional in response to a rapidly evolving situation involving an armed suspect who suddenly pointed a gun in Gannon's face and began firing within only a few seconds.

Further, even if a question remains as to qualified immunity, Plaintiff cannot succeed on her *Monell* claims against the City. Plaintiff not only lacks evidence of a constitutional violation, but she also cannot prove that any municipal policy or practice was the cause of her alleged violation of constitutional rights. Furthermore, Plaintiff cannot succeed on a direct Fourth Amendment violation against a local municipality. For all of these reasons, the City is entitled to judgment in its favor as to both counts of Plaintiff's Complaint.

## MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

### I.  STATEMENT OF FACTS

Plaintiff Jennifer Kilnapp ("Kilnapp") became a certified police officer in January 2016 (*Kilnapp Dep.* 15:10-14). Defendant Officer Bailey Gannon ("Gannon") became a certified police officer in May 2020 (*Gannon Dep.* 20:19-25, 21:1-12). Kilnapp was Gannon's field training officer at the time of the alleged incident (*Kilnapp Dep.* 25:1-3). A field training officer is tasked with training and instructing probationary patrol officers, like Gannon, in the field to ensure that probationary officers are following divisional protocols and acting safely (*Id.*, 26:15-20; *Ryan Dep.* 177:2-8; see also *Exhibit A-9* (GPO 1.1.24)). This ultimately made Kilnapp a "de facto supervisor and trainer" (*Ryan Dep.* 94:4-12), for which she received supplemental compensation (*Kilnapp Dep.* 25:14-25, 26:1-3; see also *Exhibit A-9*). At the time of the incident, Kilnapp had more than four years of experience in the field working as a police officer, and had gone on hundreds of calls[1] involving armed suspects for two different police departments (*Kilnapp Dep.* 136:16-25, 137:1-14). Gannon, conversely, had just graduated from the Cleveland Police Academy a few months prior to the alleged incident (*Gannon Dep.* 20:19-25, 21:1-12).

#### A.  The Call and Initial Response

At approximately 3:30am on July 20, 2020, Kenya Watts ("Watts") dialed 911 for assistance with an armed man who had shot a gun into the floor of the boarding house[2] at which she was residing (*Kilnapp Dep.* 33:13-24, 35:21-23; *Gannon Dep.* 61:14-19). The armed man was later identified as Darryl Borden ("Borden") (*Kilnapp Dep.* 38:17-20). Upon Kilnapp and Gannon's arrival, Watts approached them from the backyard (*Id.*, 35:1-4). She "seemed frantic"

---

[1] See Kilnapp's testimony that she went on one "gun run" per shift as an estimate of previous gun-related incidents (*Kilnapp Dep.* 136:16-25).

[2] Kilnapp's Complaint incorrectly claims "no report of the man shooting at anyone or otherwise being physically violent" (ECF Doc. 1, Page ID #4 at ¶ 18).

and informed the officers that Borden had a firearm and he would shoot at them (*Gannon Dep.* 62:1-2; *Kilnapp Dep.* 35:13-20, 35:24-25, 36:1-5). Kilnapp then proceeded into the house, and Gannon followed, in an attempt to locate Borden (*Gannon Dep.* 62:21-25). The situation was serious enough for Kilnapp to have her gun drawn and in the side-ready position when she entered the house (ECF Doc. 14-2 at 0:24; *Kilnapp Dep.* 46:1-5). Gannon followed behind her (ECF Doc. 14-2 at 0:30).

Inside, the house was dark, cluttered, and quiet (ECF Doc. 14-2 at 0:40-1:57, *Kilnapp Dep.* 36:20, 37:2-18). Upon entry, Gannon was again advised by Watts that Borden had a gun (ECF Doc. 14-2 at 0:38). Using a flashlight to see, Kilnapp stood at the bottom of the stairs and said to Gannon, "Come on, he's upstairs," indicating for him to ascend the stairs first (*Id.* at 0:50). Gannon complied, lighting his path with his own flashlight (*Id.* at 0:56). When Gannon paused on a landing in the stairwell,[3] Kilnapp proceeded ahead of him and called out for Borden using his nickname "Moose" (*Id.* at 1:17). Having received no response from Borden, Kilnapp flashed her light into a bedroom to check if Borden was there (*Id.* at 1:30-1:40; *Kilnapp Dep.* 38:12-16). Watts then called out from the first floor that Borden was in the bathroom and indicated to Gannon which door was the bathroom (ECF Doc. 14-2 at 1:40-1:44; *Kilnapp Dep.* 40:6-8, 59:19-21). Gannon was essentially standing just outside the bathroom door at the top of the stairs, while Kilnapp was standing several feet behind Gannon down the hallway (ECF Doc. 14-2 at 1:42; *Kilnapp Dep.* 60:5-10). Gannon attempted to open the bathroom door (*Kilnapp Dep.* 41:15-22; ECF Doc. 14-2 at 1:40).[4]

---

[3] The subject stairwell is comprised of two sets of stairs going in opposite directions and separated by a landing approximately half way up to the second floor; the second set of stairs ends with another landing adjacent to the second floor hallway which connects to the subject bathroom where Borden was holed up in ambush. See *Exhibit B-21* for photographs of the subject stairwell and landing areas for the Court's reference. See also ECF Doc. 14-2 at 0:25-1:56.

[4] While the Complaint cavalierly claims that Gannon could have chosen to employ any of several alternative tactics to confront Borden (ECF Doc. 1, Page ID #5, at ¶ 24), so could have Kilnapp who was the superior officer and

### B.  The Armed Encounter

Gannon stood before the closed bathroom door and tried to open it while shining a flashlight with his right hand and holding his unholstered gun in his dominant left hand (ECF Doc. 14-2 at 1:44-1:48, *Kilnapp Dep.* 62:15-19; *Gannon Dep.* 63:22-25). Borden then suddenly swung the door open and faced Gannon while raising a handgun and pointing it directly at Gannon (ECF Doc. 14-2 at 1:48, *Gannon Dep.* 64:1-7, 77:18-20).[5] Kilnapp never saw Borden and could not see into the bathroom (*Kilnapp Dep.* 59:14-18, 60:11-18, 62:7-14). However, based upon her subsequent review of Gannon's WCS, Kilnapp agrees that Borden pulled his right arm up from a position at the side of his body to approximately face level with Gannon (*Id.*, 166:8-10, 167:3-17). Her testimony is consistent with both Gannon's recollection and the WCS footage, and supports Gannon's testimony that Borden pointed a gun at him.

There is no evidence that disputes this fact. Borden admitted to police that he was hiding inside the bathroom with a gun because he was afraid that people were coming to kill him (*Exhibit B-4* (Homicide File – Lt. Treasa Kennedy's Report)). Additionally, a careful viewing of Gannon's WCS at a reduced playback speed[6] shows Borden opening the bathroom door and wielding a small, shiny object in his right hand (ECF Doc. 14-2 at 1:48; *Exhibit B-24* (still frames)). Borden's gun was later found hidden under the bathroom sink and is shiny and silver in color (*Exhibit B-1* (Homicide File – Borden's Original Investigation Report) at p.14; *Exhibit B-20* (Photographs)).

---

Gannon's field training officer. Any alleged deficiency in Gannon's chosen course of action is also attributable to Kilnapp as she made no attempt to remedy or adjust Gannon's conduct before the door opened. See also *Exhibit A-9* (GPO 1.1.24(III)(G)).

[5] Kilnapp's Complaint incorrectly claims that Borden was "holding a firearm … down at his side in one hand … pointed towards the ground," and "it was not raised or pointed at Gannon" (ECF Doc. 1, Page ID #5, at ¶ 28). All available evidence supports the fact that Borden pulled open the door and then raised the gun to point it at Gannon.

[6] Reducing the playback speed of ECF Doc. 14-2 to .25 on VLC media player will provide the slowest playback speed while still preserving audio; a playback speed of .12 will preclude audio but improve the visual of Borden when the bathroom door opens. See also *Exhibit B-24* for still frames from ECF Doc. 14-2.

The following sequence took approximately 5 seconds between the time Borden suddenly pulled open the bathroom door and the last shots were fired (ECF Doc. 14-2 at 1:49-1:54). With a gun pointed at him, Gannon jumped out of Borden's line of fire and retreated down the stairs while calling out "Get back" (ECF Doc. 14-2 at 1:48-1:50).[7] After quickly reaching the landing between the two flights of stairs, Gannon turned and faced the direction of the bathroom while descending the second flight of stairs (*Id.* at 1:52; *Kilnapp Dep.* 77:12-21). Gannon's left hand can be seen moving into a firing position forward and toward the right, which is the direction where Borden was in the bathroom (ECF Doc. 14-2 at 1:52; *Kilnapp Dep.* 173:4-25). At this point, Borden starts firing several shots in rapid succession and Gannon returns fire towards the bathroom where Borden stood with gun drawn less than three seconds before (ECF Doc. 14-2 at 1:51-1:55; *Kilnapp Dep.* 42:3-7, 176:11-17, *Gannon Dep.* 64:8-17). Even Plaintiff admits, upon review of the WCS, that Gannon was facing towards the bathroom[8] when the shooting started (*Kilnapp Dep.* 173:4-25, 176:11-17). Unbeknownst to Gannon and without saying anything, Kilnapp moved from her position down the hall to put herself on the stairs between Gannon and the mortal threat Borden presented from the bathroom (*Id.*, 176:21-25, 177:1-22). Kilnapp testified that she certainly was not behind Gannon when the firing started[9] (*Id.*, 174:4-6). She was ultimately shot during this exchange of gunfire, which lasted approximately two seconds.

Importantly, Kilnapp testified that she first heard shots fired when she was on the second floor, prior to starting down the stairs (*Id.*, 43:13-21). She then felt pain when she got to the first

---

[7] Kilnapp's Complaint incorrectly claims that Gannon "panicked" and was "screaming as he fled" (ECF Doc. 1, Page ID #6, ¶ 31, 36).

[8] Whereas Kilnapp's Complaint incorrectly claims that Gannon "pointed his gun over his head behind him – in the opposite direction he was running – and began shooting" (ECF Doc. 1, Page ID #6, at ¶ 37), and that Gannon "was not looking where he was shooting" (¶ 38) and that his shots were "blindly fired bullets" (¶ 39). There is no evidence whatsoever to support this theory.

[9] Further, Kilnapp admits that she lacks any evidence to support a theory that Gannon shot Kilnapp with the mistaken belief that she was Borden following him down the stairs, as alleged in her Complaint (ECF Doc. 1, Page ID #16, at ¶ 101; *Kilnapp Dep.* 89:4-25, 90:1-7).

or second step of the first flight of stairs going down (*Id.*, 42:8-12, 43:5-11). This testimony notably indicates a gap in time between the first shots fired and the onset of pain and is consistent with the sequence of Borden firing first and Gannon returning fire, the latter of which struck Kilnapp.

Both officers subsequently exited the house in short order and Gannon radioed for police assistance and EMS after realizing that Kilnapp was injured (ECF Doc. 14-2 at 2:00-2:47; *Gannon Dep.* 66:17-25, 67:1-21). Gannon attempted to render aid and comfort, while also protecting Kilnapp and himself from further danger (ECF Doc. 14-2 at 2:45-7:00; *Gannon Dep.* 66:17-25, 67:1-21).

### C.  The City's Investigation

Gannon's swift radio communication advising that shots had been fired effectively launched a complex, multi-unit response and coordinated investigation (ECF Doc. 14-2 at 2:02; *Neidbalson Dep.* 44:23-25, 45:1-15, 46:1-22; *Exhibit B-2* (Homicide File - Synopsis Report Exhibit); *Exhibit B-9* (Internal Affairs File - Initial Case Assignment)). After SWAT successfully extracted Borden from the house and the scene was secured, the procedurally-mandated FIT response[10] initiated two simultaneous and bifurcated investigations, as is consistent with the FIT Manual[11] (*Neidbalson Dep.* 54:13-19, 55:7-11, 55:20-25, 56:1-5; *Borden Dep.* 31:15-25; *Exhibit B-2*; *Exhibit B-9*). Officers from Homicide, the Crime Scene & Record Unit, and Internal Affairs began to gather evidence and collect information (*Neidbalson Dep.* 46:7-22; *Exhibit B-2*; *Exhibit B-9*). One team was led by Homicide Detective David Borden, while the Internal Affairs team was led by Sergeant Jacquelyn Bennett (*Borden Dep.* 48:16-18, 49:3-5; *Neidbalson Dep.* 57:15-18; *Exhibit B-9*).

---

[10] See *Exhibit B-32* (CDP FIT Procedural Manual) at p.6; See also *Exhibit B-33* (GPO 2.01.07).
[11] See *Exhibit B-32* at p.10.

These parallel investigations thoroughly collected and analyzed all of the available evidence in this case, including but not limited to witness and officer statements, available WCS,[12] photographs, physical evidence (Ex. clothing, bullets, bullet casings), and forensics (Ex. gunshot residue, DNA swabs) (*Neidbalson Dep*. 46:7-22; *Borden Dep.* 50:16-25; *Exhibit B-1*; *Exhibit B-3* (Homicide – Reports Upon Call-Up); *Exhibit B-5* (Homicide File - Interviews with Kilnapp and Gannon); *Exhibit B-10* (Internal Affairs File - Fit Call-Up Reports); *Exhibit B-11* (Internal Affairs File – Investigative Log); *Exhibit B-12* (Internal Affairs File – WCS Review); *Exhibit B-13* (Internal Affairs File - Kilnapp's Garrity Interview); *Exhibit B-14* (Internal Affairs File - Gannon's First Garrity Interview); *Exhibit B-15* (Internal Affairs File - Gannon's Second Garrity Interview)).

A study of the firearms collected, combined with the results of the Ballistics report,[13] established that Gannon fired two rounds from his service weapon, one of which hit Kilnapp[14] after she moved into the crossfire (*Borden Dep*. 67:6-15; *Kilnapp Dep*. 177:2-4; *Exhibit B-25* (Ballistics Report)).  The second round fired by Gannon lodged into a door frame on the first floor (*Gannon Dep*. 72:20-25; *Borden Dep*. 111:22-25, 112:1-3; *Exhibit B-25*; *Exhibit B-23* (Photographs)). Borden's gun was found to have five spent shell casings (*Borden Dep.* 70:22-25, 71:1-8; *Exhibit B-1* at p.14; *Exhibit B-20*). Two of his bullets were recovered in the wall opposite the bathroom door, where Gannon had stood prior to retreating (*Borden Dep.* 78:14-25, 79:1,25, 80:1-3; *Exhibit B-22* (Photographs)). Borden was ultimately indicted[15] on July 30, 2020, for six

---

[12] Kilnapp did not activate her WCS upon entry into the house, so Gannon's video is the only footage available (*Neidbalson Dep*. 182:6-8; *Sheehan Dep.* 51:22-25, 52:1-7).

[13] This report is dated April 23, 2021 and is the only piece of conclusive evidence to confirm that one of Gannon's bullets hit Kilnapp (*Borden Dep.* 52:24-25, 53:1-3, 53:10-12; *Neidbalson Dep.* 77:12-22).

[14] A question still remains today as to whether some of Kilnapp's injuries were caused by one of Borden's unrecovered bullets based on the number and nature of her wounds (*Borden Dep.* 9:4-21).

[15] Cuyahoga Court of Common Pleas, Case No. 651870-20-CR

felony counts, including two counts of attempted murder,[16] based upon the evidence collected and presented to the prosecutor's office early in the investigation (*Exhibit B-6* (Prosecutor's Decision on Borden); *Exhibit C* (Indictment); *Exhibit B-16* (Internal Affairs File - Final FIT Report by Bennett)). On September 9, 2020, the prosecutor ruled that no papers would be issued for Gannon (*Exhibit B-7* (Homicide File - Prosecutor's Decision on Gannon); *Exhibit B-8* (Homicide File – Report on Prosecutor's Decision on Gannon); *Exhibit B-16*).

All evidence collected by the Homicide unit was documented in a dedicated file (*Borden Dep.* 13:7-9, 27:15-18; see also *Exhibits* B-1, B-2, B-3, B-4, B-5). Internal Affairs documented its independent investigation in a separate file, which properly included recommendations and findings[17] at the close of its investigation (*Neidbalson Dep.* 68:6-8, 188:1-24; *Bennett Dep.* 60:9-11; *Sheehan Dep.* 51:3-13; *Exhibit B-16*; *Exhibit B-17* (Internal Affairs File – Policy and Training Assessment)). Among the findings, Sgt. Bennett determined that Gannon's use of deadly force was "within policy," as Gannon and Kilnapp "encountered an armed subject" who was "waiting to ambush" and fired at the officers (*Exhibit B-16* at p.4; *Bennett Dep.* 43:11-15). Further, Sgt. Bennett recommended a disciplinary specification against Kilnapp for failure to activate her WCS in violation of GPO 4.06.04[18] (*Exhibit B-16*, *Exhibit B-26* (Kilnapp Notice of Charges)).

Sgt. Bennett's recommendations were then reviewed and supplemented by Internal Affairs Lieutenant Mitch Sheehan, who also recommended discipline for Gannon based on his delayed activation of WCS[19] as well as remedial training for both officers (*Exhibit B-18* (Internal Affairs File - Final FIT Report by Lt. Sheehan). Acting Commander Charles Neidbalson subsequently

---

[16] Borden ended up pleading to one count of Attempted Felonious Assault on a Peace Officer after the results of the April 2021 Ballistics Report were provided to his counsel and placed on the record at Sentencing (see Case No. 651870-20-CR; *Exhibit D* (Borden Plea Transcript); *Exhibit E* (Borden Sentencing Transcript)).

[17] See *Exhibit B-34* (CDP Internal Affairs Unit Policies and Procedures Manual).

[18] See also *Exhibit B-28* (GPO 4.06.04) and *Exhibit B-29* (DN 18-014)

[19] He ultimately received Verbal Counseling (see *Exhibit B-27*) in accordance with GPO 4.06.04 (*Exhibits B-28*) and DN 18-014 (*Exhibit B-29*).

approved all such findings and recommendations (*Exhibit B-19* (Internal Affairs File – Final FIT Report by Lt. Neidbalson). The finding that Gannon's use of deadly force was "within policy" was also later reviewed and administratively approved by the Force Review Board on June 3, 2021, which met to discuss the results of the investigation and dissect the findings and evidence (*Exhibit B-30* (FRB Checklist); see also *Exhibit B-31* (GPO 2.01.08)). The City's robust and cumulative investigations were consistent with Court-approved policies and practices.[20]

### D. The Cleveland Police Academy's Training Program

The Cleveland Police Academy ("Academy") attended by Bailey Gannon is certified by the Ohio Peace Officer Training Commission ("OPOTC") as meeting all mandatory training required by the State of Ohio (*Exhibit A* (Declaration of Shawn Smith)). Coursework includes extensive training in Use of Force, Crisis Intervention, Firearms, and Building Searches, among dozens of other topics (*Id.*; see also *Exhibit A-1* (Audit Sheet)). In fact, the City of Cleveland goes above and beyond state requirements by providing over 400 hours of supplemental training on topics which include, among many others, Use of Force, Search and Seizure, Building Searches, Active Shooter, and Crisis Intervention (*Exhibit A*; see also *Exhibits A-2*, *A-3*, *A-4*, *A-4a*, *A-5* (OPOTA coursework for each respective topic)). All sections of the OPOTC curriculum are required to be completed before a recruit can be eligible to sit for the certification test with OPOTC and the State of Ohio (*Id.*). The Academy conducts additional testing on its supplemental topics to ensure proficiency as well (*Id.*).

Furthermore, Judge Oliver has previously approved the language and procedures laid out in the City's Use of Force policies, which include definitions, procedures, de-escalation, and reporting requirements, as meeting constitutional requirements (See *Exhibits F* & *G*). The resultant

---

[20] See 1:15-CV-01046-SO; see also *Exhibits F* & *G* (Court Orders approving the City's Use of Force policies)

GPOs that controlled police conduct with regard to Use of Force at the time of the subject incident reflect this approved language (See *Exhibit A-6* (GPOs 2.01.01, 2.01.02, 2.01.03, 2.01.04)). The training that Gannon received at the Academy was consistent with these court-approved policies and procedures (*Exhibit A*). Moreover, with Gannon being a probationary patrol officer having finished training within weeks of the incident at issue, there is no temporal disconnect between the training he received and the events that occurred on July 20, 2020.

## II.    LEGAL STANDARD OF REVIEW

A court must grant summary judgment where there remain no genuine issues as to any material fact, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion and, viewing the evidence most strongly in favor of the party opposing the motion, that conclusion is adverse to the non-moving party. *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002); *Hopson v. Daimler Chrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002). Summary judgment is proper if a defendant establishes that a fact cannot be genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials…" *Fed.R.Civ.P.56(c)(1)(A)*.

The movant can also demonstrate "that an adverse party cannot produce admissible evidence to support" facts necessary to succeed on a claim. *Fed.R.Civ.P.56(c)(1)(B)*. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp.3d 731, 736 (N.D. Ohio 2015).

## III.     LAW AND ARGUMENT

### A.  There Was No Constitutional Violation by Gannon.

To prevail on a § 1983 *Monell* claim, a plaintiff must prove two things: (1) a violation of a constitutional right; and (2) that a municipal policy or custom directly caused the violation. E.g., *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690-692 (1978); *Jocke v. City of Medina*, 2023 WL 5167326, at *4 (6th Cir.) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell* in original)). Plaintiff cannot meet the first prong of this test because there was no violation of a constitutional right.

In this matter, Gannon's actions are at issue on the night in question. The City, therefore, incorporates by reference as if fully rewritten herein the law and arguments contained in Defendant Officer Bailey Gannon's separately filed Motion for Summary Judgment. Summarily stated, Gannon's actions in returning fire in the defense of himself and others were reasonable and necessary under the undisputed facts. See *Hood v. City of Columbus, Ohio*, 827 F. App'x 464, 469 (6th Cir. 2020) (holding that "the proximity of Green to the Officers, the fact that he had a gun with him and either shot at or was about to shoot at the Officers, and the split-second decision that the Officers had to make—suggest that the Officers did not violate Green's constitutional rights when they first fired at Green"). See also *Neal v. St. Louis Cnty. Bd. of Police Comm'rs*, 217 F.3d 955, 960 (8th Cir. 2000) (an officer does not violate the constitutional rights of another when he accidently shoots a fellow officer during a shootout with an armed suspect potentially threatening the officer).

Furthermore, under the Fourteenth Amendment, a plaintiff must overcome a substantially higher hurdle than that which is required under the "objective reasonableness" test of *Graham*. *Graham v. Connor*, 490 U.S. 386, 359, 109 S.Ct. 1865 (1989). The test applied by the Supreme

Court requires that the action "shocks the conscience." *Id.* (*citing Lewis, supra.* at 846, 1717). In this case, which involved "one of those 'rapidly evolving, fluid, and dangerous predicament[s] which precludes the luxury of calm and reflective pre-response deliberation'" an officer's reflexive actions "shock the conscience" only if he employed force "maliciously and sadistically for the very purpose of causing harm." *Claybrook v. Birchwell*, 199 F.3d 350, 359-60 (6th Cir. 2000). There is no question that Gannon's actions were an attempt to protect Kilnapp, as opposed to intentionally causing her harm.

The collective evidence adduced in this case therefore leaves Plaintiff unable to demonstrate a clearly established constitutional violation, and Gannon is entitled to qualified immunity. As such, the inquiry on the remainder of the *Monell* claim should end here, and the City should be granted summary judgment as to both counts in Plaintiff's Complaint.

### B.  No Municipal Policy or Custom Directly Caused a Constitutional Violation.

Irrespective of whether or not Plaintiff can prove a violation of a constitutional right, her claims against the City nonetheless fail because there is insufficient evidence to prove that any official policy or custom of the City caused the violation. In *Monell*, the Supreme Court held that "[a] municipality cannot be held vicariously liable under § 1983 for the acts of its employees or agents." *Cherrington v. Skeeter*, 344 F.3d 631, 645 (6th Cir. 2003) (citing *Monell*, 436 U.S. at 694). That is why a *Monell* claim also requires that the constitutional violation be caused by the execution of a municipality's "official policy or custom." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 1996). Plaintiff "bears a heavy burden of proof" in proving a *Monell* claim. *Thomas v. Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

As the Sixth Circuit explained in *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017), "when a municipality's alleged responsibility for a constitutional violation stems

from an employee's unconstitutional act, the city's failure to prevent the harm must be shown to be deliberate under 'rigorous requirements of culpability and causation.'" *Id.* at 995. "A showing of simple or even heightened negligence will not suffice." *Gregory*, 444 F.3d at 752. Rather, Plaintiff must "demonstrate that the municipality acted with *deliberate indifference*," which "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (citations omitted) (emphasis added). Moreover, Plaintiff must show that the municipality's "policy or custom was the *moving force* behind the alleged violations." *Miller v. Sanilac Cty.* 606 F.3d 240, 255 (6th Cir. 2010) (emphasis added).

There are four possible theories for proving *Monell* liability:

(1) the existence of an illegal official policy or legislative enactment;
(2) that an official with final decision-making authority ratified illegal actions;
(3) the existence of a policy of inadequate training or supervision; or
(4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*E.g., Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013)).

The admissible Rule 56 evidence adduced to date does not establish that any official policy or legislative enactment has caused Plaintiff's alleged constitutional violation. An official policy refers to "acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). Nor does the evidence support a finding that an official with final decision-making authority caused the alleged constitutional violation through ratification of illegal actions. Furthermore, as to inadequate training and supervision, alleged "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (emphasis added). The evidence does not support this avenue of *Monell* liability. Lastly, regarding a custom of tolerance or acquiescence of

federal rights violations, it is not enough to show that the treatment of Plaintiff by Gannon, standing alone or in conjunction with only a few other instances, is the basis for liability. *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) (four other incidents of improper conduct alone did not make the required showing of a "widespread, permanent, and well-settled custom"); *Houpt v. City of Cleveland*, No. 1:13-cv-1836, 2013 WL 6330905, *2 (N.D. Ohio Dec. 5, 2013) ("a plaintiff must demonstrate a clear and persistent pattern of illegal activity"), *citing Thomas*, *supra*, at 432.

### 1. No Official City of Cleveland Policy Was the Moving Force For Any Alleged Constitutional Violation.

"[T]o satisfy the *Monell* [official policy or legislative enactment] requirements a plaintiff must [1] identify the policy, [2] connect the policy to the City itself and [3] show that the particular injury was incurred because of the execution of the policy.'" *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993) (citation omitted). Proof of an "official policy" requires "formal rules or understandings – often but not always committed to writing – that [were] intended to, and [did] establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).

In this case, Plaintiff does not even allege that any specific official policy caused the alleged excessive force.[21] Regardless, the relevant City of Cleveland Use of Force policies are set forth in the Cleveland Division of Police's General Police Orders 2.01.01, 2.01.02, 2.01.03, 2.01.04, 2.01.05 which were both in effect at the time of the incident and were taught to Gannon as a recruit at the Academy (See *Exhibit A*). These policies require all uses of force to be proportional,

---

[21] See Complaint, *in toto*, ECF Doc. 1, PageID 1-20; see also Plaintiff's Brief in Opposition to Defendant City of Cleveland's Motion to Dismiss (ECF Doc. 19, Page ID #121-122 ("the Complaint plausibly pleads municipal liability under any of three different theories: failure to train; an unconstitutional custom; and/or, ratification of Gannon's excessive use of force").

objectively reasonable, and constitutional (See *Exhibit A-6* (GPO 2.01.03)). For instance, the general use of force policy requires:

> Consistent with the Division's mission, including the commitment to carry out its duties with a reverence for the sanctity of human life, it is the policy of the Division to use only that force which is necessary, proportional to the level of resistance, and objectively reasonable based on the totality of circumstances confronting an officer. Officers shall also take all reasonable measures to de-escalate an incident and reduce the likelihood or level of force. Any use of force that is not necessary, proportional, and objectively reasonable and does not reflect reasonable de-escalation efforts, when safe and feasible to do so, is prohibited and inconsistent with Divisional policy.

*Id.* at p.1.

Additionally, an officer may only use force which is necessary to achieve a lawful objective. *Id.* These are only a few examples of the City's extensive official policy regarding Use of Force.

Furthermore, Judge Oliver has previously approved both the language and procedures laid out in the City's Use of Force policies, which include definitions, procedures, de-escalation, and reporting requirements, as meeting constitutional requirements (see *Exhibits F & G*). The resultant GPOs that controlled police conduct with regard to Use of Force at the time of the subject incident reflect this approved language. The training that Gannon received at the Academy was consistent with these court-approved policies and procedures (*Exhibit A*). As such, the City is entitled to judgment in its favor on the first avenue of potential *Monell* liability.

### 2. No City of Cleveland Official With Final Decision-Making Authority Ratified Any Prior Similar Unconstitutional Acts.

The second theory for a potential *Monell* claim requires a showing that a final policymaker ratified the allegedly illegal conduct. *Monell*, *supra*. "A final policymaker's approval of illegal actions is 'chargeable to the municipality because their decision is final.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Ratification therefore requires that (1) a final policymaker (2) ratify the illegal actions of a subordinate through (a) affirmative approval or (b) failure to

investigate and punish similar actions prior to the actions at issue herein. See, e.g., *Alsaada v. City of Columbus*, 536 F.Supp.3d 216, 270-71 (S.D.Ohio 2021). In this case, Plaintiff lacks evidence of all of the elements required to prove a *Monell* ratification theory because none exists.

First, there is no allegation or evidence that a final policymaker affirmatively approved Gannon's actions prior to the incident at issue, which is a necessary antecedent to prove ratification. In general, "[w]rongful conduct after an injury cannot be the proximate cause of the same injury." *Tompkins v. Frost*, 655 F.Supp. 468, 472 (E.D.Mich. 1987); *Fox v. Van Oosterum*, 987 F.Supp. 597, 604 (W.D.Mich. 1997), aff'd, 176 F.3d 342 (6th Cir.1999). Moreover, pursuant to the City's Charter and formally acknowledged by the Sixth Circuit, only the City's Mayor and the Director of Public Safety have final and unreviewable authority to establish official city policy. See *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) ("The applicable Ohio law, that is, the City Charter of Cleveland and section 135.09(a) of the Cleveland Code, reveals that the Chief of Police is subordinate to the Director of Public Safety. Cleveland, Ohio, Code § 135.09(a) (1988)"). There is no evidence to establish that any action relevant to this case, let alone an demonstrably illegal action, was approved by the Mayor or Director of Public Safety at any time. Plaintiff therefore cannot meet the first prong of the ratification theory.

Furthermore, a plaintiff cannot establish a ratification claim by asserting that an official's after-the-fact investigation of the incident at issue in a lawsuit constitutes ratification of the actions taken during the incident. *Burgess v. Fischer*, 735 F.3d at 478, citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-484, 106 S.Ct. 1292 (1986) ("a plaintiff must demonstrate that a 'deliberate choice to follow a course of action is made [by the final policymaker] from among various alternatives by the official [, and] that course of action must be shown to be the *moving force* behind or cause of the plaintiff's harm (emphasis added)). The *Burgess* court rejected a

sheriff's "approval of a post hoc investigation [by a jail administrator]" of a use of force incident

as being a causal link to the plaintiff's injuries and thus, rejected the plaintiff's *Monell* ratification

theory. Similarly, the Sixth Circuit in *Wright v. Euclid*, 962 F.3d 852 (6th Cir. 2020), stated the

lack of investigation and discipline in other use-of-force cases occurring after the incident that is

the subject of a plaintiff's lawsuit cannot have "led the way" to a plaintiff's injuries. *Id.*, at 882.

> As held in a case that the Sixth Circuit has affirmed,

> Plaintiff also alleges that defendant Stewart's decision not to investigate the violation after he had been alerted to the transgression triggers municipal liability. Because Sheriff Stewart is a county policymaker, plaintiff argues, his single decision constitutes culpable municipal action under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 471, 106 S.Ct. 1292, 1292, 89 L.Ed.2d 452 (1986). Plaintiff's theory, however, fails once again to demonstrate the causation necessary to find this injury fairly attributable to the municipality. Here, plaintiff argues, in effect, that the Sheriff's decision, made after the violation took place, somehow caused the violation to occur. **Plaintiff's assertion defies logic**. Consequently, his claims against defendant Stewart and the County based on this premise will be dismissed as well.

*Fox v. Van Oosterum*, 987 F. Supp. 597, 604 (W.D. Mich. 1997), aff'd, 176 F.3d 342 (6th Cir.

1999) (emphasis added). See also *Est. of Frerichs by Dunn v. Knox Cnty.*, *Tennessee*, No. 3:16-

CV-693-TAV-CCS, 2017 WL 3160568, at *10 (E.D.Tenn. July 25, 2017); *Teare v. Indep. Loc.*

*Sch. Dist. Bd. of Educ.,* No. 1:10-CV-01711, 2011 WL 4633105, at *8 (N.D. Ohio Aug. 18, 2011),

report and recommendation adopted, No. 1:10 CV 01711, 2011 WL4633095 (N.D.Ohio Sept.

30, 2011); (*James Edwards  V. Craig Alan Matthews, Et Al*., Guernsey Cnty., No. 2:17-CV-236,

2018 WL 3462506, at *8 (S.D. Ohio July 17, 2018; "once an individual's rights have been violated,

a subsequent failure to conduct a meaningful investigation cannot logically be the "moving force"

behind the alleged constitutional deprivation,") (*Greenlee v. Miami Twp, Ohio*, No. 3:14-CV-173,

2015 WL 631130 (S.D. Ohio Feb. 12, 2015), aff'd (Sept. 23, 2015) (*Borton v. City of Dothan*, 734

F. Supp. 2d 1237, 1255 (M.D. Ala. 2010).

Not only is the record flush with evidence of multiple complex, procedurally Court-approved investigations done into this matter (i.e. Homicide, Internal Affairs, Force Investigation Team ("FIT"), Crime Scene & Record Unit, Force Review Board), but any attempt by Plaintiff to criticize those investigations will do nothing to advance a ratification theory for *Monell* liability since the investigations took place after the incident occurred.

Similarly, a decision not to discipline a police officer regarding the incident that is the subject of the present litigation cannot, by itself, support a ratification theory. See, e.g., *Robertson v. Taylor*, 2024 WL 519891, at *4 (N.D.Ohio February 8, 2024). Judge Patricia Gaughan stated:

> Plaintiff also refers to his own shooting, including allegations that Police Chief Williams was a final decision maker who ratified the investigation into Taylor's conduct and approved the recommendation to not discipline Taylor. (Compl. ¶¶ 64–71.) But this cannot form the basis for prior ratification of an illegal act because it would have occurred after Plaintiff's injuries and could not have caused them.

*Id.* at *3-4, citing *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020).

For all of these reasons, Plaintiff cannot prove *Monell* liability under a ratification theory. Consequently, the City of Cleveland is entitled to summary judgment on a ratification theory of *Monell* liability.

### 3. Plaintiff's "Inadequate Training" Theory Fails as a Matter of Law.

The third method of proving *Monell* liability is the hardest to prove because "inadequate training" is a nebulous concept, and, thus, *Monell* liability is "at its most tenuous where a claim turns on a failure to train." *City of Canton v. Harris*, 489 U.S. 378, 388-390 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

To succeed on a failure to train claim, a plaintiff must prove: (1) the training was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's "deliberate indifference"; and (3) the inadequacy was closely related to or actually caused the injury. *Zavatson*

*v. City of Warren, Michigan*, 714 F. App'x 512, 526 (6th Cir. 2017). "Deliberate indifference" is a "stringent standard of fault, requiring proof that a municipality disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388-390 (1989).

"[A] plaintiff cannot rely solely on a single incident to demonstrate that a municipality had a policy or custom of inadequate training. Rather, a plaintiff must demonstrate a clear and persistent pattern of illegal activity." *Houpt v. City of Cleveland*, No. 1:13 CV 1836, 2013 WL 6330905, at *2 (N.D.Ohio Dec. 5, 2013), citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifferences for purposes of failure to train." *Robertson v. Taylor*, No. 1:23 CV 891, 2024 WL 519891, at *4 (N.D.Ohio Feb. 8, 2024), citing, inter alia, *Connick*, 563 U.S. at 62. "[I]t is unlikely that two incidents occurring over a decade apart are sufficient to create a pattern for purposes of a *Monell* claim." *Robertson*, at *5, fn. 4, citing *Alphabet v. City of Cleveland*, No. 1:05CV1792, 2006 WL 3241785, at  *15 (N.D.Ohio  Nov. 7, 2006) (finding that "four complaints of unconstitutional conduct by different officers over the span of four years can hardly be deemed a 'numerosity of incidents,' or a 'widespread extent of practices' that would render the risk of similar harm so obvious that the City should have known of it.").

"A failure-to-train claim…requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Robertson*, at *4 (emphasis added), citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). "Policymakers continued adherence to an approach that they know or should know has failed to prevent tortious

conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Connick,* 563 U.S. at 62. "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violation of constitutional rights." *Id.* Additionally, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, 489 U.S. at 388-390.

Plaintiff cannot satisfy any of the three elements of an inadequate training theory of *Monell* liability in this case. Regarding the first prong, the City of Cleveland's training on use of deadly force, crisis intervention, de-escalation, and constitutional policing during the relevant time, as outlined in the facts above, was robust. Not only did the Cleveland Police Academy, from which Gannon graduated in 2020, cover all requirements mandated by the Ohio Peace Officer Training Commission, including but not limited to Use of Force and Firearms training, but it went above and beyond the mandated coursework with hundreds of additional hours of coursework covering Use of Force, Building Searches, Active Shooter, and Crisis Intervention, among numerous other topics (See *Exhibit A*). Additionally, Lt. Neidbalson testified throughout his deposition, over Plaintiff's repeated objection, that the legal standard for the use of deadly force was intrinsic to his training and key to determining the reasonableness of any particular use of force (See *Neidbalson Dep.* 160:23-25, 161:1-9, 163:20-25, 164:1-11, 165:2-19, 166:20-25, 167:1-4, 170:18-25, 171:1, 172:4-25, 173:1-16). Plaintiff has failed to adduce any evidence to dispute the sufficiency of the voluminous course materials and training curriculum of the Cleveland Police Academy. As such, Plaintiff cannot meet the first prong of the failure to train theory of *Monell* liability.

Turning to the second prong, Plaintiff has also failed to adduce any admissible evidence of prior instances of similar misconduct so as to show that the City was on notice that its training with respect to the use of force was deficient. See *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Plaintiff does not identify in her Discovery Responses, Disclosures, or Complaint any other prior cases finding a constitutional harm under similar circumstances.

Moreover, to the extent she may try to rely on generic reports from a Court-appointed group (the Monitoring Team) that do not specify what or how any alleged training program was deficient, those reports did not put the City of Cleveland on notice of any training deficiencies with respect to the alleged constitutional issues in this case. See, e.g. *Connick,* 563 U.S. at 61 (four prior instances of violations in a ten-year period did not put a municipality "on notice" that specific training was necessary to avoid future violations involving different types of evidence); *Berry v. Delaware Cnty*. Sheriff's Off., 796 F. App'x 857, 862 (6th Cir. 2019); *Est. of Hickman v. Moore*, 502 F. App'x 459, 469 (6th Cir. 2012); *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 (6th Cir. 2006).  Even if prior instances did exist, there is no evidence to support a claim that the City was deliberately indifferent (i.e. did nothing) in response to such allegedly deficient training.

Alternatively, Plaintiff cannot succeed under a single incident theory whereby "a plaintiff must allege a complete failure to train the officers, training that is so reckless or grossly negligent that future misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Campbell v. Hamilton Cnty*., 2023 WL 6295803, at *9 (S.D. Ohio Sept. 27, 2023) (citation and alterations omitted). Given the City's continuous, cumulative approach to training on constitutional issues, and indisputably OPOTC-certified course materials and curriculum, no reasonable jury could find that the City's training was "so reckless or grossly

negligent" that a constitutional violation like the ones alleged in this case was "substantially certain to result." *Id.* A single instance of what, at worst (assuming Plaintiff's unsupported version of the events), could be a poor split-second judgment on *how* to return fire[22] does not support a claim that the City's entire training program on the use of deadly force was inadequate. Such a singular instance is not "substantially certain to result" from training that counsels the exact opposite. *M.P. by Next Friend Williams v. Oak Park*, No. 19-13501, 2021 WL 3566281, at *9 (E.D.Mich. Aug. 12, 2021).

Lastly, the record doesn't support a finding that a training deficiency was closely related to or actually caused the injury alleged by Plaintiff. See *Zavatson*, *supra*. This critical disconnect is fatal to Plaintiff's claims as well. Gannon admitted he was trained on the constitutional application of deadly force (*Gannon Dep.* 38:17-25, 39:1-25, 40:1). Further, he was trained on all four cardinal rules of firearm safety before his accidental shooting of Plaintiff (*Id.*, 50:4-25, 51:1-25, 52:1-25, 53:1-25, 54:1-5). His training at Academy included 60 hours of firearms instruction, plus supplemental courses (See *Exhibits A-1*, *A-4. A-4a*). He was mere weeks removed from completing the OPOTC-certified curriculum and from passing the State of Ohio peace officer certification test. A claim that Gannon may not have followed the City's training, or a potential supposition by Plaintiff suggesting that other or additional training should have occurred is of no consequence to this analysis. *Lewis v. City of Irvine*, Ky., 899 F.2d 451, 455 (6th Cir. 1990)("[w]hether [an officer's] training was the best and most comprehensive available has no bearing on the plaintiffs' failure to train claim").

---

[22] Noting that an officer's use of deadly force in response to deadly force being used against him, or under the belief it was about to be used against him is patently constitutional, see *Hood v. City of Columbus, Ohio*, 827 F. App'x 464, 469 (6th Cir. 2020) (finding it objectively reasonable for the Officer, in a split-second decision, to fire at Plaintiff who had a gun and either shot at or was about to shoot at the Officer).

As such, Plaintiff cannot meet the requirements to sustain a *Monell* claim under a theory of inadequate training. Accordingly, the City is entitled to judgment in its favor on this theory of *Monell* liability.

### 4. The City of Cleveland Did Not Have a Custom of Tolerance of Unconstitutional Use of Deadly Force Prior to the July 20, 2020 Incident.

Plaintiff is required to demonstrate all the following to prove a "custom of tolerance" theory of *Monell* liability:

1. The existence of a clear and persistent pattern of prior unconstitutional uses of deadly force in a similar manner (or, as applicable, other specific constitutional) violations;
2. Notice on the part of the City of Cleveland;
3. Deliberate indifference to the prior unconstitutional uses of deadly force (or, as applicable, other specific constitutional) violations by the City of Cleveland; &
4. The City of Cleveland's custom of deliberate indifference to prior unconstitutional uses of deadly force was the "moving force" behind Plaintiff's alleged unconstitutional use of deadly force.

*Stewart v City of Memphis¸* 788 F.Appx. 341, 346-47 (6th Cir. 2019); *Arendale v. City of Memphis*, 519 F.3d 587, 599-600 (6th Cir. 2008).

To satisfy the first element, a plaintiff cannot simply identify a single incident or even a limited number of similar incidents to demonstrate the custom was so widespread and permanent to have the force of law. E.g., *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) (five incidents of improper conduct alone did not make the required showing of a "widespread, permanent, and well-settled custom); *Hunter v. District of Columbia*, 824 F.Supp. 125, 133 (D.D.C. 2011) ("The plaintiff must 'present concentrated, fully packed, precisely delineated scenarios.'"). Moreover, even if specific indicia had been included, this Court has held that four incidents simply is not enough for a *Monell* claim. *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010)

Here, Plaintiff cannot demonstrate a custom-of-tolerance theory for a *Monell* violation as there was no evidence adduced of similar instances that would support a clear and persistent pattern

of unconstitutional uses of deadly force. Under Plaintiff's unsupported theory of the relevant incident, as alleged in her Complaint, this would require similar instances of police officers running away while firing blindly over their heads.[23] No prior similar instances have been discovered. In fact, the collective evidence has demonstrated a drastically different set of facts - one that shows Gannon returning fire toward a known threat's location after being confronted with a gun pointed at him and after attempting to retreat. As such, Plaintiff cannot meet the first element of this theory of *Monell* liability.

The failure to prove a clear and persistent pattern of prior similar civil rights violations negates the need to address the second (notice), third (deliberate indifference), and fourth (moving force) components. Nonetheless, it cannot be said that a single instance of an officer allegedly not having a verified and visible target when he returned fire toward the room where a confirmedly armed man was standing and shooting (i.e. the bathroom) indicates a "widespread, permanent, and well-settled custom" of unconstitutional uses of deadly force. *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010). With insufficient prior similar incidents, the City of Cleveland could not have been on notice of or deliberately indifferent to an alleged custom of tolerance of prior similar unconstitutional acts. Nor can a non-existent custom be the "moving force" behind the harm that Plaintiff alleges in her Complaint. Accordingly, this last theory of *Monell* liability also fails on the merits.

### C. Count One Must be Dismissed as Plaintiff Cannot Pursue a Direct Fourth Amendment Violation Against a Local Municipality.

There is no direct action at law available against a municipality under the Fourth Amendment to the U.S. Constitution. *Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 941 (6th Cir. 2004) (Regarding the 14th Amendment, "It incorporates most of the guarantees of the Bill of

---

[23] See Complaint (ECF Doc.1 Page ID #1-2, 6).

Rights—which originally restricted only the Federal Government, see *Barron v. Baltimore*, 32 U.S. 243, 247, 7 Pet. 243, 8 L.Ed. 672 (1833)—and protects these rights from state infringement.) See also *Thomas v. Shipka*, 818 F.2d 496, 503 (6th Cir.), on reh'g in part, 829 F.2d 570 (6th Cir. 1987), cert. granted, judgment vacated, 488 U.S. 1036, 109 S. Ct. 859, 102 L. Ed. 2d 984 (1989), and vacated, 872 F.2d 772 (6th Cir. 1989) (holding that § 1983 provides the exclusive remedy for the constitutional claims against a City). See also *LaBorde v. City of Gahanna*, 946 F. Supp. 2d 725, 731 (S.D. Ohio 2013), aff'd, 561 F. App'x 476 (6th Cir. 2014).)  As such, Count One of the Complaint should be dismissed as Plaintiff has pled it as a direct action against the City of Cleveland under the Fourth Amendment.

## IV.    CONCLUSION

Plaintiff has failed to adduce sufficient facts to support either of her two claims for excessive force. The facts demonstrate that there was no constitutional violation or clearly established violation of Plaintiff's Fourth or Fourteenth Amendment rights. Further, Plaintiff cannot succeed on any of the four theories of *Monell* liability against the City. Nor can Plaintiff succeed on a direct Fourth Amendment violation against a local municipality. For all of the aforementioned reasons, the City of Cleveland is entitled to judgment as a matter of law in its favor as to both counts of Plaintiff's Complaint.

Respectfully Submitted,

MARK GRIFFIN (0064141)
Director of Law

By: s/*Michael J. Pike*
WILLIAM MENZALORA (0061136)
Chief Assistant Director of Law
MICHAEL J. PIKE (0074063)
Assistant Director of Law
CARLI YOUNG (0095433)
Assistant Director of Law
City of Cleveland, Department of Law
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114
Tel: (216) 664-2800
Email: WMenzalora@clevelandohio.gov
Email: MPike@clevelandohio.gov
Email: CYoung2@clevelandohio.gov
*Attorneys for Defendant City of Cleveland*

## CERTIFICATE OF COMPLIANCE

This case is currently assigned to the standard track. The page limit requirement for the Memorandum in Support has been modified by order of the Judicial Officer to twenty five (25) pages, and the Memorandum complies with said modification.

By: */s/ Michael J. Pike*
MICHAEL J. PIKE (0074063)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was filed electronically on the 6th day of September, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: */s/ Michael J. Pike*
MICHAEL J. PIKE (0074063)