**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| Jennifer Kilnapp | ) | CASE NO. 1:22-CV-01225 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | **Plaintiff Jennifer Kilnapp's opposition to Defendant Gannon's motion for summary judgment** |
| | ) | |
| City of Cleveland, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Jennifer Kilnapp hereby submits her opposition to Defendant Gannon's motion for summary judgment. For the reasons explained, the motion is without merit and should be denied.

## Table of contents


Table of authorities .......... iii

Statement of the issues .......... 1

Factual background .......... 1

A. Rookie officer Bailey Gannon decides to open a door where he believes there was a man with a gun without first bothering to take any basic tactical safety measures .......... 1

B. While running away down stairs from someone inside a bathroom he could not see and who was neither chasing nor threatening him, Gannon decides to shoot without looking or aiming. .......... 6

C. Internal affairs finds that Gannon left Kilnapp "in the crossfire" and failed to consider his surroundings or avoid unnecessary risk to her when he decided to open fire without looking where he was shooting .......... 11

Summary of the argument .......... 12

Law and analysis .......... 14

I. The Sixth Circuit has already held that the Fourth Amendment applies to this case, as Gannon admits he intentionally fired the bullet that hit Kilnapp. .......... 15

II. Gannon violated the Fourth Amendment not only by unreasonably deciding to use deadly force, but also by using it in an unreasonable manner .......... 16

A. The allegations the Sixth Circuit found at the pleadings stage create a question of fact are supported by the evidence now. .......... 17

B. Gannon's decision to use deadly force when and how he did were independently objectively unreasonable. .......... 19

III. The Sixth Circuit has already rejected Gannon's claim of qualified immunity and that holding controls. .......... 24

Conclusion .......... 25

# Table of authorities

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 15
*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .......... 24
*Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011) .......... 22
*Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007) .......... 21
*Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989) .......... 22
*Campbell v. Cheatham Cty. Sheriff's Dept.*, 47 F.4th 468 (6th Cir. 2022). .......... 21
*Daunt v. Benson*, 999 F.3d 299 (6th Cir. 2021) .......... 15
*David v. City of Bellevue*, 706 Fed. Appx. 847 (6th Cir. 2017) .......... 22
*Estate of Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008) .......... 21
*Foster v. Patrick*, 806 F.3d 883 (6th Cir. 2015) .......... 17
*Graham v. Connor*, 490 U.S. 386 (1989) .......... 16, 22
*Hankins v. City of Inkster, Michigan*, 832 Fed. Appx. 373 (6th Cir. 2020) .......... 15
*Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019) .......... passim
*Keahey v. Marquis*, 978 F.3d 474 (6th Cir. 2020) .......... 15
*Kilnapp v. City of Cleveland*, 6th Cir. No. 22-4059, 2023 U.S. App. LEXIS 18620 (July 21, 2023) .......... 15, 16, 17, 24
*King v. Taylor*, 694 F.3d 650 (6th Cir. 2012) .......... 22
*Knowlton v. Richland Cty.*, 726 Fed. Appx. 324 (6th Cir. 2018) .......... 22
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......... 14
*Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017) .......... 15
*Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015) .......... 17
*Musacchio v. United States*, 577 U.S. 237 (2016) .......... 15
*Pepper v. United States*, 562 U.S. 476 (2011) .......... 15
*Redrick v. City of Akron*, 2021 U.S. App. LEXIS 33892 (6th Cir. Nov. 15, 2021) .... 17, 20, 22
*Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005) .......... 16
*Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005) .......... 21
*Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998) .......... 22
*Yates v. Cleveland*, 941 F.2d 444 (6th Cir. 1991) .......... 21
*Yazdian* v. *ConMed Endoscopic Techs., Inc.*, 793 F.3d 634 (6th Cir. 2015) .......... 14
*Zulock v. Shures*, 441 Fed. Appx. 294 (6th Cir. 2014) .......... 21

**Statement of the issues**

1. Gannon lacked probable cause to use deadly force when and in the manner he did, in violation of the Fourth Amendment.
2. Gannon violated Kilnapp's clearly established rights and the Sixth Circuit has already rejected his qualified immunity claim.

**Factual background**

Bailey Gannon applied to the Cleveland police academy in May 2017 but failed the multiple-choice admission test. (Dep. Gannon at 9) (Doc. #59-1). After reapplying, he joined Cleveland's 145th academy class in August 2019 and became a Cleveland police officer in May 2020. (*Id*. at 18, 20–21). His father Thomas Gannon was then a sergeant with the Cleveland Division of Police ("CDP" or the "Division") (*Id*. at 206).

Jennifer Kilnapp became a police officer in 2016, beginning with the University Hospitals police department. (Dep. Kilnapp at 15) (Doc. #60-1). In August 2017, she joined CDP. (*Id*. at 17). In the Summer of 2020, the Division assigned her to partner with Gannon, who was in his probationary phase. (*Id*. at 24–25); (*see* Dep. Gannon at 22–23).

*A. Rookie officer Bailey Gannon decides to open a door where he believes there was a man with a gun without first bothering to take any basic tactical safety measures*.

In the early hours of July 20, 2020, Kilnapp and Gannon responded to a call on the east side of Cleveland about an emotionally disturbed man with a gun in a boarding house. (Gannon Answer at ¶ 8) (Doc. #14, PageID #72). Dispatch told them the caller was "a possible mental female saying that a male had shot a hole in the floorboard." (Dep. Gannon at 61). After learning from the caller that the man was upstairs, the officers entered the two-story house, and Gannon began first up the stairs. (*Id*. at 61–62); (Dep. Kilnapp at 38). The staircase had two flights: a set going up in one direction,

followed by a landing, and then a second set going up in the opposite direction. (Dep. Kilnapp at 37–38); (Dep. David Borden at 82) (Doc. #63-1). Laser scans later taken by the Ohio Bureau of Criminal Investigations ("BCI") show the staircase layout:



(Dep. Bennett at 79, Exh. 15, figure 2 at Cleveland #000800) (attached as Exhibit A).

When the officers got upstairs, the caller told them that the man, Darryl Borden, was in the bathroom. (Dep. Kilnapp at 40); (Dep. Gannon at 63). The City's witnesses list a variety of tactics Gannon should have chosen from at that point. First, he should have announced their presence as police and asked Borden to come out. (Dep. Ryan at 18) (Doc. #65-1). Safety Director Dornat Drummond repeatedly stressed that the proper course of action was to continually announce themselves and call for Borden to come out. (Dep. Drummond at 237–38, 244) (*E.g.*, "And I would just continue to identify myself as the police, Cleveland police, and why we are here. Tell him to come out."; "If I knew the person was in [the bathroom], I would announce myself again and ask them to come out, show their hands and come out.") (attached as Exhibit B). According to Drummond and other City witnesses, if that did not work, Gannon should have called

for backup or a supervisor, who could have called SWAT or the Crisis Intervention Team. (Dep. Sheehan at 59) (Doc. #66-1); (Dep. Ryan at 18, 181); (Dep. Drummond at 239). At a minimum though, Gannon should have found a position of cover from which to handle the situation instead of standing right next to the door. (Dep. Ryan at 181).

Gannon did none of these things. He admits he did not announce their presence as police officers. (Gannon Answer at ¶ 9) (Doc. #14, PageID #72); (Dep. Gannon at 73–74). Nor did he ask Borden to come out of the bathroom or otherwise try to make verbal contact with him. (Dep. Gannon at 106–07). As he put it, "I didn't know exactly how to handle the situation." (*Id*. at 62). So he instead immediately moved to the bathroom door, which the caller told him was "behind you." (Dep. Gannon at 63); (*see* Gannon WCS at approx. 1:37–43 mark) (Doc. #61-2).

Then, despite no need for immediate engagement, Gannon decided to just open the bathroom door. (*Id*. at 63). When he did, Borden was inside and—so Gannon claims—holding a gun. Gannon later told both internal affairs and the homicide unit that Borden was holding it "in both hands," pointing it at him from "about eight feet away," going so far as to "[d]emonstrate[] with both hands outstretched in front of him." (Homicide file, report of David Borden at pg. 2) (Doc. #62-17, PageID #1957); (Dep. Gannon at 64, Exh. 8, Gannon video interview, July 30, 2024, at approx. 4:28 mark) (manually filed as Exhibit C); (Bennett interview notes at pg. 1) (Doc. #62-27, PageID #1985). Shown below is Gannon's demonstration to IA:




(Gannon video interview, July 27, 2024, at approx. 5:12 mark) (manually filed as Exhibit D). He mirrored that pose during his interview with the homicide unit as well:



(Exh. C at approx. 4:31 mark). The evidence shows Gannon's claim is doubtful, at best.

For one thing, his body camera does not show Borden pointing a gun at all, let alone how Gannon claims. Internal affairs Lieutenant Mitchell Sheehan admits "no you don't see that in the body cam." (Dep. Sheehan at 61, 64–65). To the contrary, the screen captures the City submitted with its motion prove his claim cannot be true. They show Borden's left hand on the door itself when Gannon opens it, meaning he could not

possibly have been holding the gun "in both hands" with both arms high and outstretched, let alone doing it from "about eight feet:"




(Gannon WCS still photos) (Doc. #62-36, PageID# 2026) (relevant portion cropped).

For another, it is not clear that Borden was in fact holding a gun when Borden opened the door. Having viewed the body camera footage frame-by-frame "countless times, forward and backward, again and again," even internal affairs Sergeant Jacquelyn Bennett conceded that "reasonable minds can disagree" about whether the body camera shows Borden raising a gun. (Dep. Bennett at 126–28). What's more, Gannon told a homicide detective that Borden was "aiming a **dark colored handgun** at him." (Report of Det. Michael Legg) (emphasis added) (relevant excerpt attached as Exhibit E). The gun found in the bathroom, however, isn't dark at all—it's a shiny, reflective silver; even the handle is light-colored. (Crime scene photos at pgs. 3–4) (Doc. #62-32, PageID #s 2004–05). None of this is to mention that—as explained in footnote 1 below—Gannon made untrue statements to investigators about the incident, including where he was standing when he fired.

*B. While running away down stairs from someone inside a bathroom he could not see and who was neither chasing nor threatening him, Gannon decides to shoot without looking or aiming.*

What *is* clear is what Gannon did next. Rather than order Borden to drop his weapon or get on the floor, he panicked. (*See* Gannon WCS) (Doc. #67–2). Gannon "immediately jumped back, shouted and ran down the stairs." (Bennett WCS review at pg. 1) (Doc. # 62-24, PageID #1975). From her position "behind [Gannon] at an angle," that is what Kilnapp saw too, explaining to IA that he "jumped back and started yelling" and "went down the stairs real quick." (Bennett-Kilnapp interview notes at pg. 1) (Doc. # 62-25, PageID #1978). Borden did not make any threatening statements or try to follow Gannon out of the bathroom. (*See* Dep. Gannon at 208, 116). It is undisputed that he stayed in the bathroom the entire time. (Dep. Drummond at 253); (*see* Dep. Kilnapp at 43, 59) (explaining she never saw Borden come out of the bathroom).

Gannon was already out of the line of sight and fire between himself and Borden as soon as he reached the stairs. (Dep. Gannon at 141, 145). The overhead from BCI's laser scans shows the bathroom on the left with the staircase around the corner on the other side of a solid wall:



(Exh. A., figure 1 at Cleveland #000799).

Nevertheless, Gannon decided to start shooting while at the same time running down the stairs. (Dep. Drummond 176–77); (Dep. Sheehan at 66); (Dep. Borden at 67, 73–74).[1] He fired twice as he ran and CDP recovered both of his ejected casings on the stairwell. (Dep. Borden at 67, 113–14). Detectives found one on the landing between the two flights of stairs and the other a few steps below the landing, on the lower flight. (*Id*. at 73–74). The City admits that Borden was still **"inside the bathroom"** when Gannon fired. (Dep. Drummond at 179) (emphasis added). Not only that, by the time Gannon opened fire, the bathroom door was already closed again and Borden "was behind the

[1] Though Gannon now claims he does not know where he was when he opened fire, (*e.g.*, Dep. Gannon at 68, 70), that isn't what he told investigators. He claimed that he "reached around the corner with his left hand and discharged his service weapon one time into the bathroom at Borden." (Dep. Borden at 109–10); (Bennett-Gannon interview notes at pg. 2) (Doc. #62-27, PageID #1986); (Dep. Gannon at 69–70). The body camera, physical evidence, and forensics all prove his claim untrue. Homicide detective David Borden admits Gannon "did not fire his gun up there…." (Dep. Borden at 109–10).

door." (*See* Dep. Ryan at 38). Thus, as both Gannon and the City admit, by force of logic, **Gannon couldn't possibly see Borden when he decided to shoot**. (Dep. Drummond at 192); (Dep. Gannon at 82, 122, 141, 144–45, Exh. 11, Gannon response to first set of requests for admissions no. 9, at pg. 5) (attached as Exhibit F). As Gannon put it mildly, "you're probably not seeing through the wall into the bathroom." (Dep. Gannon at 141). Meanwhile, Kilnapp never fired her weapon. (Dep. Borden at 70–71, 74); (*see* Homicide synopsis report) (Doc. #62-14, PageID #1924).

Unable to see Borden, Gannon does not know *what* he saw when he decided to shoot. (*Id*. at 134). By extension, he cannot say if he was even aiming at anything:

> Q. I'm not asking what you saw right now. I'm asking what you were aiming at when you pulled the trigger.
>
> A. So, sir –
>
> Mr. Russell: Objection.
>
> A. -- I believe those are almost one in the same. **Because in order to aim at something, one would have to see it.**
>
> Q. In order to aim at a target, right, you have to see it, correct?
>
> A. **In order to aim at anything you would have to see it.** And if I can't recall exactly what I saw at that moment, I don't know how you'd like me to answer this."

(Dep. Gannon at 134–35) (emphasis added).

Gannon similarly cannot say how he was holding the gun when he opened fire. BCI traced a bullet trajectory from one of his spent casings to a bullet hole near the top of the stairs, entering on a slightly downward angle. (Dep. Borden at 76–77); (*see* Exh. A, figure 1 at Cleveland #000799); (crime scene photos at pgs. 4–5, 8) (Doc. #62-33, Page ID #s 2009–10, 2013). Gannon is about 5'9". (Dep. Borden at 164). Because of his height,

combined with elevation drop from the bullet hole to the stair he fired from, the downward angle of entry suggests Gannon was likely holding the gun above eye level when he fired. His body camera footage is not inconsistent with that, and Gannon claims he does not remember how he was holding the gun relative to eye level when he fired, (Dep. Gannon at 135–36).

However he held the gun, Gannon's decision to shoot it put Kilnapp in the line of his fire. He knew she was trailing behind him down the stairs. (Dep. Sheehan at 109); (Dep. Gannon 128–29, 187). He chose to fire anyway. Although he claims to have intentionally pulled the trigger only once, he admits it was his intentionally fired bullet that hit Kilnapp. (Dep. Gannon at 64, 71–72).[2]

Kilnapp was on the upper flight of stairs or the first or second step down when she felt the pain. (Dep. Kilnapp at 42–43). Fired from below, the bullet went into and through Kilnapp's right forearm, exiting upward and hitting her bicep before entering her right armpit and lodging in her back. (*Id*. at 55–56); (Dep. Borden at 144–45). Gannon's body camera shows him running away while Kilnapp yells after him, "I'm shot. I'm shot." (Gannon WCS at approx. 1:58–2:04 mark) (Doc. #61-2); (Dep. Gannon at 148). EMS ultimately rushed Kilnapp to the hospital. (Dep. Kilnapp at 53–54).

---

[2] There is a question of fact whether Gannon intentionally fired both bullets. His gun had an augmented "New York 1" trigger, which requires additional force to pull the trigger. (Dep. Drummond at 85). So much so that Drummond admits it "would be difficult" to fire the weapon accidentally. (*Id*.).

Once there, Gannon told another officer that he didn't know "which bullet she was hit by, whether it was us shooting at him or him shooting at us. Because at one point I turned and ducked out." (Dep. Gannon at 159, Exh. 5, Gannon complete WCS video at approx. 21:37–45 mark) (manually filed as Exhibit G). A minute later he told another officer the same, saying "**I don't know if I shot her when I turned and ran**." (*Id*. at 161, Exh. 5. at approx. 22:33–43 mark) (emphasis added).

In fact, both the physical evidence and BCI's bullet tracing show it could only have been Gannon. There is no dispute Borden fired only twice while the officers were in the house, and Director Drummond admits the "evidence shows conclusively that those two bullets were fired through the bathroom—the closed bathroom door." (Dep. Drummond at 185). They traveled a few feet into the wall directly across from the bathroom on a downward angle—nearly 180 degrees in the opposite direction from Gannon and Kilnapp. (Dep. Borden at 78); (*see* crime scene photos at pgs. 2–4) (Doc. #62-34, PageID #2015–17). BCI's scans show those two bullets (depicted in red and green in Exhibit A) were not fired in Kilnapp's vicinity. (Dep. Sheehan at 128).

Although CDP had evidence from the start to suggest it was Gannon who shot Kilnapp, CDP did not tell her that until March 2021. (Dep. Kilnapp at 99). When Detective Borden finally did tell Kilnapp, she "started to weep, and she was visibly shaken." (*Id*. at 55). He can't say for how long though: she was still weeping when he left the room. (*Id*. at 56).

Kilnapp is still struggling to recover. Gannon's bullet caused nerve damage to her dominant arm. (Dep. Kilnapp at 45, 92, 103, 156). The bullet left other lingering

effects as well. She still suffers pain and weakness from the various wounds, which have required "many sessions of physical therapy," nerve blocks, and massotherapy. (*Id*. at 92, 156, 179). Her doctor also diagnosed her with PTSD, which she still suffers from and treats for. (*Id*. at 92, 143–44, 154). She still has nightmares and paranoia. (*Id*. at 92, 101). According to her doctor, because of the PTSD, Kilnapp will not be able to return to CDP. (*Id*. at 144).

### *C. Internal affairs finds that Gannon left Kilnapp "in the crossfire" and failed to consider his surroundings or avoid unnecessary risk to her when he decided to open fire without looking where he was shooting.*

Though internal affairs' investigatory failures are addressed in opposition to the City's motion, a few of its findings are relevant here. IA found that Gannon's decision to fire while "on the stairwell retreating" left Kilnapp "in the crossfire." (Report of Lt. Mitchell Sheehan at pg. 2) (Doc. #62-30, PageID #1999). It also found that Gannon fired his weapon without a verified and visible target—meaning without looking what he was shooting at. (*E.g.,* Dep. Sheehan at 112). Reviewing the incident after IA, the Force Review Board disapproved of Gannon's decision making and tactics. (Force Review Board checklist at pgs. 2–3) (Doc. #62-42, PageID #s 2054–55). It found that Gannon failed to consider his surroundings before firing, one of the four primary firearms safety rules. (*Id*. at pg. 5, PageID #2057); (Dep. Drummond at 281–82). It likewise found that **Gannon failed to "[a]void unnecessary risks"** to Kilnapp. (Doc. #62-42. at pg. 5, PageID #2057) (emphasis added). Despite those findings, the Force Review Board voted to approve Gannon's use of force, over one dissent. (*See id*. at pg. 9, PageID #2060).

Board member Kenneth Ryan "voted disapproval" for the "force applied" by Gannon. (*Id*. at pg. 9, PageID #2061).

After learning about the shooting from this lawsuit, in the Summer or early Fall of 2022, new CDP Superintendent of Internal Affairs Christopher Viland opened his own investigation of the original investigation. (Dep. Viland at 206–07) (attached as Exhibit H). On September 19, 2022, he submitted a written report to then-Chief Drummond. (*Id*. at Exh. 1) (attached as Exhibit I). When Viland did that, he knew the monitoring team was going to conduct its own review and that his report might end up as evidence in the consent decree case. (*Id*. at 127–28). In his report, Viland called "Spurious" the Division's original finding that Gannon did not violate the use-of-force policy with his intentionally fired shot. (*Id*. at Exh. 1, pg. 4). Noting, among other things, that officers are "prohibited from discharging a firearm, '…at a threat that is not verified and visible,'" Viland wrote that Gannon's "intentional discharge" did violate the use-of-force policy. (*Id*. at Exh. 1, pg. 4) (*quoting* CDP General Police Order 2.01.01, § VIII(A)(15)). That policy, as both Viland and Drummond explains, requires that all uses of force be "objectively reasonable." (Dep. Viland at 92–93); (Dep. Drummond at 74). The City has since admitted in the consent decree case that CDP's original approval of Gannon's use of force was an "unsupported finding…." (Response to Monitoring Team, N.D. Ohio Case No. 1:15-cv-01046 at pg. 3) (Doc. # 475-5, PageID # 10580).

**Summary of the argument**

In July 2020, rookie police officer Bailey Gannon shot his partner, Jennifer Kilnapp. Screaming as he fled down a flight of stairs from a man inside a closed

bathroom who was neither chasing nor threatening him, Gannon raised his gun above eye level and began firing without looking (or aiming) where he was shooting. He did so despite knowing his partner was in the line of fire. His decisions to shoot *when* he did and *how* he did were objectively unreasonable. Either or both decisions violated the Fourth Amendment.

As an initial matter, the Sixth Circuit has already reviewed this case and found there are questions of fact. Though that was at the pleadings stage, the evidence establishes the allegations that the Court of Appeals held dispositive. Gannon fired without looking where he was shooting. He did so while running down the stairs away from a man who remained "inside the bathroom" behind a closed door. His partner—whom the Court of Appeals called a "proxy for a reasonable officer—never fired. There is no reason to deviate from the Court of Appeals' analysis and conclusion.

The appellate decision aside, Gannon lacked the requisite probable cause to start shooting *when* he did. With nobody threatening, chasing, or pointing a gun at him, Gannon had no objectively reasonable basis to open fire when he did. In fact, because the man was behind a closed bathroom door when Gannon fired, neither officer was even in the man's line of sight. As Gannon put it, "you're probably not seeing through the wall into the bathroom." One of the City's own training Lieutenants admitted it would be an unreasonable use of force for Gannon to fire from the stairs if nobody was shooting through the bathroom wall in his direction. That is what happened though. Thus, Gannon's decision to use deadly force when he did was objectively unreasonable.

So was the *manner* in which he chose to use it. Any reasonable officer would know it is not acceptable to shoot without looking and without concern for who might be in the line of fire. Yet Gannon decided to fire while running down a flight of stairs without looking where he was shooting, apparently holding the gun above eye level as he did. The City's own investigators found that Gannon failed to avoid "unnecessary risk" to Kilnapp or to consider his surroundings before shooting, in violation of basic firearms safety rules. Viewing these facts in the light most favorable to Kilnapp, there is at least a question of fact for trial whether Gannon violated the Fourth Amendment.

Not only that, Gannon violated clearly established law. The Sixth Circuit already said so, noting: "In this case, there is no doubt that the law is clearly established." This Court should therefore deny Gannon's motion for summary judgment.

## **Law and analysis**

Summary judgment is proper only if the moving party proves there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court must "believe" the nonmovant's evidence. *Yazdian* v. *ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644 (6th Cir. 2015). It must view the facts and draw all reasonable factual inferences in the nonmovant's favor. *E.g. Shelby Cty. Bd. of Educ.*, 711 F.3d at 696 (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Conversely, a court must "abstain from making credibility determinations, weighing evidence, and 'drawing of legitimate inferences' in favor of the moving party because those are 'jury functions, not those of a judge.'" *Shelby Cty. Bd. of Educ.*, 711 F.3d at 696

(*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Ultimately, the question is whether the facts are "so one-sided that one party must prevail as a matter of law." *Shelby Cty. Bd. of Educ.*, 711 F.3d at 696 (*quoting Anderson*, 477 U.S. 242 at 251–52). When viewing the facts through this lens (and even if not) Gannon's motion should be denied.

## I. The Sixth Circuit has already held that the Fourth Amendment applies to this case, as Gannon admits he intentionally fired the bullet that hit Kilnapp.

On Gannon's interlocutory appeal, the Sixth Circuit held that the Fourth Amendment and its reasonableness test applies to this case. *Kilnapp v. City of Cleveland*, 6th Cir. No. 22-4059, 2023 U.S. App. LEXIS 18620, at *14 (July 21, 2023). The law-of-the-case doctrine precludes Gannon from rearguing that legal issue.

"The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (*quoting Pepper v. United States*, 562 U.S. 476, 506 (2011)) (further internal quotation omitted); *accord e.g., Miller v. Maddox*, 866 F.3d 386, 389–90 (6th Cir. 2017) (internal citations omitted). The doctrine "is primarily 'intended to enforce a district court's adherence to an appellate court's judgment….'" *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) (*quoting Miller*, 866 F.3d at 390); *Hankins v. City of Inkster, Michigan*, 832 Fed. Appx. 373, 376–77 (6th Cir. 2020). In other words, it generally "precludes reconsideration of issues that were expressly or impliedly decided at an earlier stage of the same case by the same or a superior court." *Keahey v. Marquis*, 978 F.3d 474, 481 (6th Cir. 2020).

On appeal, the Sixth Circuit rejected the same argument Gannon makes once more—that there could be no Fourth Amendment seizure because he did not intend to hit Kilnapp. *Kilnapp*, 2023 U.S. App. LEXIS 18620 at *11–14. Analyzing the relevant case law, the Court of Appeals held that if Gannon fired his gun intentionally, hitting Kilnapp in the process, a Fourth Amendment seizure occurred. *Id*. at *12–14. The Court explained that where an officer's physical act is done intentionally, even "an unintentional victim is protected under the Fourth Amendment." *Id.* That is what happened here. It is what Gannon himself admits: the bullet he fired intentionally is the one that hit Kilnapp. (Dep. Gannon at 64, 71–72). By itself, this ends the inquiry about whether the Fourth Amendment applies.[3] "To hold otherwise would ignore binding Supreme Court precedent." *Kilnapp*, 2023 U.S. App. LEXIS 18620, at *14.

## II. Gannon violated the Fourth Amendment not only by unreasonably deciding to use deadly force, but also by using it in an unreasonable manner.

The Fourth Amendment prohibits police from using excessive force while making an arrest or seizure. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). It is axiomatic that the use of deadly force is permissible "only in rare circumstances." *E.g., Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019); *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (citations omitted). An officer may use deadly force "only" when there is "probable cause to believe that a suspect poses a threat of serious physical harm, either

[3] Alternatively, Gannon violated the Fourteenth Amendment's ban on excessive force. For purposes of the record, Kilnapp incorporates by references the legal arguments on this issue from her opposition Gannon's motion for judgment on the pleadings.

to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). To determine whether that high bar is met, courts look to the totality of circumstances and consider "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Redrick v. City of Akron*, 2021 U.S. App. LEXIS 33892, at *8 (6th Cir. Nov. 15, 2021) (*quoting Graham*, 490 U.S. at 396). "In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force.'" *Jacobs*, 915 F.3d at 1040 (*quoting Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015)) (emphasis in original). As the Sixth Circuit held on Gannon's interlocutory appeal, "where the suspect poses no immediate threat to the safety of an officer or others, the use of deadly force is unreasonable and violates the Fourth Amendment." *Kilnapp*, 2023 U.S. App. LEXIS 18620, at *11 (*citing Foster v. Patrick*, 806 F.3d 883, 887 (6th Cir. 2015)).

*A. The allegations the Sixth Circuit found at the pleadings stage create a question of fact are supported by the evidence now.*

The Sixth Circuit's analysis at the pleadings stage remains the proper analysis to apply. Viewing the facts in the light most favorable to Kilnapp, the Court held that "Gannon acted unreasonably by blindly deploying a firearm over his head when no suspect was in pursuit of him." *Kilnapp*, 2023 U.S. App. LEXIS 18620, at *14–15. Noting that "Borden remained in the bathroom, while Gannon ran downstairs and deployed the first shots from his firearm," the Court of Appeals concluded that "any reasonable officer would know it to be unacceptable to fire a gun blindly when no imminent threat is present." *Id.* at *15. The Court explained further that "Kilnapp can be construed to

serve as a proxy for a reasonable officer; she stood beside Gannon during the same incident, without firing her weapon or fleeing." *Id*. at *15. Based on those facts, the Court held there was a question of fact whether Gannon's actions were objectively reasonable. The evidence supports all these facts now.

Even though she was in position to see whether Borden was attempting to come out of the bathroom after Gannon fled, Kilnapp—the "proxy for a reasonable officer"—never fired her weapon. (*See, e.g.,* Dep. Borden at 70–71, 74). Indeed, Borden remained in the bathroom the entire time. (Dep. Drummond at 253). He was *still* "inside the bathroom" with the door closed when Gannon decided to start shooting while running down the staircase. (Dep. Drummond at 179); (Dep. Ryan at 38). It is thus undisputed that Gannon could not possibly see Borden (or vice versa) when he made that decision. (*E.g.,* Dep. Gannon at 82, 122, 141, 144–45, Exh. F). More than that, Gannon does not even claim he was aiming at anything when he pulled the trigger. As he put it, "[i]n order to aim at anything you would have to see it." (*Id*. at 134–35). These are the same facts the Court of Appeals held dispositive at the pleadings stage, so there remains a question of fact for trial now.

Who fired first does not impact resolution of this motion because there is a question whether of fact whether Gannon had probable cause to use deadly force at all, let alone in the manner he did. That said, the Monitoring Team concluded Gannon shot first, explaining to the court overseeing the consent decree that the audio and video footage "indicates Gannon shot first while retreating." (Monitoring Team Assessment, N.D. Ohio Case No. 1:15-cv-01046 at pg. 5) (Doc. #475-1, PageID #10568). Gannon's

interview with the homicide unit suggests the same. During that interview, Gannon said "I shot once at him, and **then** he started firing real quick." (Exh. C at approx. 25:47–50 mark) (emphasis added); (Dep. Gannon at 188). For his part, Director Drummond admits there is no forensic evidence showing who fired first. (Dep. Drummond at 173). And the IA investigator testified "you can't tell who has fired first" based on the body camera. (Dep. Bennett at 127). At this stage though, the standard of review requires accepting that Gannon fired first.

Accordingly, the analysis used by the Sixth Circuit remains the proper one to follow, as does the Court's conclusion holding there are questions of fact for trial.

*B. Gannon's decision to use deadly force when and how he did were independently objectively unreasonable.*

The Sixth Circuit's legal analysis aside, the facts show Gannon's lacked probable cause to use deadly force *when* or *how* he did. Standing alone, either creates a question of fact for trial about the objective reasonableness of his actions.

With respect to the former, there is at least a question of fact whether Gannon had probable cause to use deadly force in the first place. The evidence does not show as a matter of law that Gannon had probable cause to believe they were facing an imminent threat of serious harm at the moment he fired from the stairs. Force Review Board Member and CDP training section Lieutenant Kenneth Ryan all-but admitted as much. Looking at BCI's scans of the house, Ryan testified it would be an unreasonable use of force if Gannon fired from the steps and Borden was not firing through the

bathroom wall in that direction. (*See* Dep. Ryan at 154, 176). For context, the relevant exchange follows:

> Q. I appreciate that, and I appreciate what you're saying. I'm saying if Borden is in the bathroom, he does not exit the bathroom, and Gannon fires his weapon here (indicating) on these stairs next to this railing that you pointed out, that would not be a reasonable use of force, correct?
>
> (Displaying photo.)
>
> MR. RUSSELL: Objection.
>
> MS. YOUNG: Objection.
>
> A. Only if Borden was not firing through that wall.
>
> Q. Okay. And we don't have any arrows coming out of that wall, correct?
>
> A. Correct.
>
> Q. Only out of the door?
>
> A. Correct.

(*Id*. at 176) (referencing Exh. A, figure 1 at Cleveland #000799). That is exactly what happened. Borden never fired through the wall and there is no evidence he tried to. Gannon, on the other hand, fired from the steps with Borden still in the bathroom behind the door. Ryan's admission alone creates a question of fact for trial.

It is not alone though. There is no evidence Borden ever made any threatening statements in the officer's presence. He did not chase the officers out of the bathroom. It isn't even clear he was holding a gun when Gannon opened the bathroom door. The body camera does not show that, and although he told a homicide detective the gun was "dark colored," a quick glance at the gun shows it to be a shiny, reflective silver.

Assuming for that sake of argument that Borden was holding a gun, that fact doesn't alter the analysis. The Sixth Circuit has held time and again that "mere possession of a weapon without more is insufficient to justify deadly force." *Redrick*,

2021 U.S. App. LEXIS 33892, at *11; *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007); *Jacobs*, 915 F.3d at 1040; *Campbell v. Cheatham Cty. Sheriff's Dept.*, 47 F.4th 468, 480 (6th Cir. 2022). Along the same lines, the fact that events unfold relatively quickly does not give an officer probable cause to use deadly force. *Estate of Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) ("the fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force'") (*quoting Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005); *accord Zulock v. Shures*, 441 Fed. Appx. 294, 302 (6th Cir. 2014).[4]

Although Gannon claims Borden was holding the gun "in both hands," pointing it at him from "about eight feet away" when he opened the bathroom door, there is no legal justification to accept that uncorroborated claim. For one thing, the still photos from his body camera refute it. For another, Gannon admits he was "frantic" during the incident and that his memory of "details might be a little off." (Dep. Gannon at 64, 67). To that end, he could not remember many of the most salient facts—where he was standing when he fired, what he saw when he fired, and whether he was aiming at anything when he fired. (*E.g., id.* at 64, 68, 70). To simply accept Gannon's claim that Borden was waiting in ambush would be to make a credibility determination that is the province of the jury. More to the point though, Gannon did not fire when he opened the

[4] The fact that it was night does not avail Gannon either. It is unreasonable for an officer to "enter a dark hallway" at night "without identifying himself as a police officer" before using deadly force. *See Yates v. Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991). Besides, police routinely work at night. There is nothing inherent about the time of day that justifies using deadly force.

bathroom door. By the time he did, he was out of Borden's line of sight and fire. As for Kilnapp, the only line of fire she was in was Gannon's.

As a rule, the Sixth Circuit refuses to grant dispositive motions in excessive force cases where there are questions of fact whether someone objectively posed a serious threat of immediate harm. *See, e.g., Jacobs*, 915 F.3d at 1040 (collecting cases); *Knowlton v. Richland Cty.*, 726 Fed. Appx. 324, 330 (6th Cir. 2018); *Bletz v. Gribble*, 641 F.3d 743, 753 (6th Cir. 2011); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). That remains true where there is a dispute whether the individual pointed a gun at the police. *Redrick*, 2021 U.S. App. LEXIS, at *11*; David v. City of Bellevue*, 706 Fed. Appx. 847, 852 (6th Cir. 2017); *King v. Taylor*, 694 F.3d 650, 662 (6th Cir. 2012); *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989). Construing the facts in the light most favorable to Kilnapp, there is a question of fact whether Gannon acted unreasonably by firing *when* he did.

There is a separate question of fact whether the *manner* in which Gannon used deadly force was objectively reasonable. *Cf. Graham*, 490 U.S. at 396 ("the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out") (emphasis in original) (*quoting Garner*, 471 U.S. at 7–8). Being aware of one's surroundings and backstop before firing a gun is "one of the four cardinal or primary firearm safety rules." (*E.g.* Dep. Drummond at 89, 281–82); (Dep. Gannon at 51–52); (*see* Dep. Viland at 40). As Drummond explained, "Officers are required to make sure that they look at their surroundings before discharging their firearm." (*Id*. at 88–89). More specifically, they must "make sure that their line of fire is clear of any innocent bystanders or officers before discharging their weapons." (*Id*. at

89–90); (Dep. Viland at 135). By extension, Defendants admit that officers may not fire their weapons at a target that is not "verified and visible"—in other words, one they can see. (Dep. Viland at 135); (Dep. Ryan at 68). The reasons why are obvious enough, but Lieutenant Ryan listed one of them: officers need to see where they are shooting so "you're not just firing a projectile through the air where it could hit something that it was not intended to hit." (Dep. Ryan at 136). Drummond offered another: **"in order to discharge a weapon at an imminent threat, one will have to see where the threat is before discharging one's weapon."** (Dep. Drummond at 89–90) (emphasis added).

By all accounts, Gannon violated these rudimentary firearms safety rules. He was not looking at any target when he decided to shoot. He does not claim he was even aiming at anything. That made it impossible for him to fire at an "imminent threat"—the "minimum requirement for the use of deadly force." *Jacobs*, 915 F.3d at 1040. Gannon similarly does not deny that he was holding the gun above eye level when he fired, and the physical and forensic evidence suggests he was. And there is no question he was running down stairs as he fired. Gannon did all this despite knowing Kilnapp was just feet behind him.

For all its faults, the Division's own Force Review Board concluded that Gannon failed to consider his surroundings before firing and failed to avoid "unnecessary risks" to Kilnapp. (*See* Doc. #62-42. at pg. 5, PageID #2057). One Board Member "voted disapproval" for the "force applied" by Gannon as a result. (*Id*. at pg. 9, PageID #2061). Superintendent Viland also concluded that Gannon failed to avoid unnecessary risk to Kilnapp, failed to consider his surroundings, and shot without a verified and visible

target. (Dep. Viland at 111, 142, 152, 167). At deposition, Viland grudgingly admitted that when an officer shoots without looking, finding that conduct objectively reasonable is "most probably not a common resolution." (Dep. Viland at 152). He admitted too that if Gannon fired without looking it would violate CDP's use of force policy—a policy "[t]hat also requires use of force to be objectively reasonable…." (*Id*. at 156).

When viewed in the light most favorable to Kilnapp—and even if not—the manner in which Gannon fired his gun was not objectively reasonable. In the words of the Sixth Circuit rejecting his qualified immunity claim, "Gannon acted unreasonably by blindly deploying a firearm over his head when no suspect was in pursuit of him." *Kilnapp*, 2023 U.S. App. LEXIS 18620, at *14–15. This Court should therefore deny Gannon's motion for summary judgment.

## III. The Sixth Circuit has already rejected Gannon's claim of qualified immunity and that holding controls.

With respect to Gannon's reiterated argument that he is entitled to qualified immunity under the "clearly established" prong, here too, the Sixth Circuit's earlier decision says otherwise. When rejecting Gannon's argument the first time, the Court of Appeals said in no uncertain terms: "In this case, there is no doubt that the law is clearly established." *Id*. at *16. It held that the law "is sufficiently clear, that in this case, based on the facts alleged in the complaint, 'every reasonable official would have understood' that Gannon's actions violated Kilnapp's Fourth Amendment rights." *Id*. at *17 (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). That holding is binding on this legal question and ends the analysis. The Court should not only reject Gannon's claim

of qualified immunity, it should also note that a second interlocutory appeal on this same basis could not be taken in good faith.

## Conclusion

For the reasons outlined above, the motion for summary judgment is without merit and should be denied.

Respectfully submitted,

/s/Matthew D. Besser
Cathleen M. Bolek (0059884)
Matthew D. Besser (0078071)
**BOLEK BESSER GLESIUS LLC**
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*

## Certificate of service

The undersigned hereby certifies that a copy of the foregoing was filed electronically this 17th day of October, 2024 and served by operation of the Court's electronic filing system upon:

Michael J. Pike
James R. Russell, Jr.
William Menzalora
Carli Young
Affan Ali

*Counsel for Defendants*

## Local Rule 7.1 certification

This case has been assigned to the standard track. This brief complies with the page limits set forth in Local Rule 7.1 as modified by leave of the Court.

/s/ Matthew D. Besser
*Counsel for Plaintiff*