UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JENNIFER KILNAPP,** | ) | CASE NO. 1:22CV1225 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| **CITY OF CLEVELAND, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**CHRISTOPHER A. BOYKO, J.**:

This matter comes before the Court upon the Motion (ECF DKT #62) of Defendant City of Cleveland for Summary Judgment. For the following reasons, the Motion is granted in the City's favor on both Counts in Plaintiff Jennifer Kilnapp's Complaint.

## I. BACKGROUND

In August of 2017, Plaintiff Jennifer Kilnapp became a police officer with the City of Cleveland Division of Police ("CDP"). Defendant Bailey Gannon became a Cleveland police officer in May of 2020 and began his one-year probationary period with the CDP. In the summer of 2020, Kilnapp was assigned to partner with Gannon as his training officer and among other things, to teach him the right protocol for handling calls. (Kilnapp Deposition, ECF DKT #60-1 at 26).

In the early morning hours of July 20, 2020, Kilnapp and Gannon responded to a call from dispatch that a female reported a man had shot a hole into the floorboards in a boarding house. When they arrived at the address, Kilnapp and Gannon encountered the female caller outside a two-story house. They learned that a man, since identified as Darryl Borden and

nicknamed "Moose," was upstairs. The building was completely dark. The officers entered with their weapons in hand. Kilnapp's firearm had an attached flashlight. Gannon had a flashlight in his right hand and his firearm in his dominant left hand. The officers routinely activated their body cameras at the same time upon arrival at the scene. (ECF DKT #60-1 at 70). On this occasion, Gannon's activated but Kilnapp's did not. (*Id*.).

The staircase had two flights: a set of stairs going one direction, a landing and then a second set going the opposite direction. Gannon went upstairs first. Kilnapp felt this was a "good training opportunity" for him. (ECF DKT #60-1 at 76). Kilnapp called out the nickname, "Moose" on the way upstairs but received no response. Kilnapp does not remember announcing that she was a police officer. (ECF DKT #60-1 at 58). Once upstairs, Kilnapp saw the door ajar to Room 4, and she looked inside for the individual. The female downstairs shouted that he was in the bathroom. Gannon pushed a door open, not knowing which room was a bathroom, and then jumped back yelling. Gannon saw a man with a gun pointed directly at him in full presentation, *i.e.*, "firing range position." (Gannon Deposition, ECF DKT #59-1 at 64). Gannon frantically retreated down the stairs. Both Kilnapp and Gannon heard gunshots. (ECF DKT #60-1 at 42; ECF DKT #59-1 at 69, 78-79, 81-82; Wearable Camera System ("WCS") footage, ECF DKT #72, Exhibit G). Gannon fired two gunshots in return; he says in an effort to protect himself and his fellow officer. (ECF DKT #59-1 at 72). First, Gannon turned and fired his gun in Borden's direction. (ECF DKT #59-1 at 64). Then, Gannon ducked his head and wildly shot a round that went into the molding or door frame. (ECF DKT #59-1 at 71-72).

Kilnapp was trailing behind Gannon down the stairs and exiting the building with him. (ECF DKT #59-1 at 128-129). While on the upper flight of stairs, Kilnapp felt pain and dropped

her gun. (ECF DKT #60-1 at 43-45). Both officers were concerned that Borden might come out after them and continue shooting. (*Id*. at 48). While running, Kilnapp shouted: "I'm shot." (WCS footage, ECF DKT #72, Exhibit G; ECF DKT #59-1 at 148). A bullet went into and through Kilnapp's forearm, exited upward, hit her bicep, entered her right armpit and lodged in her back. (ECF DKT #60-1 at 55-56).

Neither officer knew whose bullet struck Kilnapp. Early investigation determined that it was Borden who shot Kilnapp and he was charged with Attempted Murder of a police officer. Kilnapp did not learn until March of 2021 that she was actually shot by a bullet from Gannon's firearm. The charge of Attempted Murder against Borden was dropped and he ultimately pled guilty to Attempted Felonious Assault (Peace Officer).

Plaintiff brought the above-captioned Complaint under 42 U.S.C. § 1983 on July 13, 2022, alleging that Gannon used excessive force against her in violation of the Fourth Amendment and alternatively, the Fourteenth Amendment; and that the CDP and the City of Cleveland have a policy or custom of tolerating, permitting, encouraging, or engaging in excessive force in violation of the Constitution.

On September 6, 2024, Gannon moved for Summary Judgment in his favor as a matter of law based upon qualified immunity. The Court denied the Motion on February 13, 2025, and the decision is currently on appeal.

On September 6, 2024, the City filed the instant Motion (ECF DKT #62), contending that Gannon did not violate Kilnapp's clearly-established constitutional rights; that Kilnapp cannot prove that any municipal policy or custom was the cause of any alleged constitutional violations; that Kilnapp cannot prove training deficiencies by the CDP; that Kilnapp cannot demonstrate that

the City ratified Gannon's conduct; and that Kilnapp's direct Fourth Amendment violation claim against the City cannot succeed.

Kilnapp responds that the CDP was on notice of the inadequate training of new officers and recruits on the proper use of force and the City chose not to correct those deficiencies. The CDP had an unconstitutional custom or policy of "permitting officers to use force in any manner so long as the initial decision to use force was justifiable." (Kilnapp's Opposition, ECF DKT #71 at 18). The CDP ratified Gannon's use of force by failing to timely investigate the incident objectively or thoroughly; and the Chief of Police approved the investigation's findings and did not discipline Gannon.

## II. LAW AND ANALYSIS

**Civil Rule 56 Standard**

A summary judgment shall be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F. 3d 1339, 1347 (6th Cir. 1994). The moving party must do so by either pointing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or by "showing that the materials cited ( by the adverse party ) do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." See Fed.R.Civ.P. 56(c)(I)(a), (b). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F. 3d at 1347.

This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact. *Betkerur v. Aultman Hospital Ass'n.*, 78 F. 3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trustees*, 980 F. 2d 399, 404-06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Bias v. Advantage*, 905 F.2d 1558, 1563 (C.A.D.C., 1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F. 3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

**42 U.S.C. § 1983 Claim**

To maintain a claim under § 1983, a plaintiff must establish that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. See *West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). The Supreme Court has interpreted the word "person" broadly; and certain local governmental units,

including municipalities, are considered persons for purposes of § 1983 liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). The first step in any such claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker*, 443 U.S. at 140.

Kilnapp asserts that she was unconstitutionally seized by excessive force in violation of the Fourth Amendment to the U.S. Constitution when she was struck by a bullet fired from her partner Bailey Gannon's gun.

Although "person" has been given a wide meaning under § 1983, when the person is a municipality, liability attaches only under a narrow set of circumstances: "A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691).

Under the Supreme Court's *Monell* doctrine, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). This means that "a municipality can be liable under § 1983 only where its policies are the 'moving force behind the constitutional violation.'" *Id*. at 389 (quoting *Monell*, 436 U.S. at 694). "Municipal liability must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff; '*respondeat superior* or vicarious liability will not attach under § 1983.'" *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) (quoting *Harris*, 489 U.S. at 385). The Sixth

Circuit has recognized four means by which a plaintiff may show that the municipality's policies or customs were connected to the constitutional violation: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).

**Inadequate Training**

Kilnapp contends that the City failed to adequately train officers on the proper use of deadly force.

"In order to show that a municipality is liable for [] fail[ing] to train its employees, a plaintiff must establish that: (1) the City's training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Jackson*, 925 F.3d at 834. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

"A failure-to-train claim . . . requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'---

necessary to trigger municipal liability." *Connick*, 563 U.S. at 62. However, "the fact that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Frodge v. City of Newport*, 501 F.App'x 519, 534 (6th Cir. 2012).

In her argument, Kilnapp relies heavily upon the recommendations and directives issued by the Monitor appointed pursuant to the Consent Decree in *United States v. City of Cleveland*, U.S. District Case No. 1:15CV1046.

In the years prior to the shooting, the Monitor's Reports determined that the CDP was "stretching the training section exceptionally thin;" "urged" the CDP to devote more resources to training; directed the CDP to "review and revise its academy and field training programs;" noted "issues with having a sufficient amount of field training officers;" concluded that the CDP must ensure that the "active use of force policy is complied with by each officer that uses force;" and determined that the CDP was not adequately training officers "how to police effectively and safely in accordance ... with the Constitution."

Dornat Drummond, who was Deputy Chief of the CDP when the Consent Decree went into effect, admits that the CDP was aware of the Monitor's recommendations and warnings concerning training. (Drummond Deposition, ECF DKT #69-2 at 111-112). And unfortunately, Gannon himself acknowledges that as a "new officer," he "didn't know exactly how to handle the situation." (Gannon Deposition, ECF DKT #59-1 at 62). On the night of July 20, 2020, there were four probationary officers in the field and only one certified field training officer ("FTO") available. Kilnapp was not *certified* as an FTO by the CDP, although she testified that she was Gannon's training officer. (Kilnapp Deposition, ECF DKT #60-1 at 26).

Kilnapp contends that a reasonable jury could find that the City knew of training deficiencies, was deliberately indifferent to remedying them and that these failures caused or were closely related to the injury she suffered.

Relevant to officer training, the City offers the Declaration of Shawn Smith, Lieutenant in charge of training for the CDP and Commander of the Ohio Basic Peace Officer Training Academy ("OPOTA").  (ECF DKT #62-1).  Smith attests that the OPOTA training is certified by the Ohio Peace Officer Training Commission ("OPOTC"), is fully compliant with the Ohio Administrative Code and is nationally accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA").  Specific to Gannon's training, the 2019-2020 coursework included Use of Force, Crisis Intervention, Firearms (handgun and shotgun) and Building Searches.  In addition, the CDP Academy provided 440 additional hours of training in topics including Use of Force, Search and Seizure, Building Searches, Active Shooter Situations and Crisis Intervention.  Every recruit must complete all sections of the curriculum before sitting for the OPOTA certification test to become a sworn peace officer in the State of Ohio.  Moreover, the supplemental Use-of-Force training that Gannon completed was approved by the Federal Court in Case No. 1:15CV1046.  Gannon finished his training within weeks of the subject incident.

The City further counters that Kilnapp's reliance on the Consent Decree and the Federal Monitor's Reports is misplaced due to the guardrails set up by the Consent Decree itself.  The Consent Decree states at ECF DKT #502 at 9 & 101-102:

> 11. This Agreement will not be construed as an admission or evidence of liability under any federal, State, or municipal law including 42 U.S.C. § 1983.  Nor is the City's entry into this Agreement an admission by the City, CDP, or its officers and

employees that they have engaged in any unconstitutional, illegal, or otherwise improper activities or conduct. The Parties acknowledge the many CDP officers who have continued to work diligently and with integrity despite challenging circumstances.

\*\*\*

403. This Agreement is enforceable only by the Parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

With regard to the Monitor's limitations (ECF DKT #502 at 96):

381. However, the Monitor, including any agent, employee, or independent contractor thereof, will not testify in any other litigation or investigative or pre-litigative proceeding with regard to any act or omission of the City, CDP, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject of which the Monitor may have received knowledge as a result of his/her performance under this Agreement.

Admissibility and evidentiary problems aside, Kilnapp offers no witness with the expertise to opine on how the City's officer training falls below a defined standard despite being compliant with the OPOTC and nationally accredited by the CALEA. Significantly, the Monitor's critiques cited by Kilnapp are generic and cannot be tested by cross-examination per the restrictions in the Consent Decree. Moreover, Kilnapp fails to demonstrate how any training inadequacies – "thin" resources or programs needing revision – cause or directly relate to the constitutional harm she endured. The deliberate indifference standard "requires that the municipality 'completely disregard' its duty to train." *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024) (citing *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023)). As is true here, "where relevant training was given, showing that 'additional training would have been helpful' does not establish municipal liability." *Harris*, 62 F.4th at 1039.

The Court finds that Kilnapp has failed to establish a *Monell* claim against the City for inadequate training or failure to train officers and recruits.

**<u>Unconstitutional Policy or Custom</u>**

Kilnapp contends that at the time of the shooting, the CDP had an "unconstitutional policy or custom permitting officers to use force in any manner so long as the initial decision to use it was justified." In support, Kilnapp offers the deposition of Christopher Viland who became Superintendent of Internal Affairs ("IA") in 2022. Viland believes there was a Division-wide misunderstanding about acceptable uses of force. After the within lawsuit was filed, Viland prepared a report for Chief of Police Drummond on September 19, 2022, analyzing the IA investigation and Force Review Board ("FRB") determination that Gannon's use of force was "Within Policy." In pertinent part, Viland states:

> I would posit that this occurred because there is an organizational cultural perception that it is the decision to use force that was determined to be within policy and not the actual physical application of the force, which may have been in violation. This idea requires additional review before recommendations can be made, . . . (ECF DKT #69-6 at 8).

Viland testified further on deposition (ECF DKT #69-5 at 131):

> **Q.** Okay. Within the division as a whole you believe, before you came in, there was an organizational cultural perception that if the decision to use force is within policy, then it's okay to use that force regardless of how the force is then applied?
> MR. PIKE: Objection, form.
> **A**. I stated that that was a possibility that required additional review but, yes, sir.

Kilnapp insists a reasonable jury could find that the CDP had an unconstitutional policy or custom regarding *how* officers are permitted to use force and that such policy or custom is "tied" to Gannon's seizure of Kilnapp.

The City submits evidence of the Use of Force policies in effect at the relevant time and taught to Gannon at the Academy. (General Orders 2.01.01-2.01.05). In pertinent part, the policies require officers to use that degree of force which is necessary, proportional to the level of resistance and objectively reasonable based on the totality of the circumstances. The City's Use of Force policies and procedures have been approved by the Judge presiding over the Consent Decree case.

The Court notes that Kilnapp uses the terms "policy" and "custom" interchangeably. However, controlling law requires the Court to analyze them significantly differently. In *Jackson*, 925 F.3d at 829, the Sixth Circuit opined on "policy":

> "[T]o satisfy the *Monell* requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.' " *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)).
>
> When proceeding under the first theory of *Monell* liability, under which a plaintiff must show an official policy or legislative enactment, the plaintiff must show that there were "formal rules or understandings — *often but not always committed to writing* — that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (emphasis added).

With regard to "custom," the Sixth Circuit in *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) stated:

> In this case, where no formal policy exists, the critical question is whether there is a particular custom or practice that " 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.' " *McClendon v. City of Detroit*, 255 Fed.App'x. 980, 982 (6th Cir.2007) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112 at 127 (1988).
> \* \* \*
> "so widespread, permanent, and well settled as to have the force of law." *Kinzer v. City*

*of W. Carrollton*, No. 3:07–cv–111, 2008 WL 3200652, at *5, 2008 U.S. Dist. LEXIS 61203, at *14 (S.D.Ohio Aug. 5, 2008).

Kilnapp's asserted "policy" on *how* officers may use deadly force is not committed to writing nor a formal fixed plan of action. In fact, it is a concept postulated by Viland (not a final decision-maker) to explain the failure of IA and the FRB to discipline Gannon, and that Viland admits would warrant further review. Moreover, Kilnapp provides no evidence that this custom or policy is widespread, permanent or well-settled as to have the force of law. Most importantly, Kilnapp provides no evidence whether a custom or a policy, the cultural perception which Viland identifies, could have logically caused, been directly related to, or been the "moving force" behind Gannon's use of deadly force. The Court questions whether a rookie probationary officer who was on the job for a mere two months could have been aware of, let alone motivated by, this so-called custom or policy.

Kilnapp has not met her burden of demonstrating the City is liable under *Monell* for either an unconstitutional policy or custom.

**Ratification**

Kilnapp argues that there is a question of fact whether the City ratified Gannon's illegal conduct by failing to properly investigate, by failing to discipline Gannon and by later "covering it up" and not reporting the incident to the Monitor.

Then-Chief of Police Calvin Williams reviewed the recommendations of the FRB that no discipline should be imposed on Gannon but that he should be required to undergo remedial training. Chief Williams concurred and adopted the retraining recommendation. In Kilnapp's view, this was in spite of the Gannon investigation being untimely, incomplete and biased.

Kilnapp again cites to Superintendent Viland's Report criticizing the quality and timeliness of CDP investigations and reminding the investigative bodies to consider in relevant instances whether officers' use of force put others at needless risk.

Kilnapp additionally asserts that a reasonable jury could find the City liable for ratifying illegal conduct because the CDP chose not to disclose the shooting incident to the Monitor.

The City points out that investigations of the incident at issue were conducted by the Homicide Unit, IA, the Force Investigation Team, the Crime Scene & Record Unit and the FRB. The ultimate decision not to discipline Gannon cannot, by itself, support a *Monell* claim of ratification. The investigations and the disciplinary finding occurred after Kilnapp's injuries and could not have caused them. *See Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020).

To prevail on a ratification claim based upon inadequate investigation requires a showing of a clear and persistent pattern of violations in prior instances concerning comparable facts. *See Pineda v. Hamilton County, Ohio*, 977 F.3d 483,495 (6th Cir. 2020); *Stewart v. City of Memphis*, 788 F.App'x 341, 344 (6th Cir. 2019). Kilnapp has not met this burden. Viland's Report followed this lawsuit and provided recommendations going forward. Moreover, inadequate and untimely processes and interviews do not causally relate to the Fourth Amendment injury Kilnapp contends she suffered. Importantly, Kilnapp cannot point the Court to any persistent, similar failures.

Kilnapp's counsel created a searchable chart of the Monitoring Team's analysis of use-of-force investigations from 2018-2019, identifying eighteen incidents where IA failed to do timely, objective and complete investigations. As previously discussed, the Consent Decree cannot be

used as evidence and the Monitor cannot be called to testify. The chart and the underlying report are not authenticated and no author is identified (a member of the Monitor's Team could not be cross-examined in any event). Further, the failure by the City to disclose the Gannon investigation to the Monitor cannot form the basis for a jury finding of § 1983 liability.

Absent competent evidence that Gannon or other officers used excessive force against bystanders or fellow officers in violation of the Fourth Amendment prior to Kilnapp's shooting, the City cannot be held to have ratified known and inevitable unconstitutional conduct.

For these reasons, Kilnapp fails to establish the City's liability for ratification under *Monell*.

**Direct Fourth Amendment Claim (Count I) and Fourteenth Amendment Claim (Count II)**

Kilnapp does not dispute that § 1983 is the exclusive remedy for constitutional claims against the City and offers no argument on her alternative Fourteenth Amendment claim. As the Sixth Circuit instructs, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.." See *Barany-Snyder v. Weiner*, 539 F.3d 327, 331 (6th Cir. 2008).

### III. CONCLUSION

For these reasons, the Motion (ECF DKT #62) of Defendant City of Cleveland for Summary Judgment is granted in the City's favor on both Counts in Plaintiff Jennifer Kilnapp's Complaint.

**IT IS SO ORDERED.**

**DATE: 5/13/2025**             **s/Christopher A. Boyko**
                                **CHRISTOPHER A. BOYKO**
                                **United States District Judge**